UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIRECT GENERAL
INSURANCE COMPANY,

              Plaintiff,

vs.

CHRISTOPHER EVANS and POLINA
DENISSOVA, individually and as co-
administrators of the ESTATE OF
ANDREW EVANS, ROGER
HARTSFIELD and D. MAX HIRSH, as
administrator of the ESTATE OF
SHANNON HARTSFIELD,

              Defendants.

CIVIL ACTION
CASE NO. 1:23-cv-03491-ELR

---

## **DIRECT GENERAL'S MOTION TO EXCLUDE HIRSH'S DESIGNATED EXPERT, DAX LOPEZ**

Plaintiff, DIRECT GENERAL INSURANCE COMPANY ("Direct General"), pursuant to Fed. R. Evid. 702 and *Daubert*, moves the Court for an Order striking and excluding D. Max Hirsh's ("Hirsh") designated expert, Dax Lopez, from testifying or otherwise offering evidence in this case. Mr. Lopez lacks the qualifications to opine in this failure to settle action, his testimony is unhelpful at resolving the ultimate legal and factual matters in dispute, and his opinions—which amount to little more than *ipse dixit* and self-serving commentary—are unreliable. In support, Direct General states as follows:

## **INTRODUCTION**

The core dispute in this lawsuit is whether Direct General acted negligently or in bad faith in the manner in which it attempted to resolve the liability claims arising from the subject multi-fatality accident. Defendants contend that Direct General acted unreasonably by pursuing a global settlement conference rather than accepting the two policy limits demands issued by Christopher Evans ("C. Evans"), one on behalf of C. Evans' mother, Nancy ("N. Evans"), and another on behalf of his son, Andrew ("A. Evans"). Direct General denies any wrongdoing, maintains that it acted in good faith at all times and in conformity with Georgia claims handling standards, customs, and practices, and further, asserts that it had no triggered duty to settle as a matter of law much less a reasonable opportunity to resolve A. Evans' claims for within policy limits.

In support of his defenses and counterclaims, Hirsh disclosed attorney Dax E. Lopez[1] as an expert that he "may" use to present opinion testimony at trial. *See* **Composite Exhibit "A."[2]** According to the disclosure, Mr. Lopez was retained to "opine on the usual and customary practice of attorneys who represent people (or their families) injured by insured tortfeasors." *See id.* His supposed expertise is "that

---

[1] Mr. Lopez was previously a judge in DeKalb County for over a decade. At his deposition, Mr. Lopez testified that he served on the bench alongside the Honorable Judge Eleanor Ross before she was elevated to this Court. *See* **Ex. "C"** at 77:21-78:17.

[2] Co-defendants, Chrisopher Evans and Polina Denissova, did not retain experts of their own; however, they represented in their discovery responses that they would rely on the experts that Hirsh identified and retained. Accordingly, Mr. Lopez functions as their expert witness too. Roger Hartsfield did not disclose any experts.

1052192/321747897.v2

of an attorney representing persons injured by insured tortfeasors." *See* **Exhibit "B"** at 2. Although this is not a matter in which A. Evans' parents' counsel are on trial for misconduct or for which they face any liability whatsoever in connection with the underlying tort judgment—that target remains firmly set on Direct General throughout the entirety of these proceedings—a cursory review of Mr. Lopez's report reflects that his opinions are nothing more than a paper thin means to backdoor-in judicially-bolstered excuses and justifications for A. Evans' parents and their counsel's actions with respect to setting up Direct General. The Court should see through this report and testimony for what it is.

As the jury will learn in due course when evaluating Direct General under the totality of the circumstances, the parents and their counsel's actions included, among others, (1) representing to Direct General that no estate would be established; (2) affirmatively agreeing to attend Direct General's global settlement conference without objection or reservation; (3) failing to mention a peep for weeks on end that Direct General's handling was improper in any regard, that Direct General's policy limits were no longer acceptable, or that the demand was no longer on the table; (4) attending the conference but refusing to participate in any meaningful fashion or to engage in settlement discussions with Direct General in that setting; and (5) then bringing a tort lawsuit, including the very estate claims that had been previously disavowed months earlier.

