EXIBIT "C"

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DIRECT GENERAL INSURANCE      : CIVIL ACTION FILE NO
COMPANY,                      : 1:23-CV-03491-ELR
                              :
          Plaintiff           :
                              :
          Vs                  :
                              :
CHRISTOPHER EVANS and         :
POLINA DENISSOVA, et al,      :
                              :
          Defendants          :



          VIDEOTAPED DEPOSITION OF DAX LOPEZ,
ESQUIRE, taken at a remote location via Zoom
videoconferencing on July 25, 2024, commencing at
10:03 a.m. before Tracey L. Alexander, a Notary Public
and Certified Shorthand Reporter.




              -    -    -

          Magna Legal Services
            (866) 624-6221
            www.MagnaLS.com



Page 2

```
 1   APPEARANCES:
 2
             HINSHAW & CULBERTSON
 3           BY:  CANDACE CRONAN, ESQ.
             201 EAST LAS OLAS BOULEVARD
 4           SUITE 1450
             FORT LAUDERDALE, FL  33301
 5           (954) 467-7900
             CCRONAN@HINSHAWLAW.COM
 6           VHARRIS@HNSHAWLAW.COM
               -- Attorneys for the Plaintiff
 7
 8           MONTLICK & ASSOCIATES
             BY:  WILLIAM PARKER, ESQ.
 9           17 EXECUTIVE PARK DRIVE
             SUITE 300
10           ATLANTA, GA  30329
             BPARKER@MONTLICK.COM
11             -- Attorneys for the Defendant,
             Christopher Evans
12
13           HAGEN ROSSKOPF
             BY:  BRUCE HAGEN, ESQ.
14           119 NORTH MCDONOUGH STREET
             DECATUR, GA  30030
15           (404) 522-7744
             BRUCE@HAGEN-LAW.COM
16             -- Attorneys for the Defendant,
             Polina Denissova
17
18           SLAPPERY & SADD
             BY:  RICHARD DOLDER, ESQ.
19           352 SANDY SPRING CIRCLE NE
             ATLANTA, GA  30328
20           RICH@LAWYERSATLANTA.COM
               -- Attorneys for the Defendant,
21           D. Max Hirsch
22
23   ALSO PRESENT:
24           MIGUEL BANUELOS,
25                   Videographer
```



1                    INDEX TO WITNESSES

2

  WITNESS

3

  DAX LOPEZ

4

5

6          DIRECT EXAMINATION          PAGE

7          By Ms. Cronan               8

8

9          CROSS-EXAMINATION

10         By Mr. Parker               (none)

11         By Mr. Dolder               (none)

12         By Mr. Hagen                (none)

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1                    INDEX TO EXHIBITS
 2
     PLAINTIFF'S
 3   EXHIBIT           DESCRIPTION        PAGE
 4   Exhibit 1         Subpoena           20/25
 5   Exhibit 2         Expert Report      55/11
 6   Exhibit 3         Handwritten Notes  60/9
 7                     (Retained by counsel)
 8
 9   DEFENDANT'S
     EXHIBIT           DESCRIPTION            PAGE
10
                       (No marked exhibits)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

1                    DEPOSITION SUPPORT INDEX

2

3    Direction to Witness Not To Answer

4    Page      Line          Page Line

5    (None)

6

7

8

9    Request for Production of Documents

10   Page  Line

11   (None)

12

13

14

15   Stipulations

16   Page  Line          Page Line

17   6

18

19

20

21

22   Questions Marked

23   Page  Line          Page Line

24   (none)

25



Page 6

S T I P U L A T I O N S

1

2          IT IS HEREBY STIPULATED AND AGREED

3     UPON by and between attorneys for the

4     respective parties hereto, that the

5     reading, signing and sealing of the

6     deposition is reserved, and that all

7     objections except as to the form of the

8     question are reserved until the time of

9     trial.

10          IT IS HEREBY STIPULATED AND AGREED

11    UPON by and between the attorneys for the

12    respective parties hereto, that this

13    deposition may be sworn to by the witness

14    being examined before a Notary Public

15    other than the Notary Public before whom

16    this examination was begun.

17          IT IS HEREBY STIPULATED AND AGREED

18    UPON by and between the attorneys for all

19    parties that pursuant to CPLR Section 3113

20    (d) this deposition is to be conducted by

21    video conference, that the court reporter,

22    the witness, videographer, and counsel

23    are all in separate remote locations and

24    participating via video conference.

25                    *      *      *



Page 7

```
 1                    (This is the deposition of

 2            DAX LOPEZ, being taken via Zoom

 3            videoconferencing.  The identity of the

 4            witness has been confirmed by the hiring

 5            attorney.

 6                    Today is July 25, 2024.  The

 7            time on the record is 10:03 A.M.  The

 8            reading, signing, and sealing of the

 9            deposition transcript is reserved.)

10                    VIDEOGRAPHER:  We are now on the

11            record.  This begins video number 1 in the

12            deposition of Dax Lopez, Esquire, in the

13            matter of Direct General Insurance Company

14            versus Estate et al in the United States

15            District Court Northern District of

16            Georgia.

17                    Today is July 25, 2024.  The time

18            is 10:03 a.m.  This deposition is being

19            taken virtually at the request of Hinshaw

20            & Culbertson, LLP.  The videographer is

21            Miguel Banuelos with Magna Legal Services.

22            The court reporter is Tracey Alexander of

23            Magna Legal Services.

24                    Will counsel and all parties

25            present state their appearances and whom
```



Page 8

```
 1              they represent?
 2                   MS. CRONAN:  Good morning.
 3              Candace Cronan on behalf of Direct General
 4              Insurance Company.
 5                   MR. DOLDER:  Rick Dolder present
 6              for Max Hirsch.
 7                   MR. PARKER:  Bill Parker for the
 8              Defendant, Christopher Evans.
 9                   VIDEOGRAPHER:  Will the court
10              reporter now swear in the witness?
11                   DAX LOPEZ, after having first
12              been duly sworn, was examined and
13              testified as follows:
14                   -    -    -
15              DIRECT EXAMINATION
16                   -    -    -
17   BY MS. CRONAN:
18   Q.      Good morning, Mr. Lopez.  Would you please
19   state your full name for the record?
20   A.      Yes, Dax Eric Lopez.
21   Q.      And have you ever had your deposition taken
22   before?
23   A.      I have not.  This will be a first.
24   Q.      Okay.  Are you a practicing attorney?
25   A.      I am.
```



Page 9

1    Q.        Okay.  So, um, I -- I assume that you're

2    probably familiar with some of the deposition rules,

3    but I'm just going to go over them briefly with you.

4                   Uh, you are here today.  Uh, you are

5    under oath.  The court reporter is going to be taking

6    down everything you say, um, and even though there is

7    a videographer present, we do need you to, of course,

8    uh, articulate your answers clearly, um, and no head

9    nods, um, all that, which I'm sure you are very

10   familiar with as an attorney, correct?

11   A.        I am.

12   Q.        And all I ask is that if I'm asking you a

13   question, uh, if you need a break, just please, uh,

14   answer the question before we take a break, but I'm

15   happy to take a break at any time if you need a break

16   throughout, uh, the deposition today.

17   A.        Great.

18   Q.        Excellent.  Have you ever served as a witness

19   at a trial or a court hearing?

20   A.        I have.

21   Q.        In what capacity?

22   A.        Uh, a couple of years ago I finished trying a

23   case in DeKalb County, and during the second portion,

24   phase 2 of the trial, which is the attorneys fees

25   portion, I was on the stand to essentially, uh, give


MAGNA
LEGAL SERVICES

Page 10

1    the jurors, um, information about the attorneys fees

2    that we were seeking.

3                    So, I was under oath on the stand,

4    uh, giving testimony about our attorneys fees in that

5    case.

6    Q.        Okay.  And do you recall the name of that

7    case?

8    A.        I do.  It's Nicholas Carisello(phonetic) et

9    al versus, um -- it's called Marr, M-A-R-R, so

10   Metropolitan Atlanta Residential Recovery.  It's a

11   malpractice case.

12   Q.        Okay.  And was that, uh, a legal malpractice

13   case?

14   A.        Medical.

15   Q.        Okay.  Thank you.  Do you recall

16   approximately the month and year you gave that

17   testimony?

18   A.        It would have been late August of 2022.

19   Q.        Now other than that, um, fee hearing, it

20   sounds like it was a fee hearing, correct?

21   A.        Well, it was part of a trial, so the jurors

22   decided.  So, yes, a portion of it.  I tried the case

23   with my co-counsel, and then we had to put up our

24   evidence on attorneys fees in the second phase.

25   Q.        Okay.  Other than that have you ever served



Page 11

1    as a witness at a trial or a court hearing?

2    A.        No.

3    Q.        Have you ever been a Plaintiff or a Defendant

4    in any litigation?

5    A.        Yes, um, about twenty-two years ago, I would

6    say.  Um, I was a federal law clerk in Puerto Rico, so

7    I clerked for a federal judge, and during my time

8    there I had an unpleasant experience at a Chinese

9    restaurant, um, that resulted in me having to sue

10    them, the Chinese restaurant.

11                        I ingested something no one should

12    have to ingest that was not food, and, uh, we filed a

13    -- a friend of mine filed a lawsuit for me.  It was

14    ongoing for about three to four months, and we settled

15    for some nominal amount.

16    Q.        Did you ever return to that restaurant?

17    A.        Uh, no.  I did not.

18    Q.        Other than that, uh, matter, uh, have you

19    ever been a Plaintiff or a Defendant in any

20    litigation?

21    A.        No.

22    Q.        Have you ever filed any, uh, agency claims,

23    uh, any governmental agency seeking relief?

24    A.        No.

25    Q.        Okay.



Page 12

1   A.          Not on my personal behalf.  Obviously on

2   behalf of my clients, yes, but in my personal

3   capacity, no.

4   Q.          Okay.  Have you ever participated in

5   arbitration as a party or a witness?

6   A.          No.

7   Q.          Okay.  Are you represented by counsel for

8   purposes of the deposition today?

9   A.          Mr. Dolder is present, uh, and I suspect

10  he'll be making some objections, but I am the expert

11  witness that he has retained.

12  Q.          Okay.  Uh, but you're not -- you don't have

13  any personal counsel with you today, correct?

14  A.          I do not.

15  Q.          Okay.  And what did you do to prepare for the

16  deposition today?

17  A.          So, I -- Mr. Dolder provided a box full of

18  documents, uh, several binders, um, including the

19  pleadings in this matter, uh, some depositions in this

20  matter, uh, it also had a lot of the exhibits that are

21  at issue, the sum of demands, the response, the

22  responses.  I think I have the claims files from

23  discovery in this case.

24              So, I reviewed -- I'll say I didn't

25  review every document that he provided but I did



Page 13

1    review the documents that lead to my opinion about the

2    demand at issue and the response from Direct General.

3    So, I focused most of my attention, uh, on the

4    documents that are related to those two things.

5    Q.        Okay.  So, you focused your attention on the

6    documents that are listed that you relied on in your

7    report, correct?

8    A.        So, I know you received the list.  I didn't

9    review every single document there, but I was provided

10   a copy of those, but I did peruse a lot of the

11   binders.  I did review a couple of the depositions,

12   um, specifically Matt Hagen's deposition and Michael

13   St. Amand's deposition, I think were the two that I

14   reviewed, um, but, yeah, I spent some time with Mr.

15   Dolder, um, on two occasions discussing and preparing

16   for today.

17   Q.        Okay.  And tell me a little bit more about

18   the binders that you're referring to.  Do you have

19   them with you right now?

20   A.        I have two of the binders.  Um, so this

21   binder here has pleadings, uh, in this matter, or some

22   of the pleadings, I'm sure it's not all of them.  Um,

23   I reviewed some of those.

24                   It also includes the September 6th

25   letter from Mr. Amand.  It has the verdicts.  It has



Page 14

1    the judgements.  It has Mr. Hirsch's Answers to the

2    Complaints.  I have got the original demand letter

3    from Montlick & Associates dated August 9th relating

4    to, uh, the death of Andrew Evans, uh, the initial

5    disclosures of Mr. Hirsch, direct preliminary report

6    and discovery plan, the scheduling order, the

7    Plaintiff Direct General Insurance Company's Answer to

8    the Defendant Counterclaim, initial disclosures of

9    Plaintiff Direct General Insurance Company, the

10   Supplementation Initial Disclosures.

11              So, I have some things here but I

12   don't think these are all the pleadings.  I have some

13   pleadings.

14   Q.        Were there any pleadings that you needed or

15   requested that you were not provided?

16   A.        No.

17   Q.        Okay.  Did you review all of the documents in

18   that binder?

19   A.        I reviewed -- I skimmed most of the documents

20   in this binder.  I focused on probably two or three of

21   them, specifically the demand letter, the demand

22   letters, uh, from Montlick & Associates relating to

23   Andrew Evans and Nancy Evans.

24              I also spent some time reviewing,

25   uh, the response letter from Mr. Amand, which I



Page 15

1    believe there's two dates.  I have got a copy that

2    says September 5th but I believe the actual copy was

3    September 6th, but the September 5th or 6th letter

4    from Mr. Amand were responding to those demand letters

5    from Montlick & Associates I spent some time with.

6    Q.        Okay.  So, those three documents were the

7    ones that you focused on, correct?

8    A.        Yes, but I also reviewed the claims files,

9    uh, for Allstate, GEICO, and Country Financial.  Uh,

10   those were provided to me.  So, I did review those

11   demand letters and those correspondence between the

12   parties relating to those claims, as well.

13             So, I am familiar with -- and I

14   spent most of my time realistically with the Country

15   Financial, uh, file which was the liability insurer

16   for Shannon Justice.

17   Q.        And why did you spend most of your time on

18   the Country Financial file?

19   A.        Uh, I think the others were UM coverage, uh,

20   which I didn't feel were really relevant to this case.

21   So, I did focus on the other hope demands to the other

22   potential liability insurer, uh, which would have been

23   Shannon Justice's insurer which is Country Financial

24   just to see what happened on that, uh, with those

25   demand letters and how Country Financial responded to



1    those letters.

2    Q.        Okay.  And the binder that you're referring

3    to now that's in front of you, um, that you just

4    discussed, there were two demands in this and also Mr.

5    St. Amand's September 6th letter, uh, is there a cover

6    sheet on that binder or anything that -- I guess, is

7    it labeled as anything in particular, or I mean like

8    on the front, like on the front cover?

9    A.        It says pleadings, Binder 1.

10   Q.        Okay.  So, Binder 1?

11   A.        Yes.  It's four binders, I believe.  Uh, one

12   had -- two of them had depositions that I believe -- I

13   do have one of the other binders here.  Let me see

14   what this one is labeled.  Um, this is Binder 4 and

15   it's document production.  I think this is the binder

16   that had a lot of the claims information, claims

17   files, from GEICO, Allstate, and Country Financial.

18   Q.        Okay.  And did you review documents in that

19   binder for your deposition today?

20   A.        I did.

21   Q.        Okay.  Which documents?

22   A.        As I said, I skimmed the files for Allstate

23   and the other UM, but I focused on a lot of the

24   documents relating to the Country Financial

25   interaction.



Page 17

1              Um, so, I did review the demand

2     letter from Montlick to Country Financial.  I did

3     review the response letters, uh, that counsel sent

4     seeking clarification to several questions that they

5     had about the relationship between the parents of Mr.

6     Andrew Evans, uh, also seeking clarification as to the

7     estate claims.

8              Um, I can't remember all of the

9     things they sought.  I know they sought clarification

10    on a number of points.  I saw that there were numerous

11    letters back and forth relating to those

12    clarifications from Montlick & Associates responding

13    to those, uh, letters seeking information.  So, I did

14    focus on that.

15              I ultimately saw that Country

16    Financial tendered its insurance limits within the

17    timeframe, uh, of the initial demand.

18    Q.       Okay.  And do you know if, um, their tender

19    was accepted?

20    A.       It was.

21    Q.       Okay.  And do you know, um, who accepted the

22    tender?

23    A.       Well, Montlick sent a demand and it was

24    accepted by, I don't remember the firm that ultimately

25    sent the letter accepting, uh, the initial demand of



Page 18

1    the policy limits.  I could look if you would like me

2    to, but --

3    Q.        Do you know if the claim, uh, which -- was it

4    for Andrew Evans?

5    A.        I believe it was both for Andrew Evans and

6    Nancy Evans.  So, I think it was $100,000.00 -- I

7    think it was $100,000/$300,000 policy.  And I believe

8    it was $100,000.00 for the death of Nancy Evans and

9    then $100,000 dollars for the death of Andrew Evans,

10   which was divided equally between his parents, $50,000

11   each.

12   Q.        Okay.  And who are Andrew Evans parents?

13   A.        Christopher Evans and, um, if you don't mind

14   me looking.  I know it's -- I know she's in the

15   pleadings, um --

16   Q.        You don't know off the top of your head what

17   her name is?

18   A.        I know it's like Desiva(phonetic)

19   Polina(phonetic), or something like that.

20   Q.        Close, but not close.

21   A.        Um, oh, Polina Denissova, yes.

22   Q.        And you said that there ae two -- there's

23   four binders in total.  So, I'm assuming there are two

24   other binders, right?

25   A.        There are.  I believe they are depositions,



Page 19

1    mostly depositions.  Again, I didn't review all of the

2    depositions.  I reviewed the two that I mentioned.

3    Q.        And the two that you reviewed, uh, were, um,

4    Matt Hagen's and Michael St. Amand's, correct?

5    A.        That's correct.

6    Q.        Okay.  In connection with the work that you

7    performed with respect to this litigation, have you

8    reviewed any other deposition transcripts?

9    A.        Not in this matter, no.

10   Q.        Okay.  Have you reviewed any deposition

11   transcripts of Direct General's employees?

12   A.        I did not.

13   Q.        Okay.  Where is your entire file regarding

14   this litigation?

15   A.        In my office.

16   Q.        Okay.  And is that on your computer?

17   A.        No.  It's in the binders.  I don't have

18   anything electronic.  Everything is paper copy.

19   Q.        Okay.  So, your files are kept all in paper,

20   is that correct?

21   A.        For this matter, yes.

22   Q.        And how do you maintain your paper files?

23   A.        Well, I was provided a box with the four

24   binders and I just keep everything in that same box.

25   Q.        And when were you provided the box of



Page 20

1    binders?

2    A.          That is a good question, um, probably in May,

3    I want to say.  Sometime in May.  I don't have a

4    specific recollection.

5    Q.          Okay.  Other than the four binders that were

6    provided in the box you believe in May, were you

7    provided with any other documents?

8    A.          I was not.

9    Q.          Okay.  Did you request any specific documents

10   that you needed to review for your report?

11   A.          I did not.

12   Q.          Okay.  Do you have any documents that have

13   not been produced that are saved on your e-mail?

14   A.          I don't believe there are any.  I don't

15   believe I have anything via e-mail, no.  Everything --

16   Q.          Okay.

17   A.          -- everything was printed out and placed in a

18   binder.

19   Q.          Okay.  And did you review the subpoena duces

20   tecum in connection with your deposition today?

21   A.          I did not.

22   Q.          Okay.  I'll show you the document.

23               MS. CRONAN:  This is going to be

24          Exhibit 1.

25               (Whereupon, Exhibit 1 was marked for



Page 21

1            identification as of this date.)

2    BY MS. CRONAN:

3    Q.        Okay.  Exhibit 1, um, is going to be actually

4    a composite exhibit.  Um, it's going to be your notice

5    and this, uh, deposition notice.

6                    Can you see this?

7    A.        It's not on my screen.  It just says Candace

8    Cronan has started screen sharing, but it does not

9    show a document.

10                   MR. DOLDER:  Yeah, I don't see one

11           either.

12                   MS. CRONAN:  You know, it's weird.

13           My screen is frozen now, and I can't stop

14           sharing.  I'm frozen, too, on my screen which

15           is really strange.

16                   THE WITNESS:  You're coming through

17           clear on our end.

18                   MS. CRONAN:  Yeah, I'm completely

19           frozen on my screen.

20                   VIDEOGRAPHER:  I just stopped screen

21           sharing to see if that helps.

22                   MS. CRONAN:  Okay.  It's frozen.

23                   MR. DOLDER:  Candace, we can hear

24           you but I don't see any image.

25                   THE WITNESS:  I can see you.



Page 22

1                    MS. CRONAN:  Yeah, I'm completely --

2           my computer is completely locked up now.  Can

3           we take a break for a second?

