UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIRECT GENERAL
INSURANCE COMPANY,

               Plaintiff,

vs.

CHRISTOPHER EVANS and POLINA
DENISSOVA, individually and as co-
administrators of the ESTATE OF
ANDREW EVANS, ROGER
HARTSFIELD, and D. MAX HIRSH, as
administrator of the ESTATE OF
SHANNON HARTSFIELD,

               Defendants.

CASE NO. 1:23-cv-03491-ELR

---

## **DIRECT GENERAL INSURANCE COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Direct General Insurance Company ("Direct General"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, respectfully states as follows for its Brief in Support of its Motion for Summary Judgment:

## **INTRODUCTION**

This action centers on whether Direct General was obligated to swallow a poison pill to its insureds' detriment in the face of multiple fatality and bodily injury claims and minimal policy limits. In the underlying 2018 car accident, four people died and three survivors sustained injuries. In the course of attempting to resolve the profound exposures facing the insureds, Direct General pursued the "go to" option

of a global settlement conference ("GSC"). D. Max Hirsh (the "Administrator"), Administrator for the Estate of Shannon Hartsfield, contends that Direct General erred in its handling of the claim by failing to accept two demands, to the detriment of other claimants. The facts and law, however, do not support the Administrator's theories, and Direct General is entitled to judgment in its favor.

Direct General seeks a declaration that it owes no duty to pay amounts in excess of the limits available under personal auto insurance policy no. 09GABD590003426 (the "Policy"), subject to a $25,000 per person bodily injury limit and a $50,000 per accident bodily injury limit. In particular, it owed no duty to settle as a threshold matter, but even if it did, Direct General acted as a reasonable and prudent insurer in handling the demand at issue. The Administrator filed counterclaims against Direct General for failure to settle under common law, attorneys' fees, and punitive damages. As set forth below, summary judgment is warranted in Direct General's favor on the declaratory claim and the counterclaims.

## STATEMENT OF FACTS

Direct General incorporates herein its Statement of Material Facts ("SOF") filed contemporaneously with this motion and brief.

Direct General issued the Policy to Roger Hartsfield ("R. Hartsfield") and Shannon Hartsfield ("S. Hartsfield") for the policy period of April 17, 2018 to January 30, 2019. (SOF, ¶ 1). The Policy is subject to bodily injury limits of $25,000

per person and $50,000 per accident, and property damage limits of $25,000 per accident. (SOF, ¶ 3). A 1996 Toyota Avalon was listed on the Policy's declarations page as an insured vehicle. (SOF, ¶ 2).

On July 27, 2018, S. Hartsfield operated the Toyota Avalon with passengers, Nancy Evans ("N. Evans"), Andrew Evans ("A. Evans"), and Richie Willis ("Willis"). (SOF, ¶ 4).[1] That day, the insured vehicle collided with a vehicle driven by Shannon Justus ("Justus"), in which his two minor sons were passengers; as a result of the collision, all occupants of the Toyota Avalon perished and the occupants of the Justus vehicle sustained bodily injuries. (SOF, ¶ 5).

On August 1, 2018, Direct General received notice of the accident from the Justuses' carrier. (SOF, ¶ 6). On August 2, 2018, Direct General spoke with R. Hartsfield and received a copy of the police report. (SOF, ¶ 9). Later that day, Direct General noted an action plan to contact all involved in the loss and to "[a]ttempt to resolve all [claims] within Limits 25/50." (SOF, ¶ 10).

On August 6, 2018, Direct General received a letter of representation from attorney Glenda Mitchell on behalf of Willis' family advising of her representation and seeking insurance information. (SOF, ¶ 11). On August 7, 2018, Direct General received letters of representation and statutory disclosure requests from Montlick &

---

[1]    Please note that the only remaining claims at issue are those pertaining to A. Evans.

Associates attorney Rory Chumley on behalf of Christopher Evans ("C. Evans"), father of A. Evans and son of N. Evans, who advised that "any discussion of the matter at this time would be premature." (SOF, ¶¶ 12-14).

On August 8, 2018, Ms. Matoy, called Montlick & Associates to discuss the disclosure requests. (SOF, ¶ 16). Ms. Matoy spoke with assistant, Kim Webb, and asked whether the firm required a certified copy of the Policy. (SOF, ¶ 16). After Ms. Webb advised that a copy of the Policy declarations would suffice, Ms. Matoy emailed her an acknowledgment letter and a copy of the declarations (SOF, ¶ 17).

On August 9, 2018, Direct General received two time-limited demands from Montlick & Associates with respect to the wrongful deaths of A. Evans and N. Evans. (SOF, ¶ 18). The demand pertaining to A. Evans (the "A. Evans Demand") identified Polina Denissova ("Denissova") as A. Evans' mother, but it explicitly noted that Montlick & Associates represented only C. Evans' interests as surviving father of A. Evans. (SOF, ¶¶ 28, 31). At the time of the accident and as of August 9, 2018, C. Evans and Denissova were divorced. (SOF, ¶ 30).

The A. Evans Demand indicated settlement would be only for C. Evans' "claims (wrongful death of [A.] Evans) against [S.] Hartsfield and/or the Estate of [S.] Hartsfield arising out of the above-referenced motor vehicle collision for an amount within policy limits to the extent provided in the attached limited liability release." (SOF, ¶ 19). The A. Evans Demand provided that the "claims released by

accepting this offer are all wrongful death claims against [S.] Hartsfield and/or the Estate of [S.] Hartsfield, subject to the terms of the attached limited liability release." (SOF, ¶ 22). The draft release included with the A. Evans Demand reflected in bold lettering at the top "LIMITED LIABILITY RELEASE WRONGFUL DEATH ONLY[.]" (SOF, ¶ 24). Denissova was not listed as an independent releasing party under the A. Evans Demand or in the attached release. (SOF, ¶ 29). R. Hartsfield was not mentioned as a releasee in the A. Evans Demand, but he was listed as a releasee in the draft release that was provided. (SOF, ¶¶ 26-27). The A. Evans Demand mentioned that Montlick & Associates had not set up an estate on behalf of A. Evans and that they would not set up an estate in the future. (SOF, ¶ 32).

