# In The Matter Of:

*Direct General Insurance Company v.*
*Christopher Evans, et al.*

*Jeanna Matoy*
*April 16, 2024*

*Professional Court Reporters LLC*
*3659 Chattahoochee Summit Drive*
*Atlanta, Georgia  30339*
*770.952.0604*
*www.ProfessionalCourtReporters.com*



**EXHIBIT B**

Min-U-Script® with Word Index

```
 1   that why --
 2        A    No.  I just pick -- pick a injured party.
 3   When there's six of them, I just grab one of them.
 4        Q    Now, when you had made these notes and
 5   you're going now to the next day, 8/3, would you call
 6   your supervisor or anybody at that point?
 7        A    I would put an activity for each -- my -- my
 8   supervisor manager, and then my manager-manager
 9   because of the fatalities.
10        Q    And at this point in time, who was your
11   manager and your manager's manager, I guess?
12        A    Stevie Salas was my manager, and Andy
13   Quackenbush is the -- her manager.
14        Q    Okay.  But you don't recall having a direct
15   conversation or a phone call with either of them?
16        A    I do not recall.
17        Q    Were you sitting in -- well, let's go back
18   up.
19             MR. JURMAN:  So let's go to the next
20   entry.
21   BY MR. JURMAN:
22        Q    Okay.  8/7.  Do you see that?
23        A    Yes.
24        Q    Okay.  So now a couple days go by?
25        A    Correct.
```

```
 1      Q    So what -- you know, what individuals here
 2   are we talking about?
 3      A    The three in the claimants' vehicle, the
 4   other party.
 5      Q    The Justuses?
 6      A    Yes.
 7      Q    So they were also potential claimants, like
 8   you said, that were taken to the emergency room?
 9      A    Yes.
10      Q    And you were asking her about what the
11   injuries were?
12      A    Correct.
13      Q    And you had sent them letters asking --
14      A    Yeah.
15      Q    -- him for information?
16      A    To call me so I could discuss what happened
17   in the accident and verify what their injuries were.
18      Q    And it says here "I asked if they were
19   represented by an attorney.  She said no."
20           And it looked like they had UM coverage and
21   they were making a claim for UM, based on this note?
22      A    Yes.
23      Q    Did she tell you what the UM coverage was at
24   this --
25      A    No.
```

```
 1   entry.
 2   BY MR. JURMAN:
 3       Q   There's other -- can you explain what you're
 4   doing here in these other task entries here --
 5       A   It puts a -- it's a diary that goes to the
 6   individuals when a policy limits demand comes in.
 7       Q   So basically you're trying to -- you're
 8   keeping track of -- well, why don't you tell us what
 9   this -- keeping track or the system keeps track or
10   something else?
11       A   Yes.  It's a diary that goes to the people
12   that I need to notify, which would be my supervisor
13   and her manager, and I believe at the time that would
14   be William Robertson.  He handled that area.
15       Q   Okay.  So going up here to the next entry,
16   your next entry, it looks like Andrew Quackenbush also
17   was involved --
18       A   He's Stevie's manager.  He's Stevie's
19   manager.
20       Q   And where's -- let's go to your next full
21   entry.  Now, we'll get to these letters in a second.
22   But just in terms of the notes, it says "Sending MCC
23   excess letters to named insured with copy of demand,"
24   on 8/15/2018, at 3:36 p.m.
25              Do you see that entry, Miss?
```

```
 1   BY MR. JURMAN:
 2        Q    And it looks like --
 3             MR. JURMAN:  Scroll down a little.
 4   BY MR. JURMAN:
 5        Q    It's the Andrew Evans.  And do you recognize
 6   this as the Andrew Evans's time limit demand?
 7   Exhibit 7?  We can page through it a little.
 8        A    Yeah, I was going to say I need to see the
 9   rest of it.
10             Yes, that's the demand letter.
11        Q    Okay.  And it says here "August 15th, 2018,"
12   on the front page.  What stamp is that, August 15th,
13   2018?
14        A    That would be from the mail room.
15        Q    The date they received it?
16        A    Yes.
17        Q    And is this the time limit demand that you
18   referred to in your notes that was reviewed by Andrew
19   Quackenbush and Ms. Ellen Greer?
20        A    Yes.
21        Q    And was this the time limit demand that you
22   called Mr. Hartsfield about?
23        A    I did not call him when we received the
24   demand.  I sent him a copy of it.
25        Q    You sent him a copy.  Okay.
```

