```
            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION


DIRECT GENERAL INSURANCE    *
COMPANY                     *
                            *
VS.                         * CIVIL ACTION FILE NO.
                            * 1:23-cv-03491-ELR
                            *
CHRISTOPHER EVANS AND       *
POLINA DENISSOVA,           *
individually and as co-     *
Administrators of the       *
ESTATE OF ANDREW EVANS,     *
ROGER HARTSFIELD AND        *
D. MAX HIRSH, as            *
administrator of the ESTATE *
OF SHANNON HARTSFIELD       *



       ****************************************

         HYBRID ORAL AND VIDEOTAPED DEPOSITION OF

                      ELLEN GREER

                    APRIL 17, 2024

       ****************************************
```

**EXHIBIT C**

       ANSWERS AND DEPOSITION OF ELLEN GREER, produced as a witness at the instance of the Defendant D. Max Hirsh, taken in the above-styled and -numbered cause on

1  Q. Okay.
2     Who -- who was your employer at that time?
3  A. The name of the company?
4  Q. Yes, ma'am.
5  A. I believe NGIC. National General Insurance
6  Company would be the correct name of the parent company.
7  Q. Okay.
8     And one of the insurance companies in the
9  family was called Direct General Insurance Company?
10 A. That's correct.
11 Q. So were you a lawyer for Direct General
12 Insurance Company?
13 A. Yes.
14    MR. JURMAN: Object.
15 Q. What years?
16 A. You're asking me what years?
17 Q. Wh- -- when were you a lawyer for Direct
18 General Insurance Company?
19 A. I worked for National Gen- -- General from 2016
20 to 2020.
21 Q. And what was your job title?
22 A. Senior claims attorney.
23 Q. And what did you do as a senior claims
24 attorney?
25 A. I did a variety of things. Can I just defer to

```
                                                                    10
 1   my LinkedIn profile and read that for you?  It's a --
 2   it's a basic job description of activities that I did
 3   for the company.
 4        Q.   Sure.
 5        A.   Okay.  I provided guidance, mentor, counseling
 6   on policy and coverage interpretation.  I trained,
 7   developed and provided technical guidance to claims on
 8   various legal topics.  I provided legal analysis and
 9   opinions on coverage issues and file handling matters.
10   I served as their resource on litigated claims and acted
11   as a liaison between claims and panel counsel.  I
12   selected and monitored panel counsel, and I granted
13   trial authority.  And I assured appropriate execution
14   and company -- of the company litigation philosophy and
15   guidelines.  And I supported, from time to time, eight
16   to ten states over the years.
17        Q.   Okay.
18             And one of those states was Georgia?
19        A.   It was.
20        Q.   All right.
21             And did you work on bad faith matters?
22        A.   Can you describe what you mean by "bad faith
23   matters"?
24        Q.   Yes.  Insurance bad faith in the third-party
25   context.
```

1  working as a team with the management and the claims
2  professionals outside the log.  Files were not directly
3  assigned to me.  These were the claims professionals'
4  files, and they worked with management, and if they saw
5  a legal question that they wanted to elevate to me, the
6  management would bring it to me and we would discuss,
7  but typically I was never required to put my opinions in
8  the log beyond the coverage analysis that I just
9  referenced.
10       Q.  Okay.
11           Let's go, please, to Bates page 6295.  And
12  just tell me when you're there.
13       A.  Almost.  Okay.  I'm there.
14       Q.  All right.
15           And there is an entry by -- it's toward the
16  bottom of the page, by William Robinson, August 10,
17  2018, at 1:57.  There are actually two of him by them at
18  that time, but one of them has your name in it, Ellen
19  Greer.
20           Do you see that?
21       A.  I do.
22       Q.  Okay. Great.
23           Well, first, who -- who was William
24  Robinson?
25       A.  So I knew him as Bill.  Bill Robinson was

```
 1  you like to just read over that page,
 2  Mr. Quackenbush's --
 3               MR. JURMAN:  What is the Bates stamp
 4  number?
 5               MR. DOLDER?  The Bates stamp number is DGIC
 6  000092.  You guys good, Rory?
 7               MR. JURMAN:  Yep.
 8               MR. DOLDER:  Okay.
 9               MR. JURMAN:  Thank you.
10               MR. DOLDER:  Sure.  Yeah, just stop me at
11  any time.
12       Q.  And, ma'am, you just let me know when you're
13  ready to take some questions.
14       A.  Okay.  I'm ready.
15       Q.  All right.
16               Now, would you agree with me that in this
17  e-mail exchange Mr. Quackenbush is asking you a question
18  and that you give him an answer?
19       A.  Yes.
20       Q.  All right.
21               And if we look down at Mr. Quackenbush's
22  e-mail, maybe the fourth line, says, Think we should
23  look at some sort of global settlement conference given
24  all the potential exposures.
25               Do you see that?
```

