# In The Matter Of:

*Direct General Insurance Company v.*
*Christopher Evans, et al.*

*Andrew George Quackenbush*
*April 30, 2024*

*Professional Court Reporters LLC*
*3659 Chattahoochee Summit Drive*
*Atlanta, Georgia  30339*
*770.952.0604*
*www.ProfessionalCourtReporters.com*



**EXHIBIT**
**E**

**Min-U-Script® with Word Index**

```
 1        A    I do not.
 2        Q    Okay.  Do you work for Direct General
 3   Insurance Company right now?
 4        A    I work for National General Management
 5   Company.
 6        Q    And as part of your work for National
 7   General, do you adjust claims from time to time for
 8   Direct General Insurance Company?
 9        A    Well, I'm a claims leader.  I'm a manager.
10   I don't adjust claims personally.  But, yes,
11   Direct General is one of the companies that we -- we
12   handle claims for.
13        Q    Okay.  And, yeah, what is your present
14   title?
15        A    Regional claims leader.
16        Q    And how long have you been a regional claims
17   leader?
18        A    Seven years.
19        Q    So since about 2017?
20        A    Correct.
21        Q    Okay.  What is a regional claims leader?
22        A    I lead a group of -- I have a bunch of -- I
23   have a group of claims managers that report to me
24   who -- their -- their adjusters handle casualty claims
25   throughout the southwest region -- or southwest
```

```
 1   while preparing for your deposition?
 2            MR. JURMAN:  Objection.
 3            THE WITNESS:  Yes.
 4   BY MR. DOLDER:
 5       Q    And did you look at -- while preparing for
 6   your deposition, did you look at documents regarding
 7   that claim?
 8       A    Yes.
 9       Q    Okay.  And in -- in 2018, Jeanna Matoy
10   worked under you; is that correct?
11       A    Yes, that's correct.
12       Q    Okay.  But there would have been a -- a
13   claims manager between you and her; is that right?
14       A    Yes.  It would have been Stevie Salas.
15       Q    Can you distinguish your duties from
16   Ms. Matoy's?
17            MR. JURMAN:  Objection.
18            THE WITNESS:  Well, as a claims leader,
19        I'm responsible for overseeing a department
20        of adjusters.  I don't specifically handle
21        claims.  I work with the managers and the
22        adjusters to handle the claims that are
23        assigned to them.
24   BY MR. DOLDER:
25       Q    And do you keep track of the claims
```