Although Hirsh employs a tails-I-win-heads-you-lose theory about how Direct General supposedly erred, no behavioral analysis expertise, especially non-scientific in nature, is needed to explain away the actions of the lawyers. Indeed, it is not even an issue that is before the Court or one that is required to resolve the actual matters in dispute. *See* [D.E. 34] (specifying the legal issues to be tried, none of which invoke Mr. Lopez). *See also* [D.E. 28; 29; 31; 45; 71] (initial disclosures). In fact, Mr. Lopez, who purportedly deals with bad faith issues on "many" of his firm's cases, including their "biggest cases," has never retained an expert for the very subject matter for which he has been retained nor ever served as an expert on these issues. *See* **Exhibit "C"** at 35:3-36:17; 39:8-11; 81:4-10.

To be clear, the jury is fully equipped on its own to judge the credibility of the parties, their motives, and whether Direct General acted as a reasonably prudent insurer. The facts make that plain. What the jury does not need, however, is a former judge turned plaintiffs' advocate to tell them through the masquerade of expert testimony that A. Evans' parents' counsel "behaved reasonably and consistent with the usual and customary practice in our profession" with regard to settlement matters and litigation. *See* **Ex. A** at ¶ 8. Beyond reeking of self-serving and non-scientific, non-methodological *ipse dixit*—all while offering insights that are entirely unremarkable and which could be equally advanced by any individual in the legal profession or, frankly, any person altogether—any minor probative value of this

4

testimony is substantially outweighed by the dangers of unfair prejudice, issue confusion, jury misleading, and waste of time. *See* Fed. R. Evid. 403.

For the reasons expressed in greater detail below, the Court should strike Mr. Lopez as an expert and exclude him from testifying. His opinions, individually and collectively, fail to satisfy the stringent admissibility requirements set forth in *Daubert* and Fed. R. Evid. 703. In this gatekeeping capacity, the Court should have little trouble determining that Mr. Lopez does not meet any, much less all three, of the *Daubert* prongs by the preponderance of the evidence.

## LEGAL STANDARDS

The admission of expert evidence is governed by Federal Rule of Evidence 702, as construed by *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court required district courts to assume a "gatekeeping" role to ensure that all expert testimony is both reliable and relevant before being admitted into evidence. 509 U.S. at 597. To that end, district courts are "charged with screening out experts whose methods are untrustworthy or whose

1052192\321747897.v2

expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).

Based on *Daubert*, the Eleventh Circuit has set forth a "rigorous" three-part inquiry for district courts to perform when determining the admissibility of expert testimony. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). In particular, the Court must assess whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink*, 400 F.3d at 1291-92 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The proponent of the expert testimony has the burden of satisfying each of the three prongs of the inquiry by a preponderance of the evidence. *See id.* at 1292. Although "there is inevitably some overlap among the basic requirements -- qualification, reliability, and helpfulness -- they remain distinct concepts and the courts must take care not to conflate them." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Further, although many factors bear on the Court's inquiry, there is no definitive checklist. *Kennington v. CVS Health Corp.*, No. 1:18-CV-01575-ELR, 2020 U.S. Dist. LEXIS 261748, at *5 (N.D. Ga. Feb. 4, 2020) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony. An expert may be qualified in various ways, including by scientific training or education or by experience in a field." *Skelton v. Action Traders, Ltd.*, 662 F. Supp. 3d 1259, 1264 (N.D. Ga. 2023) (cleaned up).

For the purpose of conducting the reliability inquiry mandated by *Daubert*, the Supreme Court has suggested that a trial court consider a number of factors, which include: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593-94. These factors are not exhaustive, and the Eleventh Circuit Court of Appeals has also considered whether an expert has relied on anecdotal evidence, such as case reports; temporal proximity; and improper extrapolation. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). The Court's inquiry under Rule 702 must focus on the methodology, not the conclusions, and the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion. *See Daubert*, 509 U.S. at 595; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data

only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

"Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261 (emphasis in original). Importantly, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. . . . Our caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." *Id.* (citation omitted). Although determining whether an expert is qualified is necessarily a case-specific determination, the Eleventh Circuit has affirmed the exclusion of testimony that fell outside of the expert's competence. *See, e.g., City of Tuscaloosa*, 158 F.3d at 565 (statistics expert could not testify on issues regarding the existence of conspiracy and legal standards).