4                    THE WITNESS:  Sure.

5                    VIDEOGRAPHER:  Off the record, 10:21

6           a.m.

7                    (Whereupon, there was a pause in the

8           proceeding.)

9                    VIDEOGRAPHER:  Back on the record,

10          10:25 a.m.  Go ahead.

11   BY MS. CRONAN:

12   Q.       Um, Mr. Lopez, I'm going to enter this as

13   Exhibit 1, and it's the subpoena to testify at a

14   deposition in a civil action.  This was the one that

15   was served on you, and also, um, the notice of taking

16   videotape deposition of you.

17                    So, I'll enter this as composite

18   Exhibit 1.

19                    MR. DOLDER:  I'm going to object to

20          the form of the question, and it assumes

21          facts that are not in evidence.

22                    MS. CRONAN:  Okay.  Which facts?

23                    MR. DOLDER:  That you served it on

24          him.

25                    MS. CRONAN:  Okay.  Well, okay.



Page 23

```
 1              I'll clarify that for Mr. Dolder.

 2                   It was not served on you personally,

 3              however Mr. Dolder agreed to accept process

 4              on your behalf.

 5                   MR. DOLDER:  Probably not the right

 6              venue for it, but that's incorrect.

 7    BY MS. CRONAN:

 8    Q.        Okay.  Well, why are you here today, Mr.

 9    Lopez?

10    A.        I mean, Mr. Dolder told me that there would

11    be a deposition today and asked me to attend, and I

12    did.  I never received the subpoena to testify or the

13    notice of deposition.  It was never served upon me.

14    Q.        Okay.  So, you have never seen the document

15    here, this subpoena?  You have never seen this

16    document?

17    A.        That is correct.

18    Q.        Okay.  So, it's four pages, and I'm happy to

19    show you.  You have never seen this?

20    A.        I have never seen that.  No.

21    Q.        Okay.  And --

22    A.        I'm here voluntarily.  I'm not here because I

23    received a subpoena.

24    Q.        Okay.  Did you know that, um, Direct General

25    did issue a subpoena that Mr. Dolder accepted?
```



Page 24

1    A.        Well, I think he mentioned there was a

2    subpoena.  I don't think we ever discussed him

3    accepting it.  I never gave him permission to accept

4    it on my behalf.

5    Q.        Okay.  If he had asked you, would you have

6    not given him permission?

7                   MR. DOLDER:  Object to the form.

8    A.        Hard to say, uh, because that's not what

9    happened.  So, I don't know how to answer that.  I

10   mean, I probably would have given him permission to,

11   but we never had that discussion.

12   Q.        Okay.  Were you asked to provide any

13   documents to Mr. Dolder for your deposition here

14   today?

15   A.        He asked me for my notes this morning, which

16   I provided.

17   Q.        Okay.  And how many pages are your notes?

18   A.        It looks like three, three pages.

19   Q.        Okay.  And is that the entirety of your notes

20   on this matter?

21   A.        Yes, ma'am.

22   Q.        Okay.  And when were those notes prepared?

23   A.        Uh, throughout my review.  They were not

24   prepared at any one time.  As I review documents I may

25   jot things down, so you'll see dates.  As I came



Page 25

1    across things there will be dates on here, some of my

2    initial impressions.

3                        So, it would have been throughout my

4    review.  They were not all created at the same time.

5    Q.        Okay.  Going back to some preliminary

6    matters, tell me, what is your highest, highest level

7    of education?

8    A.        Juris doctorate Vanderbilt Law School.

9    Q.        Okay.  And where did you attain your law

10   degree?

11   A.        Vanderbilt Law School.

12   Q.        Okay.  And what year did you graduate?

13   A.        2001.

14   Q.        Okay.  Did you have any special areas or

15   studies, um, absent of your legal studies?

16   A.        No, just classes you need to do to graduate.

17   I mean, I may have focused a little bit more on

18   employment law but, um, that was just out of interest.

19   Q.        Okay.  And where did you attend

20   undergraduate?

21   A.        Vanderbilt University.

22   Q.        And what year did you graduate?

23   A.        1998.

24   Q.        And what was your major?

25   A.        Political science.



Page 26

1  Q.        Okay.  And did you attain a bachelor's of

2  science?

3  A.        That's correct.

4  Q.        Okay.  Do you have any teaching experience?

5  A.        No direct teaching experience.  Uh, I -- when

6  I served as a judge I would often be asked to come

7  speak to law students at the various law schools in

8  Georgia on numerous topics, um, brief writing,

9  professionalism, evidence.

10             Um, so I did, you know -- I would do

11  like guest lecturing at the law schools.  I also did a

12  fair amount -- to this day I still do a fair amount of

13  teaching at, uh, the Judicial College in Georgia.

14             Uh, when I was a judge I would be

15  asked to speak on numerous topics, and I am still

16  asked to speak on topics related to being a judge.

17  Q.        So, these, uh, speaking, are these like

18  seminars or are they courses?

19  A.        So, judges in Georgia, particularly state

20  court judges have two conferences a year which is

21  where they get their credits, their continuing

22  education credits, uh, and that's where most of the

23  judges attend to get their credits over two

24  conferences.  So, I'm often asked to speak at those

25  conferences.



Page 27

1   Q.          Okay.  And what are the topics of your, uh,

2   speaking engagements?

3   A.          Uh, I have spoken primarily on, um,

4   interpreter issues, how to handle interpreters and the

5   legal issues surrounding, um, Defendants that do not

6   speak English.  That was an area that I focused on a

7   great deal.

8                    I was a member, and I'm still a

9   member of Commission on Interpreters in Georgia, and I

10  help draft the rules relating to the interpreters in

11  Georgia.  So, I'm still asked to speak about some of

12  the legal issues having to deal with the individuals

13  who do not speak English, uh, sort of an access to

14  justice issue.

15                   I also now speak a fair amount as to

16  the judicial ethics.  I am on the Judicial

17  Qualifications Commission in Georgia, which is the

18  commission that regulates judges in Georgia.  So, I am

19  asked to speak about judicial qualification issues and

20  judicial ethics.

21  Q.          Okay.  And are those speaking engagements,

22  the audience, is that limited to judges?

23  A.          For the most part, yes.

24  Q.          Okay.  When you say for the most part, what

25  do you mean?



Page 28

1  A.          There might be staff attorneys that attend

2   from time-to-time or other judicial staff, uh, but the

3   primary audience are judges.

4  Q.          Okay.  Do you hold any professional licenses?

5  A.          Law license.

6  Q.          Okay.  And where, or what state is your law

7   license in?

8  A.          Georgia.

9  Q.          Okay.  And when did you attain that license?

10  A.          I graduated in 2001 but because I clerked for

11   a year -- I did pass the bar in 2001, uh, but because

12   I clerked for a year, I was not sworn in until 2002.

13   So, I guess my law license would be 2002.

14  Q.          Okay.  And where did you clerk after law

15   school?

16  A.          Federal District Court of Puerto Rico.

17  Q.          Okay.  And which judge were you assigned to?

18  A.          His name was Hector Laffitte.  He is no

19   longer on the bench.

20  Q.          Okay.  Do you have any professional

21   certifications?

22  A.          I'm not sure what you are asking.  Could you

23   clarify?

24  Q.          Not necessarily as an attorney but just in

25   general, have you taken any courses and received any



Page 29

1   certification?

2   A.          I don't think so.  No, nothing comes to mind.

3   Q.          Okay.  Where are you currently employed?

4   A.          I'm a partner at DelCampo, Grayson & Lopez in

5   Dunwoody, Georgia.

6   Q.          Okay.  And what county is Dunwoody, Georgia

7   located in?

8   A.          It's DeKalb County.

9   Q.          Okay.  And how long have you been employed as

10  a partner at DelCampo, Grayson & Lopez?

11  A.          Since September of 2021.

12  Q.          Okay.  And where were you employed prior to

13  September of 2021?

14  A.          I served as a state court judge in DeKalb

15  County from 2010 until 2020.

16  Q.          Okay.  And when you were a state court judge

17  what type of cases were you assigned to?

18  A.          So, state court handles criminal misdemeanor

19  matters, so no felonies, and then on the civil side

20  pretty much any large civil action, um, medical

21  malpractice, products liability, wrongful death.

22              Uh, we also handle a fair number of

23  just law cases, uh, anything that did not require, uh

24  -- that did not have equity as an issue.  So, if

25  you're asking for equitable relief, you would have to



Page 30

1    go to superior court and I have no equity relief

2    powers.

3                    So, we have no threshold on the

4    amount of damages.  So, large wrongful death actions

5    were filed and small actions, as well.  We also didn't

6    have any jurisdiction over real estate or, um, family

7    law matters.  So, that would be exclusively in the

8    superior court.

9                    So, I didn't have to do family law,

10   real estate law, or anything with equitable relief.

11   Q.        Okay.  Going back to your current employment,

12   uh, are you a W2 employee at DelCampo, Grayson &

13   Lopez?

14   A.        I am not.

15   Q.        How are you compensated?

16   A.        I receive a K1, so distributions from the

17   profits.

18   Q.        Okay.  And are DelCampo and Grayson also K1

19   partners?

20   A.        They are.

21   Q.        Okay.  Are there any other partners in your

22   law practice?

23   A.        There are not.

24   Q.        Okay.  Do you have any other attorneys

25   working for you?



Page 31

1    A.          We don't.

2    Q.          Okay.  Prior to your judgeship where were you

3    employed?

4    A.          I worked at a small firm called Foltz Martin,

5    also no longer in existence.  Um, it was a small --

6    they did -- it had two sections, a real estate

7    corporate section and then a litigation section.  I

8    was part of the litigation section.

9    Q.          And how many years were you there?

10   A.          Almost three.

11   Q.          Okay.  And before that where were you

12   employed?

13   A.          I worked at a firm called Ashe, Rafuse &

14   Hill, also not in existence.  I think there's a

15   pattern here.  Um, as soon as I left those firms no

16   longer -- maybe I was legally holding them together.

17               Uh, yes, a small firm that did

18   mostly employment but had a small litigation section.

19   So, I did both employment class actions and

20   litigation.

21   Q.          Okay.  And now in the Foltz Martin firm, were

22   you handling defense work or plaintiff work?

23   A.          Mostly defense work but we would take a

24   plaintiff's case from time-to-time, if it was a good

25   enough case.  We also did some financial cases on the



Page 32

1    plaintiff's side on the contingency basis.  The vast

2    majority of my work was defense.

3    Q.         And now at Ashe, Refuse & Hill were you doing

4    mostly defense and plaintiff side work?

5    A.         The same.  Mostly defense but we did take an

6    occasional plaintiff case.  We actually took a couple

7    of those to trial.  A couple of the plaintiffs cases

8    actually went to trial.

9               They were mostly in the employment

10   context where we represented the plaintiffs in those

11   cases.

12   Q.         Okay.  And before Ashe, Refuse & Hill where

13   were you employed?

14   A.         I was at Holland & Knight.

15   Q.         Okay.  And what was your position at Holland

16   & Knight?

17   A.         Just associate at Holland & Knight in the

18   litigation section, uh, mostly working in products

19   liability, uh, employment law, government relations,

20   business litigation, just wherever they needed me.

21   Q.         Okay.  And approximately what timeframe were

22   you employed by Holland & Knight?

23   A.         It would have been after my clerkship, so

24   2002 until 2005.

25   Q.         Okay.  And why did you leave Holland &



Page 33

1    Knight?

2    A.        I wanted to get more trial experience.  Uh,

3    as an associate of a big firm you don't really get to

4    try a whole lot of cases.  I went to a trial heavy

5    firm that did a fair amount of trials, and I got to

6    try several cases at my next firm.

7    Q.        Okay.  In your current position at DelCampo,

8    Grayson & Lopez what are your primary practice areas?

9    A.        So, we do wrongful death and catastrophic

10   injury cases.  Um, so, that could encompass most any

11   area of law.

12                  In the last three years I have

13   handled a large product liability case, time

14   manufacturer.  We do several premises liability cases

15   where individuals are, you know, injured at an

16   apartment complex or a shopping center usually as a

17   result of third-party criminal act.

18                  I do a fair amount of medical

19   malpractice cases, um, car wreck cases, trucking

20   cases.  We have had several large trucking matters,

21   just a little bit -- whatever results in, like I said,

22   wrongful death or catastrophic injuries.

23                  So, we are not a volume shop, so we

24   don't have a lot of cases but a lot of our cases are

25   significant.



Page 34

1  Q.        Okay.  And are those mostly plaintiff of

2  defense cases?

3  A.        All plaintiff.

4  Q.        Okay.  Do you do any defense work at all?

5  A.        I do not.

6  Q.        Okay.

7  A.        Uh, hold on.  I did one case for the

8  defendant as an employment matter.  I represented a

9  doctor, uh, who was sued by her practice.

10             So, yes.  I represented a defendant

11  in that case, but that's the only case where I

12  defended.

13  Q.        Okay.  Have you ever done any work for an

14  insurance company?

15  A.        Yes.

16  Q.        Tell me about that.

17  A.        Uh, probably at Foltz Martin I think we had a

18  couple of insurance clients.  I think Cincinnati was

19  probably the largest one.  So, we handled whatever

20  they sent our way, um, slip and falls, premises cases.

21             Um, you're testing my memory.  It

22  was a long time ago.  It was not my primary focus but

23  I did handle several cases for them.

24  Q.        Okay.  Did any of those cases, uh, when you

25  were at that Ashe firm, did they involve any bad faith



Page 35

1    claims?

2    A.        At Ashe, no.

3    Q.        Okay.  In your current capacity do you, uh,

4    deal with insurance disputes or bad faith matters?

5    A.        I do.

6    Q.        Okay.  And in what capacity?

7    A.        As the plaintiff who's attempting to recover

8    for my clients.  So, currently I think we have several

9    bad faith matters arising from verdicts that we have

10   attained.

11   Q.        Okay.  And so the cases that you're handling,

12   were you actually representing the claimants in the

13   underlying litigation?

14   A.        Correct.

15   Q.        Okay.  And approximately what percentage of

16   your current practice, uh, relates to insurance claims

17   or bad faith matters?

18   A.        Well, all our cases -- most of our cases

19   involve insurance claims.

20   Q.        Okay.

21   A.        Um, for personal injury, you know, a personal

22   injury firm typically will not take a case unless

23   there is something to recover.

24   Q.        Right.  Whether it be insurance or

25   self-insured, okay.



Page 36

1  A.          Correct, um, but mostly insurance.

2  Q.          Okay.  And so tell me, what about bad faith,

3   uh, matters, what percentage would you guess your

4   practice, uh, deals with, what percentage of bad faith

5   matters?

6  A.          Well, that's sort of a loaded question.  I

7   think all our cases have the potential to result in a

8   bad faith litigation.  Um, if we are litigating, that

9   means we were not able to resolve it with a demand

10  letter, um, and we might be, you know, the defendant

11  might be in a bad faith posture at that point.  There

12  might be some excess policy exposure at that point.

13             So, we do deal with these issues on

14  many of our cases.  Now, in terms of actually getting

15  to the bad faith litigation, um, again, probably two

16  or three of our biggest cases right now are sort of in

17  that posture.

18  Q.          Okay.  But are they actively pending, um, in

19  a bad faith suit?

20  A.          No.  We are still in the appeals process, but

21  we fully anticipate that they will all end up in bad

22  faith litigation.

23  Q.          Okay.  Okay.

24  A.          We have handled several bad faith cases, um,

25  but, again, it's a small number of cases that actually



Page 37

1    get to the litigation portion of bad faith, but we

2    have had some those in the time that I have been at

3    the firm.

4    Q.        Okay.  So, you're drawing a distinction

5    between like allegations of bad faith versus ones that

6    actually go into suit with bad faith, correct?

7    A.        Yes.

8    Q.        Okay.  Have you ever been employed by an

9    insurance company?

10   A.        Directly, no.  I have done insurance defense

11   work through my firms, but I have never been employed

12   by an insurance company.

13   Q.        Okay.  Have you ever had any other claims

14   that you were involved in that were against Direct

15   General Insurance Company?

16   A.        I don't believe so, um, but maybe twenty-two

17   years of litigation I can't say with 100 percent

18   certainty that they have never been involved in one of

19   my cases.  Off the top of my head, I can't think of

20   any.

21   Q.        Okay.  Do you subscribe to any professional

22   publications in connection with your work?

23   A.        So, I receive -- I'm a member of the Georgia

24   Trial Lawyers Association.  I receive, um, their

25   magazine.  It usually has articles related to the



Page 38

1    practice of law on the plaintiff's side.  Um, through

2    the state bar I think I'm a member of the litigation

3    section and the product liability section.

4    Q.        Okay.  And when did you switch over from the

5    defense -- from the defense to the plaintiff's side?

6    A.        Well, I became a judge for eleven years, so I

7    was not actively practicing law.  Uh, so I have been a

8    full-time plaintiff's lawyer for the last three years.

9    Q.        Okay.  Do you follow any blogs on insurance

10   issues or insurance claims?

11   A.        No.

12   Q.        Okay.  Have you ever authored any blogs on

13   insurance issues or insurance claims?

14   A.        I have not.

15   Q.        Okay.  Do you consider yourself to be an

16   expert in any area?

17   A.        Um, again, I think that question is a little

18   bit vague.  I am well-versed in numerous areas, um,

19   relating to the practice of law and judging.

20              Um, here my focus in this case is

21   what a reasonable and prudent plaintiff's attorney

22   would do in a situation similar to the one in this

23   case where there are numerous claimants and

24   insufficient limits, and I think I would definitely be

25   an expert in that situation.



Page 39

1   Q.        And why is that?

2   A.        It's a common situation that as a plaintiff's

3   attorney I encounter on a weekly basis, it's not

4   uncommon.  Um, and based on my education, training,

5   experience, and knowledge, uh, I would definitely say

6   that I'm well-versed in how to handle those

7   situations.

8   Q.        Have you ever retained an expert for the

9   subject matter for which you're testifying in this

10  matter?

11  A.        I have not.

12  Q.        Okay.  What materials do experts in your

13  field generally rely on to render opinions such as

14  yours?

15  A.        Pleadings in the case, um, the actual demands

16  and responses to those demands, uh, and any

17  correspondence relating to the underlying claimant.

18  Q.        Anything else?

19  A.        Claims file at issue, um, and any other

20  claims files related to any insurance questions,

21  insurance policies that may cover this particular

22  wreck.

23  Q.        Okay.  Have you ever served as an expert

24  witness in any matter before?

25  A.        I have been engaged to be an expert on fees,



Page 40

```
 1   9-11-68 fees on one occasion, but I was never -- I
 2   don't think the case ever made it, uh, into a hearing
 3   posture.
 4   Q.        Okay.
 5   A.        I signed an affidavit on fees.
 6   Q.        Okay.  So, other than your -- that instance
 7   of having an affidavit on fees, was there any other
 8   instance where you served as an expert in any matter?
 9   A.        No.
10   Q.        And who retained you to serve as an expert in
11   that matter?
12   A.        In that matter, that would have been the
13   plaintiff's attorney that was successful, uh, at
14   trial, and I can't remember who it was off the top of
15   my head.
16   Q.        Do you remember what the case style was, the
17   name of the case?
18   A.        I don't.  Actually now that I think about it
19   it was Daren Summerville, the plaintiff's attorney in
20   town, but I don't recall -- I believe it was a dental
21   malpractice case, uh, where they obtained a 10 million
22   dollar verdict at trial, but I don't know the style of
23   the case off the top of my head.
24   Q.        Do you recall how much, uh, time was incurred
25   approximately that you were, I guess -- what was the
```



Page 41

1    subject of your declaration or affidavit?

2    A.         I think that was opining as to the

3    reasonableness of the fees and the hourly rate that

4    was being sought, um, plus the reasonableness of the

5    hours expended in obtain that verdict, but I don't

6    recall the details, how much the fees were or how many

7    hours they were claiming to try to get reimbursed for.

8    Q.         Okay.  Do you recall, uh, how much you were

9    compensated in that matter?

10   A.         I don't believe I was compensated.  Um, I was

11   asked to do it.  You know, this is the thing, as a

12   former judge I get called on a lot of issues and

13   people ask me to do things.  It's not my primary

14   revenue source.

15              So, I'm sure I should have billed

16   them.  I'm sure I quoted something but, you know, it

17   took me less than an hour to do the affidavit.  So, I

18   probably didn't send a bill.  So, I don't think I was

19   compensated.