The A. Evans Demand stated that it was brought pursuant to O.C.G.A. § 9-11-67.1. (SOF, ¶ 35). To settle, Direct General was demanded to pay "the amount of $100,000 + the amount of 'ALL AVAILABLE INSURANCE FUNDS[.]'" (SOF, ¶ 36). The A. Evans Demand stated that the $100,000 figure was used for "example purposes only." (SOF, ¶ 39). It also provided that "if the limit of coverage is higher than this amount, our demand will be for said higher amount," but did not contain a similar floor. (SOF, ¶¶ 40-41).

The A. Evans Demand defined "ALL AVAILABLE INSURANCE FUNDS" as "inclusive of but not limited to" the following: (a) the full policy of insurance on the Toyota Avalon, noting that "if the limit of coverage is higher than this amount,

the demand is for that higher amount;" (b) the full policy limits of insurance of any other vehicle or viable insurance in effect on July 27, 2018 which would provide coverage to the accident; and (c) the full policy limits of insurance for any umbrella coverage via homeowners, corporation, or business insurance that would afford coverage to S. Hartsfield for the accident. (SOF, ¶ 37).

The A. Evans Demand provided that if it was alleged that only the Policy afforded coverage to the subject accident, then Montlick & Associates would require affidavits "attesting to same" from R. Hartsfield, any other person living in the household of S. Hartsfield, and a representative of Direct General. (SOF, ¶ 38).

On August 10, 2018, attorney Chumley sent a demand to C. Evans' uninsured motorist carrier, Allstate, acknowledging "that the defendant vehicle only had minimal coverage of $25,000.00 / $50,000.00 of liability coverage." (SOF, ¶ 42).

Also on August 10, 2018, Direct General's adjuster, Ms. Matoy, noted receipt of the two demands from C. Evans as "both for $100,000" and that she "need[ed] to review with supervisor as we have another fatality in [the insured vehicle] and he does not have UM coverage." (SOF, ¶ 43).

On August 13, 2018, Direct General's regional claims manager, Andrew Quackenbush, emailed Ellen Greer, Direct General's in-house counsel, stating that he believed Direct General "should look at some sort of [GSC] given all the potential exposures," and that he would "appreciate any guidance [Ms. Greer] can provide."

(SOF, ¶ 44). Later that day, Ms. Greer sent an email to Mr. Quackenbush agreeing that in light of the three fatality claims, "it would be a good idea to engage Mike St[.] Amand to negotiate a global pro rata settlement of all parties, and to meet the respective terms of each demand letter." (SOF, ¶ 45).

On August 15, 2018, Ms. Matoy noted that she was "[s]ending MCC [multiple competing claimant] excess letter to [R. Hartsfield] with copy of demand." (SOF, ¶ 48). Thereafter that day, Ms. Matoy issued a letter to R. Hartsfield notifying him of potential excess exposure posed by claims that have or may arise out of the subject accident. (SOF, ¶ 49). The letter also advised R. Hartsfield that he had the right to retain independent counsel and was accompanied by a copy of the A. Evans Demand (as well as the demand for N. Evans). (SOF, ¶ 50).

On August 15, 2018, Direct General retained attorney Michael St. Amand to assist in the tender of its limits to all claimants involved in the subject accident at a GSC. (SOF, ¶ 51).

On August 21, 2018, attorney Matthew Hagen with the firm Hagen Rosskopf, LLC faxed a letter of representation to Direct General on behalf of Denissova. (SOF, ¶ 55). An affidavit accompanying the letter of representation advised that Denissova was "making a claim against your insured for injuries sustained by [her] resulting from your insured's breach of duty of care to me." (SOF, ¶ 56).

On August 23, 2018, attorney Jack Witcher issued a letter of representation to Direct General on behalf of Justus. (SOF, ¶ 57).

On September 4, 2018, Ms. Matoy called counsel for Justus and Willis and advised them of the impending issuance of a letter advising that a GSC would be scheduled for October 8, 2018. (SOF, ¶ 59). Ms. Matoy also attempted to call counsel for C. Evans and Denissova and left a message for a call back. (SOF, ¶ 60). On September 6, 2018, Montlick & Associates returned the call at which time Ms. Matoy advised them of the anticipated GSC. (SOF, ¶ 61).

On September 5, 2018, Mr. Quackenbush emailed attorney St. Amand to discuss whether the GSC was the appropriate avenue for resolution. (SOF, ¶ 62). In particular, Mr. Quackenbush asked, "[b]y setting up the GSC have we protect[ed] ourselves from any Holt type exposure? Is there anything else we need to be doing? I just want to make sure we are okay as we are coming up on 30 days from our initial receipt of the demand via fax." (SOF, ¶ 62). In response, attorney St. Amand advised it was a "[g]ood question and no good answer." (SOF, ¶ 63). More specifically, Mr. St. Amand advised that "there is no absolute way to create a 'safe harbor' from potential excess exposure" and that "Georgia law simply requires that the carrier act in a manner that holds the interests of its insureds at least equal to its own." (SOF, ¶ 64).

Mr. St. Amand acknowledged that "[c]ase law allows the carrier to settle certain claims to the detriment of others so long as the carrier is acting in good faith." (SOF, ¶ 65). He added, however, that "[i]n a situation like what we have here," the following should be done:

> the carrier should act reasonably to attempt to treat all claimants fairly and to minimize the insured's potential "personal" exposure.
>
> Scheduling a [GSC] has become the "go to" choice to resolve multiple high exposure losses where there are not enough limits.
>
> By scheduling the [GSC] and tendering limits, we are doing everything we can reasonably do to accomplish our goals.

(SOF, ¶ 66).