1     Q    Was this the letter that you referred to
2  previously that Ellen Greer and Andy Quackenbush had
3  reviewed?
4     A    Yes.
5     Q    Was this letter in response to the time
6  limit demands?
7     A    Yes.
8     Q    Was this letter sent out within 30 days of
9  the time limit demand?
10    A    Yes.
11    Q    Now, you didn't attend the global settlement
12 conference; correct?
13    A    The file was transferred to me [sic] prior
14 to the global settlement conference.
15          MR. JURMAN:  Let's -- why don't we take
16 five so I can review my notes, please.
17          (A discussion ensued off the record.)
18          THE VIDEOGRAPHER:  Off the record at
19 12:21 p.m.
20          (A recess was taken from 12:21 p.m. to
21     12:28 p.m.)
22          THE VIDEOGRAPHER:  On the record,
23 12:28 p.m.
24          MR. JURMAN:  I have no further
25 questions at this time, but I do reserve my right to

1        A    Correct.
2                MR. DOLDER:  And, Rory, I'm sorry.  Am
3   I pronouncing your name correctly?
4                MR. JURMAN:  You're nailing it
5   perfectly.
6                MR. DOLDER:  Oh.  Perfect.  I should
7   have already known that.  Apologies.
8   BY MR. DOLDER:
9        Q    All right.  So we already established that
10  this claim, the death claim of Andrew Evans, was
11  assigned to you after it was first reported to the
12  company; correct?
13       A    Yes.
14       Q    All right.  I'm just -- some of this I can
15  skip because you went through it with your lawyer
16  some.  All righty.
17       A    If you scroll really fast, I have to look
18  away.  I have motion sickness.
19       Q    Okay.  Well, just look away, and I'll let
20  you know when I get to the place I need to be because
21  it's actually kind of cumbersome.
22       A    I understand.  I was just letting you know.
23       Q    No, no, no.  That's fine.  I mean, let's not
24  get uncomfortable.  Is that why you're in a
25  land-locked state?

```
 1        A    Yes.
 2        Q    So here we have a -- all right.  That's you
 3   making an entry on August 2, 2018; correct?
 4        A    Yes.
 5        Q    All right.  And so by this time, August 2,
 6   2018, had you conducted your coverage evaluation?
 7        A    Yes.
 8        Q    Okay.  And so Shannon Hartsfield was covered
 9   for the wreck that took place on July 27, 2018;
10   correct?
11        A    Yes.
12        Q    And here we have an entry from you also
13   dated August 2, 2018, and it's on Bates stamp page --
14   excuse me -- 6308.  And do you see here where it says
15   "Insured 100 percent"?
16        A    Yes.
17        Q    Okay.  And does that mean your investigation
18   and evaluation had determined that Shannon Hartsfield
19   was 100 percent at fault?
20        A    Yes.
21        Q    For the wreck?
22        A    Correct.
23        Q    Yes.  Thank you.  And it says "claimant
24   zero."  Does that mean that you determined that Andrew
25   Evans was blameless for the accident?
```

1        A    He's a passenger, a negligent-free passenger
2   in our car.  Yes.
3        Q    Negligent free?
4        A    Correct.
5        Q    Okay.  So he bore no fault for the accident;
6   correct?
7        A    Yes.
8        Q    Let's go back -- all right.  I'm going back
9   in time a little bit.  Sorry.  But we've got this
10  entry also, August 2, 2018, at 12:18.  And you told
11  Mr. Hartsfield that the policy limits were not enough
12  to compensate all the injured claimants; is that
13  correct?
14       A    Yes.
15       Q    Okay.  And so at this point you had
16  determined that this claim was going to vastly exceed
17  policy limits; correct?
18            MR. JURMAN:  Objection.
19            THE WITNESS:  Yes.
20  BY MR. DOLDER:
21       Q    In fact, it was kind of a no-brainer, wasn't
22  it?
23            MR. JURMAN:  Objection.
24            THE WITNESS:  Not necessarily.  We
25  still had other folks in the other car that we needed

```
 1   matching note in my file when I received it.
 2   BY MR. DOLDER:
 3        Q    Well, do you remember looking at a note
 4   with -- a claim note with Mr. Jurman that -- where you
 5   stated you reviewed the demand on August 10?
 6        A    Correct.
 7        Q    So is this the demand you reviewed on August
 8   10?
 9        A    Yes.
10        Q    And this is a time-limited demand; correct?
11        A    Yes.
12        Q    And it's a offer to settle the wrongful
13   death claim of Andrew Evans; correct?
14        A    Yes.
15        Q    Okay.  Now, at this time in 2018, August
16   2018 -- 2018, excuse me -- had Direct General
17   communicated to you procedures for handling demands on
18   an obvious policy-limit claim?
19              MR. JURMAN:  Objection.
20              THE WITNESS:  We were still
21   investigating the claim.  So, yes, once -- I just note
22   that the demand came in and notify everybody that we
23   have a policy limits demand.
24   BY MR. DOLDER:
25        Q    Okay.  But -- and my question's a little
```