1      A.   I do.
2      Q.   All right.
3           Now, are -- did you take this to mean that
4  Mr. Quackenbush was asking you what you thought of the
5  prospect of convening a global settlement conference?
6      A.   Can you repeat your question?
7      Q.   Sure.
8           Did you take this to mean that
9  Mr. Quackenbush was suggesting that Direct General
10 convene a global settlement conference?
11     A.   Yes, he said, I think we should look at some
12 sort of global settlement conference given all the
13 potential exposures.
14     Q.   Right.
15          And would you agree he was seeking guidance
16 from you on that?
17     A.   Yes.
18     Q.   Okay.
19          And are you aware, sitting here today, of
20 any earlier reference to convening a global settlement
21 conference with regard to the claims arising out of the
22 July 27, 2018, car wreck?
23     A.   Well, let's see.  This is dated August 13.  I
24 can look at the materials that you provided me prior --
25 with the subpoena prior to today, and there may have --

1  there could have been some discussion in the log.  Let
2  me look.
3              So there's -- the second day that Jeanna
4  Matoy was assigned to the file, there is a mention of
5  her action plan, and from the get-go, she was seeking to
6  settle all the claims and get releases for the named
7  insured and the insured driver.  And so let's see if she
8  said -- be nice if these were highlighted and marked,
9  wouldn't it?
10     Q.  Well, the -- the --
11     A.  Quick -- quicker reference.
12     Q.  I -- I will say the question was whether you
13  were aware.  I didn't ask you to do any research, but
14  that's fine, if that's what you want to do.
15              MR. JURMAN:  Hold on, objection.  She's
16  trying to answer your question.
17              MR. DOLDER:  I know, Rory.
18              MR. JURMAN:  If you don't want to withdraw
19  the question, then let her answer, just like you said
20  you would let her do.
21              MR. DOLDER:  That's what I'm doing, I'm
22  letting her answer, right.
23              MR. JURMAN:  Very good.  So let her take
24  her time then.
25              MR. DOLDER:  I -- I am.  What -- what are