1       Christopher Evans is the surviving parent of
2       Andrew, that there's a -- a mother who's not
3       represented, Polina.  There is some question
4       of whether an estate's going to be opened or
5       not.  It created some -- some questions that
6       we would have.
7            I think the demand asked for a hundred
8       thousand dollars when we had $25,000 in
9       available -- a hundred thousand dollars or
10      policy limits if it's greater and we had
11      $25,000 in -- in available coverage per
12      person.
13           You know, it's -- and -- and, truly,
14      the -- the time frame, how quickly it came in
15      without having a full understanding of what
16      the other injuries were and who was
17      presenting claims at that point.
18 BY MR. DOLDER:
19      Q    I'm just scrolling down a few pages.
20      A    Yes, sir.
21      Q    And if there's anything you want to look at,
22 you know, to remind yourself or to explain, feel free
23 to let me know.
24      A    Thank you, sir.
25      Q    I'm on Bates page 1322 of the demand.

```
 1      Q    Okay.  And -- and by the way, I mean, if you
 2  need a break at any time, as long as we're not in the
 3  middle of a question, I -- I hope you'll tell me.  You
 4  don't -- you don't have to wait an hour if you need to
 5  stretch your back before then.
 6      A    Okay.  Thank you very much, sir.  I'll take
 7  you up on that.
 8      Q    Yeah.  Do.  Do.  Do.  It's not a -- it's not
 9  a marathon test.
10           All righty.  Do you see the document I have
11  up --
12      A    I do.
13      Q    -- the e-mail?
14      A    Yes, sir.
15           MR. DOLDER:  Thank you.  I'm going to
16      mark this as Exhibit 3.
17                 (Exhibit No. 3 was marked.)
18  BY MR. DOLDER:
19      Q    And it's an e-mail Bates stamped DGIC 237
20  through 239.  The first page looks like an e-mail from
21  Jeanna Matoy dated August 15, 2018.
22           And, Mr. Quackenbush -- oh, you know, before
23  we -- we left, you -- you testified, you know, to the
24  effect that a -- a decision was made to seek
25  Mr. St. Amand's help.
```

```
 1        A    That is correct.  Yes.
 2        Q    Okay.  And who else was in -- in on that
 3   decision besides you and Ms. Greer?
 4        A    I don't recall anyone else being involved in
 5   the -- in the decision.
 6        Q    Okay.  You didn't have to ask anyone else in
 7   order to make that decision?
 8        A    No, sir.
 9        Q    That was within your authority?
10        A    Yes, sir.
11        Q    Okay.  Thank you.
12             So -- and -- and by the way, so Exhibit 3,
13   is this one of the documents you looked at in
14   preparing for your deposition today?
15        A    Yes, sir.
16        Q    All right.  And it -- does -- does this
17   reflect an e-mail from Jeanna Matoy to
18   Michael St. Amand?
19        A    Yes, sir.
20        Q    And it's dated August 15, 2018; correct?
21        A    That is correct.
22        Q    Excuse me.  I can't get to the highlight
23   function.  All right.  Well -- oh, there we go.
24             So you -- after you guys made the decision
25   to retain Michael St. Amand, you first reached out to
```

```
 1  him on August 15, 2018?
 2       A    That's what it appears, yes.
 3       Q    Yeah.  And I -- I note that it doesn't
 4  appear that you are on the -- this e-mail from
 5  Ms. Matoy to Michael St. Amand; right?
 6       A    That does -- it does not appear I was, no.
 7       Q    Yeah.  But did you reach out to
 8  Mr. St. Amand before August 15, 2018?
 9       A    I don't recall doing so, no.
10       Q    Okay.  Do you know whether Ms. Greer did?
11       A    I do not know.
12       Q    Okay.  I'm going down to the end of the
13  e-mail because that's how we get to the beginning.
14            And, again, I -- I don't want to go too
15  fast, so feel free to stop me, but I'm on page 2.  And
16  it looks like we have an e-mail from you to Ms. Greer;
17  is that right?
18       A    Yes, sir.
19       Q    Okay.  And so had you already spoken to
20  Ms. Greer about this claim?
21       A    I don't believe so, no.
22       Q    You think this was your first communication
23  with Ms. Greer about this claim?
24       A    I believe it is, yes.
25       Q    All right.  And -- and at this time,
```

1          MR. JURMAN:  Objection.
2          THE WITNESS:  Again, I'm not an attorney
3     in Georgia.  We -- we attempted to do so by
4     notifying -- or, you know, asking everyone to
5     attend a settlement conference by tendering
6     our limits and taking the steps to -- to
7     resolve all the claims to best protect the
8     insured.
9  BY MR. DOLDER:
10     Q    But you would agree that if you use $50,000
11  to settle all three claims, you can't pay $25,000 each
12  with respect to the two settlement demands; right?
13         MR. JURMAN:  Objection.
14         THE WITNESS:  Well, we had $50,000 in
15     total.  We had two demands, but we had six
16     total claimants.  We asked Mr. St. Amand to
17     work on apportioning that amount to resolve
18     all the claims.
19  BY MR. DOLDER:
20     Q    And did you also want him to meet the
21  respective settlement terms of each demand letter?
22     A    We -- yes, we wanted him to -- to meet all
23  the terms or all the terms that were possible and
24  address them as part of the settlement conference.
25     Q    And so I'm back up on the -- the first page