As for the "helpfulness" prong, the Court is required to examine whether the expert testimony applies to "matters that are beyond the understanding of the average lay person." *See Frazier*, 387 F.3d at 1262; *see also United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). "Proffered expert testimony generally will not help the trier of fact when it offers

8

nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63. This prong requires trial courts to "exclude expert testimony that is 'imprecise and unspecific,' or [when the] factual basis is not adequately explained." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005). To be helpful, a nexus must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591).

Moreover, "[b]ecause of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Frazier*, 387 F.3d at 1263 (internal citation omitted). "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming." *Id.* (internal citations omitted). "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id.*

## **ARGUMENT**

### I.     Mr. Lopez Lacks the Minimal Qualifications to Offer Expert Testimony in this Failure to Settle Action

"The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Roper v. Kawasaki Heavy Indus., Ltd.*, No. 1:13-CV-03661-ELR, 2015 U.S. Dist. LEXIS 187419, at *14 (N.D. Ga. June 29, 2015) (citation omitted). Although this Court has recognized that it is "of little consequence to the Court's inquiry" if a proposed expert "does not have a degree or license in his or her professed specialty," as that "goes to the weight of his or her testimony rather than its admissibility," *see id.* at *12, it has still found individuals to be unqualified to opine on matters in a case despite having impressive credentials and skillsets. *See id.* at *15 ("[A]lthough the Court has little doubt Denham is a highly skilled and well-trained mechanical engineer and former automotive technician, it is skeptical as to whether he is qualified to give expert testimony regarding a motorcycle VR."). Similarly, here, although Mr. Lopez's background as a former jurist is noteworthy, that mere status plus his current occupation as a plaintiffs' lawyer do not together qualify him to opine about issues in this lawsuit.

As a preliminary matter, it is not fully clear what type of expert Mr. Lopez claims to be. On the one hand, he undoubtedly has a generic background in practicing law, including experience with presiding over tort disputes and presently

10

acting as a plaintiffs-oriented advocate in injury cases. However, on the other hand, his background reflects no knowledge, skill, experience, training, or education in the fields of psychology, neuroscience, behavioral analysis, or general exploration of the human psyche and motivations. To be clear, the subject matters on which Mr. Lopez opines do not require a background in the legal profession. They do not require a background as a judge. And they do not require a background as a current attorney. After all, the premise upon which he arrives at his opinions for what a plaintiffs' lawyer would "customarily consider" in determining how to act with respect to cases involving multiple injury claimants and insufficient policy limits includes examining the Georgia Rules of Professional Conduct, Georgia common law, and Georgia statutory law. That basic framework—which applies to all lawyers and governs every legal case and every legal dispute imaginable no matter the field of law or circumstances—is hardly unique so as to justify the need for expert witness testimony.

It is beyond dispute that A. Evans' parents were entitled to zealous, competent, and diligent representation following the death of their son. All parties are entitled to such representation, plaintiffs and defendants alike. It is also unquestioned that all lawyers must operate ethically and within the bounds of the law. That does not change depending upon the facts of a case, the number of claimants, the severity of the injuries, or the amount of insurance available. And it

11

is further undisputed that A. Evans' parents' lawyers are not on trial in this case for their handling of the file.

Reduced to its core, to whatever extent Mr. Lopez purports to opine as an ethicist, psychologist, or, in reality, a public relations representative for A. Evans' parents' lawyers, he nonetheless lacks qualifications to opine about any *actual* issue in dispute in this case. Most obviously, Mr. Lopez's background fails to show how he is qualified to assist the fact finders in resolving the "legal issues to be tried" in this case, as jointly submitted by the parties, *see* [D.E. 34]:

- Whether Direct General's obligation to indemnify its insured, S. Hartsfield, is limited to the applicable limits of the automobile liability policy based on its handling of settlement negotiations involving its insured;

- Whether the demand to resolve A. Evans' claims was a valid demand;

- Whether Direct General had an obligation to accept a demand from representatives of A. Evans;

- Whether Direct General negligently or in bad faith failed to settle the subject wrongful death claim;

- Whether any such negligent or bad faith failure to settle the subject wrongful death claim proximately caused the judgment against Mr. Hirsh;

- Whether Mr. Hirsh is entitled to attorneys' fees under O.C.G.A. § 13-6-11;

- Whether Mr. Hirsh is entitled to punitive damages; and

- Whether Mr. Hirsh is entitled to other general and special damages and/or nominal damages.