20              Like I said, the case was not really

21   -- I was not deposed and I never had to testify at a

22   hearing or a trial.  So, my, um -- the case -- my

23   involvement in the case was very limited.

24   Q.         Who retained you in this matter?

25   A.         It would be Mr. Rich Dolder on behalf of Max



Page 42

1    Hirsch.

2    Q.        Okay.  And who contacted you in connection

3    with this matter?

4    A.        Mr. Rich Dolder.

5    Q.        And when did he contact you?

6    A.        Probably April, May timeframe.

7    Q.        And how was the contact made?

8    A.        I believe he called me, and then we set up a

9    lunch, uh, to go and discuss my potential involvement

10   in this case.  So, we had lunch together.

11   Q.        Okay.  And do you recall approximately when

12   that lunch occurred?

13   A.        It would have been in the spring, so I think

14   in the April May timeframe, um, probably May of this

15   year.

16   Q.        Have you ever worked with Mr. Dolder before?

17   A.        I have not.

18   Q.        Was this the first time you have ever met Mr.

19   Dolder face to face?

20   A.        I think we met before.  I'm very familiar

21   with his firm and his partners, but it's the first

22   time we spent this much time together, yes, and got to

23   know each other.

24   Q.        Okay.  And what were you told in connection

25   with this matter?



Page 43

1  A.        Uh, he asked me, uh, if I was familiar with

2  the case, which I believe I had read about in the

3  Legal Fulton Daily.  I know Mr. Hagen very well.  So,

4  I remember seeing the headlines.

5               Um, he informed me sort of the

6  factual basis of the case and what happened in the

7  underlined case, and leading up to the trial of the

8  verdict, and then he discussed -- I mean, we discussed

9  my potential involvement as an expert for limited --

10  for the limited purpose of discussing what a

11  reasonable and prudent plaintiff's attorney would do

12  in similar circumstances.

13  Q.        Okay.  And is there anything else that you

14  were provided with regard to the case?

15  A.        At that time, no.  Um, I think it was

16  probably a week or two later he dropped off the books

17  with the binders --

18  Q.        Okay.

19  A.        -- for my review.

20  Q.        Okay.  Did Mr. Dolder, uh, ask you if you had

21  been an expert before?

22  A.        I'm sure he did.

23  Q.        Okay.  And did you tell him that you hadn't

24  ever served as an expert in a similar matter?

25  A.        Correct.



Page 44

1    Q.        Okay.

2    A.        I think he is aware that I have not served as

3    an expert.

4    Q.        And what are the terms of your fee

5    arrangement with Mr. Dolder?

6    A.        $600.00 an hour.

7    Q.        And how did you come to that, uh, hourly

8    rate?

9    A.        So, my -- I'm a mediator.  I mediate roughly

10   $1,100.00 an hour.  Um, I felt that that was pretty

11   too excessive.  So, $600.00 seems like a reasonable

12   amount for my time.

13   Q.        And is Mr. Dolder the one that specifically

14   retained you?

15   A.        I'm sure I'm retained by Max Hirsch through

16   Mr. Dolder.  The client's retaining me.

17   Q.        Okay.  And who is paying you?

18   A.        Good question.  I believe probably Mr.

19   Dolder's firm.

20   Q.        Have you received any compensation to date?

21   A.        I have, uh, $6,600.00.

22   Q.        Okay.  So that is approximately ten hours,

23   correct?

24   A.        More or less, yes.

25   Q.        Okay.  And were those ten hours, uh, expended



Page 45

1  preparing the report?

2  A.         It was probably to review, and then it

3  includes the report but it also includes the review of

4  documents.

5  Q.         Okay.  Other than the $6,000 that you have

6  been paid, are there any outstanding invoices?

7  A.         Yes.  Probably I have expended probably

8  another eight hours, um, in preparation for this

9  deposition, plus the time today.

10  Q.         Okay.  Were you given any restrictions or

11  limitations on what your report was going to be?

12  A.         No.  I don't think so.  I mean, I was asked

13  to opine as to what a reasonable plaintiff's attorney

14  would do in this situation.  So, I limited my review

15  of the documents to try to answer that question, but,

16  no, I was not restricted or -- I mean, I was given an

17  assignment and I reviewed the documents and came up

18  with an opinion.

19  Q.         And who selected the materials that you

20  reviewed?

21  A.         Mr. Dolder provided the binders that I have.

22  Q.         Okay.  Were you aware that there are other

23  materials on this matter that you were not provided?

24  A.         I'm sure there are.  That's not surprising.

25  Q.         Okay.  If you had been aware of these



Page 46

1    materials would that have changed your opinion here

2    today?

3    A.        I believe you would have to show me something

4    specific.  I'm not going to speculate as to what I

5    have not seen.

6    Q.        Okay.  But what you have reviewed or relied

7    on is stated in your report, correct?

8    A.        Correct -- well, not what I reviewed.  My

9    report is based on my review, but I don't believe --

10   yes, actually, sorry.  There is the addendum, correct,

11   yes.

12                  Everything I reviewed that I needed

13   to, uh, complete the report is stated in the addendum.

14   Q.        And who prepared that addendum to the report?

15   A.        Mr. Dolder.

16   Q.        Did you have any input in that addendum?

17   A.        The addendum is a list of all of the

18   documents that he provided to me.  I reviewed the

19   addendum and verified that it was accurate.

20   Q.        Is there anything that you decided that you

21   would not rely on that was on the list?

22   A.        I don't think I made a conscious decision not

23   to rely on something, no.

24   Q.        What did you perceive your role to be in this

25   case?



Page 47

```
 1   A.         To opine as to what a reasonable and prudent

 2   plaintiff's attorney would do in a situation where

 3   there are multiple claimants and insufficient limits.

 4                   It's very limited to serve the

 5   beginning portion of the case where an attorney is

 6   reviewing, uh, a potential claim and what the next

 7   steps would be, and what appropriate actions should be

 8   taken at that point.

 9                   So, my opinion is very limited.  I'm

10   not here to opine as to internal insurance practices

11   or procedures.  It very much is limited to what the

12   attorney, you know, standing in the plaintiff's

13   attorney's shoes would and should do.

14   Q.         And which plaintiff attorney are you

15   referring to?

16   A.         I believe in this case it's Rory Chumley from

17   Montlick & Associates.

18   Q.         Do you know Rory Chumley personally?

19   A.         I do not.  I have never met Mr. Chumley.

20   Q.         Okay.  But when you're referring to a

21   plaintiff's attorney you're referring to Rory Chumley,

22   correct?

23   A.         Correct.

24   Q.         Tell me, what is your opinion?

25   A.         My opinion is that in a situation like this
```



Page 48

1    where there were numerous claimants with incredibly

2    significant damages, um, that a plaintiff's attorney

3    is representing, you know, some of the claimants as to

4    act quickly, uh, because there's a race to the limits

5    at that point.

6                    Because at that point, you know, an

7    experienced plaintiff attorney knows that in this type

8    of situation there is probably not sufficient limits.

9    It's not a commercial vehicle.  It's not a business

10   vehicle.  It's a personal vehicle.

11                   Georgia law requires $25,000.00 as a

12   minimum.  We always start from the assumption that

13   that's what we are kind of racing for in those types

14   of situations when there are individuals involved.

15   So, in that case, uh, a reasonable plaintiff's

16   attorney is going to try to send a demand letter as

17   quickly as possible because you are sort of at a race

18   with the other claimants for those limits.

19                   In this case in particular, which

20   involve deaths, uh, we know that the damages far

21   exceed whatever might, uh, be available in insurance

22   limits.  So, getting out the demand letter as quickly

23   as possible is critical, uh, to represent your client

24   in the most effective and zealous way.

25   Q.       And the first part when you're saying, um,



Page 49

1    the whole race to the finish, is that what you're

2    saying?

3    A.          Race to the limits.

4    Q.          Race to the limits.  Tell me more about that

5    verbiage.

6    A.          Well, uh, Georgia permits the insurers, uh,

7    to deplete or payout other claimants without taking

8    into consideration who else might be involved, or who

9    else might have a claim.  So, under that standard, if

10   I know that there are other claimants, and in this

11   case there would have been at least Mr. Chumley

12   represented Mr. Evans, Chris Evans, uh, as the son,

13   surviving son of Nancy Evans as a father of Andrew

14   Evans.  So, he would have had two of the death claims,

15   uh, that he was representing.

16              He knows there's at least one other

17   death claim, Mr. Louis also perished in that accident,

18   and we know there were individuals in the other

19   vehicle, the Justice vehicle, who were injured.  So,

20   there were numerous claims, all of whom have claims

21   for the same amount of insurance that's at issue in

22   this case.

23              So, Mr. Chumley has a duty to try to

24   get his demand letter out as quickly as he possibly

25   can in order to put his clients in the best position



Page 50

1    to maximize their recovery, uh, particularly in this

2    kind of case where there are insufficient, most

3    likely, you know, he's assuming insufficient limits,

4    and it turned out there were insufficient limits.

5                    So, if you get your demand out

6    first, the insurer has to respond most likely to your

7    claim, um, because you're -- they are on the clock, 30

8    days, to respond to your claim, and the likelihood

9    that your claimants could potentially get the limits

10   is increased if you get the letter out first.

11   Q.        Okay.  And is that based on your experience

12   as a practicing attorney?

13   A.        Absolutely.

14   Q.        Okay.

15   A.        Excuse me, as a practicing plaintiff's

16   attorney, absolutely.

17   Q.        Okay.  And is Mr. Chumley's conduct at issue

18   in this case?

19   A.        I'm not sure I understand your question.

20   Q.        Well, it seems as though your opinion, uh,

21   you know, references, uh, actions that were taken by

22   Mr. Chumley.  Is his conduct at issue in this case?

23   A.        My opinion is that he acted appropriately and

24   represented his client, and that he did exactly what a

25   reasonable prudent plaintiff's attorney would have



Page 51

1    done in like or similar circumstances.

2    Q.       Okay.  And do you know what the legal issues

3    are to be tried in this case?

4                 MR. DOLDER:  Objection, form.

5    A.       I don't believe that's within the purview of

6    my expert opinion.

7    Q.       Okay.  And so in your expert opinion, um, if

8    you could just simply say that, please tell me for the

9    record what it is.

10   A.       My opinion is that Mr. Chumley is the

11   attorney, uh, representing, uh, Mr. Evans acted

12   appropriately in sending a 9-11-67.1 demand letter on

13   behalf of Mr. Evans for the death of his mother, and

14   then separately sending a separate demand on behalf of

15   Mr. Evans for the death of his son, complied with

16   9-11-67.1.

17                 He did it as quickly as he possibly

18   could because he was aware that there were other

19   claimants involved, and there most likely would be

20   insufficient limits to cover all the claims in this

21   case, um, and so he acted in an appropriate fashion in

22   getting those letters out as quickly as he could in

23   hopes of maximizing the potential recovery for his two

24   claims.

25   Q.       Okay.  Is it your opinion that, uh, Mr.



1    Chumley's letters complied with OCGA 9-11-67.1?

2    A.        Yes.  Absolutely.

3    Q.        Okay.  And --

4    A.        As it existed at that time.  It's been

5    amended several times since then, but as it existed at

6    that time, yes.

7    Q.        Okay.  And do you believe that there are

8    valid offers to settle?

9    A.        Absolutely.

10   Q.        And why is that?

11   A.        If you read the letters there are clear

12   policy limits demands.  Uh, they give the appropriate

13   timeframe, which is 30 days.  They provide, uh, the

14   information that the statute requires as to what kind

15   of release would be granted.  I believe it was a

16   limited liability release in this case.  Um, so, it

17   complied with the material terms of 9-11-67.1.

18   Q.        Okay.  And other than your experience as a

19   plaintiff's attorney, uh, what is the precise basis

20   for your opinions in this matter?

21   A.        Well, I did serve as a judge for eleven years

22   entrusted with the enforcement of statutes and

23   interpretation statutes.

24   Q.        Okay.  And anything else?  Like did you

25   perform any testing or survey work?



Page 53

```
 1   A.          No.

 2   Q.          Have you published any articles on this

 3    matter?

 4   A.          No.

 5   Q.          Okay.  And why was it reasonable and

 6    consistent with the customary practice that you're

 7    saying?

 8                    MR. DOLDER:  Object to form.

 9   A.          If Mr. Chumley did not act quickly, one of

10    the other claimants could have potentially, Mr.

11    Willis, for instance, would have potentially sent in a

12    letter sooner than Mr. Chumley, through his counsel,

13    and could obtain the limits before Mr. Chumley could

14    do that for his client.

15                    So, it would limit the amount of

16    money that would be available to pay out those claims.

17    Uh, you know, if Direct General received limits

18    demands or other demands from Mr. Louis, or the

19    Justices for that matter, that could have depleted the

20    entirety of the policy limit leaving Mr. Chumley's

21    clients with nothing.

22                    So, he had to act quickly to ensure

23    that his clients could be protected and would have

24    some ability to recover in this case.

25   Q.          Okay.  Do you know if there had been any
```



Page 54

1    other experts retained by Mr. Hirsch in this matter?

2    A.        I'm sure there have been.  I'm not familiar

3    with who they are.

4    Q.        Okay.

5    A.        Nor have they impacted my opinion in anyway.

6    Q.        Okay.  Do you contemplate developing any

7    other opinions or conclusions in this matter?

8    A.        I do not.  My opinion is very limited to what

9    the plaintiff's attorney would have done, you know, in

10   like or similar circumstances to what Mr. Chumley

11   faced when this case, you know, when he signed up this

12   case.

13   Q.        Do you know if, uh, Christopher Evans ever

14   filed a bar complaint against Mr. Chumley?

15   A.        I'm not aware.  No.

16   Q.        Okay.  But to your knowledge there's no, um,

17   bar proceeding against Mr. Chumley, correct?

18   A.        Not that I'm aware.

19   Q.        Okay.  And beyond the report that you

20   prepared and was served in this case, are you offering

21   any other opinions that are not in that report?

22   A.        I am not.

23   Q.        Okay.  No, you're not -- there's no affidavit

24   or anything beyond that report, correct?

25   A.        That's correct.

Page 55

```
 1   Q.        Okay.
 2                   MS. CRONAN:  Can we take a break?  I
 3         want to review those documents, Mr. Dolder.
 4                   MR. DOLDER:  Sure.  Thank you.
 5                   VIDEOGRAPHER:  Off the record at
 6         11:07 a.m.
 7                   (Whereupon, there was a pause in the
 8         proceeding.)
 9                   VIDEOGRAPHER:  Back on the record,
10         11:27 a.m.
11                   (Whereupon, Exhibit 2 was marked for
12         identification, as of this date.)
13                   MS. CRONAN:  I want to mark the
14         expert report of Dax Lopez.
15                   THE WITNESS:  I want to make one
16         correction.  Before I told you that it's
17         three pages of notes.  I left one off.  It's
18         four pages.  So, hopefully you received four
19         pages.
20                   MS. CRONAN:  Yes, I did.  It's four
21         handwritten pages.
22                   THE WITNESS:  Correct, yes.  I
23         apologize for that.
24                   MS. CRONAN:  No worries.  And this
25         is Exhibit 2.  It's titled written report of
```



Page 56

1          Dax Lopez, Esquire, prepared pursuant to Rule

2          26A2B.

3     BY MS. CRONAN:

4     Q.        Have you seen this document before, Mr.

5     Lopez?

6     A.        I have.

7     Q.        Okay.  And is this your expert report, uh,

8     for this matter?

9     A.        It is.

10    Q.        Okay.  And it looks like it's a total of

11    eleven pages including exhibits, is that correct?

12    A.        That sounds correct.

13    Q.        Okay.  And is this your entire report in

14    connection with this case?

15    A.        It is.

16    Q.        Okay.  Were there any draft reports prepared

17    in connection with this case?

18    A.        I believe this is substantially -- I'm sure

19    there were drafts, um, but this is substantially what

20    -- I don't think there were a lot of drafts that had

21    substantial revisions or edits.

22    Q.        Okay.  And the structure of this report, is

23    this, uh, a template that you, uh, obtained, uh, from

24    a source?

25    A.        Mr. Dolder helped me with the, with the



Page 57

1    structure.  Yes.

2    Q.        Okay.  And what part of this is your own

3    versus Mr. Dolder's?

4    A.        I believe Mr. Dolder sent me a draft copy,

5    um, at least an initial draft, and then I edited it,

6    um, but I can't tell you how much is his.  I mean, I

7    think he did the first draft, uh, of the report and

8    sent it to me.

9                  I reviewed it, and then I edited the

10   portions that I thought either needed editing or

11   deletion, but I don't have a red line to show what I

12   added versus what he did.

13   Q.        Okay.  And is there something that you're

14   looking for?  I see you're looking in your binder.

15   A.        No.  I'm looking at the report.

16   Q.        Okay.  Okay.

17   A.        Just the paper copy.

18   Q.        And you said that, uh, Mr. Dolder provided

19   input.  Uh, what portion of the report was input by

20   Mr. Dolder?

21   A.        I believe he provided the first draft of the

22   report.  He sent me a first draft.

23   Q.        And now the statement of pages, the section

24   under number 1, is that prepared by you?

25   A.        He provided a draft and I reviewed it, and he



Page 58

1    edited it, augmented the portions that I thought

2    needed to be augmented and cleared up the things that

3    I thought needed to be cleared up.

4    Q.        Do you recall specifically what revisions you

5    made?

6    A.        I do not.

7    Q.        Were there a lot of revisions?

8    A.        I don't believe there were a whole lot of

9    revisions.  I did add some things.  I don't believe I

10   deleted anything but I did add to the report.

11   Q.        Okay.  Do you recall how long the report was

12   when you received it from Mr. Dolder?

13   A.        I think it was about -- when I received it it

14   didn't have, I think Mr. Dolder -- no, I think it was

15   about four pages.  I think that's right.

16   Q.        It looks like it, yes.  It looks like the

17   report itself is four and then your signature is on

18   page 5.

19   A.        Correct.

20   Q.        And what methodology did you use to base your

21   opinions on?

22   A.        I based it on my, uh, knowledge, experience

23   and education as a plaintiff's attorney and as a

24   former judge.

25   Q.        Okay.  And how does being a plaintiff's



Page 59

1    attorney and a former judge qualify you in this

2    matter?

3    A.        Well, as a plaintiff's attorney I see these

4    situations everyday.  I see these kinds of cases

5    everyday, uh, and I'm familiar with the appropriate

6    actions of an attorney who's representing a client.

7                      As a judge I was often asked to

8    intervene in cases where there were bad faith issues.

9    As a judge I became familiar with the law of bad faith

10    and also interpreting, hope demands, hope statues, and

11    the hope case were common issues that I would review

12    as a judge.

13    Q.        Okay.  Did you consult any manuals in

14    formulating your report?

15    A.        No.  I did not.

16    Q.        Okay.

17    A.        I did consult the statute.

18    Q.        What statute are you referring to?

19    A.        OCGA 9-11-67.1.

20    Q.        Okay.

21    A.        And I did review the case law that I cited.

22    Q.        Okay.  Were you provided those specific cases

23    by Mr. Dolder?

24    A.        I believe they were the initial draft he

25    provided, but I was familiar with those cases from my



Page 60

1    time on the bench.

2    Q.        So, the handwritten notes that were provided

3    to us earlier today, um, they are four pages.  Just to

4    confirm, those are all of your notes that you have in

5    connection with this matter?

6    A.        That's correct.

7                   MR. CRONAN:  I'm going to enter the

8              the notes, I believe, as Exhibit 3.

9                   (Whereupon, Exhibit 3 was marked for

10             identification, as of this date.)

11   BY MS. CRONAN:

12   Q.        Okay.  Can you see my screen okay?  It's your

13   notes.

14   A.        Yes.  I can see them, and I have them in

15   front of me.

16   Q.        Can you decipher them?

17   A.        If you ask me to, I could probably give you

18   at least a good idea of what I was trying to say.

19   Q.        So, at the top it says, uh, Tuesday at 3:00

20   p.m.  What was that referring to?

21   A.        Yeah, I believe, uh, that was a time that,

22   uh, I set up with Mr. Dolder to prepare for today.

23   So, Tuesday would have been this past Tuesday.

24   Q.        Okay.  And when was this, I guess this

25   portion of your notes, when was this prepared?