Mr. St. Amand added that "with 3 fatalities and others with unknown injuries and damages, my belief is this is the best option." (SOF, ¶ 67). He further stated that he "noticed that the attorneys representing survivors have not indicated that the estate claims for pain and suffering, medical and funeral expenses are being addressed. We do want to make sure ALL claims are resolved to the extent possible. We may not be able to force anyone to set up an estate, but we should ask on the front end." (SOF, ¶ 68).

On September 6, 2018, Mr. Quackenbush shared attorney St. Amand's email response with Ms. Greer, as well as his supervisors, asking if she was "comfortable with the plan of action?" (SOF, ¶ 69). Ms. Greer advised Mr. Quackenbush that she agreed with the plan. (SOF, ¶ 71).

Later on September 6, 2018, attorney St. Amand issued a letter via email to attorneys Chumley, Witcher, Mitchell, and Hagen. (SOF, ¶ 72). Pursuant to the cover email, attorney St. Amand advised that Direct General had approved the tender of its policy limits of $50,000 "to resolve all claims" against its insured from the subject accident. (SOF, ¶ 73). The attached letter identified N. Evans, A. Evans, Willis, Justus, and Justus' two sons as potential claimants with claims arising out of the subject accident. (SOF, ¶ 74). The letter reiterated that Direct General agreed to tender its "per accident" limits of $50,000 among the claimants "and in an effort to be fair to all claimants and to its insured, would like the available limits to be allocated between all claimants based upon their relative injuries and damages." (SOF, ¶ 75).

Attorney St. Amand advised that "[i]n order to fairly address the interests of all claimants, Direct General is asking representatives of all interested parties to attend a [GSC] to determine a fair allocation of Direct General's $50,000.00 limits that is acceptable to all." (SOF, ¶ 76). The letter then advised of the scheduled GSC on October 8, 2018. (SOF, ¶ 77). Attorney St. Amand further requested that claimants submit information in advance of the GSC to make sure that liens and other sources of payment are taken into consideration while allocating the limits. (SOF, ¶ 78). Additionally, attorney St. Amand explicitly requested that wrongful death claimants identify "who will be acting as administrator(s) or executor(s) of the

estates to ensure that the claims for pain and suffering, medical expenses, funeral and burial expenses are being addressed." (SOF, ¶ 79). Mr. St. Amand's letter reiterated that "[i]t is Direct General's desire that any settlement be a complete resolution of all claims[.]" (SOF, ¶ 80).

On September 7, 2018, Mr. Quackenbush noted that an excess letter and demand had been sent to R. Hartsfield and that Ms. Matoy "has been in contact with [R. Hartsfield] by phone as well, he is aware of [the] steps we are taking to protect his interests." (SOF, ¶ 81).

The following day, Ms. Matoy again attempted to call R. Hartsfield to discuss the resolution plan, but was unable to reach him or leave a message. (SOF, ¶ 82).

Following issuance of attorney St. Amand's September 6, 2018 letter, neither Direct General nor attorney St. Amand received any response to the letter advising that the GSC was unacceptable. (SOF, ¶ 86). In advance of the GSC, on October 4, 2018, attorney St. Amand was advised by counsel for Willis and counsel for Denissova that representatives for Willis, Denissova, and C. Evans would attend the GSC. (SOF, ¶ 87). On October 5, 2018, Direct General adjuster, Robert Jackson, noted that he spoke with Mr. St. Amand, who advised that all lawyers, except Witcher, responded and agreed to the time coordinated for the GSC. (SOF, ¶ 88).

On October 8, 2018, attorney St. Amand oversaw the scheduled GSC, attended by attorneys Chumley, Hagen, and Mitchell. (SOF, ¶ 88). At the GSC,

attorney Mitchell advised that her client expressed interest in resolving her client's claims. (SOF, ¶¶ 96- 97). However, attorneys Chumley and Hagen took the position that "Direct General failed to respond timely to the time limit demands sent by Mr. Chumley on behalf of his clients and are unwilling at this time to settle within limits, allocate Direct General's limits or entertain settlement at all." (SOF, ¶ 93). Mr. St. Amand relayed to Direct General that Chumley was of the position that "the only options to Direct General were to accept the policy limit demands to the detriment of the parties who failed to make time limit demands or to seek clarification as to the terms of settling without 'rejecting' the demands." (SOF, ¶ 94). Mr. St. Amand advised that "Mr. Hagan now seems to have joined forces with Chumley although the parents seem to have been pursuing their interests separately[.]" (SOF, ¶ 95).

Nearly two years later, on October 6, 2020, C. Evans and Denissova, individually and as Co-Administrators of the Estate of A. Evans, filed suit in the State Court of DeKalb County against D. Max Hirsh, as Administrator of the Estate of S. Hartsfield (the "Underlying Lawsuit"). (SOF, ¶ 98). The complaint asserted counts for negligence and bad faith against S. Hartsfield, and sought wrongful death damages, medical and final expenses, and estate damages. (SOF, ¶ 99).

The Underlying Lawsuit proceeded to jury trial and on July 19, 2023, the jury returned a verdict in favor of C. Evans and Denissova in the amount of $14 million. (SOF, ¶ 100). On August 2, 2023, the Court entered a final judgment for same (SOF,

¶¶ 101). On April 26, 2024, an attorney's fees award of $453,838.61 was entered in C. Evans and Denissova's favor in the Underlying Lawsuit. (SOF, ¶ 102).

## ARGUMENT AND LEGAL AUTHORITY

### A.    Standard for Summary Judgment

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party, and is material if it might change the suit's outcome. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When ruling on a motion for summary judgment, the Court must view all evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must show the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial in order to survive summary judgment. *See id.* at 324-26. The essential question is "whether the evidence

13

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Id.* at 252.