1      A      Yes.
2      Q      And how was that communicated to you by
3  Direct General?
4      A      I have been handling claims for a very long
5  time, as you know, and it's a procedure on all claims.
6      Q      And what else did Direct General require you
7  to do when you receive a time-limited demand like
8  this?
9      A      Notify --
10              MR. JURMAN:  Objection.
11              THE WITNESS:  Sorry.  Go ahead.
12              Notify them -- my manager, her manager
13  when a time-limit demand comes in.
14  BY MR. DOLDER:
15      Q      And so in this specific case, you -- whom
16  did you notify?  Mr. Quackenbush?
17      A      Stevie Salas and Andy -- Andrew Quackenbush.
18      Q      Salas and Quackenbush.  Okay.  Anyone else?
19      A      At that time we had a regional person,
20  attorney, that handled the area, and that would have
21  been -- I can't remember his name, but it's in -- it's
22  in -- on a task that I sent him.
23      Q      Okay.  It's documented in the claim notes?
24      A      Yes.  William Robinson.  Sorry.  That's who
25  it was.

1  only."
2          Do you see that?
3      A   Yes.
4      Q   Now, I remember you indicating to Mr. Jurman
5  when you were looking at the claim notes that it was
6  your belief that this demand was for $100,000;
7  correct?
8      A   Policy -- yes, policy limits.
9      Q   Okay.  So you thought that Direct General
10 was going to have to pay $100,000 to meet the terms of
11 this demand?
12             MR. JURMAN:  Objection.
13             THE WITNESS:  It's what the attorneys
14 ask for.  We have a $50,000 policy limit.
15 BY MR. DOLDER:
16     Q   Okay.  Now, but do you see where the
17 attorney writes in the letter that your company has
18 not divulged said coverage amount in writing?  Do you
19 see that?
20     A   Yes.
21     Q   So did you take that to mean that he didn't
22 know what the coverage policy limits were at the time?
23             MR. JURMAN:  Object.
24             THE WITNESS:  I had sent him a copy of
25 the policy.

```
 1   sometimes they don't want them.
 2       Q    And how do you know that?
 3       A    By asking them.
 4       Q    Okay.
 5       A    And I had already asked if they wanted a
 6   certified copy of the policy, and they said no.
 7       Q    Okay.  And but when claimants or their
 8   attorneys ask for affidavits as a condition of
 9   settlement, you try to provide them; correct?
10       A    Yes.
11               MR. JURMAN:  Objection.
12               THE WITNESS:  Yes.
13   BY MR. DOLDER:
14       Q    Okay.  And you've provided affidavits like
15   the ones requested here many times in order to settle
16   claims in the past; correct?
17               MR. JURMAN:  Objection.
18               THE WITNESS:  Yes.
19   BY MR. DOLDER:
20       Q    Besides the amount that we've talked about a
21   few times, was there anything about this demand that
22   you found unusual?
23       A    No.
24       Q    Pretty run-of-the-mill?
25               MR. JURMAN:  Objection.
```

1    Q    It's August 15, 2018; correct?
2    A    Yes.
3    Q    And this is, as far as you know, the first
4  communication with St. Amand about this claim;
5  correct?
6    A    Yes.
7    Q    And prior to sending this email, you had
8  received instructions from Mr. Quackenbush and
9  Ms. Greer to retain Mr. St. Amand to convene a global
10 settlement conference; correct?
11            MR. JURMAN:  Objection.
12            THE WITNESS:  Yes.
13 BY MR. DOLDER:
14   Q    Is that correct?
15   A    Yes.
16   Q    Now, the -- you included the two demands you
17 had received on this email; right?
18   A    Yes.
19   Q    Okay.  And did you ask Mr. St. Amand to do
20 anything with the demands?
21   A    To the -- review them.
22   Q    Where is that written?
23   A    I sent him all the documents for review.
24   Q    But did you ask him to review the demands?
25   A    I sent him the documents, all the documents,