1  you objecting about?
2       A.  All right.  So I had to review the file to see.
3  I was looking at the date, August 13, to see if there
4  was anything prior to that in the file.  And I couldn't
5  recall, so that's what I'm looking for.
6       Q.  Okay.
7       A.  So on August 2nd, her action plan, it -- one of
8  the items is to attempt to resolve all within limits of
9  25/50, so she didn't talk about a global settlement
10 conference there, but I believe that's where the genesis
11 of it was, because it was a widely accepted way to
12 handle our Georgia nimin -- minimum limits cases when
13 you have multiple competing claims with insufficient
14 policy limits.
15           And she knew from August 2nd that she had
16 three fatalities in a policy of 25/50.  So I think
17 probably there was some thought of it at that point,
18 even though it doesn't say global settlement conference.
19      Q.  Okay.
20          You were --
21      A.  She was looking out for the insured from day
22 one.
23      Q.  And you glean -- have you spoken to Ms. Matoy?
24      A.  I have not.
25      Q.  Okay.

```
                                                              26
 1              Are you aware that she gave testimony in
 2   this case?
 3        A.   I don't know that I was.
 4        Q.   Okay.
 5              Are you aware of anyone giving testimony in
 6   this case?
 7        A.   No.
 8        Q.   Now, back to Exhibit 2.
 9        A.   Yes.
10        Q.   So -- and just to catch up, we -- we have
11   Mr. Quackenbush asking about your -- for your guidance
12   on a global settlement conference, and if we go up, we
13   see your response.  And that third paragraph includes
14   this quote, I agree that it would be a good idea to
15   engage Mike St. Amand to negotiate a global pro
16   rattle -- pro rata settlement of all parties and to meet
17   the respective settlement terms of each demand.
18              Do you see that?
19        A.   I do.
20        Q.   Okay.
21              So fair to say that you thought a global
22   settlement conference was a good idea?
23        A.   Yes.
24        Q.   And you proposed hiring Mike St. Amand to do
25   it, correct?
```

1  A. I think I know what my practice would have been
2  and what I would have meant, and Andy would have known
3  too. We had a close working relationship, and he knows
4  that our goal is always to get all the parties released
5  in favor of the named insured. And so to the extent
6  that we can do that, we're gonna try to do that.
7  Q. Okay.
8       So did you want Mike St. Amand to accept
9  the demands?
10 A. At this point we wanted to assign the task to
11 Mike St. Amand for handling, to schedule the global
12 settlement conference, and yes, we had $50,000. We had
13 three fatalities. We had three people in another
14 vehicle which were injured. We didn't know the extent
15 of the injuries, because according to the log notes,
16 they didn't want to talk to us.
17      So we wanted to give everybody a
18 proportionate piece of the pie and get releases for the
19 insured driver and the named insured, and that's what we
20 wanted Mike St. Amand to do for us.
21 Q. Okay.
22      Well, when -- if one meets the terms of a
23 demand, isn't that another way of saying accept the
24 demands?
25      MR. JURMAN: Objection.

1    Q.  Do you have an answer?
2    A.  It could be a way, yes.
3    Q.  Okay.
4        And si- -- since you know other things that
5  you -- you might have meant that -- words that aren't in
6  here, is that what you meant?
7            MR. JURMAN:  Objection.
8    A.  No, I don't think -- I -- I don't -- I don't
9  think that's what I meant.  I think what I meant was
10 we're going to assign this to Mike St. Amand to handle
11 the matter for us for the insured, to protect the
12 insured and the insured driver, and to the extent
13 possible, meet the settlement demands.  It's gonna be
14 pretty hard to meet them when -- when you have the three
15 fatalities, but we were gonna do our best to protect the
16 insured.
17   Q.  Well, was Mike St. Amand authorized to accept
18 those two settlement demands?
19   A.  Well, I think there were other parties
20 involved, but he -- he was -- yes, he was -- he was
21 authorized to -- to schedule a global settlement
22 conference, get all the parties at the table, hash it
23 out, talk about UM, talk about injuries, talk about
24 liens, talk about other sources of recovery, and cut
25 pieces of the pie for the claimants.

```
                                                                      38
 1   was produced in the litigation, and it is what it is.
 2        A.   Oh, I see.  Okay.  I didn't know who had
 3   compiled this document, so yeah.
 4        Q.   Okay.
 5        A.   So you want me to look at 122, the letter?
 6        Q.   Sure, that -- that version's fine.
 7        A.   Okay.  So -- and your question to me was?
 8        Q.   Whether you remember having any thoughts on
 9   whether Direct General should attempt to accept the
10   demand for the wrongful death of Andrew Evans.
11        A.   Well, if you're asking me if I think a child's
12   death is worth $25,000, that's a very small sum.
13        Q.   Well, it's not what I'm asking though.
14        A.   All right.  Then, please, can you reword your
15   question?
16        Q.   Yeah.  When you saw -- do you remember when you
17   saw this demand, did you think Direct General should try
18   to accept it?
19        A.   Well --
20             MR. JURMAN:  Objection.
21        A.   I -- I don't remember, and in looking at the
22   letter, sitting here today, there -- there is a concern
23   about the dollar amount demand.
24        Q.   What is that concern?
25        A.   Well, they're asking for payment in the amount
```