1    A    Not to the best of my recollection, no.
2    Q    Did you discuss this claim with Mr. Bogdan
3  at any time?
4    A    Not to the best of my recollection.
5    Q    So you wouldn't say that they were -- that
6  Mr. Bogdan or -- or Mr. Brown were involved in
7  deciding the plan of action referred to in your
8  e-mail; correct?
9    A    No, I don't believe that they were involved
10 in the decision-making.
11   Q    And up here, we have Ms. Greer responding to
12 you saying, "Yes, I agree with this plan."
13        Do you see that?
14   A    Yes, sir.
15   Q    Are you aware of anyone else agreeing with
16 the plan?
17   A    I'm not aware of anyone else.
18        MR. DOLDER:  All right.  I'm marking as
19    Exhibit 6 a two-page document.  It's Bates
20    stamp CE0000 1826 through 1827.
21            (Exhibit No. 6 was marked.)
22 BY MR. DOLDER:
23   Q    It looks like a -- a letter on Gray, Rust,
24 St. Amand stationery dated September 6, 2018.
25        And -- well, let me ask you first:  Is this

1  a document you reviewed in preparation for your
2  deposition?
3       A    Yes, sir, I believe it is.
4       Q    Okay.  And prior to preparing for your
5  deposition, did you ever see this letter?
6       A    I believe I would have seen it back in -- in
7  September of 2018.
8       Q    Okay.  So -- and am I going too fast, or are
9  you familiar with the exhibit?
10      A    I may ask you to -- to go back to certain
11 parts if you ask me questions, but I'm fairly
12 familiar --
13      Q    Okay.
14      A    -- with the letter.
15      Q    Sure.  Thank you.
16           Is this the letter you wanted Mr. St. Amand
17 to send?
18      A    Yes, sir.
19      Q    Did Mr. St. Amand write anything in this
20 letter you did not want him to write?
21      A    No, I don't believe so.
22      Q    And would you agree this is a counteroffer
23 to the time-limited demand to settle the wrongful
24 death claim of Andrew Evans?
25           MR. JURMAN:  Objection.

1        THE WITNESS:  No, sir, I would not.  I
2    believe it was an acceptance.  We recognized
3    that there was multiple claimants.  We had
4    two demands -- or two -- two fatalities that
5    had made demands.
6        We -- the -- the file notes reflect that
7    Jeanna had reached out to each law firm to
8    discuss the idea of a settlement conference
9    and everyone seemed to be in agreement --
10   were in agreement for it.  And this was just
11   confirming that, sending it along saying
12   we'll -- we'll get together in October and
13   we'll -- we'll -- we'll look to apportion the
14   moneys that were available.
15       Again, our insured had purchased $50,000
16   in coverage, the minimum limits in the state,
17   and we were trying our best to resolve all
18   the claims within those $50,000.
19 BY MR. DOLDER:
20   Q   So to -- just to be clear, are -- is it your
21 testimony that the September 6, 2018, letter was an
22 acceptance of the time-limited demand for the wrongful
23 death of Andrew Evans?
24   A   I believe it was a tender of our limits.
25   Q   Okay.  But I'm -- I'm asking you if it was

```
 1   an acceptance.
 2            MR. JURMAN:  Objection.
 3            THE WITNESS:  I'm -- I'm not an
 4       attorney, sir.  I believe it's an -- it's an
 5       acceptance of the demands.  Again, we -- we
 6       tendered our full limits in an attempt to
 7       resolve all the claims that were being
 8       presented.
 9   BY MR. DOLDER:
10       Q    Well, you're not an attorney.  You're a
11   claims professional; correct?
12       A    Yes, sir.
13       Q    And in your job as a claim professional, you
14   have to know something about the law; correct?
15            MR. JURMAN:  Objection.
16            THE WITNESS:  I know the -- I guess a
17       layman's understanding of the law or -- or
18       slightly more than that, but we rely on our
19       attorneys to provide legal guidance.
20   BY MR. DOLDER:
21       Q    Well, you -- a good claim professional knows
22   more about the law than the average layman; true?
23            MR. JURMAN:  Objection.
24            THE WITNESS:  I believe so.  And I think
25       I -- I responded in that way.
```