To be certain, Mr. Lopez opines that the "August 9, 2018 demand signed by Rory Chumley [C. Evans' counsel] complied with O.C.G.A. § 9-11-67.1 and was reasonable in all respects." *See* **Ex. "A"** at ¶ 4. He also opines that the demand was an "objective opportunity to settle" and that Direct General's September 6, 2018 letter regarding the global settlement conference (which A. Evans' parents' attorneys attended) was "a counteroffer and rejection of the August 9, 2018, offer." *See id.* at ¶¶ 5-6. Those opinions, of course, are inadmissible legal conclusions. *See, e.g.*, *Cook ex rel. Estate of Tessier*, 402 F.3d at 1112 ("testifying experts may not offer legal conclusions"); *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."); *Leathers v. State Farm Mut. Auto. Ins. Co.*, No. 1:12-cv-00198-SCJ, 2012 U.S. Dist. LEXIS 202645, at *9 (N.D. Ga. Dec. 3, 2012) ("As a general matter, all witnesses, either acting as a lay witness or an expert witness, 'are prohibited from testifying as to questions of law regarding

the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct.'") (citation omitted).

By the same token, Mr. Lopez's opinion about the reasonableness of counsel "filing suit and bringing and exploring an estate claim," *see* **Ex. "A"** at ¶ 8, is also unqualified and off-base because only the clients—A. Evans' parents—can decide the scope, purpose, and objectives of representation, including the decision to bring suit. *See* Ga. R. Prof. Conduct 1.2. On this point, his report does not reflect that he holds any first-person insights as to the parents' thought processes. And he has never spoken with the parents at any point altogether. *See* **Ex. "C"** at 79:9-13.

But even if he did, he is not permitted to testify about their state of mind or that of their attorneys. *See, e.g.*, *Ross v. Awe*, No. CV419-201, 2022 U.S. Dist. LEXIS 157473, at *19 (S.D. Ga. Aug. 31, 2022) (excluding state of mind testimony); *Cason v. C.R. Bard, Inc.*, No. 1:12-CV-1288-MHS, 2015 U.S. Dist. LEXIS 58918, at *39-40 (N.D. Ga. Feb. 9, 2015) (explaining that expert testimony on one's knowledge, intent, or state of mind is inadmissible and noting that such testimony is "improper also because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help'") (citation omitted); *see also* *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (finding no error in the district court's decision to strike the portions of the expert's testimony "which contain legal conclusions as to another person's state of mind").

14

Further, although Mr. Lopez's unadorned commentary that the underlying demand "does not bear the hallmarks of what Direct General alleges to be a 'set up,'" *see id.* at ¶ 5, which testimony potentially may be construed as a factual conclusion rather than a legal conclusion, *see, e.g.*, *United States v. Long*, 300 F. App'x 804, 815 (11th Cir. 2008) (deeming "statement that Cash Today bore the hallmarks of a 'Ponzi scheme'" to be factual whereas "statement that Cash Today was an artifice or scheme to defraud" to be "more problematic" because it "comes much closer to embodying an impermissible legal conclusion"), Georgia law keeps the focus on the carrier when assessing "set up" defenses. *See Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1278 (N.D. Ga. 2009) ("Georgia law does apparently recognize the possibility of a 'set up.' The *Holt* court specifically adopted language . . . which cautioned that the rule of law relating to tortious failure to settle claims should not permit a plaintiff's attorney to 'set up' an insurer for an excess judgment. It is the court's view that a jury will hear . . . all of the circumstances of the interaction between Plaintiff's counsel and the insurer *to determine whether the insurer's actions meet the standard* for tortious failure to settle.") (emphasis added).

Simply put, even if the Court is to bend over backwards to generously construe Mr. Lopez's background as somehow qualifying him to opine about insurance claims handling matters, that is not a subject for which he has been advanced. Hirsh's other expert, Louis Fey, was retained for that purpose.