Page 61

1   A.         So, I just did a running, you know, I had a
2     note pad.  I just kept it running.  So, this first
3     page was probably a couple of weeks ago, two or three
4     weeks ago.
5   Q.         Okay.
6   A.         So, to be clear, I started reviewing this
7     case probably in late May but then my mother had a
8     medical emergency that took me out of the practice for
9     about three weeks.  So, I probably didn't pick that
10    back up until June.
11               So, there was a gap probably from
12    the time I started drafting these notes until starting
13    my review.  So, this is a compilation from probably
14    the last couple of months.
15  Q.         Okay.  Are these four pages -- were they, um,
16    like prepared on different dates or are they from the
17    same --
18  A.         Correct.
19  Q.         Okay.
20  A.         Yeah, it was not a continuous -- these are
21    not four pages that were done at the same time.  As I
22    picked up my review I just kept, you know, using the
23    same note pad from my review.
24  Q.         And are these notes based on telephone
25    conferences with Mr. Dolder?



Page 62

1   A.          These are all related to my review of the

2   documents.

3   Q.          So, were these notes that you kind of jotted

4   down as you were going through documents?

5   A.          That is correct.

6   Q.          Okay.  And on page 2, if you look there is,

7   um, a note in the left margin.  It says -- and I think

8   it says, correct me if I'm wrong, if I'm reading this

9   correctly it says, not designed to be difficult to

10  accept.  Is that what it reads there?

11  A.          That's correct.

12  Q.          And what did you mean by that?

13  A.          I think that relates to Mr. Chumley's

14  letters, demand letters.  You know, in Georgia there

15  are some attorneys who are infamous for sending the

16  types of demand letters that are difficult to accept

17  in terms of the offer.

18              So, you know, they have very

19  unrealistic acceptance terms which are set

20  intentionally to try to trip up the insurance company.

21  So, I think I just noted in my review of these

22  demands, they are pretty straightforward demands with

23  pretty straightforward terms, and they were not

24  designed to be difficult to accept.

25  Q.          Okay.  And next to that in writing it says,



Page 63

1    policies for the mother.  Um, is that your -- does

2    that say Allstate letter, GEICO letter, is that

3    correct?

4    A.        Yes.  I think those -- I was looking at those

5    and I had some confusion as to who had the UM because

6    there are letters from both Allstate and GEICO.  I

7    think ultimately I determined that GEICO had the UM

8    for the mom, Polina.

9    Q.        Okay.  And now in your notes there's a

10   reference to the estate here.  I can't really read

11   this writing, but do you know what you were writing in

12   this box right here?

13   A.        Yes.  The time to create the estate takes

14   time, is the first -- I believe that's the first thing

15   I wrote.  Uh, settled wrongful death not estate, and

16   then child has no assets.

17                 So, I think I was just reminding

18   myself of why you won't set up an estate in certain

19   circumstances.  So, in this situation where you have a

20   race to the limits, you don't have time to set up an

21   estate.  Um, there are insufficient limits, so you

22   probably don't need the estate, um, for strategic

23   reasons, um, especially when a child has no assets and

24   no medical and no pre-death suffering.  You're not

25   going to set up an estate in that situation.  You



Page 64

1    settle the wrongful death claim and not create the

2    estate.

3    Q.        Okay.  And under that in your notes it looks

4    like you have three numbered lines.  Um, what is that

5    referring to?

6              It looks like it says -- I'm not

7    really sure actually.  If you can tell me, it says

8    normal and I can't really read the rest.

9    A.        Yeah, uh, normal like demands, meaning I

10   thought the demands in this case were pretty standard,

11   uh, nothing, uh, out of the ordinary.

12             Um, this goes back to my previous

13   note, not a set up.  So, it's not designed, uh, to set

14   up the insurance company as some of the demands that

15   we have seen, uh, in other cases.

16             Um, let's see, oh, normal dispute of

17   estate claim after rejection.  So, after the rejection

18   of the demand it's not uncommon to, at that point,

19   revisit the issue of the estate as to whether you

20   would want to pursue an estate claim in the

21   litigation.

22   Q.        Okay.  And do you recall if Mr. Chumley

23   stated anything with regard to establishing an

24   estate?

25   A.        Yes.  He said he was not going to establish



Page 65

1    an estate.

2    Q.        Okay.  And do you know if he ever did

3    establish an estate?

4    A.        I believe an estate was eventually

5    established, and then ultimately it was dropped when

6    they did some discovery and realized there was no

7    discernable pre-death pain and suffering.

8    Q.        Do you know why he would affirmatively state

9    that an estate would not be created in the letter?

10   A.        Well, under Georgia law you can settle just

11   the death claim, the wrongful death claim.  You don't

12   need to do the estate claim.  Um, that happens all the

13   time.

14              Uh, wrongful death claims are

15   settled all the time without the estate claims.  It

16   actually happened in this case.  Uh, Country Financial

17   settled the wrongful death claim after it had some

18   initial questions about the estates and they asked

19   clarification questions about whether the estate would

20   be set up, or whether there would be an estate, and

21   they were informed that they would not be created.

22   They went ahead and settled the wrongful death portion

23   of the case, and not the estate case.  So, that

24   happens all the time.

25   Q.        Do you know if Mr. Chumley was aware of the



Page 66

1   policy limits at the time the demand letters were

2   sent?

3   A.          According to his letter he was not, um, and I

4   did not see anywhere in the file any written

5   disclosure pre-demand of what the policy limits were.

6                   So, I don't know what Mr. Chumley

7   knew, but from the file that I received there was no

8   pre-demand disclosure in writing, um, and his letter

9   seems to indicate that he was not aware of what the

10  policy limits were.

11  Q.          Do you know if he informed any other carrier

12  that he was aware of the policy limits for the Direct

13  General policy?

14  A.          I do not.  I have never spoken to Mr.

15  Chumley.

16  Q.          Did you review any documents that would

17  reflect whether or not he was aware of the policy

18  limits?

19  A.          I do not believe I saw any documents that

20  would reflect such a -- would reflect his knowledge.

21  Q.          Okay.  And how going to, uh, page 3, it says

22  race to the limits.  Um, what made you write that on

23  this page?

24  A.          I think that's what we have been talking

25  about.  Uh, in this situation where you have multiple



Page 67

1    claimants and insufficient limits you as a prudent and

2    reasonable plaintiff's attorney are going to worry,

3    uh, that the limits might be exhausted on another

4    claimant before your client has an opportunity to make

5    a demand.

6                    So, it really is a race with the

7    other attorneys who are representing the other

8    claimants to see who could get the demands out as

9    quickly as possible.

10                   That's one of the reasons you won't

11   set up an estate in this case.  Estates take a long

12   time to set up, uh, and you can delay your ability to

13   send out those types of demands.

14                   So, you don't want the insurer, uh,

15   to exhaust his policy limits on other claimants,

16   because if they do that, your client will be out of

17   luck and may not be able to recover anything in this

18   case.

19   Q.        Okay.  And to your knowledge and from your

20   review of the file, how did Direct General stop the

21   demand letters, uh, that were sent by Mr. Chumley?

22   A.        I believe there was the September 6th letter

23   from Mr. St. Amand, uh, that basically requested that

24   they have a global summit conference to allocate, uh,

25   the limits among the different claimants.



Page 68

1  Q.        Okay.  And do you know if Mr. Chumley

2  attended the global settlement conference?

3  A.        I do believe I did see that in the -- in the

4  depositions that I reviewed from Mr. Hagen and Mr.

5  Amand that Mr. Chumley showed up.  There was some

6  testimony that he showed up but not participate in the

7  settlement conference.

8              I believe Mr. St. Amand said he

9  showed up but he said he would not be participating in

10 the settlement conference.

11 Q.        Do you think that's unusual to show up and

12 not participate in the settlement conference?

13 A.        Um, I don't know if I have an opinion to

14 whether it's unusual or not.  I mean, he may have

15 showed up to see what was going on, but again, Direct

16 General had missed the 30 day deadline.  So, you have

17 different conversations with your client at that

18 point.

19              You have options after that point

20 that did not exist when you send the demand letter,

21 meaning there might be some bad faith exposure and you

22 have to explain that to your client, uh, that that

23 might be an option in this case.

24 Q.        Do you know if, uh, the letter from St. Amand

25 on September 6th was within the 30 day time period?



Page 69

1   A.          I believe it was.

2   Q.          Okay.  And do you know how long after the

3   global settlement conference took place?

4   A.          Not off the top of my head, I don't.

5   Q.          Okay.  Do you recall off the top of your

6   head, do you know who else attended the global

7   settlement conference?

8   A.          If I recall correctly from the depositions,

9   uh, Matt Hagen attended.  Um, Mr. Chumley showed up

10  but was not there to participate, and I think Glenda

11  Mitchell may have attended, as well, but I was not

12  really focused on those claims because that's not part

13  of my opinion.

14  Q.          Okay.  And under this race for the limits,

15  uh, what does it say there?

16  A.          Um, I have one won some races, lost others --

17  or lost races.  So, meaning personally, myself, uh,

18  when I'm in Mr. Chumley's position there have been

19  times where I was the first to send the demand and we

20  were able to secure policy limits for my clients as

21  opposed to other claimants, and then there have been

22  other situations where a client engaged me too late

23  and someone else had already secured, uh, the policy

24  limits for their claim leaving my client without an

25  ability to recover.



Page 70

1   Q.        Okay.  So, it was -- what was the purpose of

2   that note?

3   A.        Just to remind myself that this happens all

4   the time.  Um, you know, again, you're acting

5   reasonably on behalf of your client.  You are going to

6   win some and lose some.

7                   Certainly if it's within your

8   control, meaning I am engaged today and I'm aware that

9   no other letters have gone out, that I have got to get

10  my letter out.  I can't procrastinate.

11                  There are other situations where a

12  client will come just too late or hire you too late

13  and someone else has already sent the letter.  Um,

14  that happens frequently.

15  Q.        How often would you lose, um, the race to the

16  limits?

17  A.        Sadly probably more than I care to admit.  I

18  could think of at least two cases off the top of my

19  head that happened fairly recently.

20  Q.        Okay.  And under that note it says

21  proactively tendered, is that correct?  Is that what

22  it says?

23  A.        Yeah.  So, I have had -- so, that's a

24  reference to a case that I had.  So, these are cases

25  that sort of relate to the issues we are talking



Page 71

1    about.

2                        So, the Soto case, which is often a

3    margin, also one of the other cases listed there, is a

4    case where the insurance company sent out a letter

5    proactive tendering the limits before any demand was

6    received and asking the parties to attend a global

7    settlement conference.  That's before receiving any

8    demands from any of the plaintiffs attorneys in that

9    situation.

10   Q.        And what are the the other cases that are

11   referenced there?

12   A.        Uh, the Moltry(phonetic) case is a case where

13   we won the race to limits.  There were five deaths and

14   five catastrophic injuries and only $100,000 on

15   limits.  Uh, and because we were able to set out our

16   demands before anyone else, we were able to attain the

17   $100,000.  Unfortunately, eight claimants did not

18   recourse in that case.

19                        Uh, the Cornell case I think is a

20   case where we settled the, uh, wrongful death portion

21   without settling the estate claims.  There was no

22   estate set up, and we settled just the wrongful death

23   portion of those claims.  Those were significant

24   claims in the millions of dollars.

25   Q.          Okay.  And why did you specifically note



Page 72

1    those particular cases?

2    A.        I thought they related to some of the issues

3    that we are dealing with in this case, you know,

4    winning and losing the race, having global settlement

5    conferences before versus after demands, and being

6    able to set wrongful death without estate claims.  I

7    just want to make sure I remembered the cases where we

8    have done those things.

9    Q.        Okay.  And on that same page it looks like

10   you're saying are there -- I can't really read the

11   rest.

12   A.        Oh, at the bottom there?

13   Q.        Yes.

14   A.        Are there cases in 11 circuit real estate

15   claims.  That was just for myself.  I really didn't do

16   any research on that.  Um, the estate claim is not

17   part of the demand, can insure or ignore the demand.

18   I think that was a note to myself to maybe look at

19   that one day.

20              Again, it didn't really relate to my

21   overall opinions, and I don't think I did any

22   research.

23   Q.        Why did it not relate to your overall

24   opinion?

25   A.        Because my overall opinion has to do with



Page 73

1    what the reasonable actions of a plaintiffs attorney

2    are in like or similar circumstance.  Plaintiffs

3    attorneys settle, uh, wrongful death cases all the

4    time without having to settle the estate claim.  That

5    happens daily.

6    Q.        Okay.  And it says -- it looks like it says

7    Marques or Jackson.  Do you know what that is?

8    A.        Yeah, Marques and Jackson.  Those are other

9    cases where I think we settled.  Marques wanted to see

10   if we settled the wrongful death without the estate.

11   I didn't go back and look.  I don't think that

12   applied.  He actually died much after the incident.

13   Um, he died while we were in litigation of unrelated

14   issues.  So, it really didn't matter here.

15              Uh, Jackson is a case where we sent

16   a demand letter for policy limits offering to settle

17   the wrongful death claim, not the estate claim.  Uh,

18   it was accepted but through our negotiations after

19   acceptance, uh, the insurer asked us to open the

20   estate so we could settle all of it.  I think we --

21   they had already tendered several million dollars in

22   that case.

23   Q.        Okay.  And is that at all related or similar

24   facts to this underlined letter?

25   A.        No.  I think it's, again, just sort of going



Page 74

1    to the overall issues of whether you could settle

2    wrongful death cases without the estate claim, but

3    there are also situations where you settle the

4    wrongful death claim, and perhaps because the insurer

5    has acted reasonably and they are asking to open an

6    estate, we might do that as a courtesy to settle the

7    claim.  It was not a requirement of the tender.

8    Q.       Okay.  And it looks like here it says Matt's

9    settlement conference.  And what is that note in

10   reference to?

11   A.       Yeah, I wanted to learn more about that

12   global settlement conference.  So, I think this is

13   probably from a conversation that I did have with

14   Rich.  He may have recommended that I look at the two

15   depositions to learn more about the settlement

16   conference, which I did.

17   Q.       Okay.  And did you find under here, it says

18   conditions to acceptance or conditions of performance.

19   Did you find any conditions in your review of the

20   matter?

21   A.       Sure.  The case of acceptance are, you know,

22   you must accept in writing within 30 days.  Uh,

23   conditions of performance are things like you have to

24   send us payment by a certain date, uh, and you must

25   give us a release by a certain date, those kind of



Page 75

1   dates.

2                       So, I just, again, just kind of keep

3   notes to make sure that I was keeping my view

4   appropriate, and sort of limit it to what I was really

5   trying to do which is what is the appropriate way to

6   send a demand.  Rory Chumley, one was to comply with

7   9-11-06.1.

8                       Again, the conditions in this case

9   were met at this standard and straightforward not in

10  any way intending to trip up the insurer or trip them

11  into not accepting, or to, uh, make it so erroneous

12  that the acceptance would be difficult by the insurer.

13  Q.        Okay.  And on the same page, uh, it says I

14  don't see a disclosure of limits in writing.  Um, is

15  that based on your review of the file?

16  A.        Right.  Fee demand, yes.

17  Q.        Okay.  And what does it say under that?

18  A.        Uh, Shannon living apart from husband.

19  Shannon, I think that was Justice.  I don't remember

20  what Shannon that was.  I don't know why I wrote that.

21  Q.        Okay.  Do you recall how many individuals

22  died in this subject accident?

23  A.        There were four, uh, in the Hartsfeld

24  vehicle.  So, Shannon Hartsfeld, Nancy Evans, Andrew

25  Evans, and Mr. Willis.  I believe those were the four



Page 76

1  deaths in this incident, and then in the Justice

2  vehicle, I don't believe anyone perished.  I think

3  there were just injuries.

4  Q.        Okay.  And at the bottom of this note, um,

5  and it looks like this is almost at the end, it says

6  there's a problem with St. Amand letter.  What does

7  that say there?

8  A.        It's not clear what amount they are offering

9  to Andrew.  So, to the extent that Mr. Armand is

10  saying that this is a tender in response to the demand

11  letter sent by Rory Chumley relating to Andrew's

12  death, there's no clear delineation as to what amount

13  he is offering.

14              He is offering to allocate some

15  money between the different claimants, and it's my

16  experience when this typically happens, what they tend

17  to suggest is an equal split between the deaths.  So,

18  I think here, I have $50,000 divided by three, so

19  those would be the three death claimants aside from

20  Shannon Hartsfeld, who would be the at-fault driver.

21              The other three individuals of her

22  vehicle would be 16.6, which is what I suspect he was

23  trying to offer, or would have offered and probably

24  even less if he would have included the Justice

25  claims, so less than $25,000.  So, it's not a tender



Page 77

1    of the policy limits in response to the Rory Chumley

2    letter.

3    Q.        Okay.  And just to be clear, your opinion in

4    this matter, uh, it does not relate to St. Amand or

5    his letter, correct?

6    A.        Well, it does relate to -- if I'm a

7    reasonable plaintiff's attorney and I receive that

8    letter, how do I interpret it, and it's interpreted as

9    a counteroffer, it's not an acceptance.  I think I do

10   write that in my report.

11   Q.        Okay.

12   A.        I did write that it was a counteroffer, and a

13   rejection.  So, a reasonable plaintiff's attorney can

14   read that letter and interpret that letter of a

15   rejection of a counteroffer.

16   Q.        Okay.  And in connection with this matter,

17   had you retained any other subject matter other than

18   what we discussed here today?

19   A.        My opinions are limited to what is in my

20   report.

21   Q.        Okay.  Are you familiar with Judge Eleanor

22   Ross?

23   A.        I am.

24   Q.        How do you know Judge Ross?

25   A.        Judge Ross, uh, served as a state court judge



Page 78

1    in DeKalb County at the same time I was there.  We

2    overlapped for about two years.

3              I was there -- I was appointed in

4    2010 and, I believe, Judge Ross was appointed in

5    mid-2011.  So, I was there eight months before she

6    was.

7              So, we served on the same court for

8    about two years before she was elevated to the Federal

9    District Court.

10   Q.       Would you see her on a daily basis?

11   A.       I don't know about daily but she was on my

12   same floor.  Our offices were near each other.

13   Q.       How far away were her chambers from where you

14   were located?

15   A.       I believe she was next door.  She was -- I

16   was at the very end.  She was the very next door to

17   us.  She was Division 5.  I was Division 6.

18   Q.       To your knowledge is Mr. Chumley the subject

19   of any legal malpractice proceedings at all, not

20   necessarily in regard to this matter but in general?

21   A.       I have no knowledge of it.

22   Q.       Okay.  Do you know if he has been put on

23   notice of committing malpractice with regard to this

24   claim?

25   A.       I am not aware of that.  No.  I don't believe



Page 79

1    Mr. Chumley was deposed or has been deposed.  I don't

2    think there were depositions nor have I ever spoken to

3    him.

4    Q.        That was going to be the next question.  Have

5    you ever spoken to him about this matter?

6    A.        No.  I have never spoken to him about

7    anything.  I had never spoken to him.  I don't know

8    Mr. Chumley.

9    Q.        Did you ever speak with Christopher Evans in

10   this matter?

11   A.        I have not.

12   Q.        Have you ever spoken with Polina?

13   A.        I have not.

14   Q.        Have you ever spoken with Max Hirsch?

15   A.        I know Mr. Hirsch but I have not spoken to

16   him about this matter.

17   Q.        Do you know him as a colleague in the legal

18   community?

19   A.        He appeared before me numerous times when I

20   was a judge.

21   Q.        Okay.  What framework did you utilize in

22   rendering your opinion?

23   A.        I relied exclusively on my education,

24   experience, training, uh, and knowledge of the law in

25   Georgia.



Page 80

1  Q.        Okay.

2  A.        And my experience as a plaintiff's attorney.

3  Q.        Yeah, and how does your experience as a

4   plaintiff's attorney qualify you?

5  A.        To gauge whether another plaintiff attorney

6   has acted appropriately?

7  Q.        Yes.

8  A.        Well, I feel that certainly given my

9   background and my training and my knowledge base,

10   having served as a judge for eleven years, interpreted

11   Georgia law for eleven years, and having served as a

12   plaintiff attorney on very significant matters, uh, in

13   the State of Georgia on a very high level of plaintiff

14   type work who deals with these issues daily, I feel

15   like I'm in a pretty good place to gauge whether the

16   law in like or similar circumstances acted

17   appropriately in sending demands in attempts to

18   maximize the recovery for his claimants.

19  Q.        Okay.  And how does, uh, being a former judge

20   qualify you as an expert in this matter?