**B.   The A. Evans Demand Did Not Trigger Direct General's Duty to Settle as a Matter of Law**

In Georgia, an insurer "may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim within the policy limits." *First Acceptance Ins. Co. of Ga. v. Hughes*, 826 S.E.2d 71, 74 (Ga. 2019) (citing *Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E.2d 519 (Ga. 2003)). "The elements of a negligent or bad faith failure to settle a claim are straightforward: '[T]he insured may sue the insurer for failure to settle only when the insurer had a duty to settle the case, breached that duty, and its breach proximately caused damage to the insured beyond the damages, if any, contemplated by the insurance contract.'" *GEICO Indem. Co. v. Whiteside*, 311 Ga. 346, 352 (2021) (quoting *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1546-47 (11th Cir. 1991)).

With respect to the first element, "an insurer's duty to settle arises only when the injured party presents a valid offer to settle within the insured's policy limits." *Hughes*, 826 S.E.2d at 73; *see also Barrett v. Safeway Ins. Co.*, 2021 Ga. Super. LEXIS 1281, *5 (Ga. Sup. Ct., DeKalb Cnty., Mar. 19, 2021) (granting carrier

summary judgment and noting that a valid offer in compliance with O.C.G.A. § 9-11-67.1 was an "essential element" to a negligent failure to settle claim).

After significant disagreement between the plaintiff and defense bars over questions bearing on this issue, such as "what constitutes an offer to which an insurer must respond . . . and how much time an offeror must provide for a response in order to trigger an insurer's duty to respond," the Georgia legislature enacted O.C.G.A. § 9-11-67.1. *See Grange Mut. Cas. Co. v. Woodard*, 797 S.E.2d 814, 822 (Ga. 2017). The version of O.C.G.A. § 9-11-67.1 applicable to causes of action for bodily injury and death arising from the use of motor vehicles between July 1, 2013 and July 1, 2021 provided that offers to settle required the following material terms: (1) the time period to accept the offer (which must be at least 30 days); (2) the amount of monetary payment; (3) the parties to be released; (4) the type of release to be provided by the offeror; and (5) the claims to be released.

As set forth below, summary judgment is warranted in Direct General's favor because the A. Evans Demand was not a valid offer to settle all claims arising from the accident within the Policy limits.

### 1. The Demand Was Not a Valid Offer under Georgia Law and Thus Did Not Trigger a Duty to Settle

In *Shin v. Infinity Ins. Co.*, No. 1:18-cv-01954-WMR, 2020 U.S. Dist. LEXIS 258902, at *8-12 (N.D. Ga. Mar. 4, 2020), the court granted the carrier summary judgment on a failure to settle claim in a multiple fatality, multiple competing

claimant, and insufficient limits scenario (as is the case here), holding that a settlement demand did not trigger a duty to settle and was invalid, in part, because it did not clearly offer to resolve the estate and wrongful death claims against the insureds for within the available limits.

In this case, numerous infirmities and inconsistences in the A. Evans Demand rendered it facially invalid and incapable of acceptance. First, the A. Evans Demand did not clearly set forth terms that complied with O.C.G.A. § 9-11-67.1, including the amount of monetary payment required to settle. For instance, attorney Chumley demanded payment in "the amount of $100,000 + the amount of 'ALL AVAILABLE INSURANCE FUNDS[.]'" (SOF, ¶ 36). The demand further provided that Chumley "also demand[ed] tender of 'ALL AVAILABLE INSURANCE FUNDS,'" which term purportedly encompassed payment of other potential carriers' limits. (SOF, ¶ 37). Although Chumley maintained in the correspondence that the $100,000 figure was used for illustrative purposes, he also expressed more than once that "if the limit of coverage is higher than this amount, our demand will be for" that higher amount. (SOF, ¶¶ 39-40). This was so even though his office was explicitly apprised of the limits two days prior and, indeed, Chumley issued a demand to Allstate on August 10, 2018 acknowledging that Direct General's available limits were $25,000. (SOF, ¶¶ 16-17, 42).

At its core, the A. Evans Demand set a payment floor of $100,000. In fact, when Ms. Matoy reviewed the two demands from attorney Chumley, she noted that they were both for $100,000. (SOF, ¶ 43). The Georgia Supreme Court, however, has clarified, that carriers have no "affirmative duty . . . to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits." *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 687 (2003). Because Direct General had no affirmative duty to negotiate with Chumley upon presentment of the A. Evans Demand, the demand was an invalid offer to settle as a matter of law.

Moreover, even if the Court were to construe all of the evidence in a light most favorable to the Defendants, the A. Evans Demand was still fatally imprecise and uncertain as to its most basic term: payment amount. *See, e.g.*, *Am. Viking Contractors, Inc. v. Scribner Equip. Co.*, 745 F.2d 1365, 1369 (11th Cir. 1984) ("Under Georgia law, an alleged contract cannot be enforced in any form of action if its terms are vague, indefinite and uncertain."). "Clarity and specificity of essential terms are [] requirements of a valid contract." *Johnson v. Univ. Health Servs.*, 931 F. Supp. 1572, 1581 (S.D. Ga. 1996). "Like any contract, a settlement agreement must show a meeting of the minds as to all essential terms: the parties must agree on all material terms, and those terms cannot be incomplete, vague, uncertain or indefinite." *McDearis v. Last Resort Grill*, Nos. 3:20-cv-93-CDL, 3:20-cv-93, 2022

U.S. Dist. LEXIS 50680, at *6 (M.D. Ga. Feb. 10, 2022) (citation omitted). Such clear, definite, precise, and certain language was lacking.