1  of a hundred thousand dollars plus the amount of all
2  available insurance funds, and -- and they go on to
3  say -- let's see.  As stated previously in this
4  correspondence --
5       Q.   Can you tell us what page?
6       A.   I am --
7       Q.   I'm sorry to interrupt.
8       A.   No, I'm -- and you -- I -- I apologize.
9            Page 128.
10      Q.   Go ahead.
11      A.   As stated previously in this correspondence, if
12 the limit of coverage is higher than a hundred thousand
13 dollars, our demand will be for whatever that amount may
14 be in this instance.
15           All right.  So their demand is for a
16 hundred thousand dollars or more, if there's higher
17 limits.
18           And this letter was dated August 9th, and
19 according to the log notes I have that you sent me, a
20 day or two before, Jeanna Matoy had talked to the
21 Montlick law firm and told them what the limits were,
22 and they knew what the limits were, and she had e-mailed
23 to them the DEC page.  So they knew we had a 25/50
24 policy, but they're asking for a hundred thousand
25 dollars.  So that's a little problematic.  It's a --

Ellen Greer                                                    4/17/2024

44

1        MR. JURMAN: Objection.
2        A. You know, I don't know what he wanted. There
3   are a lot of issues in the letter that concerned us,
4   which is what led us to sign the file out to a Georgia
5   attorney, Mike St. Amand, to set up the global
6   settlement conference for the company.
7             It did -- it did -- you know, I don't know
8   what he wanted, but I -- but I believe that the law firm
9   had information to know what our policy limits were when
10  they drafted this letter.
11       Q. Did -- did you consider calling Mr. Chumley
12  and -- or writing to him and seeking clarification?
13       A. That would not have been something I would have
14  done.
15       Q. But did -- did you consider ad- -- strike that.
16            Did you consider advising one of your claim
17  professionals to do that?
18       A. I don't remember what I considered. We may
19  have discussed all those issues. I think the decision
20  was made because of these problems, and the letter came
21  in what was -- so, let's see, August 9th. The fatality
22  accident had occurred July 27th, very quickly, and due
23  to the severity of the claims and the minimal policy
24  limits, the plan was to assign it out, to have a Georgia
25  attorney set up the global settlement conference.

1              This is how we handle many of our minimum
2    limits cases.  The global settlement conferences work.
3    They're successful.  It's an industry accepted practice,
4    and so that's what we did.
5              (Exhibit Number 3 marked.)
6         Q.  Let me hand you what's been marked as
7    Exhibit 3.  This is Bates stamped DGIC 000139 through
8    142.  It looks like it's an e-mail from Andrew
9    Quackenbush to Jeanna Matoy dated September 6, 2018.
10   And it is -- I mean, take your time looking at it, of
11   course.  Is Exhibit 3 familiar to you?
12        A.  Yes.
13        Q.  Okay.  And this includes a message from you
14   saying, Andy, yes, I agree with this plan.
15             Right?
16        A.  It does.
17        Q.  Okay.
18             And I guess still no independent
19   recollection of this e-mail exchange?
20        A.  No.
21        Q.  Okay.
22             But at the time, you would agree that you
23   are agreeing with the earlier and lengthier e-mail from
24   Mr. St. Amand that is below your message, correct?
25        A.  Yes, when he speaks of scheduling a global