Accordingly, Mr. Lopez lacks qualifications to provide expert testimony about any matter in dispute. He should be excluded as a whole. To the extent, however, the Court finds him qualified to testify at trial, at bare minimum his opinions as set forth in paragraphs 4, 5, 6, and 8 should be stricken.

## II.    Mr. Lopez's Opinions Do Not Help to Resolve the Factual and Legal Matters in Dispute

The United States Court of Appeals for the Eleventh Circuit has explained that the "touchstone" for the "helpfulness" inquiry is relevance. *See Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021). In particular, "expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. Even if the expert's testimony is relevant, it generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* (cleaned up). Accordingly, to be helpful, an expert's testimony must concern matters "that are beyond the understanding of the average lay person." *Id.* Mr. Lopez's opinions fail to satisfy these exacting standards.

First, as set forth above, the general purpose of which Mr. Lopez has been retained, opining about "the usual and customary practice of attorneys who represent people (or their families) injured by insured tortfeasors," *see* **Ex. "A,"** is immaterial. Whether Direct General's duty to settle was triggered as a matter of law is wholly unaffected by lay or expert testimony. Only the Court can make this determination. *See, e.g.*, *Pearson v. Dillingham*, Civil Action No. 7:16-CV-54 (HL), 2017 U.S. Dist.

LEXIS 212244, at *7 (M.D. Ga. Dec. 28, 2017) ("Whether or not a legal duty exists is a question of law for the court.") (citation omitted); *Acuity Brands Lighting, Inc. v. Manus Prods., Inc.*, No. 1:19-cv-02852-AT, 2022 U.S. Dist. LEXIS 236804, at *42 (N.D. Ga. Mar. 14, 2022) (existence of a duty is a legal question). *See also First Acceptance Ins. Co. of Ga. v. Hughes*, 305 Ga. 489, 489 (2019) ("[A]n insurer's duty to settle arises only when the injured party presents a valid offer to settle within the insured's policy limits."); *Concepcion v. United Servs. Auto. Ass'n*, 2020 Ga. State LEXIS 3701, at *22-23 (Chatham Cnty., July 22, 2020) (granting summary judgment in carrier's favor on failure to settle claim; "the record reflects as a matter of law that there was no valid demand from Abraham to settle for the policy limits and so there was no offer that triggered the Defendant's duty to settle the Abraham's claims against the Plaintiff. Absent a duty to settle, there is no evidence to support a claim [] on the bad faith or negligent failure to settle").

Second, even if Direct General's duty to settle was implicated, whether A. Evans' parents' counsel did or did not conform to the supposed practices of lawyers when dealing with fatality claims does absolutely nothing to make Direct General any more or less liable for its claims handling decisions. On this point, even assuming a "zealous, competent and diligent attorney" would have recognized the case as a "race for the limits," known that Direct General "very well might exhaust its limits paying other claimants," or determined that "the better practice would be

to comply with O.C.G.A. § 9-11-67.1 as soon as reasonably possible," *see* **Ex. "A"** at ¶¶ 1-3, none of that impacts whether Direct General acted as an ordinarily prudent insurer under the totality of the circumstances. True, Direct General maintains that it was never provided a reasonable opportunity to settle within policy limits; but that clear as day conclusion from the record is independent of whether the parents' lawyers performed in accordance with "usual and customary practices" of injury lawyers. If the lawyers acted appropriately or inappropriately, the result is still the same for Direct General—it proceeded as it did by carrying out the global settlement conference. Put differently, any after-the-fact editorializing of the lawyers' conduct through the lens of attorney expert testimony does not change the reasonableness of Direct General's course of actions at the time it occurred and as it occurred. *See GEICO Indem. Co. v. Whiteside*, 311 Ga. 346, 352 (2021) ("[T]he unreasonableness of the insurer's conduct is at the heart of a negligent or bad faith failure-to-settle claim, and the reasonableness of the insurer's actions or decisions must be judged at the time they were taken or made.").