21  A.        Well, as a judge you're, you know, required

22   to have a strong understanding of Georgia Law.  You

23   also are in a position where you have to interpret

24   Georgia statutes, and so, uh, in this case when I'm

25   looking at that type of matter, I'm looking to see if


MAGNA ▶
LEGAL SERVICES

Page 81

1    it complied with Georgia Law, particularly 9-11-67.1

2    sending an appropriate policy limits demand, and I

3    believe that was complied with in this case.

4    Q.        Okay.  And I just want to be clear, you have

5    not served as an expert in any other matter, correct?

6    A.        That's correct.  Just matter that we

7    discussed.

8    Q.        Just the fee matter.  Other than that, no

9    other matters?

10   A.        That's correct.

11   Q.        And tell me more.  You said that you're a

12   mediator, is that correct?

13   A.        That's correct.

14   Q.        And, uh, what entity do you serve as a

15   mediator for?

16   A.        Uh, a company called Miles Mediation here in

17   Atlanta.

18   Q.        And how long have you been a mediator with

19   Miles Mediation?

20   A.        Uh, probably since early '22.

21   Q.        Okay.  And what types of cases do you

22   typically mediate?

23   A.        So, I mediate sort of high dollar death and

24   catastrophic injury cases.  Um, I'm mediating a

25   medical malpractice matter that resulted in a death.



Page 82

1    I'm mediating product liability cases, premises cases.

2              Typically I also mediate a fair

3    number of cases where the, uh, plaintiff is Hispanic,

4    Spanish speaking.  So, there are very few Spanish

5    speaking mediators in Georgia.  My law partner is one

6    of them, Ted DelCampo.  He is also a former judge.

7    So, we sort of got the market cornered on those types

8    of cases because there are not that many of us who do

9    that.

10             That's not exclusively what I do.  I

11   also do, again, sort of high dollar deaths of

12   catastrophic injury cases.

13   Q.       And what portion of your practice or your

14   day-to-day, I guess, how much mediation do you do

15   versus, uh, actually practicing law?

16   A.       Yeah, I probably -- my mediation practice is

17   about 15 percent of what I do.  So, I probably mediate

18   four cases a month.  Um, I try to limit because I do

19   practice law full-time and I have a very active time

20   calendar.  I tried several cases since I left the

21   bench.

22             So, I do limit the amount of tine

23   that I mediate but I do sort of exclusively do sort

24   of, you know, high dollar cases.  So, um, folks know

25   they can just text me.  I don't usually open up my



Page 83

1    calendar, but the lawyers who handle those kinds of

2    cases will text me and contact me to get me involved

3    with their cases.

4    Q.        Okay.

5    A.        And as I mentioned, my billing rate there is

6    $1,100 an hour.

7    Q.        Okay.  But for this deposition of your

8    services here it's $600 an hour, correct?

9    A.        That's correct.

10   Q.        Okay.  And what did you perceive your role to

11   be in this case?

12                  MR. DOLDER:  Objection.  Asked and

13             answered.

14   A.        Again, just to engage the appropriateness of

15   the plaintiff attorney, Mr. Rory Chumley, uh, in how

16   he dealt with the demands and how he dealt with the

17   receipts of Mr. St. Amand's letter of September 6th,

18   uh, whether he was acting appropriately to maximize

19   and protect and preserve the interest of his clients.

20   Q.        Okay.  And your opinion is that he was acting

21   appropriately, correct?

22   A.        That's correct.

23   Q.        And is there anything else in connection with

24   your opinion that you have not stated today?

25   A.        Uh, not that I'm aware of.  All of my



Page 84

1    opinions are listed in my report.  So, we have now

2    discussed some of them.  They are listed in my

3    report.

4    Q.        So, you're not offering any opinions that are

5    not in the report in connection with this case,

6    correct?

7    A.        That's correct.

8    Q.        Okay.  And there's no other materials that

9    you intend to rely on for your report or not

10   referenced or that you told me about today, correct?

11   A.        That's correct.

12   Q.        Have you ever been disciplined, uh, either in

13   your capacity as a judge or as an attorney?

14   A.        I have not.

15   Q.        Okay.  Have you ever been the subject of a

16   bar complaint?

17   A.        I have not.  Um, yes.  I think when I was a

18   young associate I did a pro bono matter, uh, where my

19   client may have sent in a bar complaint, but it was

20   immediately dismissed.

21   Q.        Okay.  And have you ever been the subject of

22   a malpractice complaint?

23   A.        I have not.

24   Q.        Okay.  How about, you know, when I say

25   complaint, I also mean like a pre-suit, demand letter.



Page 85

1    A.        No.

2    Q.        Okay.  Other than, uh, your role as a former

3    judge, have you ever, uh, served in any other capacity

4    or run for public office?

5    A.        No, just in my role as a judge.

6    Q.        Have you ever been convicted of a crime?

7    A.        I have not.

8    Q.        Okay.

9    A.        Hold on, in Georgia misdemeanors are traffic

10   offenses.  So, in the most literal sense everybody who

11   has ever pled guilty to a misdemeanor traffic offense

12   has been convicted of a crime.

13                  So, other than traffic offenses, I

14   have not.

15   Q.        So none other than traffic offenses?

16   A.        Correct.

17   Q.        And currently do you perform any work for any

18   insurance companies?

19   A.        I do not.

20   Q.        Okay.  And when was the last time you

21   performed work for an insurance company?

22   A.        2008, 2009, somewhere in that time frame.

23   Q.        And was that like right before you, uh,

24   started your judgeship?

25   A.        Right.  I was -- I became a judge in the



Page 86

1    middle 2010.  So that would be the time.

2    Q.        Okay.  How often, uh, do you see Judge Ross?

3    A.        I don't see her that often anymore.  Um, I

4    probably haven't seen her since maybe the Christmas

5    season, you know, with all the lawyer parties.  At

6    the Christmas parties you might run into some judges,

7    but we don't see each other at all.

8    Q.        Okay.

9                 MS. CRONAN:  I don't have any other

10            questions.  Thank you.

11                 VIDEOGRAPHER:  Off the record at

12            12:06.

13                 (Witness excused.)

14                 (Attorney Cronan and Attorney Dolder

15            both ordered copies of the transcript.)

16

17

18

19

20

21

22

23

24

25



Page 87

1                    C E R T I F I C A T E

2

3              I do hereby certify that I am a

4    Notary Public in good standing, that the aforesaid

5    testimony was taken before me, pursuant to notice, at

6    the time and place indicated; that said deponent was

7    by me duly sworn to tell the truth, the whole truth,

8    and nothing but the truth; that the testimony of said

9    deponent was correctly recorded in machine shorthand

10   by me and thereafter transcribed under my supervision

11   with computer-aided transcription; that the deposition

12   is a true and correct record of the testimony give by

13   the witness; and that I am neither of counsel nor kin

14   to any party in said action, nor interested in the

15   outcome thereof.

16

17              WITNESS my hand and official seal this

18              30th day of July, 2024.

19

20

21

22              _Tracey L. Alexander_

23                   Tracey L. Alexander

24                   Notary Public

25



Page 88

1                    INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over

4    carefully and make any necessary changes.  You should

5    assign a reason in the appropriate column on the

6    errata sheet for any change made.

7                    After making any changes which has

8    been noted on the following errata sheet, along with

9    the reason for the change, sign your name to the

10   errata sheet and date it.

11                   You are signing it subject to the

12   changes you have made in the errata sheet, which will

13   be attached to the deposition.  You must sign in the

14   space provided.

15                   Return the original errata sheet to

16   the deposing attorney within thirty (30) days of

17   receipt of the transcript by you.

18

19

20

21

22

23

24

25



Page 89

```
1                    -  -  -  -  -  -

2                    E  R  R  A  T  A

3                    -  -  -  -  -  -

4     PAGE          LINE              CHANGE

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____.
```



Page 90

```
 1              -   -   -   -   -   -

 2                 E   R   R   A   T   A

 3              -   -   -   -   -   -

 4   PAGE          LINE              CHANGE

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____.
```



Page 91

1                    ACKNOWLEDGMENT OF DEPONENT

2

3              I, _____, do hereby

4    certify that I have read the foregoing pages ___ to

5    ___ and that the same is a correct transcription of

6    the answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10             DATE _____

11

12             _____

13              SIGNATURE

14

15             Subscribed and sworn to before  me

16             this __ day of _____, 2024.

17

18             My commission expires:

19             _____

20

21             _____

22

23              Notary Public

24

25



Page 92

1                    LAWYER'S NOTES

2     PAGE           LINE

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____.



# Magna
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



**A**

**ability**
53:24 67:12 69:25
**able**
36:9 67:17 69:20
71:15,16 72:6
**absent**
25:15
**absolutely**
50:13,16 52:2,9
**accept**
23:3 24:3 62:10,16
62:24 74:22
**acceptance**
62:19 73:19 74:18,21
75:12 77:9
**accepted**
17:19,21,24 23:25
73:18
**accepting**
17:25 24:3 75:11
**access**
27:13
**accident**
49:17 75:22
**accurate**
46:19
**ACKNOWLEDG...**
91:1
**act**
33:17 48:4 53:9,22
**acted**
50:23 51:11,21 74:5
80:6,16
**acting**
70:4 83:18,20
**action**
1:3 22:14 29:20
87:14
**actions**
30:4,5 31:19 47:7
50:21 59:6 73:1
**active**
82:19
**actively**

36:18 38:7
**actual**
15:2 39:15
**add**
58:9,10
**added**
57:12
**addendum**
46:10,13,14,16,17,19
**admit**
70:17
**ae**
18:22
**affidavit**
40:5,7 41:1,17 54:23
**affirmatively**
65:8
**aforesaid**
87:4
**agency**
11:22,23
**ago**
9:22 11:5 34:22 61:3
61:4
**agreed**
6:2,10,17 23:3
**ahead**
22:10 65:22
**al**
1:7 7:14 10:9
**Alexander**
1:15 7:22 87:23
**allegations**
37:5
**allocate**
67:24 76:14
**Allstate**
15:9 16:17,22 63:2,6
**Amand**
13:25 14:25 15:4
67:23 68:5,8,24
76:6 77:4
**Amand's**
13:13 16:5 19:4
83:17
**amended**

52:5
**amount**
11:15 26:12,12 27:15
30:4 33:5,18 44:12
49:21 53:15 76:8,12
82:22
**Andrew**
14:4,23 17:6 18:4,5,9
18:12 49:13 75:24
76:9
**Andrew's**
76:11
**answer**
5:3 9:14 14:7 24:9
45:15
**answered**
83:13
**answers**
9:8 14:1 91:6
**anticipate**
36:21
**anymore**
86:3
**anyway**
54:5
**apart**
75:18
**apartment**
33:16
**apologize**
55:23
**appeals**
36:20
**appearances**
2:1 7:25
**appeared**
79:19
**applied**
73:12
**appointed**
78:3,4
**appropriate**
47:7 51:21 52:12
59:5 75:4,5 81:2
88:5
**appropriately**

50:23 51:12 80:6,17
83:18,21
**appropriateness**
83:14
**approximately**
10:16 32:21 35:15
40:25 42:11 44:22
**April**
42:6,14
**arbitration**
12:5
**area**
27:6 33:11 38:16
**areas**
25:14 33:8 38:18
**arising**
35:9
**Armand**
76:9
**arrangement**
44:5
**articles**
37:25 53:2
**articulate**
9:8
**Ashe**
31:13 32:3,12 34:25
35:2
**aside**
76:19
**asked**
23:11 24:5,12,15
26:6,15,16,24 27:11
27:19 41:11 43:1
45:12 59:7 65:18
73:19 83:12
**asking**
9:12 28:22 29:25
71:6 74:5
**assets**
63:16,23
**assign**
88:5
**assigned**
28:17 29:17
**assignment**



45:17
**associate**
32:17 33:3 84:18
**Associates**
2:8 14:3,22 15:5
  17:12 47:17
**Association**
37:24
**assume**
9:1
**assumes**
22:20
**assuming**
18:23 50:3
**assumption**
48:12
**Atlanta**
1:2 2:10,19 10:10
  81:17
**attached**
88:13 91:8
**attain**
25:9 26:1 28:9 71:16
**attained**
35:10
**attempting**
35:7
**attempts**
80:17
**attend**
23:11 25:19 26:23
  28:1 71:6
**attended**
68:2 69:6,9,11
**attention**
13:3,5
**attorney**
7:5 8:24 9:10 28:24
  38:21 39:3 40:13,19
  43:11 45:13 47:2,5
  47:12,14,21 48:2,7
  48:16 50:12,16,25
  51:11 52:19 54:9
  58:23 59:1,3,6 67:2
  73:1 77:7,13 80:2,4
  80:5,12 83:15 84:13

86:14,14 88:16
**attorneys**
2:6,11,16,20 6:3,11
  6:18 9:24 10:1,4,24
  28:1 30:24 62:15
  67:7 71:8 73:3
**attorney's**
47:13
**at-fault**
76:20
**audience**
27:22 28:3
**augmented**
58:1,2
**August**
10:18 14:3
**authored**
38:12
**available**
48:21 53:16
**aware**
44:2 45:22,25 51:18
  54:15,18 65:25 66:9
  66:12,17 70:8 78:25
  83:25
**a.m**
1:15 7:7,18 22:6,10
  55:6,10

**— B —**
**bachelor's**
26:1
**back**
17:11 22:9 25:5
  30:11 55:9 61:10
  64:12 73:11
**background**
80:9
**bad**
34:25 35:4,9,17 36:2
  36:4,8,11,15,19,21
  36:24 37:1,5,6 59:8
  59:9 68:21
**Banuelos**
2:24 7:21
**bar**

28:11 38:2 54:14,17
  84:16,19
**base**
58:20 80:9
**based**
39:4 46:9 50:11
  58:22 61:24 75:15
**basically**
67:23
**basis**
32:1 39:3 43:6 52:19
  78:10
**beginning**
47:5
**begins**
7:11
**begun**
6:16
**behalf**
8:3 12:1,2 23:4 24:4
  41:25 51:13,14 70:5
**believe**
15:1,2 16:11,12 18:5
  18:7,25 20:6,14,15
  37:16 40:20 41:10
  42:8 43:2 44:18
  46:3,9 47:16 51:5
  52:7,15 56:18 57:4
  57:21 58:8,9 59:24
  60:8,21 63:14 65:4
  66:19 67:22 68:3,8
  69:1 75:25 76:2
  78:4,15,25 81:3
**bench**
28:19 60:1 82:21
**best**
49:25
**beyond**
54:19,24
**big**
33:3
**biggest**
36:16
**bill**
8:7 41:18
**billed**

41:15
**billing**
83:5
**binder**
13:21 14:18,20 16:2
  16:6,9,10,14,15,19
  20:18 57:14
**binders**
12:18 13:11,18,20
  16:11,13 18:23,24
  19:17,24 20:1,5
  43:17 45:21
**bit**
13:17 25:17 33:21
  38:18
**blogs**
38:9,12
**bono**
84:18
**books**
43:16
**bottom**
72:12 76:4
**BOULEVARD**
2:3
**box**
12:17 19:23,24,25
  20:6 63:12
**BPARKER@MO...**
2:10
**break**
9:13,14,15,15 22:3
  55:2
**brief**
26:8
**briefly**
9:3
**BRUCE**
2:13
**BRUCE@HAGEN...**
2:15
**business**
32:20 48:9

**— C —**
**C**



87:1,1
**calendar**
82:20 83:1
**called**
10:9 31:4,13 41:12
42:8 81:16
**Candace**
2:3 8:3 21:7,23
**capacity**
9:21 12:3 35:3,6
84:13 85:3
**car**
33:19
**care**
70:17
**carefully**
88:4
**Carisello(phonetic)**
10:8
**carrier**
66:11
**case**
9:23 10:5,7,11,13,22
12:23 15:20 31:24
31:25 32:6 33:13
34:7,11,11 35:22
38:20,23 39:15 40:2
40:16,17,21,23
41:20,22,23 42:10
43:2,6,7,14 46:25
47:5,16 48:15,19
49:11,22 50:2,18,22
51:3,21 52:16 53:24
54:11,12,20 56:14
56:17 59:11,21 61:7
64:10 65:16,23,23
67:11,18 68:23
70:24 71:2,4,12,12
71:18,19,20 72:3
73:15,22 74:21 75:8
80:24 81:3 83:11
84:5
**cases**
29:17,23 31:25 32:7
32:11 33:4,6,10,14
33:19,19,20,24,24

34:2,20,23,24 35:11
35:18,18 36:7,14,16
36:24,25 37:19 59:4
59:8,22,25 64:15
70:18,24 71:3,10
72:1,7,14 73:3,9
74:2 81:21,24 82:1
82:1,3,8,12,18,20
82:24 83:2,3
**catastrophic**
33:9,22 71:14 81:24
82:12
**CCRONAN@HIN...**
2:5
**center**
33:16
**certain**
63:18 74:24,25
**certainly**
70:7 80:8
**certainty**
37:18
**certification**
29:1
**certifications**
28:21
**Certified**
1:16
**certify**
87:3 91:4
**chambers**
78:13
**change**
88:6,9 89:4 90:4
**changed**
46:1
**changes**
88:4,7,12 91:7
**child**
63:16,23
**Chinese**
11:8,10
**Chris**
49:12
**Christmas**
86:4,6

**Christopher**
1:7 2:11 8:8 18:13
54:13 79:9
**Chumley**
47:16,18,19,21 49:11
49:23 50:22 51:10
53:9,12,13 54:10,14
54:17 64:22 65:25
66:6,15 67:21 68:1
68:5 69:9 75:6
76:11 77:1 78:18
79:1,8 83:15
**Chumley's**
50:17 52:1 53:20
62:13 69:18
**Cincinnati**
34:18
**CIRCLE**
2:19
**circuit**
72:14
**circumstance**
73:2
**circumstances**
43:12 51:1 54:10
63:19 80:16
**cited**
59:21
**civil**
1:3 22:14 29:19,20
**claim**
18:3 47:6 49:9,17
50:7,8 64:1,17,20
65:11,11,12,17
69:24 72:16 73:4,17
73:17 74:2,4,7
78:24
**claimant**
39:17 67:4
**claimants**
35:12 38:23 47:3
48:1,3,18 49:7,10
50:9 51:19 53:10
67:1,8,15,25 69:21
71:17 76:15,19
80:18

**claiming**
41:7
**claims**
11:22 12:22 15:8,12
16:16,16 17:7 35:1
35:16,19 37:13
38:10,13 39:19,20
49:14,20,20 51:20
51:24 53:16 65:14
65:15 69:12 71:21
71:23,24 72:6,15
76:25
**clarification**
17:4,6,9 65:19
**clarifications**
17:12
**clarify**
23:1 28:23
**class**
31:19
**classes**
25:16
**clear**
21:17 52:11 61:6
76:8,12 77:3 81:4
**cleared**
58:2,3
**clearly**
9:8
**clerk**
11:6 28:14
**clerked**
11:7 28:10,12
**clerkship**
32:23
**client**
48:23 50:24 53:14
59:6 67:4,16 68:17
68:22 69:22,24 70:5
70:12 84:19
**clients**
12:2 34:18 35:8
49:25 53:21,23
69:20 83:19
**client's**
44:16



**clock**
50:7
**close**
18:20,20
**colleague**
79:17
**College**
26:13
**column**
88:5
**come**
26:6 44:7 70:12
**comes**
29:2
**coming**
21:16
**commencing**
1:14
**commercial**
48:9
**commission**
27:9,17,18 91:18
**committing**
78:23
**common**
39:2 59:11
**community**
79:18
**companies**
85:18
**company**
1:4 7:13 8:4 14:9
  34:14 37:9,12,15
  62:20 64:14 71:4
  81:16 85:21
**Company's**
14:7
**compensated**
30:15 41:9,10,19
**compensation**
44:20
**compilation**
61:13
**complaint**
54:14 84:16,19,22,25
**Complaints**

**14:2**
**complete**
46:13
**completely**
21:18 22:1,2
**complex**
33:16
**complied**
51:15 52:1,17 81:1,3
**comply**
75:6
**composite**
21:4 22:17
**computer**
19:16 22:2
**computer-aided**
87:11
**conclusions**
54:7
**conditions**
74:18,18,19,23 75:8
**conduct**
50:17,22
**conducted**
6:20
**conference**
6:21,24 67:24 68:2,7
  68:10,12 69:3,7
  71:7 74:9,12,16
**conferences**
26:20,24,25 61:25
  72:5
**confirm**
60:4
**confirmed**
7:4
**confusion**
63:5
**connection**
19:6 20:20 37:22
  42:2,24 56:14,17
  60:5 77:16 83:23
  84:5
**conscious**
46:22
**consider**