Second, the A. Evans Demand was wholly unclear as to who is even subject to its terms. For instance, in one breath, the demand represented that it was a "reasonable opportunity to settle Christopher Evans' claims (wrongful death of Andrew Evans) against Shannon Marie Hartsfield and/or the Estate of Shannon Marie Hartsfield[.]" (SOF, ¶ 19). However, in the very next breath, the "DRAFT limited liability release" provided by Chumley "FOR EXAMPLE PURPOSES ONLY" reflected that payment of $100,000 "OR THE LIMIT OF COVERAGE IF FOUND TO BE HIGHER AS PER OUR CORRESPONDENCE OF 08/09/18" would cause C. Evans to "acquit, remise, release, and forever discharge [S. Hartsfield], The Estate of [S. Hartsfield] and [R. Hartsfield]." (SOF, ¶ 25). Indeed, while the proposed release was for example purposes, the A. Evans Demand expressly provided that claims released were "subject to the terms of the attached limited liability release." (SOF, ¶ 22). Denissova, who was not a party to the A. Evans Demand, was also not a releasing party. (SOF, ¶ 29).

Undeniably, R. Hartsfield should have always been a releasee from any and all claims. But the A. Evans Demand is composed in such an unclear and internally inconsistent manner that even though the "claims released by accepting this offer [were] all wrongful death claims against [S. Hartsfield] and/or the Estate of [S.

Hartsfield], subject to the terms of the attached limited liability release," *see* (SOF, ¶ 22), there was no clarity whether acceptance would release R. Hartsfield. Likewise, there was no certainty that Denissova would release him (or the S. Hartsfield estate) for wrongful death claims she shared with C. Evans, much less any claims she potentially had separate from him. To be clear, R. Hartsfield's name and identity is expressly omitted from the demand itself as a party that would be released from liability, but was included in the release whose terms controlled the A. Evans Demand. (SOF, ¶¶ 26-27). As was the case with the deficient payment term, construing all of the evidence in a light most favorable to the Defendants, the A. Evans Demand is fatally imprecise and uncertain as to the "party or parties the claimant or claimants will release if such offer is accepted" and "[t]he claims to be released." *See* O.C.G.A. § 9-11-67.1(a)(3), (5).

Third, the A. Evans Demand required the exercise of conditions well-beyond Direct General's control to even accept it. For example, the demand requested payment of "ALL AVAILABLE INSURANCE FUNDS," which invoked other potential carriers' policies. And the demand further requested completion of affidavits from R. Hartsfield and any other persons living in the household of S. Hartsfield. (SOF, ¶ 38). However, the A. Evans Demand was issued only to Direct General, who could only offer its own limits of liability, and Direct General could not force anyone other than R. Hartsfield to comply with the affidavit request.

Accordingly, for these individual and collective reasons, the A. Evans Demand was not a valid offer capable of acceptance under O.C.G.A. § 9-11-67.1 so as to trigger Direct General's obligation to settle as a matter of law.

### 2. The Demand Was Not an Offer to Settle All Claims Within Policy Limits and Thus Did Not Trigger a Duty to Settle

As noted above, the A. Evans Demand is facially a request for above-Policy limits amounts to settle the wrongful death claim. But, more importantly, in the context of fatality-related claims arising from accidents, "Georgia law is clear that while there is separate and distinct recovery for the Estate and the wrongful death beneficiaries, recovery is limited to the per-person bodily injury liability limit. Therefore, a demand by the Estate for the entire policy limits is not a demand within limits because it excludes the wrongful death claim." *Shin*, 2020 U.S. Dist. LEXIS 258902, at *11 (internal citation omitted). And the same exists vice versa.

In this vein, the United States Court of Appeals for the Eleventh Circuit has recognized that a carrier "is not liable for failing to respond to a time-sensitive offer to settle for policy limits when the offer does not resolve fully the claim against its insured." *See Linthicum v. Mendakota Ins. Co.*, 687 F. App'x 854, 857 (11th Cir. 2017) (citing *Baker v. Huff*, 747 S.E.2d 1, 7 (Ga. Ct. App. 2013)). This is because a carrier has "no duty to engage in negotiations concerning a settlement demand that [is] in excess of the insurance policy's limits." *Id.* at 858.

In *Linthicum*, an insurer was presented with a demand to settle a wrongful death claim, but not the corresponding estate claim, in exchange for the available policy limits. *See id*. at 856-57. Like here, no estate had been set up nor had a personal representative been appointed at the time the demand was issued. *See id.* at 857-58. The claimants argued that their demand triggered the insurer's duty to settle because it was for "full settlement" and they "presented no estate claim[.]" *See id. Id*. at 858. The court, however, disagreed, explaining that this was "not an offer to fully settle a claim within the policy limits to which Mendakota Insurance had a duty to respond." *See id.* at 857-58 (cleaned up). In particular, like here, the estate claim cause of action "potentially was available" to the claimants. *See id.* at 858. Indeed, the Eleventh Circuit found it "undeniably" true that the claimants had "the right to decide what claim they would present and what claim they would not present," *id.*, but "even so, the possibility existed that they could sue both for the wrongful death of their child and for his pain and suffering," the latter of which belongs to the estate. *Id*. (cleaned up). As such, the appellate panel affirmed the district court's grant of summary judgment in favor of the insurer, holding that the insurer "was not obligated to accept the Linthicums' offer to settle only the 'wrongful death claim' or to continue negotiations because the offer would have exceeded the policy limits" by reason of the potential estate claim. *Id*. at 858-59.

Here, attorney Chumley recognized the existence of potential estate claims in the A. Evans Demand—because such claims, even if unperfected at that moment like in *Linthicum*, always existed for the parents to pursue individually or together. Hence why Chumley could only state in the A. Evans Demand that *his firm* would not set up an estate. Denissova, after all, was separately represented and could not be bound to the estate claim commentary mentioned in the A. Evans Demand. She was noticeably not a party to the demand or the release. And Chumley's draft release, expressly entitled "LIMITED LIABILITY RELEASE WRONGFUL DEATH ONLY," *see* (SOF, ¶ 24), necessarily left an estate claim unaddressed.