1  up before I ask any questions.
2           MR. YEE:  And you said that was Exhibit 1
3  to the pleadings?
4           MR. DOLDER:  It --
5           MR. YEE:  To the complaint?
6           MR. DOLDER:  Well, it -- just in the
7  pleadings, it's Doc 1-1, Page 18 of 78.  It's a page --
8           MR. YEE:  Understood.  Understood.
9           MR. DOLDER:  -- from the policy you
10 attached to your complaint.
11          MR. YEE:  Understood.  One moment.
12          All right.  You're on the page -- you said
13 18 of 78, and that would be Part A - Liability Coverage?
14          MR. DOLDER:  Yes.
15          MR. YEE:  Okay.
16          All right.  We have it in -- in front of
17 us.
18      Q.  A -- a -- and, ma'am, we can make this quick,
19 if you want.
20          But does this policy give Direct General
21 discretion to settle claims as it sees fit?
22      A.  We will settle or defend with a lawyer of our
23 choice, as we consider appropriate, any claim or suit
24 asking for these damages.
25      Q.  Is that a yes or a no?

1        A.   That is a yes.
2        Q.   Thank you.
3             If we go down -- and I'm sorry.  Back to
4   Exhibit 3, if you don't mind.
5        A.   Okay.
6        Q.   So again, on the second page of that exhibit,
7   which is Bates 140, and about in the middle, there's a
8   short paragraph, and it reads as follows:  Plus, we are
9   asking for all claimants to present their injury claims,
10  document injuries and special damages, identify other
11  available insurance (UM), and identify liens that need
12  to be addressed.
13            Did I read that substantially correctly?
14       A.   Yes, you did.
15       Q.   Thank you.
16            Now, why did Direct General want
17  information about UM insurance?
18       A.   Well --
19            MR. JURMAN:  Objection.
20            THE WITNESS:  Go ahead.
21            Oh, he objected.
22       A.   Because it would help, when everybody is
23  sitting at the table, to find out who's been compensated
24  by UM coverage when they're parceling out the pieces of
25  the pie that's far too small for all these people.

Ellen Greer                                                    4/17/2024

57

1  your deposition, right?
2       A.  Yes.
3       Q.  Okay.
4               Did -- did you see anything that causes you
5  to think, gosh, I should not have approved this?
6               MR. JURMAN:  Objection.
7       A.  Can you be more specific with your question?
8       Q.  Yes.
9               Is there anything in Mr. St. Amand's
10 September 6, 2018, letter that you disapprove of him
11 having said, or wrote, I should say?
12      A.  Well, he tendered the limits.  He accepted that
13 Direct General was going to pay the full 50,000 limits.
14 I'm not saying I disapproved of that; I'm just seeing --
15 noting what I see.
16      Q.  Sure.  Sure.
17      A.  There was the -- the time-limit demand that
18 we've discussed, and we discussed some of the problems
19 that the company saw with it, that time-limit demand.
20 This is -- this is a timely response, within the
21 30 days, and he tendered limits, invited everybody to
22 the global settlement conference to make a fair
23 allocation that's acceptable to all.
24              And then he talks about UM, the wrongful
25 death claim, the estates of the decedents, and potential

1  he had with them about this settlement conference that
2  was upcoming.  All I have is the e-mail and the letter.
3  So he may have done all kinds of other conversations and
4  e-mails and writings with the other attorneys, and I
5  don't have any knowledge of that.
6       Q.  Okay.
7             But -- and -- and I qualified my question.
8  That's why I qualified my question as -- as to what you
9  know of.
10            Do you know of anything Michael St. Amand
11 did in handling this claim that Direct General didn't
12 want him to do?
13            MR. JURMAN:  Objection.
14      A.  Based upon the information that I've been
15 provided here today, no.
16      Q.  Okay.
17            And do you have any independent
18 recollection of -- of him doing anything you didn't want
19 him to do?
20      A.  No.
21      Q.  Okay.  Thank you.
22            On -- on the letter, so it's the second --
23 the first page of the letter, which is the second page
24 of Exhibit 5, near the bottom, second paragraph to the
25 bottom, you pointed to this as -- as -- as tender