In evaluating whether Direct General is to be on the hook for the underlying financial judgment, as Defendants maintain it should be, "the applicable standard of care requires that the insurer 'must use such care as would have been used by an ordinarily prudent insurer with no policy limit applicable to the claim.'" *Baker v. Huff*, 323 Ga. App. 357, 363 (2013) (citation omitted). In this setting, to "find that

the insurer acted unreasonably in declining to accept a time-limited settlement offer, the facts must be sufficient to permit a jury to find that no ordinarily prudent insurer would have declined to accept the offer." *Id.* Moreover, consideration of the "relevant circumstances" includes "the insurer's knowledge of facts relevant to liability and damages on the claim; the insurer's diligence in conducting a reasonable investigation to discover the relevant facts; and the terms of the settlement offer and any response by the insurer." *See id.* at 364.

Unsurprisingly, whether the tort claimants' lawyers "behaved reasonably and consistent with the usual and customary practices" "by filing suit and bringing and exploring an estate claim," *see* **Ex. "A"** at ¶ 8, does not assist with resolving whether Direct General faces extracontractual liability predicated on its pre-litigation handling of A. Evans' claim.[3] More bluntly, Defendants' core theory of liability— that Direct General acted unreasonably and imprudently under the totality of the circumstances by not accepting C. Evans' policy limits demands on a timely basis— remains unaffected by the lawyers' actions in filing a lawsuit and prosecuting an estate claim *after* the supposed misconduct already occurred.

---

[3] It is undisputed that Direct General's policy limits were unacceptable to the parents after they filed suit. From that point on, all settlement opportunities implicated amounts well-beyond the policy limits. However, no such liability can be premised on Direct General's refusal to settle for above-limits amounts. In particular, Georgia law does not impose "an affirmative duty on the company to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits." *See Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 687 (2003). As the Georgia Supreme Court pronounced, a carrier "may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim *within the policy limits*."). *See id.* at 684 (emphasis added).

Third, as expressed above in the discussion addressing Mr. Lopez's lack of qualifications to provide expert testimony in this matter, even if there are some topics that his report addresses that bear some relevance, they remain off-limits and inadmissible in nature as legal conclusions and state of mind testimony.

Fourth, even if Mr. Lopez was qualified and could potentially discuss relevant subjects that assist the fact finder in resolving the actual disputes in this case, his opinions nonetheless should be stricken under Rule 403, Fed. R. Evid. In particular, allowing his testimony to be introduced at trial creates a substantial likelihood of prejudicing Direct General and misleading and confusing the jury as to the issues at hand. Again, none of the lawyers involved are parties to this action, they are not on trial, they do not face legal exposure for failing to settle the claims at hand, they have not been charged with ethical breaches or malpractice, and whether they performed "zealous[ly], competent[ly] and diligent[ly]," *see* **Ex. "A,"** or below that, it would still not change the actual trajectory of what occurred.

To be clear, if any testimony contextualizing the lawyers' conduct is needed, Defendants and their prior lawyers can provide their first-hand accounts of what occurred to the jury, just as Direct General's claims personnel will.[4] Stated

---

[4] Because Hirsh and A. Evans' parents all rely on Mr. Lopez's opinions in support of their claims and defenses, which opinions squarely implicate the communications that the parents held with their counsel about their decisions to file suit, pursue estate claims, and how to proceed in response to Direct General's September 6, 2018 correspondence, Direct General maintains that the parents have waived and forfeited any potential attorney-client privilege they may have once held on these matters. "The attorney-client privilege belongs solely to the client, and the client may waive it, either expressly or by implication. Once a party waives the attorney-client privilege as to a communication, the waiver generally extends to all other communications relating to the same subject matter. Further, once waived,

differently, the lawyers and the parents' credibility can be assessed directly by the jury without having a former judge turned preeminent plaintiffs' injury lawyer vouching that the parents' lawyers behaved as other similarly situated attorneys would have under the facts and circumstances of the case. The gatekeeping function of *Daubert* demands more.

Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors" and "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments," *see Frazier*, 387 F.3d at 1262-63, Mr. Lopez's exclusion is warranted on relevance grounds alone.

### III.   Mr. Lopez's Report and Opinions Are Categorically Unreliable and Little More than Self-Serving *Ipse Dixit* Commentaries

Although the precise basis for which Mr. Lopez arrived at his opinions is uncertain—he conducted no testing, performed no survey work, published no

---

the attorney-client privilege cannot be reasserted." *Mohawk Indus. v. Interface, Inc.*, No. 4:07-CV-0212-HLM, 2008 U.S. Dist. LEXIS 104317, at *19 (N.D. Ga. Sep. 29, 2008) (cleaned up).