38:15
**consideration**
49:8
**consistent**
53:6
**consult**
59:13,17
**contact**
42:5,7 83:2
**contacted**
42:2
**contemplate**
54:6
**context**
32:10
**contingency**
32:1
**continuing**
26:21
**continuous**
61:20
**control**
70:8
**conversation**
74:13
**conversations**
68:17
**convicted**
85:6,12
**copies**
86:15
**copy**
13:10 15:1,2 19:18
  57:4,17
**Cornell**
71:19
**cornered**
82:7
**corporate**
31:7
**correct**
9:10 10:20 12:13
  13:7 15:7 19:4,5,20
  23:17 26:3 35:14
  36:1 37:6 43:25
  44:23 46:7,8,10

47:22,23 54:17,24
54:25 55:22 56:11
56:12 58:19 60:6
61:18 62:5,8,11
63:3 70:21 77:5
81:5,6,10,12,13
83:8,9,21,22 84:6,7
84:10,11 85:16
87:12 91:5
**correction**
55:16
**corrections**
91:7
**correctly**
62:9 69:8 87:9
**correspondence**
15:11 39:17
**counsel**
4:7 6:22 7:24 12:7,13
  17:3 53:12 87:13
**Counterclaim**
14:8
**counteroffer**
77:9,12,15
**Country**
15:9,14,18,23,25
  16:17,24 17:2,15
  65:16
**county**
9:23 29:6,8,15 78:1
**couple**
9:22 13:11 32:6,7
  34:18 61:3,14
**course**
9:7
**courses**
26:18 28:25
**court**
1:1 6:21 7:15,22 8:9
  9:5,19 11:1 26:20
  28:16 29:14,16,18
  30:1,8 77:25 78:7,9
**courtesy**
74:6
**cover**
16:5,8 39:21 51:20



coverage
15:19
co-counsel
10:23
CPLR
6:19
create
63:13 64:1
created
25:4 65:9,21
credits
26:21,22,23
crime
85:6,12
criminal
29:18 33:17
critical
48:23
Cronan
2:3 3:7 8:2,3,17
20:23 21:2,8,12,18
21:22 22:1,11,22,25
23:7 55:2,13,20,24
56:3 60:7,11 86:9
86:14
CROSS-EXAMIN...
3:9
Culbertson
2:2 7:20
current
30:11 33:7 35:3,16
currently
29:3 35:8 85:17
customary
53:6

—————— D ——————
d
2:21 6:20
daily
43:3 73:5 78:10,11
80:14
damages
30:4 48:2,20
Daren
40:19

date
21:1 44:20 55:12
60:10 74:24,25
88:10 91:10
dated
14:3
dates
15:1 24:25 25:1
61:16 75:1
Dax
1:12 3:3 7:2,12 8:11
8:20 55:14 56:1
day
26:12 68:16,25 72:19
87:18 91:16
days
50:8 52:13 74:22
88:16
day-to-day
82:14
deadline
68:16
deal
27:7,12 35:4 36:13
dealing
72:3
deals
36:4 80:14
dealt
83:16,16
death
14:4 18:8,9 29:21
30:4 33:9,22 49:14
49:17 51:13,15
63:15 64:1 65:11,11
65:14,17,22 71:20
71:22 72:6 73:3,10
73:17 74:2,4 76:12
76:19 81:23,25
deaths
48:20 71:13 76:1,17
82:11
DECATUR
2:14
decided
10:22 46:20

decipher
60:16
decision
46:22
declaration
41:1
defendant
2:11,16,20 8:8 11:3
11:19 14:8 34:8,10
36:10
Defendants
1:8 27:5
DEFENDANT'S
4:9
defended
34:12
defense
31:22,23 32:2,4,5
34:2,4 37:10 38:5,5
definitely
38:24 39:5
degree
25:10
DeKalb
9:23 29:8,14 78:1
delay
67:12
DelCampo
29:4,10 30:12,18
33:7 82:6
deleted
58:10
deletion
57:11
delineation
76:12
demand
13:2 14:2,21,21 15:4
15:11,25 17:1,17,23
17:25 36:9 48:16,22
49:24 50:5 51:12,14
62:14,16 64:18 66:1
67:5,21 68:20 69:19
71:5 72:17,17 73:16
75:6,16 76:10 81:2
84:25

demands
12:21 15:21 16:4
39:15,16 52:12
53:18,18 59:10
62:22,22 64:9,10,14
67:8,13 71:8,16
72:5 80:17 83:16
Denissova
1:7 2:16 18:21
dental
40:20
deplete
49:7
depleted
53:19
deponent
87:6,9 91:1
deposed
41:21 79:1,1
deposing
88:16
deposition
1:12 5:1 6:6,13,20
7:1,9,12,18 8:21 9:2
9:16 12:8,16 13:12
13:13 16:19 19:8,10
20:20 21:5 22:14,16
23:11,13 24:13 45:9
83:7 87:11 88:3,13
depositions
12:19 13:11 16:12
18:25 19:1,2 68:4
69:8 74:15 79:2
DESCRIPTION
4:3,9
designed
62:9,24 64:13
Desiva(phonetic)
18:18
details
41:6
determined
63:7
developing
54:6
died



73:12,13 75:22
**different**
61:16 67:25 68:17
76:15
**difficult**
62:9,16,24 75:12
**direct**
1:3 3:6 7:13 8:3,15
13:2 14:5,7,9 19:11
23:24 26:5 37:14
53:17 66:12 67:20
68:15
**Direction**
5:3
**Directly**
37:10
**discernable**
65:7
**disciplined**
84:12
**disclosure**
66:5,8 75:14
**disclosures**
14:5,8,10
**discovery**
12:23 14:6 65:6
**discuss**
42:9
**discussed**
16:4 24:2 43:8,8
77:18 81:7 84:2
**discussing**
13:15 43:10
**discussion**
24:11
**dismissed**
84:20
**dispute**
64:16
**disputes**
35:4
**distinction**
37:4
**distributions**
30:16
**District**

1:1,1 7:15,15 28:16
78:9
**divided**
18:10 76:18
**Division**
1:2 78:17,17
**doctor**
34:9
**doctorate**
25:8
**document**
12:25 13:9 16:15
20:22 21:9 23:14,16
56:4
**documents**
5:9 12:18 13:1,4,6
14:17,19 15:6 16:18
16:21,24 20:7,9,12
24:13,24 45:4,15,17
46:18 55:3 62:2,4
66:16,19
**doing**
32:3
**Dolder**
2:18 3:11 8:5,5 12:9
12:17 13:15 21:10
21:23 22:19,23 23:1
23:3,5,10,25 24:7
24:13 41:25 42:4,16
42:19 43:20 44:5,13
44:16 45:21 46:15
51:4 53:8 55:3,4
56:25 57:4,18,20
58:12,14 59:23
60:22 61:25 83:12
86:14
**Dolder's**
44:19 57:3
**dollar**
40:22 81:23 82:11,24
**dollars**
18:9 71:24 73:21
**door**
78:15,16
**draft**
27:10 56:16 57:4,5,7

57:21,22,25 59:24
**drafting**
61:12
**drafts**
56:19,20
**drawing**
37:4
**DRIVE**
2:9
**driver**
76:20
**dropped**
43:16 65:5
**duces**
20:19
**duly**
8:12 87:7
**Dunwoody**
29:5,6
**duty**
49:23

---

**E**

**E**
87:1,1 89:2 90:2
**earlier**
60:3
**early**
81:20
**EAST**
2:3
**edited**
57:5,9 58:1
**editing**
57:10
**edits**
56:21
**education**
25:7 26:22 39:4
58:23 79:23
**effective**
48:24
**eight**
45:8 71:17 78:5
**either**
21:11 57:10 84:12

**Eleanor**
77:21
**electronic**
19:18
**elevated**
78:8
**eleven**
38:6 52:21 56:11
80:10,11
**emergency**
61:8
**employed**
29:3,9,12 31:3,12
32:13,22 37:8,11
**employee**
30:12
**employees**
19:11
**employment**
25:18 30:11 31:18,19
32:9,19 34:8
**encompass**
33:10
**encounter**
39:3
**enforcement**
52:22
**engage**
83:14
**engaged**
39:25 69:22 70:8
**engagements**
27:2,21
**English**
27:6,13
**ensure**
53:22
**enter**
22:12,17 60:7
**entire**
19:13 56:13
**entirety**
24:19 53:20
**entity**
81:14
**entrusted**



52:22
**equal**
76:17
**equally**
18:10
**equitable**
29:25 30:10
**equity**
29:24 30:1
**Eric**
8:20
**errata**
88:6,8,10,12,15 91:9
**erroneous**
75:11
**especially**
63:23
**ESQ**
2:3,8,13,18
**Esquire**
1:13 7:12 56:1
**essentially**
9:25
**establish**
64:25 65:3
**established**
65:5
**establishing**
64:23
**estate**
7:14 17:7 30:6,10
31:6 63:10,13,15,18
63:21,22,25 64:2,17
64:19,20,24 65:1,3
65:4,9,12,15,19,20
65:23 67:11 71:21
71:22 72:6,14,16
73:4,10,17,20 74:2
74:6
**estates**
65:18 67:11
**et**
1:7 7:14 10:8
**ethics**
27:16,20
**Evans**

1:7 2:11 8:8 14:4,23
14:23 17:6 18:4,5,6
18:8,9,12,13 49:12
49:12,13,14 51:11
51:13,15 54:13
75:24,25 79:9
**eventually**
65:4
**everybody**
85:10
**everyday**
59:4,5
**evidence**
10:24 22:21 26:9
**exactly**
50:24
**examination**
3:6 6:16 8:15
**examined**
6:14 8:12
**exceed**
48:21
**Excellent**
9:18
**excess**
36:12
**excessive**
44:11
**exclusively**
30:7 79:23 82:10,23
**Excuse**
50:15
**excused**
86:13
**EXECUTIVE**
2:9
**exhaust**
67:15
**exhausted**
67:3
**exhibit**
4:3,4,5,6,9 20:24,25
21:3,4 22:13,18
55:11,25 60:8,9
**exhibits**
4:1,10 12:20 56:11

**exist**
68:20
**existed**
52:4,5
**existence**
31:5,14
**expended**
41:5 44:25 45:7
**experience**
11:8 26:4,5 33:2 39:5
50:11 52:18 58:22
76:16 79:24 80:2,3
**experienced**
48:7
**expert**
4:5 12:10 38:16,25
39:8,23,25 40:8,10
43:9,21,24 44:3
51:6,7 55:14 56:7
80:20 81:5
**experts**
39:12 54:1
**expires**
91:18
**explain**
68:22
**exposure**
36:12 68:21
**extent**
76:9
**e-mail**
20:13,15

_____

**F**

**F**
87:1
**face**
42:19,19
**faced**
54:11
**facts**
22:21,22 73:24
**factual**
43:6
**fair**
26:12,12 27:15 29:22

33:5,18 82:2
**fairly**
70:19
**faith**
34:25 35:4,9,17 36:2
36:4,8,11,15,19,22
36:24 37:1,5,6 59:8
59:9 68:21
**falls**
34:20
**familiar**
9:2,10 15:13 42:20
43:1 54:2 59:5,9,25
77:21
**family**
30:6,9
**far**
48:20 78:13
**fashion**
51:21
**father**
49:13
**federal**
11:6,7 28:16 78:8
**fee**
10:19,20 44:4 75:16
81:8
**feel**
15:20 80:8,14
**fees**
9:24 10:1,4,24 39:25
40:1,5,7 41:3,6
**felonies**
29:19
**felt**
44:10
**field**
39:13
**file**
1:3 15:15,18 19:13
39:19 66:4,7 67:20
75:15
**filed**
11:12,13,22 30:5
54:14
**files**



12:22 15:8 16:17,22
19:19,22 39:20
**financial**
15:9,15,18,23,25
16:17,24 17:2,16
31:25 65:16
**find**
74:17,19
**finish**
49:1
**finished**
9:22
**firm**
17:24 31:4,13,17,21
33:3,5,6 34:25
35:22 37:3 42:21
44:19
**firms**
31:15 37:11
**first**
8:11,23 42:18,21
48:25 50:6,10 57:7
57:21,22 61:2 63:14
63:14 69:19
**five**
71:13,14
**FL**
2:4
**floor**
78:12
**focus**
15:21 17:14 34:22
38:20
**focused**
13:3,5 14:20 15:7
16:23 25:17 27:6
69:12
**folks**
82:24
**follow**
38:9
**following**
88:8
**follows**
8:13
**Foltz**

31:4,21 34:17
**food**
11:12
**foregoing**
91:4
**form**
6:7 22:20 24:7 51:4
53:8 91:8
**former**
41:12 58:24 59:1
80:19 82:6 85:2
**formulating**
59:14
**FORT**
2:4
**forth**
17:11
**four**
11:14 16:11 18:23
19:23 20:5 23:18
55:18,18,20 58:15
58:17 60:3 61:15,21
75:23,25 82:18
**frame**
85:22
**framework**
79:21
**frequently**
70:14
**friend**
11:13
**front**
16:3,8,8 60:15
**frozen**
21:13,14,19,22
**full**
8:19 12:17
**fully**
36:21
**full-time**
38:8 82:19
**Fulton**
43:3

---
**G**
---
**GA**

2:10,14,19
**gap**
61:11
**gauge**
80:5,15
**GEICO**
15:9 16:17 63:2,6,7
**general**
1:3 7:13 8:3 13:2
14:7,9 23:24 28:25
37:15 53:17 66:13
67:20 68:16 78:20
**generally**
39:13
**General's**
19:11
**Georgia**
1:1 7:16 26:8,13,19
27:9,11,17,18 28:8
29:5,6 37:23 48:11
49:6 62:14 65:10
79:25 80:11,13,22
80:24 81:1 82:5
85:9
**getting**
36:14 48:22 51:22
**give**
9:25 52:12 60:17
74:25 87:12
**given**
24:6,10 45:10,16
80:8 91:6
**giving**
10:4
**Glenda**
69:10
**global**
67:24 68:2 69:3,6
71:6 72:4 74:12
**go**
9:3 22:10 30:1 37:6
42:9 73:11
**goes**
64:12
**going**
9:3,5 20:23 21:3,4

22:12,19 25:5 30:11
45:11 46:4 48:16
60:7 62:4 63:25
64:25 66:21 67:2
68:15 70:5 73:25
79:4
**good**
8:2,18 20:2 31:24
44:18 60:18 80:15
87:4
**government**
32:19
**governmental**
11:23
**graduate**
25:12,16,22
**graduated**
28:10
**granted**
52:15
**Grayson**
29:4,10 30:12,18
33:8
**great**
9:17 27:7
**guess**
16:6 28:13 36:3
40:25 60:24 82:14
**guest**
26:11
**guilty**
85:11

---
**H**
---

**Hagen**
2:13,13 3:12 43:3
68:4 69:9
**Hagen's**
13:12 19:4
**hand**
87:17
**handle**
27:4 29:22 34:23
39:6 83:1
**handled**
33:13 34:19 36:24



**handles**
29:18
**handling**
31:22 35:11
**handwritten**
4:6 55:21 60:2
**happened**
15:24 24:9 43:6
65:16 70:19
**happens**
65:12,24 70:3,14
73:5 76:16
**happy**
9:15 23:18
**Hard**
24:8
**Hartsfeld**
75:23,24 76:20
**head**
9:8 18:16 37:19
40:15,23 69:4,6
70:19
**headlines**
43:4
**hear**
21:23
**hearing**
9:19 10:19,20 11:1
40:2 41:22
**heavy**
33:4
**Hector**
28:18
**help**
27:10
**helped**
56:25
**helps**
21:21
**hereto**
6:4,12
**he'll**
12:10
**high**
80:13 81:23 82:11,24
**highest**

25:6,6
**Hill**
31:14 32:3,12
**Hinshaw**
2:2 7:19
**hire**
70:12
**hiring**
7:4
**Hirsch**
2:21 8:6 14:5 42:1
44:15 54:1 79:14,15
**Hirsch's**
14:1
**Hispanic**
82:3
**hold**
28:4 34:7 85:9
**holding**
31:16
**Holland**
32:14,15,17,22,25
**hope**
15:21 59:10,10,11
**hopefully**
55:18
**hopes**
51:23
**hour**
41:17 44:6,10 83:6,8
**hourly**
41:3 44:7
**hours**
41:5,7 44:22,25 45:8
**husband**
75:18

———————
**I**
———————
**idea**
60:18
**identification**
21:1 55:12 60:10
**identity**
7:3
**ignore**
72:17

**image**
21:24
**immediately**
84:20
**impacted**
54:5
**impressions**
25:2
**incident**
73:12 76:1
**included**
76:24
**includes**
13:24 45:3,3
**including**
12:18 56:11
**incorrect**
23:6
**increased**
50:10
**incredibly**
48:1
**incurred**
40:24
**INDEX**
3:1 4:1 5:1
**indicate**
66:9
**indicated**
87:6
**individuals**
27:12 33:15 48:14
49:18 75:21 76:21
**infamous**
62:15
**information**
10:1 16:16 17:13
52:14
**informed**
43:5 65:21 66:11
**ingest**
11:12
**ingested**
11:11
**initial**
14:4,8,10 17:17,25

25:2 57:5 59:24
65:18
**injured**
33:15 49:19
**injuries**
33:22 71:14 76:3
**injury**
33:10 35:21,22 81:24
82:12
**input**
46:16 57:19,19
**instance**
40:6,8 53:11
**INSTRUCTIONS**
88:1
**insufficient**
38:24 47:3 50:2,3,4
51:20 63:21 67:1
**insurance**
1:3 7:13 8:4 14:7,9
17:16 34:14,18 35:4
35:16,19,24 36:1
37:9,10,12,15 38:9
38:10,13,13 39:20
39:21 47:10 48:21
49:21 62:20 64:14
71:4 85:18,21
**insure**
72:17
**insurer**
15:15,22,23 50:6
67:14 73:19 74:4
75:10,12
**insurers**
49:6
**intend**
84:9
**intending**
75:10
**intentionally**
62:20
**interaction**
16:25
**interest**
25:18 83:19
**interested**


MAGNA
LEGAL SERVICES

87:14
**internal**
47:10
**interpret**
77:8,14 80:23
**interpretation**
52:23
**interpreted**
77:8 80:10
**interpreter**
27:4
**interpreters**
27:4,9,10
**interpreting**
59:10
**intervene**
59:8
**invoices**
45:6
**involve**
34:25 35:19 48:20
**involved**
37:14,18 48:14 49:8
51:19 83:2
**involvement**
41:23 42:9 43:9
**issue**
12:21 13:2 23:25
27:14 29:24 39:19
49:21 50:17,22
64:19
**issues**
27:4,5,12,19 36:13
38:10,13 41:12 51:2
59:8,11 70:25 72:2
73:14 74:1 80:14

**J**

**Jackson**
73:7,8,15
**jot**
24:25
**jotted**
62:3
**judge**
11:7 26:6,14,16

28:17 29:14,16 38:6
41:12 52:21 58:24
59:1,7,9,12 77:21
77:24,25,25 78:4
79:20 80:10,19,21
82:6 84:13 85:3,5
85:25 86:2
**judgements**
14:1
**judges**
26:19,20,23 27:18,22
28:3 86:6
**judgeship**
31:2 85:24
**judging**
38:19
**judicial**
26:13 27:16,19,20
28:2
**July**
1:14 7:6,17 87:18
**June**
61:10
**Juris**
25:8
**jurisdiction**
30:6
**jurors**
10:1,21
**justice**
15:16 27:14 49:19
75:19 76:1,24
**Justices**
53:19
**Justice's**
15:23

**K**

**keep**
19:24 75:2
**keeping**
75:3
**kept**
19:19 61:2,22
**kin**
87:13

**kind**
48:13 50:2 52:14
62:3 74:25 75:2
**kinds**
59:4 83:1
**knew**
66:7
**Knight**
32:14,16,17,22 33:1
**know**
13:8 17:9,18,21 18:3
18:14,14,16,18
21:12 23:24 24:9
26:10 33:15 35:21
36:10 40:22 41:11
41:16 42:23 43:3
47:12,18 48:3,6,20
49:10,18 50:3,21
51:2 53:17,25 54:9
54:11,13 61:1,22
62:14,18 63:11 65:2
65:8,25 66:6,11
68:1,13,24 69:2,6
70:4 72:3 73:7
74:21 75:20 77:24
78:11,22 79:7,15,17
80:21 82:24,24
84:24 86:5
**knowledge**
39:5 54:16 58:22
66:20 67:19 78:18
78:21 79:24 80:9
**knows**
48:7 49:16
**K1**
30:16,18