Most importantly, underscoring the halfhearted nature of Chumley's commentary and validating the very concerns Direct General had about accepting the A. Evans Demand, C. Evans and Denissova later established an estate for A. Evans *and* brought an estate claim in the Underlying Lawsuit. (SOF, ¶ 99). Simply put, as with the demand in *Linthicum*, the A. Evans Demand did not resolve all fatality-related A. Evans claims arising from the accident. And as with *Linthicum*, *Shin*, and *Baker*, the subject A. Evans Demand promoted piecemeal claim resolution rather than full and complete protection for the insureds. Direct General's duty to settle, accordingly, was not triggered as a matter of law by the A. Evans Demand.

**C.**    **Even if Direct General Owed a Duty to Settle, It Did Not Act Unreasonably or Imprudently in Its Handling as a Matter of Law**

Even if Direct General's duty to settle was triggered by the A. Evans Demand, Direct General is entitled to judgment as a matter of law because it is indisputable that Direct General acted reasonably and prudently in response to the A. Evans Demand. In other words, it never breached any duty owed to the insureds.

"Regardless of the type of coverage at issue, the unreasonableness of the insurer's conduct is at the heart of a negligent or bad faith failure-to-settle claim, and the reasonableness of the insurer's actions or decisions must be judged at the time they were taken or made." *Whiteside*, 311 Ga. 346 at 352. Generally, the reasonableness of an insurer's actions is a question for the jury and turns on the totality of the circumstances. *See Hallmark Ins. Co. v. Fanin*, No. 1:17-CV-04839-CAP, 2019 U.S. Dist. LEXIS 132717, at *14 (N.D. Ga. June 24, 2019). Nonetheless, Georgia courts have recognized that summary judgment in favor of carriers can be entered on common law failure to settle claims where appropriate. *See, e.g.*, *Hughes*, 826 S.E. 489; *Baker*, 323 Ga. App. 357; *Linthicum*, 687 F. App'x 854.

With respect to settlement, an insurer must give its insured "the same faithful consideration it gives its own interest." *See S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 269 (1992) (citation omitted). To promote equal consideration of the insured's and the carrier's interests, the "applicable standard of care requires that the insurer 'must use such care as would have been used by an ordinarily prudent insurer with no

policy limit applicable to the claim.'" *See Baker*, 323 Ga. App. at 363 (citation omitted). "Whether the basis for imposing tort liability on the insurer is phrased in terms of bad faith or negligence, an insurer may be liable for damages for failing to settle for the policy limits if, but only if, such ordinarily prudent insurer would consider that choosing to try the case rather than accept an offer to settle within the policy limits would be taking an unreasonable risk that the insured would be subjected to a judgment in excess of the policy limits." *Id.* (cleaned up). "An ordinarily prudent insurer does not incur liability 'solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney.'" *Id.* (citing *Holt*, 262 Ga. at 269). Instead, "[t]o find that the insurer acted unreasonably in declining to accept a time-limited settlement offer, the facts must be sufficient to permit a jury to find that no ordinarily prudent insurer would have declined to accept the offer." *See id.*

In evaluating whether the insurer acted reasonably under the totality of the circumstances, Georgia courts evaluate nonexclusive factors, including: clarity of the insured's liability; degree to which the damages are ascertainable; insurer's actual knowledge of liability and damages; insurer's failure to inform its insured about the settlement offer; insurer's diligence in conducting a reasonable investigation to discover the relevant facts; and terms of the settlement offer and any response by the insurer. *See Fanin*, 2019 U.S. Dist. LEXIS 132717, at *14 (citation

omitted); *Baker*, 323 Ga. App. at 364. Additional factors include "whether there has been a reasonable valuation of the case and whether, at each stage, rejections of settlement demands were consciously made in terms of deliberative judgment and evaluation, as opposed to rejections based on other or no reasons." *Camacho v. Nationwide Mut. Ins. Co.*, 287 F.R.D. 688, 698 (N.D. Ga. 2012) (citations omitted).

When faced with multiple claimants with claims likely exceeding insufficient limits, as here, "a liability insurer may, in good faith and without notification to others, settle part of multiple claims against its insured even though such settlements deplete or exhaust the policy limits so that remaining claimants have no recourse against the insurer." *Miller v. Ga. Interlocal Risk Mgmt. Agency*, 232 Ga. App. 231, 231, 501 S.E.2d 589 (Ga. App. 1998) (citing *Allstate Ins. Co. v. Evans*, 200 Ga. App. 713, 714-15 (1991)). However, an insurer is *not* obligated to settle claims on a first-come-first served basis nor obligated to settle fewer than all claims; instead, "[w]hether to evaluate claims for settlement one at a time or together is in the discretion of the insurer." *Id*. at 232. In this respect, the Georgia Supreme Court has explained that "*Miller* does not require that an insurer settle part of multiple claims" but rather, like here, settlement of multiple claims can be "in the insured's best interest as it would reduce the overall risk of excess exposure," especially where claimants express interest in attending a GSC. *See Hughes*, 305 Ga. at 497.

Here, no reasonable factfinder could conclude that Direct General acted unreasonably, imprudently, negligently, or in bad faith by not accepting the N. Evans and A. Evans Demands before their expiration deadlines. Direct General never challenged coverage or liability, or maintained that its limits adequately compensated all claimants or anyone in particular. Rather, beyond those of A. Evans and N. Evans, significant claims existed for other fatality and non-fatality claimants such that Direct General's insureds would have faced profound personal exposure had the policy limits been exhausted. As such, after consideration by senior claims leadership, in-house counsel, and outside counsel, Direct General tendered the entirety of the Policy limits globally to all claimants within the time period to respond to the A. Evans Demand. (SOF, ¶¶ 20, 72-75). This was the "go to" option for how to proceed in these trying circumstances. (SOF, ¶ 66). And, all decedents' counsel agreed to attend the GSC without objection or reservation of any kind.

Had Direct General exhausted its full per person policy limits in response to the A. Evans and N. Evans Demands, the insureds would have been exposed to an additional fatality claim (Willis), three bodily injury claims (the Justuses) of unknown severity, and estate claims from N. Evans and A. Evans. Further, Direct General would have no obligation under its Policy to defend the insureds against any of those claims once the limits were depleted. This topsy-turvy situation does not minimize exposures or maximize protections for the insureds. In fact, the opposite.