Here, by voluntarily injecting the propriety of their lawyers actions and decision making as supposedly relevant inquiries for the jury to consider—after all, Mr. Lopez concludes that "[t]he attorneys representing Andrew Evans's parents behaved reasonably and consistent with the usual and customary practice in our profession by filing suit and bringing and exploring an estate claim" and that a plaintiff's lawyer "would further recognize that Direct General faced potential liability in excess of its policy limits, making acceptance of the policy limits (or less at a Global Settlement Conference) impossible without consultation with the client concerning the possibility of a recovery in excess of policy limits," *see* **Ex. "A"** at ¶¶ 7-8—the parents and Hirsh have relinquished any claims to protect the attorney-client confidences that undergirded the lawyers' actions. It is now fair game, and they cannot have it both ways. "The attorney-client privilege was intended as a shield, not a sword. . . . a party may waive the privilege if it injects into the case an issue that in fairness requires an examination of otherwise protected communications." *See id.* at *20 (cleaned up). Simply put, like here, a party "may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. Selective disclosure for tactical purposes waives the privilege." *Cox v. Adm'r United States Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994) (cleaned up).

articles, authored no treatises, and seemingly has never provided testimony on the matter in which he claims expertise—what is certain is that his opinions require a fact finder to just take his word for it. But that is not how it works. *See, e.g.*, *Frazier*, 387 F.3d at 1261 ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.") (internal citations omitted).

Mr. Lopez's opinions and analytic framework, spanning a whopping handful of paragraphs, *see* **Ex. "A,"** fail to explain why it is "reasonabl[e] and consistent with the usual and customary practice in our profession" for a lawyer to send a demand, disclaim any intent to pursue estate claims, agree to attend a global settlement conference, sit idly by and withhold complaints about purported claims handling deficiencies, attend the conference as previously represented (for only a few minutes), contend there that the prior demand was rejected and the policy limits no longer acceptable, and then "fil[e] suit and bring[] and explor[e] an estate claim." *See id.*

His report's background section that sets forth supposed "customar[y] consider[ations]" that plaintiff attorneys make in situations involving multiple competing claimants with insufficient limits, *see id.* at ¶¶ A – D, does not even

address attorney customs and practices. Instead, setting aside the two sentence assertion that Georgia lawyers must be ethical, zealous, competent, and diligent— all incontrovertible—the entirety of his framework focuses on *insurer* obligations, *insurer* liability, and *insurer* claims handling. *See id.* In other words, Mr. Lopez's report, which necessarily relies on his experience as a judge and current plaintiffs' lawyer, does not even "explain *how* that experience leads to the conclusion reached, *why* that experience is a sufficient basis for the opinion, and *how* that experience is reliably applied to the facts." *See Frazier,* 387 F.3d at 1265 (emphasis added).

These shortcomings are alone disqualifying; but, more importantly, even if Mr. Lopez actually presented more of a bridge to span the chasm between paragraphs A through D (supposed customs and practices) and 1 through 8 (opinions) of his report, there are still glaring indicia of unreliability. For instance, where an opinion is advanced solely for the purpose of litigation, the Court may weigh that "heavily against the admissibility" of the opinion. *See Sumner v. Biomet, Inc.*, 434 F. App'x 834, 843 (11th Cir. 2011). The Court is also permitted to consider whether the "expert's methodology has been contrived to reach a particular result." *See Rink*, 400 F.3d at 1293 n.7. Here, it bears emphasis that Mr. Lopez represents plaintiffs in injury cases, he has served as an expert only once (fee dispute case) of which he had minimal involvement, *see* **Ex. "C"** at 39:23-41:23; 81:4-10, he has not authored any publications in the last decade, he has not testified in the last four years (if ever),

and, as discussed, his opinions focus on largely irrelevant and prejudicial matters. In fact, he testified that he "realistically" spent most of his time examining the actions and file of non-party, Country Financial. *See* **Ex. "C"** at 15:13-16:1; 16:22-25.