**L**

**L**
1:15 6:1 87:23
**labeled**
16:7,14
**Laffitte**
28:18
**large**
29:20 30:4 33:13,20

**largest**
34:19
**LAS**
2:3
**late**
10:18 61:7 69:22
70:12,12
**LAUDERDALE**
2:4
**law**
11:6 25:8,9,11,18
26:7,7,11 28:5,6,13
28:14 29:23 30:7,9
30:10,22 32:19
33:11 38:1,7,19
48:11 59:9,21 65:10
79:24 80:11,16,22
81:1 82:5,15,19
**lawsuit**
11:13
**lawyer**
38:8 86:5
**lawyers**
37:24 83:1
**LAWYER'S**
92:1
**lead**
13:1
**leading**
43:7
**learn**
74:11,15
**leave**
32:25
**leaving**
53:20 69:24
**lecturing**
26:11
**left**
31:15 55:17 62:7
82:20
**legal**
1:21 7:21,23 10:12
25:15 27:5,12 43:3
51:2 78:19 79:17
**legally**



31:16
**letter**
13:25 14:2,21,25
15:3 16:5 17:2,25
36:10 48:16,22
49:24 50:10 51:12
53:12 63:2,2 65:9
66:3,8 67:22 68:20
68:24 70:10,13 71:4
73:16,24 76:6,11
77:2,5,8,14,14
83:17 84:25
**letters**
14:22 15:4,11,25
16:1 17:3,11,13
51:22 52:1,11 62:14
62:14,16 63:6 66:1
67:21 70:9
**let's**
64:16
**level**
25:6 80:13
**liability**
15:15,22 29:21 32:19
33:13,14 38:3 52:16
82:1
**license**
28:5,7,9,13
**licenses**
28:4
**likelihood**
50:8
**limit**
53:15,20 75:4 82:18
82:22
**limitations**
45:11
**limited**
27:22 41:23 43:9,10
45:14 47:4,9,11
52:16 54:8 77:19
**limits**
17:16 18:1 38:24
47:3 48:4,8,18,22
49:3,4 50:3,4,9
51:20 52:12 53:13

53:17 63:20,21 66:1
66:5,10,12,18,22
67:1,3,15,25 69:14
69:20,24 70:16 71:5
71:13,15 73:16
75:14 77:1 81:2
**line**
5:4,4,10,16,16,23,23
57:11 89:4 90:4
92:2
**lines**
64:4
**list**
13:8 46:17,21
**listed**
13:6 71:3 84:1,2
**literal**
85:10
**litigating**
36:8
**litigation**
11:4,20 19:7,14 31:7
31:8,18,20 32:18,20
35:13 36:8,15,22
37:1,17 38:2 64:21
73:13
**little**
13:17 25:17 33:21
38:17
**living**
75:18
**LLP**
7:20
**loaded**
36:6
**located**
29:7 78:14
**location**
1:13
**locations**
6:23
**locked**
22:2
**long**
29:9 34:22 58:11
67:11 69:2 81:18

**longer**
28:19 31:5,16
**look**
18:1 62:6 72:18
73:11 74:14
**looking**
18:14 57:14,14,15
63:4 80:25,25
**looks**
24:18 56:10 58:16,16
64:3,6 72:9 73:6
74:8 76:5
**Lopez**
1:12 3:3 7:2,12 8:11
8:18,20 22:12 23:9
29:4,10 30:13 33:8
55:14 56:1,5
**lose**
70:6,15
**losing**
72:4
**lost**
69:16,17
**lot**
12:20 13:10 16:16,23
33:4,24,24 41:12
56:20 58:7,8
**Louis**
49:17 53:18
**luck**
67:17
**lunch**
42:9,10,12

—————————————
**M**
—————————————
**machine**
87:9
**magazine**
37:25
**Magna**
1:21 7:21,23
**maintain**
19:22
**major**
25:24
**majority**

32:2
**making**
12:10 88:7
**malpractice**
10:11,12 29:21 33:19
40:21 78:19,23
81:25 84:22
**manuals**
59:13
**manufacturer**
33:14
**margin**
62:7 71:3
**mark**
55:13
**marked**
4:10 5:22 20:25
55:11 60:9
**market**
82:7
**Marques**
73:7,8,9
**Marr**
10:9
**Martin**
31:4,21 34:17
**material**
52:17
**materials**
39:12 45:19,23 46:1
84:8
**Matt**
13:12 19:4 69:9
**matter**
7:13 11:18 12:19,20
13:21 19:9,21 24:20
34:8 39:9,10,24
40:8,11,12 41:9,24
42:3,25 43:24 45:23
52:20 53:3,19 54:1
54:7 56:8 59:2 60:5
73:14 74:20 77:4,16
77:17 78:20 79:5,10
79:16 80:20,25 81:5
81:6,8,25 84:18
**matters**



25:6 29:19 30:7
33:20 35:4,9,17
36:3,5 80:12 81:9
**Matt's**
74:8
**Max**
2:21 8:6 41:25 44:15
79:14
**maximize**
50:1 80:18 83:18
**maximizing**
51:23
**ma'am**
24:21
**MCDONOUGH**
2:14
**mean**
16:7 23:10 24:10
25:17 27:25 43:8
45:12,16 57:6 62:12
68:14 84:25
**meaning**
64:9 68:21 69:17
70:8
**means**
36:9
**mediate**
44:9 81:22,23 82:2
82:17,23
**mediating**
81:24 82:1
**mediation**
81:16,19 82:14,16
**mediator**
44:9 81:12,15,18
**mediators**
82:5
**medical**
10:14 29:20 33:18
61:8 63:24 81:25
**member**
27:8,9 37:23 38:2
**memory**
34:21
**mentioned**
19:2 24:1 83:5

**met**
42:18,20 47:19 75:9
**methodology**
58:20
**Metropolitan**
10:10
**Michael**
13:12 19:4
**middle**
86:1
**mid-2011**
78:5
**Miguel**
2:24 7:21
**Miles**
81:16,19
**million**
40:21 73:21
**millions**
71:24
**mind**
18:13 29:2
**mine**
11:13
**minimum**
48:12
**misdemeanor**
29:18 85:11
**misdemeanors**
85:9
**missed**
68:16
**Mitchell**
69:11
**Moltry(phonetic)**
71:12
**mom**
63:8
**money**
53:16 76:15
**month**
10:16 82:18
**months**
11:14 61:14 78:5
**Montlick**
2:8 14:3,22 15:5 17:2

17:12,23 47:17
**morning**
8:2,18 24:15
**mother**
51:13 61:7 63:1
**multiple**
47:3 66:25
**M-A-R-R**
10:9

---

**N**

**N**
6:1
**name**
8:19 10:6 18:17
28:18 40:17 88:9
**Nancy**
14:23 18:6,8 49:13
75:24
**NE**
2:19
**near**
78:12
**necessarily**
28:24 78:20
**necessary**
88:4
**need**
9:7,13,15 25:16
63:22 65:12
**needed**
14:14 20:10 32:20
46:12 57:10 58:2,3
**negotiations**
73:18
**neither**
87:13
**never**
23:12,13,14,15,19,20
24:3,11 37:11,18
40:1 41:21 47:19
66:14 79:6,7
**Nicholas**
10:8
**nods**
9:9

**nominal**
11:15
**normal**
64:8,9,16
**NORTH**
2:14
**Northern**
1:1 7:15
**Notary**
1:15 6:14,15 87:4,24
91:23
**note**
61:2,23 62:7 64:13
70:2,20 71:25 72:18
74:9 76:4
**noted**
62:21 88:8 91:8
**notes**
4:6 24:15,17,19,22
55:17 60:2,4,8,13
60:25 61:12,24 62:3
63:9 64:3 75:3 92:1
**notice**
21:4,5 22:15 23:13
78:23 87:5
**number**
7:11 17:10 29:22
36:25 57:24 82:3
**numbered**
64:4
**numerous**
17:10 26:8,15 38:18
38:23 48:1 49:20
79:19

---

**O**

**O**
6:1
**oath**
9:5 10:3
**object**
22:19 24:7 53:8
**Objection**
51:4 83:12
**objections**
6:7 12:10



obtain
41:5 53:13
obtained
40:21 56:23
Obviously
12:1
occasion
40:1
occasional
32:6
occasions
13:15
occurred
42:12
OCGA
52:1 59:19
offense
85:11
offenses
85:10,13,15
offer
62:17 76:23
offered
76:23
offering
54:20 73:16 76:8,13
  76:14 84:4
offers
52:8
office
19:15 85:4
offices
78:12
official
87:17
oh
18:21 64:16 72:12
okay
8:24 9:1 10:6,12,15
  10:25 11:25 12:4,7
  12:12,15 13:5,17
  14:17 15:6 16:2,10
  16:18,21 17:18,21
  18:12 19:6,10,13,16
  19:19 20:5,9,12,16
  20:19,22 21:3,22

22:22,25,25 23:8,14
23:18,21,24 24:5,12
24:17,19,22 25:5,9
25:12,14,19 26:1,4
27:1,21,24 28:4,6,9
28:14,17,20 29:3,6
29:9,12,16 30:11,18
30:21,24 31:2,11,21
32:12,15,21,25 33:7
34:1,4,6,13,24 35:3
35:6,11,15,20,25
36:2,18,23,23 37:4
37:8,13,21 38:4,9
38:12,15 39:12,23
40:4,6 41:8 42:2,11
42:24 43:13,18,20
43:23 44:1,17,22,25
45:5,10,22,25 46:6
47:20 50:11,14,17
51:2,7,25 52:3,7,18
52:24 53:5,25 54:4
54:6,16,19,23 55:1
56:7,10,13,16,22
57:2,13,16,16 58:11
58:25 59:13,16,20
59:22 60:12,12,24
61:5,15,19 62:6,25
63:9 64:3,22 65:2
66:21 67:19 68:1
69:2,5,14 70:1,20
71:25 72:9 73:6,23
74:8,17 75:13,17,21
76:4 77:3,11,16,21
78:22 79:21 80:1,19
81:4,21 83:4,7,10
83:20 84:8,15,21,24
85:2,8,20 86:2,8
OLAS
2:3
ones
15:7 37:5
ongoing
11:14
open
73:19 74:5 82:25
opine

45:13 47:1,10
opining
41:2
opinion
13:1 45:18 46:1 47:9
  47:24,25 50:20,23
  51:6,7,10,25 54:5,8
  68:13 69:13 72:24
  72:25 77:3 79:22
  83:20,24
opinions
39:13 52:20 54:7,21
  58:21 72:21 77:19
  84:1,4
opportunity
67:4
opposed
69:21
option
68:23
options
68:19
order
14:6 49:25
ordered
86:15
ordinary
64:11
original
14:2 88:15
outcome
87:15
outstanding
45:6
overall
72:21,23,25 74:1
overlapped
78:2

_____
P
_____
P
6:1
pad
61:2,23
page
3:6 4:3,9 5:4,4,10,16

5:16,23,23 58:18
61:3 62:6 66:21,23
72:9 75:13 89:4
90:4 92:2
pages
23:18 24:17,18 55:17
55:18,19,21 56:11
57:23 58:15 60:3
61:15,21 91:4
paid
45:6
pain
65:7
paper
19:18,19,22 57:17
parents
17:5 18:10,12
PARK
2:9
Parker
2:8 3:10 8:7,7
part
10:21 27:23,24 31:8
  48:25 57:2 69:12
  72:17
participate
68:6,12 69:10
participated
12:4
participating
6:24 68:9
particular
16:7 39:21 48:19
  72:1
particularly
26:19 50:1 81:1
parties
6:4,12,19 7:24 15:12
  71:6 86:5,6
partner
29:4,10 82:5
partners
30:19,21 42:21
party
12:5 87:14
pass



28:11
**pattern**
31:15
**pause**
22:7 55:7
**pay**
53:16
**paying**
44:17
**payment**
74:24
**payout**
49:7
**pending**
36:18
**people**
41:13
**perceive**
46:24 83:10
**percent**
37:17 82:17
**percentage**
35:15 36:3,4
**perform**
52:25 85:17
**performance**
74:18,23
**performed**
19:7 85:21
**period**
68:25
**perished**
49:17 76:2
**permission**
24:3,6,10
**permits**
49:6
**personal**
12:1,2,13 35:21,21
48:10
**personally**
23:2 47:18 69:17
**peruse**
13:10
**phase**
9:24 10:24

**pick**
61:9
**picked**
61:22
**place**
69:3 80:15 87:6
**placed**
20:17
**plaintiff**
1:5 2:6 11:3,19 14:7
14:9 31:22 32:4,6
34:1,3 35:7 47:14
48:7 80:5,12,13
82:3 83:15
**plaintiffs**
32:7,10 71:8 73:1,2
**plaintiff's**
4:2 31:24 32:1 38:1,5
38:8,21 39:2 40:13
40:19 43:11 45:13
47:2,12,21 48:2,15
50:15,25 52:19 54:9
58:23,25 59:3 67:2
77:7,13 80:2,4
**plan**
14:6
**pleadings**
12:19 13:21,22 14:12
14:13,14 16:9 18:15
39:15
**please**
8:18 9:13 51:8 88:3
**pled**
85:11
**plus**
41:4 45:9
**point**
36:11,12 47:8 48:5,6
64:18 68:18,19
**points**
17:10
**policies**
39:21 63:1
**policy**
18:1,7 36:12 52:12
53:20 66:1,5,10,12

66:13,17 67:15
69:20,23 73:16 77:1
81:2
**Polina**
1:7 2:16 18:21 63:8
79:12
**Polina(phonetic)**
18:19
**Political**
25:25
**portion**
9:23,25 10:22 37:1
47:5 57:19 60:25
65:22 71:20,23
82:13
**portions**
57:10 58:1
**position**
32:15 33:7 49:25
69:18 80:23
**possible**
48:17,23 67:9
**possibly**
49:24 51:17
**posture**
36:11,17 40:3
**potential**
15:22 36:7 42:9 43:9
47:6 51:23
**potentially**
50:9 53:10,11
**powers**
30:2
**practice**
30:22 33:8 34:9
35:16 36:4 38:1,19
53:6 61:8 82:13,16
82:19
**practices**
47:10
**practicing**
8:24 38:7 50:12,15
82:15
**precise**
52:19
**preliminary**

14:5 25:5
**premises**
33:14 34:20 82:1
**preparation**
45:8
**prepare**
12:15 60:22
**prepared**
24:22,24 46:14 54:20
56:1,16 57:24 60:25
61:16
**preparing**
13:15 45:1
**present**
2:23 7:25 8:5 9:7
12:9
**preserve**
83:19
**pretty**
29:20 44:10 62:22,23
64:10 80:15
**previous**
64:12
**pre-death**
63:24 65:7
**pre-demand**
66:5,8
**pre-suit**
84:25
**primarily**
27:3
**primary**
28:3 33:8 34:22
41:13
**printed**
20:17
**prior**
29:12 31:2
**pro**
84:18
**proactive**
71:5
**proactively**
70:21
**probably**
9:2 14:20 20:2 23:5



24:10 34:17,19
36:15 41:18 42:6,14
43:16 44:18 45:2,7
45:7 48:8 60:17
61:3,7,9,11,13
63:22 70:17 74:13
76:23 81:20 82:16
82:17 86:4
**problem**
76:6
**procedures**
47:11
**proceeding**
22:8 54:17 55:8
**proceedings**
78:19
**process**
23:3 36:20
**procrastinate**
70:10
**produced**
20:13
**product**
33:13 38:3 82:1
**production**
5:9 16:15
**products**
29:21 32:18
**professional**
28:4,20 37:21
**professionalism**
26:9
**profits**
30:17
**propounded**
91:7
**protect**
83:19
**protected**
53:23
**provide**
24:12 52:13
**provided**
12:17,25 13:9 14:15
15:10 19:23,25 20:6
20:7 24:16 43:14

45:21,23 46:18
57:18,21,25 59:22
59:25 60:2 88:14
**prudent**
38:21 43:11 47:1
50:25 67:1
**public**
1:15 6:14,15 85:4
87:4,24 91:23
**publications**
37:22
**published**
53:2
**Puerto**
11:6 28:16
**purpose**
43:10 70:1
**purposes**
12:8
**pursuant**
6:19 56:1 87:5
**pursue**
64:20
**purview**
51:5
**put**
10:23 49:25 78:22
**p.m**
60:20

___

**Q**

**qualification**
27:19
**Qualifications**
27:17
**qualify**
59:1 80:4,20
**question**
6:8 9:13,14 20:2
22:20 36:6 38:17
44:18 45:15 50:19
79:4
**questions**
5:22 17:4 39:20
65:18,19 86:10 91:6
**quickly**

48:4,17,22 49:24
51:17,22 53:9,22
67:9
**quoted**
41:16

___

**R**

**R**
87:1 89:2,2 90:2,2
**race**
48:4,17 49:1,3,4
63:20 66:22 67:6
69:14 70:15 71:13
72:4
**races**
69:16,17
**racing**
48:13
**Rafuse**
31:13
**rate**
41:3 44:8 83:5
**read**
43:2 52:11 63:10
64:8 72:10 77:14
88:3 91:4
**reading**
6:5 7:8 62:8
**reads**
62:10
**real**
30:6,10 31:6 72:14
**realistically**
15:14
**realized**
65:6
**really**
15:20 21:15 33:3
41:20 63:10 64:7,8
67:6 69:12 72:10,15
72:20 73:14 75:4
**reason**
88:5,9
**reasonable**
38:21 43:11 44:11
45:13 47:1 48:15

50:25 53:5 67:2
73:1 77:7,13
**reasonableness**
41:3,4
**reasonably**
70:5 74:5
**reasons**
63:23 67:10
**recall**
10:6,15 40:20,24
41:6,8 42:11 58:4
58:11 64:22 69:5,8
75:21
**receipt**
88:17
**receipts**
83:17
**receive**
30:16 37:23,24 77:7
**received**
13:8 23:12,23 28:25
44:20 53:17 55:18
58:12,13 66:7 71:6
**receiving**
71:7
**recollection**
20:4
**recommended**
74:14
**record**
7:7,11 8:19 22:5,9
51:9 55:5,9 86:11
87:12
**recorded**
87:9
**recourse**
71:18
**recover**
35:7,23 53:24 67:17
69:25
**recovery**
10:10 50:1 51:23
80:18
**red**
57:11
**reference**


MAGNA ▶
LEGAL SERVICES

63:10 70:24 74:10
**referenced**
71:11 84:10
**references**
50:21
**referring**
13:18 16:2 47:15,20
  47:21 59:18 60:20
  64:5
**reflect**
66:17,20,20
**Refuse**
32:3,12
**regard**
43:14 64:23 78:20,23
**regarding**
19:13
**regulates**
27:18
**reimbursed**
41:7
**rejection**
64:17,17 77:13,15
**relate**
70:25 72:20,23 77:4
  77:6
**related**
13:4 26:16 37:25
  39:20 62:1 72:2
  73:23
**relates**
35:16 62:13
**relating**
14:3,22 15:12 16:24
  17:11 27:10 38:19
  39:17 76:11
**relations**
32:19
**relationship**
17:5
**release**
52:15,16 74:25
**relevant**
15:20
**relied**
13:6 46:6 79:23

**relief**
11:23 29:25 30:1,10
**rely**
39:13 46:21,23 84:9
**remember**
17:8,24 40:14,16
  43:4 75:19
**remembered**
72:7
**remind**
70:3
**reminding**
63:17
**remote**
1:13 6:23
**render**
39:13
**rendering**
79:22
**report**
4:5 13:7 14:5 20:10
  45:1,3,11 46:7,9,13
  46:14 54:19,21,24
  55:14,25 56:7,13,22
  57:7,15,19,22 58:10
  58:11,17 59:14
  77:10,20 84:1,3,5,9
**reporter**
1:16 6:21 7:22 8:10
  9:5
**reports**
56:16
**represent**
8:1 48:23
**represented**
12:7 32:10 34:8,10
  49:12 50:24
**representing**
35:12 48:3 49:15
  51:11 59:6 67:7
**request**
5:9 7:19 20:9
**requested**
14:15 67:23
**require**
29:23