Attorney Chumley callously argued that Direct General should have simply accepted the A. Evans and N. Evans Demands to the detriment of all others because his demands were extended first in time. But this snooze-you-lose approach is unworkable in a multiple fatality scenario, promotes a race-to-the carrier framework, encourages litigation over compromise, and most troubling, requires the carrier to knowingly subject and expose its insureds to catastrophic claims from others. In practice, this would result in the very same failure to settle arguments against Direct General, but simply shifting them from one claimant to another.

In short, Direct General made a reasonable, deliberate, meaningful, thoughtful, and appropriate decision to globally tender its limits (as allowed by Georgia law) to treat all claimants fairly and to protect its insureds from all exposures (as required by Georgia law), rather than wiping its hands clean by accepting demands on a first-come, first-serve basis. *See Camacho*, 287 F.R.D. at 698 (holding that reasonableness depends, in part, on conscious actions rather than "rejections based on other or no reasons"). Summary judgment is warranted.

### D.    Direct General's Conduct Did Not Proximately Cause an Excess Judgment as a Matter of Law

The final element of a failure to settle claim is extracontractual damages proximately caused by the carrier's purported breach. *See Whiteside,* 311 Ga. at 352. As Georgia courts recognize, the failure to settle framework "creates an incentive, in cases where damages greatly exceed policy limits, for a plaintiff to attempt to set

up a bad faith claim." *See White v. Cheek*, 360 Ga. App. 557, 564 (2021) (McFadden, C.J., concurring). It is "not bad faith to reject an offer made in bad faith," i.e., one in which the offeror lacks an intent to settle. *See id.* at 567. Even if Direct General breached duties owed to the Insureds, the record reflects that Direct General was not the root cause of the excess judgment that was entered; rather Direct General was set up so that the minimal policy limits could be skirted. Summary judgment is proper where, like here, carriers are not provided a reasonable opportunity to settle. *See, e.g.*, *Baker*, 323 Ga. App. at 367.

Here, attorney Chumley presented a convoluted demand that did not offer to resolve all of A. Evans claims; the demand was not issued in coordination with Denissova; both attorneys Hagen and Chumley affirmatively agreed to attend the GSC; both attorneys withheld objections and never expressed concerns for weeks leading up to the GSC about Direct General's handling, the status of the A. Evans Demand, or their willingness to accept policy limits; they later attended the GSC but refused to participate or engage in settlement discussions there; and most shockingly, they later brought the Underlying Lawsuit and asserted estate claims—which supposedly had been disavowed. In other words, counsel sat back in silence while knowing full well that Direct General labored under the belief that C. Evans and Denissova, like Willis' family, was agreeable to participating in the GSC.

1052192\322060435.v1

Bluntly, A. Evans and Denissova's counsel's set up efforts proximately caused the subject excess judgment. Although the Administrator contends that Direct General should have responded to the demand by seeking an extension or clarification, those are little more than pretextual bases to find fault against Direct General. If those truly were material shortcomings, then the parents' counsel should never have agreed to attend the GSC without objection, much less lull Direct General into inaction before the GSC took place. Simply put, the Administrator's after-the-fact bare contention that "it was impossible to settle for $50,000 all claims" and that the GSC was "unreasonable, unfeasible, not bona fide and in bad faith," *see* [D.E. 24 at ¶¶ 21, 24], flies in the face of the parties' contemporaneous discussions. In short, such allegations underscore the set up nature of the parents' counsel's actions and make clear the lack of a reasonable opportunity to settle on Direct General's part. Summary judgment on the failure to settle claims is appropriate.

### E.    The Administrator's Counterclaim for Punitive Damages Fails as a Matter of Law

The Administrator's counterclaim for punitive damages fails as a matter of law because the Administrator cannot satisfy the ultra-heightened burden of proof to show, through clear and convincing evidence, that Direct General acted with conscious indifference to the consequences of failing to settle by accepting the A. Evans Demand. Under O.C.G.A. § 51-12-5.1, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that

the defendant's action showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences." Rather, conscious indifference requires an "intentional disregard of the rights of another, knowingly or willfully disregarding such rights." *See Gilman Paper Co. v. James*, 219 S.E.2d 447, 450 (Ga. 1975).

In this case, the Administrator would need to produce clear and convincing evidence that Direct General willfully disregarded its insureds' rights and interests, or intended to harm them by rejecting the A. Evans Demand. As detailed herein, there is absolutely no evidence to support this assertion. On the contrary, the facts and events reflected above demonstrate the extreme care and prudence by which Direct General and its claims professionals handled the claims and the A. Evans Demand; Direct General made the informed and reasoned decision to globally tender its Policy limits to all claimants to protect its insureds from extracontractual exposure and to treat all the claimants fairly. This was, again, the "go to" option.

Furthermore, even if there was a genuine dispute of material fact as to whether the Administrator was entitled to punitive damages, such damages are limited to $250,000 as a matter of law. In particular, O.C.G.A. § 51-12-5.1(f) and (g) limit punitive damages to $250,00 unless "the defendant acted, or failed to act, with the specific intent to cause harm." No reasonable factfinder could determine that, at any point, Direct General acted or failed to act with the specific intent to cause harm to

its insureds. The furthest from that. Because the claims for punitive damages are unavailing as a matter of law, summary judgment is proper on the Administrator's third counterclaim. *See, e.g.*, *Fanin*, 2019 U.S. Dist. LEXIS 132717, at *26-27 (granting summary judgment on the punitive damages counterclaim even though denying cross-motions for summary judgment on the failure to settle claim).