Casting further suspicions about the reliability of his report, although Mr. Lopez's signature is reflected on his June 24, 2024 report, whether he independently crafted his opinions or actually reviewed the materials listed in his report to prepare those very opinions is far from clear. For instance, based on an undated draft report from Mr. Lopez that was produced to Direct General, when discussing the "data considered by the witness," a note is included reflecting, "Dax, we will prepare[.]" *See* **Composite Exhibit "D"** at MH000883. Additionally, in the "statement of opinions" section, that same report says "NOTE: It would be helpful to have a list of questions you would like me to answer or opine upon." *See id.* at MH000880. That draft report is strikingly similar to the final report issued before the deposition.

Most importantly, Mr. Lopez testified that—contrary to what is reflected in his report—he did *not* review all of the items listed; instead, Hirsh's counsel, Rich Dolder, prepared the list of items that Mr. Lopez supposedly reviewed; Mr. Dolder prepared the vast majority (if not entirety) of Mr. Lopez's report; Mr. Lopez made only insubstantial revisions or edits to Mr. Dolder's drafts; and Mr. Lopez could not recall what revisions he himself made to the report bearing his name and signature. *See* **Ex. "C"** at 13:5-16; 18:22-19:12; 46:6-15; 56:16-58:19.

1052192\321747897.v2

Taken together, Mr. Lopez's report raises more questions than answers. This is not simply a matter of lack of credibility or a consideration for the weight of testimony. It goes to the very foundation of the report and opinions. After all, an expert report must be "prepared" by the expert rather than ghost-written by counsel with the expert's name slapped on. *See* Fed. R. Civ. P. 26(a)(2)(B). "*Daubert* requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). That gatekeeping function compels exclusion here.

## CONCLUSION

Viewed against *Daubert*'s rigorous standards, and considering that Defendants bear the burden of establishing each *Daubert* prong (qualification, helpfulness, and reliability) by a preponderance of the evidence, Mr. Lopez should be excluded and his report stricken. He fails each prong, and his testimony—geared almost exclusively to extraneous matters—is highly prejudicial to Direct General, misleading to the jury, confusing as to the issues in dispute, and broadly speaking, unnecessary for resolving any factual or legal issue at hand.

Accordingly, for the reasons set forth above, Direct General respectfully requests that the Court (1) grant this motion; (2) exclude Mr. Lopez from testifying or otherwise offering evidence in this case; and (3) grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,


**HINSHAW & CULBERTSON LLP**

s/ *Rory Eric Jurman*

Rory Eric Jurman
Georgia State Bar No. 162639
rjurman@hinshawlaw.com
201 East Las Olas Boulevard
Suite 1450
Ft. Lauderdale, FL 33301
Telephone: 954-467-7900
Facsimile: 954-467-1024
Secondary: vharris@hinshawlaw.com
*Attorney for Direct General Insurance Company*

26

Case No. 1:23-cv-03491-ELR

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this document has been prepared in Times New Roman, 14-point font in accordance with and as approved by the Court in Local Rule 5.1(C).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on August 23, 2024, that a true and correct copy of the foregoing has been furnished to the individuals listed below via e-mail and among other delivery method so indicated upon:

Bruce Hagen, Esq.
Matthew R. Hagen, Esq.
Hagen Rosskopf, LLC
119 North McDonough Street
Decatur, GA 30030
Phone: (404) 751-0294
Email: bruce@hagen-law.com;
matt@hagen-law.com
**Counsel for Polina Denissova**

Roger Hartsfield
29 Duncan Drive SW
Cartersville, GA 30120
**Pro Se Defendant**
**Via U.S. Mail**

William A. Parker, Jr., Esq.
Montlick & Associates, P.C.
17 Executive Park Drive,
Suite 300
Atlanta, GA 30329
Phone: (404) 235-5000
Fax: (678) 539-5905
Email: bparker@montlick.com
**Counsel for Christopher Evans**

Richard E. Dolder, Esq.
James (Jay) Sadd, Esq.
Slappey & Sadd, LLC
352 Sandy Springs Circle, NE
Atlanta, GA 30328
(404) 255-6677 (office)
(404) 345-0590 (mobile)
Email: Rich@lawyersatlanta.com;
jay@lawyersatlanta.com
**Counsel for D. Max Hirsh**

1052192\321747897.v2