**required**
80:21
**requirement**
74:7
**requires**
48:11 52:14
**research**
72:16,22
**reserved**
6:6,8 7:9
**Residential**
10:10
**resolve**
36:9
**respect**
19:7
**respective**
6:4,12
**respond**
50:6,8
**responded**
15:25
**responding**
15:4 17:12
**response**
12:21 13:2 14:25
  17:3 76:10 77:1
**responses**
12:22 39:16
**rest**
64:8 72:11
**restaurant**
11:9,10,16
**restricted**
45:16
**restrictions**
45:10
**result**
33:17 36:7
**resulted**
11:9 81:25
**results**
33:21
**retained**
4:7 12:11 39:8 40:10
  41:24 44:14,15 54:1

77:17
**retaining**
44:16
**return**
11:16 88:15
**revenue**
41:14
**review**
12:25 13:1,9,11
  14:17 15:10 16:18
  17:1,3 19:1 20:10
  20:19 24:23,24 25:4
  43:19 45:2,3,14
  46:9 55:3 59:11,21
  61:13,22,23 62:1,21
  66:16 67:20 74:19
  75:15
**reviewed**
12:24 13:14,23 14:19
  15:8 19:2,3,8,10
  45:17,20 46:6,8,12
  46:18 57:9,25 68:4
**reviewing**
14:24 47:6 61:6
**revisions**
56:21 58:4,7,9
**revisit**
64:19
**Rich**
41:25 42:4 74:14
**RICHARD**
2:18
**RICH@LAWYER...**
2:20
**Rick**
8:5
**Rico**
11:6 28:16
**right**
13:19 18:24 23:5
  35:24 36:16 58:15
  63:12 75:16 85:23
  85:25
**role**
46:24 83:10 85:2,5
**Rory**



47:16,18,21 75:6
76:11 77:1 83:15
**Ross**
77:22,24,25 78:4
86:2
**ROSSKOPF**
2:13
**roughly**
44:9
**Rule**
56:1
**rules**
9:2 27:10
**run**
85:4 86:6
**running**
61:1,2

——————————
**S**

**S**
6:1,1
**SADD**
2:18
**Sadly**
70:17
**SANDY**
2:19
**saved**
20:13
**saw**
17:10,15 66:19
**saying**
48:25 49:2 53:7
72:10 76:10
**says**
15:2 16:9 21:7 60:19
62:7,8,9,25 64:6,7
66:21 70:20,22 73:6
73:6 74:8,17 75:13
76:5
**scheduling**
14:6
**school**
25:8,11 28:15
**schools**
26:7,11

**science**
25:25 26:2
**screen**
21:7,8,13,14,19,20
60:12
**seal**
87:17
**sealing**
6:5 7:8
**season**
86:5
**second**
9:23 10:24 22:3
**section**
6:19 31:7,7,8,18
32:18 38:3,3 57:23
**sections**
31:6
**secure**
69:20
**secured**
69:23
**see**
15:24 16:13 21:6,10
21:21,24,25 24:25
57:14 59:3,4 60:12
60:14 64:16 66:4
67:8 68:3,15 73:9
75:14 78:10 80:25
86:2,3,7
**seeing**
43:4
**seeking**
10:2 11:23 17:4,6,13
**seen**
23:14,15,19,20 46:5
56:4 64:15 86:4
**selected**
45:19
**self-insured**
35:25
**seminars**
26:18
**send**
41:18 48:16 67:13
68:20 69:19 74:24

75:6
**sending**
51:12,14 62:15 80:17
81:2
**sense**
85:10
**sent**
17:3,23,25 34:20
53:11 57:4,8,22
66:2 67:21 70:13
71:4 73:15 76:11
84:19
**separate**
6:23 51:14
**separately**
51:14
**September**
13:24 15:2,3,3 16:5
29:11,13 67:22
68:25 83:17
**serve**
40:10 47:4 52:21
81:14
**served**
9:18 10:25 22:15,23
23:2,13 26:6 29:14
39:23 40:8 43:24
44:2 54:20 77:25
78:7 80:10,11 81:5
85:3
**services**
1:21 7:21,23 83:8
**set**
42:8 60:22 62:19
63:18,20,25 64:13
64:13 65:20 67:11
67:12 71:15,22 72:6
**settle**
52:8 64:1 65:10 73:3
73:4,16,20 74:1,3,6
**settled**
11:14 63:15 65:15,17
65:22 71:20,22 73:9
73:10
**settlement**
68:2,7,10,12 69:3,7

71:7 72:4 74:9,12
74:15
**settling**
71:21
**Shannon**
15:16,23 75:18,19,20
75:24 76:20
**sharing**
21:8,14,21
**sheet**
16:6 88:6,8,10,12,15
91:9
**shoes**
47:13
**shop**
33:23
**shopping**
33:16
**shorthand**
1:16 87:9
**show**
20:22 21:9 23:19
46:3 57:11 68:11
**showed**
68:5,6,9,15 69:9
**side**
29:19 32:1,4 38:1,5
**sign**
88:9,13
**signature**
58:17 91:13
**signed**
40:5 54:11
**significant**
33:25 48:2 71:23
80:12
**signing**
6:5 7:8 88:11
**similar**
38:22 43:12,24 51:1
54:10 73:2,23 80:16
**simply**
51:8
**single**
13:9
**situation**



38:22,25 39:2 45:14
47:2,25 48:8 63:19
63:25 66:25 71:9
**situations**
39:7 48:14 59:4
69:22 70:11 74:3
**skimmed**
14:19 16:22
**SLAPPERY**
2:18
**slip**
34:20
**small**
30:5 31:4,5,17,18
36:25
**son**
49:12,13 51:15
**soon**
31:15
**sooner**
53:12
**sorry**
46:10
**sort**
27:13 36:6,16 43:5
48:17 70:25 73:25
75:4 81:23 82:7,11
82:23,23
**Soto**
71:2
**sought**
17:9,9 41:4
**sounds**
10:20 56:12
**source**
41:14 56:24
**space**
88:14
**Spanish**
82:4,4
**speak**
26:7,15,16,24 27:6
27:11,13,15,19 79:9
**speaking**
26:17 27:2,21 82:4,5
**special**

25:14
**specific**
20:4,9 46:4 59:22
**specifically**
13:12 14:21 44:13
58:4 71:25
**speculate**
46:4
**spend**
15:17
**spent**
13:14 14:24 15:5,14
42:22
**split**
76:17
**spoken**
27:3 66:14 79:2,5,6,7
79:12,14,15
**spring**
2:19 42:13
**St**
13:13 16:5 19:4
67:23 68:8,24 76:6
77:4 83:17
**staff**
28:1,2
**stand**
9:25 10:3
**standard**
49:9 64:10 75:9
**standing**
47:12 87:4
**start**
48:12
**started**
21:8 61:6,12 85:24
**starting**
61:12
**state**
7:25 8:19 26:19 28:6
29:14,16,18 38:2
65:8 77:25 80:13
**stated**
46:7,13 64:23 83:24
**statement**
57:23

**States**
1:1 7:14
**statues**
59:10
**statute**
52:14 59:17,18
**statutes**
52:22,23 80:24
**steps**
47:7
**STIPULATED**
6:2,10,17
**Stipulations**
5:15
**stop**
21:13 67:20
**stopped**
21:20
**straightforward**
62:22,23 75:9
**strange**
21:15
**strategic**
63:22
**STREET**
2:14
**strong**
80:22
**structure**
56:22 57:1
**students**
26:7
**studies**
25:15,15
**style**
40:16,22
**subject**
39:9 41:1 75:22
77:17 78:18 84:15
84:21 88:11
**subpoena**
4:4 20:19 22:13
23:12,15,23,25 24:2
**subscribe**
37:21
**Subscribed**

91:15
**substance**
91:8
**substantial**
56:21
**substantially**
56:18,19
**successful**
40:13
**sue**
11:9
**sued**
34:9
**suffering**
63:24 65:7
**sufficient**
48:8
**suggest**
76:17
**suit**
36:19 37:6
**SUITE**
2:4,9
**sum**
12:21
**Summerville**
40:19
**summit**
67:24
**superior**
30:1,8
**supervision**
87:10
**Supplementation**
14:10
**SUPPORT**
5:1
**sure**
9:9 13:22 22:4 28:22
41:15,16 43:22
44:15 45:24 50:19
54:2 55:4 56:18
64:7 72:7 74:21
75:3
**surprising**
45:24



**surrounding**
27:5
**survey**
52:25
**surviving**
49:13
**suspect**
12:9 76:22
**swear**
8:10
**switch**
38:4
**sworn**
6:13 8:12 28:12 87:7
  91:15

---

**T**

**T**
6:1,1 87:1,1 89:2
  90:2
**take**
9:14,15 22:3 31:23
  32:5 35:22 55:2
  67:11
**taken**
1:13 7:2,19 8:21
  28:25 47:8 50:21
  87:5
**takes**
63:13
**talking**
66:24 70:25
**teaching**
26:4,5,13
**tecum**
20:20
**Ted**
82:6
**telephone**
61:24
**tell**
13:17 25:6 34:16
  36:2 43:23 47:24
  49:4 51:8 57:6 64:7
  81:11 87:7
**template**

56:23
**ten**
44:22,25
**tend**
76:16
**tender**
17:18,22 74:7 76:10
  76:25
**tendered**
17:16 70:21 73:21
**tendering**
71:5
**terms**
36:14 44:4 52:17
  62:17,19,23
**testified**
8:13
**testify**
22:13 23:12 41:21
**testifying**
39:9
**testimony**
10:4,17 68:6 87:5,8
  87:12
**testing**
34:21 52:25
**text**
82:25 83:2
**Thank**
10:15 55:4 86:10
**thereof**
87:15
**thing**
41:11 63:14
**things**
13:4 14:11 17:9
  24:25 25:1 41:13
  58:2,9 72:8 74:23
**think**
12:22 13:13 14:12
  15:19 16:15 18:6,7
  24:1,2 29:2 31:14
  34:17,18 35:8 36:7
  37:19 38:2,17,24
  40:2,18 41:2,18
  42:13,20 43:15 44:2

45:12 46:22 56:20
  57:7 58:13,14,14,15
  62:7,13,21 63:4,7
  63:17 66:24 68:11
  69:10 70:18 71:19
  72:18,21 73:9,11,20
  73:25 74:12 75:19
  76:2,18 77:9 79:2
  84:17
**third-party**
33:17
**thirty**
88:16
**thought**
57:10 58:1,3 64:10
  72:2
**three**
11:14 14:20 15:6
  24:18,18 31:10
  33:12 36:16 38:8
  55:17 61:3,9 64:4
  76:18,19,21
**threshold**
30:3
**time**
6:8 7:7,17 9:15 11:7
  13:14 14:24 15:5,14
  15:17 24:24 25:4
  33:13 34:22 37:2
  40:24 42:18,22,22
  43:15 44:12 45:9
  52:4,6 60:1,21
  61:12,21 63:13,14
  63:20 65:13,15,24
  66:1 67:12 68:25
  70:4 73:4 78:1
  82:19 85:20,22 86:1
  87:6
**timeframe**
17:17 32:21 42:6,14
  52:13
**times**
52:5 69:19 79:19
**time-to-time**
28:2 31:24
**tine**

82:22
**titled**
55:25
**today**
7:6,17 9:4,16 12:8,13
  12:16 13:16 16:19
  20:20 23:8,11 24:14
  45:9 46:2 60:3,22
  70:8 77:18 83:24
  84:10
**told**
23:10 42:24 55:16
  84:10
**top**
18:16 37:19 40:14,23
  60:19 69:4,5 70:18
**topics**
26:8,15,16 27:1
**total**
18:23 56:10
**town**
40:20
**Tracey**
1:15 7:22 87:23
**traffic**
85:9,11,13,15
**training**
39:4 79:24 80:9
**transcribed**
87:10
**transcript**
7:9 86:15 88:17
**transcription**
87:11 91:5
**transcripts**
19:8,11
**trial**
6:9 9:19,24 10:21
  11:1 32:7,8 33:2,4
  37:24 40:14,22
  41:22 43:7
**trials**
33:5
**tried**
10:22 51:3 82:20
**trip**



62:20 75:10,10
**trucking**
33:19,20
**true**
87:12
**truth**
87:7,7,8
**try**
33:4,6 41:7 45:15
  48:16 49:23 62:20
  82:18
**trying**
9:22 60:18 75:5
  76:23
**Tuesday**
60:19,23,23
**turned**
50:4
**twenty-two**
11:5 37:16
**two**
13:4,13,15,20 14:20
  15:1 16:4,12 18:22
  18:23 19:2,3 26:20
  26:23 31:6 36:15
  43:16 49:14 51:23
  61:3 70:18 74:14
  78:2,8
**type**
29:17 48:7 80:14,25
**types**
48:13 62:16 67:13
  81:21 82:7
**typically**
35:22 76:16 81:22
  82:2

---

**U**

**U**
6:1
**uh**
9:4,4,8,13,13,16,22
  9:25 10:4,12 11:12
  11:17,18,18,22,23
  12:9,12,18,19,20
  13:3,21 14:4,4,22

14:25 15:9,9,15,19
15:19,22,24 16:5,11
17:3,6,13,17,25
18:3 19:3 21:5 24:8
24:23 26:5,13,14,17
26:22 27:1,3,13
28:2,11 29:22,23,23
30:12 31:17 32:18
32:19 33:2 34:7,9
34:17,24 35:3,16
36:3,4 38:7 39:5,16
40:2,13,21,24 41:8
42:9 43:1,1,20 44:7
44:21,25 46:13 47:6
48:4,15,20,21,23
49:6,6,12,15 50:1
50:20,21 51:11,11
51:25 52:12,13,19
53:17 54:13 56:7,23
56:23,23 57:7,18,19
58:22 59:5 60:19,21
60:22 63:15 64:9,11
64:11,13,15 65:14
65:16 66:21,25 67:3
67:12,14,21,23,24
68:22,24 69:9,15,17
69:23 71:12,15,19
71:20 73:3,15,17,19
74:22,24 75:11,13
75:18,23 77:4,25
79:24 80:12,19,24
81:14,16,20 82:3,15
83:15,18,25 84:12
84:18 85:2,3,23
86:2
**ultimately**
17:15,24 63:7 65:5
**um**
9:1,6,8,9 10:1,9,19
11:5,6,9 12:18
13:12,14,15,20,22
15:19 16:3,14,23
17:1,8,18,21 18:13
18:15,21 19:3 20:2
21:3,4 22:12,15
23:24 25:15,18 26:8

26:10 27:3,5 29:20
30:6 31:5,15 33:10
33:19 34:20,21
35:21 36:1,8,10,15
36:18,24 37:16,24
38:1,17,18,20 39:4
39:15,19 41:4,10,22
42:14 43:5,15 44:10
45:8 48:2,25 50:7
51:7,21 52:16 54:16
56:19 57:5,6 60:3
61:15 62:7 63:1,5,7
63:21,22,23 64:4,12
64:16 65:12 66:3,8
66:22 68:13 69:9,16
70:4,13,15 72:16
73:13 75:14 76:4
81:24 82:18,24
84:17 86:3
**uncommon**
39:4 64:18
**undergraduate**
25:20
**underlined**
43:7 73:24
**underlying**
35:13 39:17
**understand**
50:19
**understanding**
80:22
**Unfortunately**
71:17
**United**
1:1 7:14
**University**
25:21
**unpleasant**
11:8
**unrealistic**
62:19
**unrelated**
73:13
**unusual**
68:11,14
**use**

58:20
**usually**
33:16 37:25 82:25
**utilize**
79:21

---

**V**

**vague**
38:18
**valid**
52:8
**Vanderbilt**
25:8,11,21
**various**
26:7
**vast**
32:1
**vehicle**
48:9,10,10 49:19,19
  75:24 76:2,22
**venue**
23:6
**verbiage**
49:5
**verdict**
40:22 41:5 43:8
**verdicts**
13:25 35:9
**verified**
46:19
**versus**
7:14 10:9 37:5 57:3
  57:12 72:5 82:15
**VHARRIS@HNS...**
2:6
**video**
6:21,24 7:11
**videoconferencing**
1:14 7:3
**videographer**
2:25 6:22 7:10,20 8:9
  9:7 21:20 22:5,9
  55:5,9 86:11
**videotape**
22:16
**VIDEOTAPED**



1:12
**view**
75:3
**virtually**
7:19
**volume**
33:23
**voluntarily**
23:22
**Vs**
1:6

**W**

**want**
20:3 55:3,13,15
   64:20 67:14 72:7
   81:4
**wanted**
33:2 73:9 74:11
**way**
34:20 48:24 75:5,10
**week**
43:16
**weekly**
39:3
**weeks**
61:3,4,9
**weird**
21:12
**well-versed**
38:18 39:6
**went**
32:8 33:4 65:22
**WILLIAM**
2:8
**Willis**
53:11 75:25
**win**
70:6
**winning**
72:4
**witness**
3:2 5:3 6:13,22 7:4
   8:10 9:18 11:1 12:5
   12:11 21:16,25 22:4
   39:24 55:15,22

86:13 87:13,17 88:1
**WITNESSES**
3:1
**won**
69:16 71:13
**work**
19:6 31:22,22,23
   32:2,4 34:4,13
   37:11,22 52:25
   80:14 85:17,21
**worked**
31:4,13 42:16
**working**
30:25 32:18
**worries**
55:24
**worry**
67:2
**wreck**
33:19 39:22
**write**
66:22 77:10,12
**writing**
26:8 62:25 63:11,11
   66:8 74:22 75:14
**written**
55:25 66:4
**wrong**
62:8
**wrongful**
29:21 30:4 33:9,22
   63:15 64:1 65:11,14
   65:17,22 71:20,22
   72:6 73:3,10,17
   74:2,4
**wrote**
63:15 75:20
**www.MagnaLS.com**
1:22
**W2**
30:12

**Y**

**yeah**
13:14 21:10,18 22:1
   60:21 61:20 64:9

70:23 73:8 74:11
   80:3 82:16
**year**
10:16 25:12,22 26:20
   28:11,12 42:15
**years**
9:22 11:5 31:9 33:12
   37:17 38:6,8 52:21
   78:2,8 80:10,11
**young**
84:18

**Z**

**zealous**
48:24
**Zoom**
1:13 7:2

**$**

**$1,100**
83:6
**$1,100.00**
44:10
**$100,000**
18:7,9 71:14,17
**$100,000.00**
18:6,8
**$25,000**
76:25
**$25,000.00**
48:11
**$300,000**
18:7
**$50,000**
18:10 76:18
**$6,000**
45:5
**$6,600.00**
44:21
**$600**
83:8
**$600.00**
44:6,11

**1**

**1**

4:4 7:11 16:9,10
   20:24,25 21:3 22:13
   22:18 57:24
**1:23-CV-03491-ELR**
1:4
**10**
40:21
**10:03**
1:15 7:7,18
**10:21**
22:5
**10:25**
22:10
**100**
37:17
**11**
72:14
**11:07**
55:6
**11:27**
55:10
**119**
2:14
**12:06**
86:12
**1450**
2:4
**15**
82:17
**16.6**
76:22
**17**
2:9
**1998**
25:23

**2**

**2**
4:5 9:24 55:11,25
   62:6
**20/25**
4:4
**2001**
25:13 28:10,11
**2002**
28:12,13 32:24



**2005**
32:24
**2008**
85:22
**2009**
85:22
**201**
2:3
**2010**
29:15 78:4 86:1
**2020**
29:15
**2021**
29:11,13
**2022**
10:18
**2024**
1:14 7:6,17 87:18
    91:16
**22**
81:20
**25**
1:14 7:6,17
**26A2B**
56:2

---
**3**
---
**3**
4:6 60:8,9 66:21
**3:00**
60:19
**30**
50:7 52:13 68:16,25
    74:22 88:16
**30th**
87:18
**300**
2:9
**30030**
2:14
**30328**
2:19
**30329**
2:10
**3113**
6:19

**33301**
2:4
**352**
2:19

---
**4**
---
**4**
16:14
**404**
2:15
**467-7900**
2:5

---
**5**
---
**5**
58:18 78:17
**5th**
15:2,3
**522-7744**
2:15
**55/11**
4:5

---
**6**
---
**6**
5:17 78:17
**6th**
13:24 15:3,3 16:5
    67:22 68:25 83:17
**60/9**
4:6
**624-6221**
1:21

---
**8**
---
**8**
3:7
**866**
1:21

---
**9**
---
**9th**
14:3
**9-11-06.1**
75:7
**9-11-67.1**

51:12,16 52:1,17
    59:19 81:1
**9-11-68**
40:1
**954**
2:5