## F.    The Administrator's Counterclaim for Attorneys' Fees and Litigation Expenses Fails as a Matter of Law

Finally, the Administrator is not entitled to attorneys' fees and litigation expenses as a matter of law. Under O.C.G.A. § 13-6-11, the Administrator must show that Direct acted in bad faith, was stubbornly litigious, or caused the Administrator unnecessary trouble and expense. "Bad faith" referenced in the statute is that "connected with the transaction and dealings out of which the cause of action arose," not purported bad faith after the cause of action has already arisen *Smith v. TJX Co., Inc.*, No. 1:18-cv-00381, 2020 U.S. Dist. LEXIS 267853, at *21 (N.D. Ga. Feb. 24, 2020) (quoting *Smith v. Stuckey*, 503 S.E.2d 284, 287-88 (Ga. Ct. App. 1998)). Such bad faith "requires more than 'bad judgment' or 'negligence,' rather the statute imports a 'dishonest purpose' or some 'moral obliquity' and implies 'conscious doing of wrong' and a 'breach of known duty through some motive of interest of ill will.'" *Lewis v. D. Hays Trucking, Inc.*, 701 F. Supp. 2d 1300, 1313 (N.D. Ga. 2010) (citations omitted). Such is lacking here.

1052192\322060435.v1

As established above, Direct General has not acted in bad faith, nor has it been stubbornly litigious or caused unnecessary trouble and expense, as at all stages of handling the underlying claim and the A. Evans Demand, Direct General exercised reasonable judgment and efforts to resolve the numerous claims against its insureds and to protect them from the significant exposures. In short, there is simply no evidence that Direct General has acted in bad faith.

With respect to "stubborn litigiousness" or "unnecessary trouble and expense," attorneys' fees under O.C.G.A. § 13-6-11 are unwarranted where a "bona fide controversy" exists. *TJX Co.*, 2020 U.S. Dist. LEXIS 267853, at *22. Such controversy exists when there is a genuine dispute on an issue of law or fact, liability, damages, or other comparable issues. *Id*. As highlighted herein, there is no question as to whether Direct General prudently handled the claims arising out of the accident and A. Evans Demand. That said, even assuming, *arguendo*, that Direct General does not prevail on its other arguments for summary judgment, its arguments are "reasonable and a rational jury could return a verdict in [its] favor." *Id*. at *23. Accordingly, Direct General has not been stubbornly litigious or caused unnecessary trouble or expense because, at a minimum, there is a bona fide controversy.

Finally, it is well-settled that attorneys' fees under O.C.G.A. § 13-6-11 are generally not available to plaintiffs-in-counterclaim, like the Administrator. *See, e.g.*, *Fanin*, 2019 U.S. Dist. LEXIS 132717, at *24-25 (granting carrier summary

judgment on counterclaimant's statutory attorney's fees claim where, like here, the counterclaim for failure to settle arose out of the same transaction or occurrence as the subject matter of the carrier's declaratory action). It is only when a defendant asserts an independent cause of action (rather than a compulsory counterclaim) that defendant may recover attorneys' fees. *Id.*; *see also Williamson v. Harvey Smith, Inc.*, 542 S.E.2d 151, 156 (Ga. 2000). Here, the Administrator's counterclaim for failure to settle arises out of the same transaction or occurrence that is the subject matter of Direct General's declaratory action: Direct General's alleged failure to accept the A. Evans Demand.

Accordingly, Direct General is entitled to judgment as a matter of law on the Administrator's second counterclaim seeking attorneys' fees and litigation expenses.

## <u>CONCLUSION</u>

Direct General submits that there are no genuine disputes of material fact on any of the claims and counterclaims for which Direct General can be liable. The record shows that, as a matter of law, Direct General (1) did not owe a duty to settle; (2) did not breach any duties to its insureds; (3) did not cause the entry of an excess judgment against its insured; (4) cannot be subjected to punitive damages; and (5) cannot be subjected to the imposition of an adverse award for attorney's fees and litigation expenses. Accordingly, Direct General is entitled to summary judgment in its favor on the underlying declaratory count and all counterclaims.

Respectfully submitted this 23rd day of August, 2024.

HINSHAW & CULBERTSON LLP

s/ *Rory Eric Jurman*

Rory Eric Jurman
Georgia State Bar No. 162639
rjurman@hinshawlaw.com
201 East Las Olas Boulevard
Suite 1450
Ft. Lauderdale, FL 33301
Telephone: 954-467-7900
Facsimile: 954-467-1024
Secondary: ibasail@hinshawlaw.com
*Attorney for Direct General Insurance Company*

## **CERTIFICATE OF COMPLIANCE**

**I HEREBY CERTIFY** that this document has been prepared in Times New Roman, 14-point font in accordance with and as approved by the Court in Local Rule 5.1(C).

/s/ *Rory Eric Jurman*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** on August 23, 2024, I electronically filed the foregoing with the Clerk of the Court, using CM/ECF. I also certify that a true and correct copy of the foregoing has been furnished to the individuals listed below via e-mail and among other delivery methods so indicated upon:

Bruce Hagen, Esq.
Matthew R. Hagen, Esq.
Hagen Rosskopf, LLC
119 North McDonough Street
Decatur, GA 30030
Phone: (404) 751-0294
Email: bruce@hagen-law.com;
matt@hagen-law.com
**Counsel for Polina Denissova**

Roger Hartsfield
29 Duncan Drive SW
Cartersville, GA 30120
**Pro Se Defendant**
**Via U.S. Mail**

William A. Parker, Jr., Esq.
Montlick & Associates, P.C.
17 Executive Park Drive,
Suite 300
Atlanta, GA 30329
Phone: (404) 235-5000
Fax: (678) 539-5905
Email: bparker@montlick.com
**Counsel for Christopher Evans**

Richard E. Dolder, Esq.
James (Jay) Sadd, Esq.
Slappey & Sadd, LLC
352 Sandy Springs Circle, NE
Atlanta, GA 30328
(404) 255-6677 (office)
(404) 345-0590 (mobile)
Email: Rich@lawyersatlanta.com;
jay@lawyersatlanta.com
**Counsel for D. Max Hirsh**