IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CIVIL ACTION FILE NO.:  1:23-cv-03491-ELR

---

DIRECT GENERAL INSURANCE COMPANY,

Plaintiff,

v.

CHRISTOPHER EVANS, et al.,

Defendants,

---

## DEFENDANT D. MAX HIRSH'S RESPONSE TO DIRECT GENERAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted on September 27, 2024, by:

*/s/ Richard E. Dolder, Jr.*
James (Jay) Sadd
Georgia Bar No. 066010
Richard E. Dolder, Jr.
Georgia Bar No. 220237
**SLAPPEY & SADD, LLC**
352 Sandy Springs Circle
Atlanta, Georgia 30328
Ph: (404) 255-6677
Fax: (404) 255-7340
rich@lawyersatlanta.com

*Attorneys for Defendant D. Max Hirsh*

## **<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ...................................................................................1

II.     STATEMENT OF FACTS ......................................................................2

    A.      An "Obvious Policy Limits Claim" .......................................................2

    B.      Counsel Quickly Sends Demands ...........................................................2

    C.      The Justuses Did not Pursue Claims with DGIC ...................................3

    D.      DGIC Receives the Demand and Decides to Reject it...........................3

    E.      DGIC "Punts" to the Claimants and Tells Them to Adjust
    the Claims and Allocate Policy Limits Amongst Themselves..............4

III.    STANDARD............................................................................................5

IV.     ARGUMENT AND CITATION OF AUTHORITY .....................................6

    A.      DGIC Had a Duty to Respond to the Demand......................................6

        1.      A "valid" demand is capable of acceptance, has a clear
        deadline, and complies with the Offer statute............................6

        2.      The duty to respond is not so narrow.......................................10

        3.      DGIC received a "valid" demand under custom and
        practice in the insurance industry .............................................11

        4.      The opportunity to settle the wrongful death claim does
        not render the demand invalid under *Linthicum* and *Shin* ........11

        5.      DGIC settled the Richie Willis wrongful death claim
        without settling an estate claims ...............................................13

6.    DGIC voluntarily understood the duty to respond ..................15

B.    Fact Issues Remain as to the Unreasonableness of
DGIC's Rejection and Counteroffer ...................................................16

1.    Under Georgia law, a failure to settle is a jury issue ...............16

a.    *An insurer must accept a demand and settle if a
trial poses an unreasonable risk* ...................................16

b.    *Negligence is enough* ......................................................17

c.    *Negligent failure to settle is a jury issue* .......................17

2.    The claim for Andrew's wrongful death posed an
unreasonable risk........................................................................18

3.    DGIC's September 6 rejection and counteroffer was
a dangerous gamble to get a better deal by resolving
numerous and nonexistent claims ..............................................19

4.    DGIC did not "tender" it limits, and its GSC proposal
was an abdication of responsibility............................................22

5.    A jury must determine if the GSC was imprudent
and futile based on what DGIC knew .......................................23

6.    DGIC's complete failure to seek clarification, when it
admits it wanted clarification, creates jury issues ...................24

7.    A jury must consider DGIC's ignorance of the law ................25

8.    A jury must consider ignorance of offer and acceptance .........26

9.    Country Financial's acceptance of the same demand
is a counterexample to be considered by the jury ....................27

10.    DGIC admitted it could not settle all claims and
promised it would try to settle some claims ...........................27

C.    Proximate Cause is for the Jury ............................................................28

D.    DGIC is Liable for Punitive Damages ..................................................29

E.    Hirsh's Entitlement to Attorneys' Fees Is a Jury Issue .......................31

V.    CONCLUSION ................................................................................................33

CERTIFICATE OF SERVICE .................................................................................34

## I.    INTRODUCTION

Direct General Insurance Company ("DGIC") promised to settle claims, "as we consider appropriate."  (Doc 1-1, p.18)  Its own attorney says DGIC has discretion to settle "as it sees fit."  (Exhibit A, 51:12 – 52:1)  In using this discretion, adjustor Jeanna Matoy agrees DGIC should settle a claim if (a) liability is reasonably clear, (b) there is a risk to the insured of a judgment in excess of policy limits, and (c) there is an opportunity to settle within policy limits.  (Exhibit B, 128:7-14)

In this case, those three conditions were met with a time-limited demand to settle a wrongful death claim.  (Doc 101-1)  The demand allegedly confused DGIC, but DGIC abdicated responsibility by never exercising its right to seek clarification.  Instead of settling claims that could be settled, DGIC threw up its hands, abdicating its promise to use discretion.  DGIC punted its claims-handling responsibilities by inviting the claimants to a "Global Settlement Conference" ("GSC") and requiring them to adjust their own claims.  DGIC believes the discretion conferred on it allows it to do whatever it wants, no matter the consequences.  With discretion comes responsibility.  This Court should deny DGIC's motion.

## II.    STATEMENT OF FACTS

### A.    An "Obvious Policy Limits Claim"

The wreck occurred July 27, 2018.  By August 2, 2018, adjustor Matoy determined three important things:

- Shannon Hartsfield had coverage.  (<u>Exhibit B</u>, 146:2-11)
- She was clearly at fault.  (<u>Exhibit B</u>, 146:17 – 147:7)
- The claim vastly exceeded policy limits.  (<u>Exhibit B</u>, 147:15-19)

In the terminology DGIC uses, it was "an obvious policy-limit claim." (<u>Exhibit B</u>, 148:12-15)  Matoy's supervisor, Andrew Quackenbush agreed and provided DGIC's definition of "obvious policy limit claim."  (<u>Exhibit C</u>, 88:22 – 89:12)  Astonishingly, Quackenbush revealed DGIC has no policies or procedures for handling such claims.  (<u>Id</u>.)  Claims Handling Guidelines will be filed under seal.

### B.    <u>Counsel Quickly Sends Demands</u>

Chris Evans, Andrew Evans' father and Nancy Evans' son, retained attorney Rory Chumley.  (<u>Exhibit D</u>, ¶3)  Chumley immediately recognized the situation as one with multiple claimants and insufficient limits.  That made it an urgent matter, as insurance companies will sometimes exhaust limits by paying other claimants. Chumley has personal knowledge of clients not being able to recover anything because other claimants sent demands first.  (<u>Exhibit D</u>, ¶¶4-7)  The attorney for claimant Denissova has similar experience and knowledge.  (<u>Exhibit E</u>, ¶¶5-6)

When there are numerous claimants and insufficient limits, attorneys must "race to the limits."  In such a situation, and in order to best serve their clients, a reasonable plaintiff's attorney will send a demand letter as quickly as possible. (<u>Exhibit F</u>, pp. 47-49)  For those reasons, Chumley promptly sent a demand on August 9, 2018, to settle the claim for Andrew's wrongful death.  (<u>Exhibit D</u>, ¶8)

Despite his O.C.G.A. § 33-3-28 request for written confirmation of policy limits, DGIC did not provide them to Chumley until the Global Settlement Conference on October 20, 2018, more than 60 days after the request.  (Exhibit D, ¶9 and ¶20 and Exhibit G)  Chumley believed DGIC would accept the demand in due course, particularly because no one from DGIC reached out to him during the pendency of the demand to seek clarification or for any other reason.  (Exhibit D, ¶¶13-14)

### C.    The Justuses Did not Pursue Claims with DGIC.

Three members of the Justus family were in another vehicle and reported injuries, but not death.  Matoy spoke to the adjustor for the Justuses' UM carrier who informed that Country Financial would pay the Justuses UM proceeds and that the Justuses did not want any of DGIC's limits.  (Doc 99-2, p. 109)  Direct General actually "closed all of the Justice's [sic] claims" precisely because, as related by adjustor Matoy, "They have UM with own carrier and adjustor said she would take care of them since we have fatalities in [the insured vehicle]."  (Exhibit H)

### D.    DGIC Receives the Demand and Decides to Reject it.

Matoy reviewed the demand on August 10, 2018, and acknowledges it was a time-limited demand to settle the claim for the wrongful death of Andrew Evans. (Exhibit B, 150:7-14)  There is nothing unusual about time-limited demands. (Exhibit B, 139:19 – 141:5)  Quackenbush agreed.  (Exhibit C, 32:10-16)  No one thought Chumley's demand was unreasonably early.  (Exhibit B, 158:2-12)

A Global Settlement Conference ("GSC") was DGIC's standard procedure for claims like this one. (Exhibit A, 25:9-14) DGIC nonetheless had no policies or procedures regarding GSCs. (Exhibit B, 174:10-13 and Exhibit C, 84:4-8) Quackenbush and attorney Greer made the decision to hold a GSC and it was within their authority to make that decision. (Exhibit C, 41:15 – 42:10) DGIC wrote that at the GSC it would make offers to each claimant and would try to settle "as many [claims] as possible." (Doc 99-16, p.1)

As instructed, adjustor Matoy sent an email to attorney Michael St. Amand instructing him to set up a GSC but not asking him legal advice on what to do. (Doc 101-6) St. Amand did not believe the scope of his representation included attempting to accept the time-limited demand. (Exhibit I, 62:16-21) "I was retained by Direct General specifically to set up a global settlement conference." (Exhibit I, 18:13-15)

### E.    DGIC "Punts" to the Claimants and Tells Them to Adjust the Claims and Allocate Policy Limits Amongst Themselves.

The first Chumley heard from DGIC in response to his demand was the September 6, 2018, letter. (Exhibit D, ¶15 and Doc 101-8) From Chumley's perspective, the letter unilaterally advised a GSC would take place at a time and place chosen by others so that various claimants could negotiate themselves how to divide the limits. (Exhibit D, ¶15) When Chumley saw the letter he thought, "You just changed everything." He believed DGIC made a counteroffer and might have negligently or in bad faith failed to accept the demand. (Exhibit D, ¶16) His reaction

4

was consistent of that of attorneys in similar situations.  (Doc 95-1, Opinions ¶¶6-8)

Chumley attended the GSC to listen.  Primarily, he wanted to know if anyone else

had sent a statutory offer so he could evaluate DGIC's potential liability for failing

to accept the offer.  (Exhibit D, ¶17)  St. Amand confirmed at the GSC that no one

else had sent any other statutory offers of settlement.  (Exhibit D, ¶18)

St. Amand also informed Chumley that the Justuses were not attending the

GSC as they were dealing with their UM/UIM carrier and were not interested in any

DGIC money.  St. Amand said, "I guess they don't want any part of this money," or

words to that effect.  (Exhibit D, ¶19)  The Justuses did not, in fact, attend the global

settlement conference.  (Exhibit I, 48:13-18 and Exhibit D, ¶19)

DGIC made no offers at the GSC.  If an offer had been made, Chumley would

have presented it to his client who was standing by just in case.  (Exhibit D, ¶21)

### III.  STANDARD

"All evidence must be viewed in the light most favorable to the party opposing

the motion for summary judgment."  *Ave. CLO Fund v. Bank of Am.*, 723 F.3d 1287,

1294 (11th Cir. 2013).  "We may not weigh conflicting evidence or make credibility

determinations."  *Jones v. UPS*, 683 F.3d 1283, 1291-92 (11th Cir. 2012).  "If the

record presents disputed issues of fact, the court may not decide them; rather, we

must deny the motion and proceed to trial."  *Id*.  "[W]e credit the nonmoving

party's *version."  Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005).

**IV.**    **ARGUMENT AND CITATION OF AUTHORITY**

**A.**    **DGIC Had a Duty to Respond to the Demand**

1.    A "valid" demand is capable of acceptance, has a clear deadline, and complies with the Offer statute.

The duty to settle arises "when the injured party presents a valid offer to settle within the insured's policy limits." *First Acceptance v. Hughes*, 305 Ga. 489, 489 (2019). In determining whether an offer was "valid," the *First Acceptance* court construed the offer as a matter of law using blackletter rules of contract construction to determine if it was capable of acceptance and had a clear and firm deadline. *Id*. at 493. The demand in this case was capable of acceptance and included a firm and clear deadline, so it was "valid" under Georgia law.

In addition, an offer that complies with O.C.G.A. § 9-11-67.1[1] will "trigger an insurer's duty to respond." *Grange v. Woodard*, 300 Ga. 848, 856-57 (2017). Indeed, the "offer statute" was enacted precisely to determine "what constitutes an offer to which an insurer must respond." DGIC agrees on this point. (Doc 98, p.15)

A demand need not be a "model of clarity" to be capable of acceptance. *Camacho v. Nationwide*, 13 F. Supp. 3d 1343, 1359 (N.D. Ga. 2014). Courts must construe a demand "in its entirety." *Id*. at 1360. "[A]mbiguities in [an] offer letter should be construed against the drafter." *First Acceptance*, 305 Ga. 489 at 496.

---

[1] The "offer statute" was passed in 2013 and has been amended twice. For convenience, the version in effect at the time of the demand is filed at Doc 101-9.

DGIC argues the demand was not capable of acceptance for four primary reasons: (1) the amount, (2) clarity as to whom would be released, (3) clarity as to the claims to be released and (4) conditions allegedly beyond DGIC's control.

**Amount, § 67.1(a)(2).**  The demand opens with, "we are providing to you a reasonable opportunity to settle" the wrongful death claim "**for an amount within policy limits**."  (Doc 101-1, p. 3 of 18)  This is classic language from *Holt*[2] and its progeny, and the demand clearly seeks "policy limits."  The demand references "*$100,000 for example purposes only*."  (Doc 101-1, p. 5 of 18)  The demand uses a figure "*for example purposes only*" because, as the demand explains, DGIC had not "divulged said coverage amount in writing."  (Doc 101-1, p. 5 of 18)  Reading the demand in its entirety, it seeks policy limits, whatever they might be.

Even if not a "model of clarity," the demand was capable of acceptance as to amount.  *Camacho*, 13 F. Supp. 3d at 1359.  The demand makes three points:

(1)  we want to settle "for an amount within policy limits"
(2)  we do not know what the limits are because we do not have written confirmation;[3] and
(3)  we are using $100,000 "for example purposes only."

Construing the three statements together, they objectively mean the demand

---

[2] *Southern General v. Holt*, 262 Ga. 267 (1992) (seminal case regarding liability for ignoring policy-limit demands when there is clear liability and high damages).

[3] DGIC had not disclosed the limits in writing.  (Exhibit D, ¶10)  DGIC alleges Matoy emailed them, but DGIC has never produced the email.

is for policy limits, whatever they might be. If DGIC had accepted and sent a check for $25,000, Evans could never have succeeded in an action to force DGIC to pay $100,000. To the extent the three statements regarding amount are ambiguous, they are construed against the drafter. *First Acceptance*, 305 Ga. 489 at 496.[4] Construing the three statements in favor of DGIC, they are for the lowest amount, the $25,000 policy limits. The statement regarding "ALL AVAILABLE INSURANCE FUNDS" does not change that analysis, as it does not refer to the DGIC policy at issue and could never mean DGIC had to pay more than its available limits under any construction of the phrase. The amount was clear.

**Parties to be released, § 67.1(a)(3).** DGIC expresses confusion as to whom would be released had it accepted. The demand plainly offered to release Shannon Hartsfield "and/or" her estate. (Doc 101-1, p. 6 of 18, ¶2) The demand offered to release DGIC. (Doc 101-1, p. 15 of 18) The draft release included Roger Hartsfield.

DGIC's alleged confusion is whether Roger would be released. First, that concern is not material. No one ever made a claim against Roger, hinted at making a claim against Roger or even thought about making a claim against Roger. No one brought a claim against Roger because no one had a claim against Roger. Ironically, the only party ever to make a claim against Roger is DGIC.

---

[4] The demand is not construed against Hirsh in this case, as he was not the drafter. The rule of ambiguity would apply when construing the demand if litigation in the Underlying Lawsuit regarding offer and acceptance had occurred.

Second, Roger being named in the release but not referenced in the body of the demand – at least by name – was not an impediment to DGIC accepting and forming an enforceable settlement contract.  The demand plainly states the release was not set in stone and the parties could draft a release after acceptance:  "*I have attached a copy of a DRAFT limited liability release* … [¶]  THIS DRAFT IS ATTACHED FOR EXAMPLE PURPOSES ONLY."   (Doc 101-1, p. 8 of 18, emphasis in original)  A normal feature of offer and acceptance is for parties to enter into an enforceable settlement agreement, leaving the drafting of a release for later performance. *Herring v. Dunning*, 213 Ga. App. 695, 699 (1994) (ruling enforceable settlement contract formed notwithstanding disagreement as to drafting of release). Furthermore, the demand states it was "subject to the terms of the attached release." (Doc 101-1, p. 6 of 18, ¶(4))  If DGIC had accepted, Roger would be released.

**Claims to be released, § 67.1(a)(5).**  The demand clearly identified the claim to be released as the wrongful death of Andrew.  (Doc 101-1, p. 6 of 18, ¶(4))  It is hard to see how there could be any confusion about that.  Indeed, DGIC argues it could not accept the demand because it offered to settle only the wrongful death claim, which means DGIC understood it.  The demand was clear as to the claim to be released, in compliance with the offer statute and capable of acceptance.

**Conditions within DGIC's control:**  DGIC contends providing affidavits was "beyond its control."  No evidence supports the assertion.  DGIC did nothing to

secure a single affidavit.  Indeed, adjustor Matoy tries to provide such affidavits when DGIC decides to accept.  (<u>Exhibit B</u>, 167:14-18) According to DGIC's expert, such affidavits are customary.  (<u>Exhibit J</u>, 48:24 –49:10)  This Court would have to construe evidence in DGIC's favor to agree with its "impossibility" argument.

The same applies to "ALL AVAILABLE INSURANCE FUNDS."  DGIC has no evidence it tried to meet the condition.  DGIC has only immaterial speculation that maybe it could not.  DGIC did not try to comply with *any* condition because it decided to punt to the claimants and have them figure it out at a GSC.

In addition to the four issues DGIC identified, the demand otherwise complied with the offer statute, was capable of acceptance and triggered the duty to respond:

**<u>Type of release, § 67.1(a)(4).</u>**  The demand identified the "type" of release as a limited release, which is standard and authorized by law.  O.C.G.A. § 33-24-41.1.

**<u>Deadline, § 67.1(a)(1).</u>**  "You have 30 days from your receipt of this offer to accept it."  (Doc 101-1, p. 6 of 18, ¶(1))  The deadline is clear.

The demand complied with the offer statute, was capable of acceptance and had a clear and firm deadline.  The demand triggered DGIC's duty to respond under *First Acceptance*, *Grange* and O.C.G.A. § 33-24-41.1.

<u>2.    The duty to respond is not so narrow.</u>

"[T]he insurer ha[s] a **duty to its insured to respond** to the plaintiff's deadline to settle the personal injury claim within policy limits when the insurer

10

ha[s] knowledge of clear liability and special damages exceeding the policy limits." *Cotton States v. Brightman*, 276 Ga. 683, 685 (2003) (emphasis added).  The rule in *Brightman* was not overruled by *First Acceptance*.  *First Acceptance* was concerned with a series of letters that did not appear to be a demand.  That is not the situation here.  Chumley's letter clearly described itself as a demand.  (Doc 101-1)  Matoy saw it as a demand.  (Exhibit B, 150:7-14)  DGIC determined its insured was clearly at fault and damages would exceed policy limits.  (Exhibit B, 146:2 – 147:19)  A jury must decide if DGIC's failure to accept was negligent or in bad faith.

3.    DGIC received a "valid" demand under custom and
practice in the insurance industry.

According to DGIC's expert, "A valid demand is one that the insurance company can respond to that is within the limits of liability that the policy affords to its insureds."  (Exhibit J, 5:18-21)  A valid demand gives rise to an opportunity to settle.  (Exhibit J, 7:14-15)  The demand meets this definition.  Under the definition of "valid" provided by DGIC's own expert, the demand was valid.

4.    The opportunity to settle the wrongful death claim does
not render the demand invalid under *Linthicum* and *Shin*.

DGIC cites no authority for the proposition that a wrongful death claimant who does not purport to administrate an estate and expresses no threats of bringing an estate claim cannot make a valid demand for the wrongful death claim only.  In arguing that no one can ever send a valid demand for a wrongful death claim only,

11

DGIC cites cases that are distinguishable, not binding on this Court, and highly unpersuasive. *Linthicum v. Mendakota Ins. Co.*, 687 F. App'x 854 (11th Cir. 2017) and *Shin v. Infinity Ins. Co.*, 2020 WL 11191819, at *2 (N.D. Ga.).

In *Shin*, the policy limits were insufficient to compensate all claimants, and the insurer received more demands than it had limits to pay. *Id*. at *1. A person sent a demand on behalf of the Shin estate but did not file papers to be appointed administrator until six weeks later. *Id*. at *1. In the meantime, the insurer interpled its limits, and the court allocated limits among claimants. *Id*. at *2. The Shin estate and the wrongful death claimants filed suit and received judgments. *Id*. at *2.

In the failure-to-settle suit, the court ruled no duty to settle was triggered. As to the wrongful death claim, there had never been a demand to settle that claim. *Id*. at *3. As to the estate claim, at the time of the demand, the offeror was not the administrator and had no authority to settle the estate claim. *Id*. at *3.

*Shin* does not apply. <u>First, it is undisputed DGIC had enough policy limits to pay all demands ever made.</u> In *Shin*, the insurer received more demands than it had limits to pay. Second, DGIC did not interplead its funds like the *Shin* insurer, allowing a neutral to allocate among competing claims. DGIC threw its limits on the table and told the claimants to work it out. (Doc 101-8) Third, Chumley sent a demand to settle only a wrongful death claim at a time an estate did not exist and when he had no authority to demand on behalf of an estate. *Shin* involved an offer

12

to settle only the estate claim, made by someone with no authority to do so, at a time the wrongful death claim did exist.  *Shin* does not apply.

*Linthicum* is easier to distinguish.  The claimant attorney negotiated with the adjuster and "identified [an estate claim] as a potential basis for recovery."  687 F. App'x at 857-58.  Early in the claim process, the attorney told the adjuster, the "case ... [involved] both a wrongful death claim and an estate claim."  *Id.* at 857.  The attorney inquired if he "could settle [the child's] case – which is both a wrongful death claim and an estate claim – without getting the estate probated."  *Id*. at 855.

In *Linthicum*, the claimant literally informed the insurer throughout a two-year period that he had two claims to bring, and then inexplicably made a demand for one of those claims.  In this case, Chumley never stated his clients had an estate claim and even stated there was no intent to form an estate.  Neither *Linthicum* nor *Shin* rescue DGIC from its failure to respond to a valid demand.

5.   DGIC settled the Richie Willis wrongful death claim without settling an estate claim.

DGIC argues it is imprudent to settle a wrongful death claim without settling an estate claim.  *But DGIC did precisely that*.  DGIC settled the Richie Willis wrongful death claim without settling an estate claim.  (Exhibit K)  The release is not executed by an estate administrator.  (Exhibit K, p.4)  No estate claims settled.

The release includes an indemnification in favor of Hartsfield if someone were to form an estate.  (Exhibit K, p.3)  All that proves, however, is that DGIC knew it

13

was not settling an estate claim.  Also, the indemnification is worthless.  If someone formed an estate and filed suit against Hartsfield, Willis's orphaned children would have to hire lawyers to defend Hartsfield and pay any judgment.  Of course, they could not reasonably do so with the $16,666 they received for their father's death. DGIC did not just leave its insured exposed to a potential estate claim, DGIC tried to shift its duty to defend and indemnify Hartsfield to Willis's children.

The truth is, "[a] liability insurer may, in good faith and without notification to others, settle part of multiple claims against its insured even though such settlements deplete or exhaust the policy limits so that remaining claimants have no recourse against [the] insurer."  *Allstate v. Evans*, 200 Ga. App. 713, 714 (1991). This is not just law, it is custom and practice in the insurance industry.  Both experts "recognize[] the customs and practices of insurance companies in Georgia who are permitted to settle matters of this kind with fewer than all of the claimants even if the policy limits are exhausted through that process."  (Exhibit L and Exhibit M, ¶5)

Furthermore, a decedent's family has the right to decide whether to bring a wrongful death or an estate claim.  *Nash v. Allstate Ins. Co.*, 256 Ga. App. 143, 145 (2002).  In *Nash*, a woman was killed in a car wreck and only $25,000 in insurance was available to satisfy the wrongful death claim and any claims held by her estate. *Id*.  The insurer interpleaded the $25,000, and the court had to decide how to divvy up the funds among three parties:  The holders of the wrongful death claim; the estate

14

which held, but did not present, claims for the woman's pain and suffering; and the hospital which held a lien of $18,000 against the estate. *Id*. at 143-44, 749.

The Court of Appeals ruled that although the estate had a right to present its claim, it also had a right not to present its claim, and it was not for the hospital or insurance company to decide. **"Someone has to determine which of the several causes of action will be satisfied out of the meager funds available, and the plaintiffs who have the right to bring those causes of action are the logical ones to make that choice."** *Id*. at 145, 750 (emphasis added). Thus, the hospital did not recover on its lien because no assets came into the estate. Georgia law encourages claimants to make decisions that maximize recovery for the surviving family. That is precisely what Chumley was trying to do for his client. (Exhibit D, ¶¶27-28)

DGIC acted within the law and custom and practice when it settled the Willis wrongful death claim but not an estate claim. DGIC acted consistently with *Nash* when it allowed Willis's family to decide what claims it would bring and what claims it would not bring. DGIC could have done the same when it received the demand for Andrew's wrongful death. A jury must determine why.

### 6.    DGIC voluntarily undertook the duty to respond.

One who voluntarily undertakes an act the party has no duty to perform must exercise reasonable care in performing the act. *Dale v. Keith Built Homes*, 275 Ga. App. 218, 219 (2005). A party has a duty to use due care in a voluntary undertaking

beyond the terms of a contract. *Monitronics v. Veasley*, 323 Ga. App. 126, 131-32 (2013). For this principle to apply, "an injured person must show **either** detrimental reliance **or** an increased risk of harm." *Dale*, 275 Ga. App. at 219 (emphasis added). DGIC insists its September 6 letter was a response to the demand. (Exhibit B, 119:1-7 and Exhibit A, 57:17-23) DGIC voluntarily undertook the duty to respond to the demand. Thus, whether the demand triggered a duty is irrelevant. DGIC voluntarily undertook the duty, and had the obligation to do so with due care. As explained below, DGIC's voluntary response was negligent or in bad faith.

### B.    Fact Issues Remain as to the Unreasonableness of DGIC's Rejection and Counteroffer

#### 1.    Under Georgia law, a failure to settle is a jury issue.

##### a.    *An insurer must accept a demand and settle if a trial poses an unreasonable risk.*

"Georgia law imposes a duty on insurers to respond reasonably when they receive offers to settle claims within their policyholders' limits." *Am. Guarantee & Liab. Ins. v. Liberty Surplus*, 835 F. App'x 447, 457 (11th Cir. 2020). "An insurer is negligent in failing to settle if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk." *First Acceptance*, 305 Ga. at 492. An ordinarily prudent insurer is tasked with deciding whether to risk trial or "to settle on the terms by which the claim could be settled." *U.S. Fid. & Guar. Co. v. Evans*, 116 Ga. App. 93, 94-95, *aff'd,* 223 Ga. 789 (1967).

An insurer faced with a demand including conditions beyond its control must do "everything within its control to accept the plaintiff's offer and thus protect its policyholder from an excess verdict." *Brightman*, 276 Ga. at 686. An insurer must do "what it can to effectuate the settlement of the claims against its insured." *Id*. This law exists because the automobile liability insurance contract gives the company absolute and unilateral discretion to accept or refuse settlement as the company considers appropriate. *Smoot v. State Farm*, 299 F.2d 525, note 19 (5th Cir. 1962) (noting that the "promise to defend is stated in positive terms while that of settlement is couched in terms of discretion").[5]

### b.    Negligence is enough.

Although often referred to as "bad faith" an insurer's negligent failure to settle is actionable. *GEICO. v. Whiteside*, 311 Ga. 346, 360 (2021) ("GEICO is liable for its negligent failure to settle … under the circumstances of this case.") *and First Acceptance*, 826 S.E.2d at 74 ("An insurer is negligent in failing to settle if …"). An insurer may be "negligent in failing to settle." *Brightman*, 276 Ga. at 685.

### c.    Negligent failure to settle is a jury issue.

A court should "permit a jury to determine whether the insurer acted unreasonably in declining to accept a time-limited settlement offer." *Holt*, 262 Ga. at 271. The factual issue is "whether the insurer had an opportunity to make an

---

[5] *Smoot* is binding. *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981).

effective compromise." *Brightman*, 276 Ga. at 685.  Liability for the failure to settle "is generally a jury issue requiring consideration of all the relevant circumstances." *Baker v. Huff*, 323 Ga. App. 357, 364 (Ga. App. 2013).  This inquiry is "generally a jury issue requiring consideration of all the relevant circumstances including the insurer's knowledge of facts relevant to liability and damages on the claim." *Hallmark v. Fannin*, 2018 WL 8929809, at \*3 (N.D. Ga.)  As discussed below, a jury must decide whether DGIC's rejection of the opportunity to settle Andrew's wrongful death claim was negligent or in bad faith.

> 2.    The claim for Andrew's wrongful death posed an unreasonable risk.

"An insurer is negligent in refusing to settle a claim if an ordinarily prudent insurer would consider it an unreasonable risk to try the case instead of settling it – meaning that the chance of an unfavorable result is not in **reasonable proportion** to the chance of a favorable result." *Dickerson v. ANPAC*, 2009 WL 1035131, at \*6 (M.D. Ga.) (emphasis added).  DGIC echoes this idea in its brief, when it notes that the totality of the circumstances in determining an insurer's negligence of bad faith includes the "insurer's actual knowledge of liability and damages."  (Doc 98, p.24)

In this case, by August 2, 2018, DGIC determined its insured was clearly at fault and that the claim for Andrew's wrongful death would vastly exceed policy limits.  (Exhibit B, 146:17 – 147:19)  Matoy received the demand a few days later and did not think there was anything unusual about it other than her mistaken belief

it was for $100,000.  (Exhibit B, 167:20-23)  No ordinarily prudent insurer would consider the risk of allowing the claim to go to trial to be in reasonable proportion to settling the claim.  The demand did not offer to settle an estate claim, which did not exist, but an insurer must settle the claims it can settle.  (Exhibit M, ¶¶4 & 10)

It is undisputed DGIC did not accept the demand.  Because the demand posed an unreasonable risk that was out of proportion to the chance of a favorable result – *either at trial or at a GSC* – a jury must determine whether DGIC acted negligently or in bad faith in rejecting the demand.

### 3.    DGIC's September 6 rejection and counteroffer was a dangerous gamble to get a better deal by resolving numerous and nonexistent claims.

A counteroffer adding additional conditions creates a jury issue as to the reasonableness of the counteroffer.  *Fortner v. Grange*, 286 Ga. 189, 191 (Ga. 2009) (noting that in response to demand including conditions beyond its control, Grange could have simply offered its limits, but instead added conditions).  A liability insurer does not have "license to refuse any offer just because it believed it could potentially get a better offer for its insured."  *Camacho*, 13 F. Supp. 3d at 1362.  In *Camacho*, the insurer rejected a demand to settle for a limited release because it preferred to get a general release.  *Id*.  The insurer argued its attempt to get a better deal rescued it from liability for an excess judgment as a matter of law.  *Id*. at 1362.  This Court disagreed, reasoning that refusing one offer in hopes of a better deal is a

"gamble" that creates a jury issue. *Id.* "The reason for this rule is that the insurer may not 'gamble with' or risk exposing the personal finances of its insured by refusing to settle within the policy limits." *Id.* at 1342-43. Georgia's highest court laid down the "no gamble" rule 30 years ago. *McCall v. Allstate*, 251 Ga. 869 (1984). As Judge Totenburg later wrote, insurance companies and the Rolling Stones know, "You can't always get what you want." *Camacho v. Nationwide*, 188 F. Supp. 3d 1331, 1343 (N.D. Ga. 2016), *aff'd,* 692 F. App'x 985 (11th Cir. 2017)

In this case, like in *Camacho*, DGIC rejected the opportunity to settle a wrongful death claim in the hopes it could get a better deal and settle more claims, even claims never presented. DGIC's gamble, as expressed in its September 6, 2018, counteroffer, was that all wrongful death claimants, three nonexistent estates, three bodily injury claimants (the Justuses), all UM carriers, all potential lienholders and all other "interested persons or entities" (whatever that means) come to DGIC's lawyer's office and negotiate an allocation "acceptable to all." (Doc 101-8) The scope of the September 6 counteroffer is recklessly unrealistic. The notion that it would lead to resolution of so many claims and parties was patently absurd.

With respect to the Justuses, their UM carrier told Matoy they would not make claims against the DGIC limits. (Doc 99-2, p.109) Matoy closed her file on the Justuses for that reason. (Exhibit H) Prior to the GSC, St. Amand knew the Justuses were not coming and did want DGIC's money. (Exhibit D, ¶ 19) The Justuses did

not show up at the GSC. DGIC's argues it did not know what the Justuses would do. DGIC did know the Justuses posed miniscule risk as compared to Andrew's wrongful death, a claim for which DGIC actually received a demand. DGIC used no discretion. A jury must decide whether DGIC's decision to reject an opportunity to settle a wrongful death claim in favor of preserving funds for unasserted claims by claimants who said they would not assert them was negligent or in bad faith.

With respect to liens, the September 6 letter reflected DGIC's decision to forgo settling a wrongful death claim unless nonexistent liens were part of a "global" deal. But DGIC did nothing about liens. DGIC conducted no lien search. No one received a statutory lien notice. O.C.G.A. § 44-14-471(a)(1). A jury must decide whether DGIC's rejection of a reasonable offer to settle the wrongful death claim of a child so that it could chase after nonexistent liens was negligent or in bad faith.

It is difficult to understand why DGIC conditioned "global" resolution on the involvement of UM carriers. The fact that Chris Evans was entitled to UM coverage for Andrew's death was irrelevant to the risk of legal liability DGIC's insured faced for Andrew's wrongful death. Chris's UM coverage was a benefit for which he paid a premium. UM proceeds belonged to him as a matter of contract between him and his insurance company. His UM benefits were none of DGIC's business. A jury must decide if DGIC's rejection of an opportunity to settle a wrongful death claim in order to involve irrelevant UM carriers was negligent or in bad faith.

21

With respect to the "interested parties and entities," DGIC did almost nothing to research them or invite them to the GSC.  DGIC put the onus on the claimants to research issues DGIC was interested in and come to the GSC to report their findings.  (Exhibit I, 74:25 – 78:4)  DGIC did not try to settle the claims, it punted to the claimants.  DGIC wanted the claimants to do the homework and then figure out who gets what.  A jury must decide if DGIC's admitted abdication of its role to determine how best to protect its insured was done negligently or in bad faith.

The GSC was a reckless gamble that failed.  DGIC made no offers and no claims settled there.  (Exhibit I, 79:22 -80:1 and Exhibit D, ¶21)  A jury should decide whether DGIC's passing off its responsibilities to the claimants instead of active settlement of claims that could be settled was negligent or in bad faith.

> 4.    DGIC did not "tender" it limits, and its GSC proposal
>        was an abdication of responsibility.

A "tender" must be "unconditional."  O.C.G.A. § 13-4-24.  *S. Gen. Ins. Co. v. Ross*, 227 Ga. App. 191, 193 (1997) (ruling that insurer's offer was conditional and, therefore, not a "tender").  Merely offering policy limits does not insulate an insurer from liability, as the jury must also consider conditions added by an insurer in response to a demand.  *Fortner*, 286 Ga. at 191.

In this case, DGIC continuously refers to its September 6 counteroffer as a "tender", arguing it was a "deliberate, meaningful, thoughtful, and appropriate decision … to treat all claimants fairly and to protect its insureds … rather than

wiping its hands clean by accepting demands on a first-come, first-serve basis." (Doc 98, p.27)  DGIC is objectively wrong as a matter of fact and law.

First, the September 6 counteroffer is not a "tender."  As St. Amand acknowledged, it was not "unconditional."  (Exhibit I, 82:2-4)  By its plain terms, the counteroffer was an invitation to allow the claimants to negotiate among themselves.  It put the onus on the claimants to research liens and identify and bring UM carriers and "interested parties."  By requiring families to identify "who will be acting as administrator(s) or executor(s) of the estates", the counteroffer effectively sought to compel families to form estates as a condition of receiving a portion of the alleged "tender."  (Doc 101-8, p.2)  The fact that an insurance company does not understand the term "tender" is itself evidence of its negligence.

Second, the September 6 counteroffer was not "deliberate, meaningful or thoughtful."  It simply assigned to the claimants the job of adjusting the claims.  DGIC did not exercise its discretion; DGIC abdicated its discretion.

> 5.    A jury must determine if the GSC was imprudent and
>       futile based on what DGIC knew.

DGIC has a category of claims called "obvious policy limit claims."  (Exhibit B, 148:12-15)[6]  DGIC's definition of an obvious policy limits claim is as follows:

---

[6] DGIC's Claims Handling Guidelines will be filed under seal.  The section identifying "obvious policy limit claims is at Page DGIC 003825 and, consistent with Quackenbush's testimony, shows no policies and procedures for such claims.

>An obvious policy limit claim would be one where you recognize that
>the limits in place aren't enough to resolve the – the claim or claims to
>be presented.

(Exhibit C, 88:22 – 89:12)  But that is exactly what DGIC tried to do with the GSC.

DGIC determined – correctly – that "the limits in place aren't enough to resolve the

– the claim or claims to be presented."  Rather than settle the claims it could settle,

it convened a GSC where no claims settled.  This was contrary to DGIC's earlier

statements, where it said it would make offers to each claimant and would try to

settle "as many as possible" at the GSC.  (Doc 99-16, p.1)  A jury must decide

whether the GSC was a prudent idea or even prudently handled in light of DGIC's

understanding that it had an obvious policy limits claim.

>6.    DGIC's complete failure to seek clarification, when it
>admits it wanted clarification, creates jury issues.

Matoy desired clarification of the demand, but she did not seek it.  (Exhibit B,

165:15-20)  Quackenbush wanted clarification and hired St. Amand to seek it.

(Exhibit C, 39:5-17)  Strangely, Quackenbush believes DGIC requested clarification

via the September 6 letter.  (Exhibit C, 80-81)  DGIC never took advantage of its

statutory right of clarification under O.C.G.A. § 9-11-67.1(d).  (Doc 101-9)  Matoy

had no Georgia-specific training on the statute, though she was supposed to have

had such training.  (Exhibit B, 186:23 – 187:6; Exhibit C, 79 and Exhibit A, 30-33)

Not seeking clarification violated custom and practice in the industry:

> But if you're confused, you pick up the phone, you call the attorney
> and you say, hey, we're confused.  Can you answer some questions?

(Exhibit N, 54:15-17)   DGIC's expert, Heinze, was unable to identify anything

contrary to any custom, standard or practice in the insurance industry for confused

adjustors to seek clarification.  (Exhibit J, pp. 50-53)

The failure to seek clarification is material, as the adjustors had not read the

demand carefully and could have been set straight.  A jury must decide if DGIC's

failure to exercise a statutory right it said it needed was negligent or in bad faith.

### 7.    A jury must consider DGIC's ignorance of the law.

DGIC alleges it could not accept the demand "because it did not offer to settle

claims of Polina Denissova, Mother of Andrew Evans."  (Exhibit O, p. 15)  DGIC

does not understand applicable law.  The Supreme Court of Georgia has ruled:

> Parents divorced, separated or living apart share the right of action, and
> one may proceed without the other.  Where one parent undertakes to
> prosecute the cause, the other is nevertheless bound by such action and
> the law provides for equitably apportioning any proceeds.

*Blanton v. Moshev*, 262 Ga. 254, 255 (1992) (noting also that O.C.G.A. § 19-7-

1(c)(6) provides that a release of a child's wrongful death claim signed by one

divorced or separated parent binds both parents to the settlement).

DGIC claims concern about the parents' relationship, but DGIC never

bothered to ask.  (Exhibit E, ¶9 and Exhibit D, ¶14 (averring DGIC did not ask "any

questions whatsoever"))  There was no problem.  (Exhibit E, ¶9)

DGIC deposed Evans and Denissova, and they testified they understood at the time they were required by law to divide the proceeds and intended to follow the law. (Exhibit P, 40:15 – 41:12 and Exhibit Q, 30:3-8)  This testimony is not cited as substantive evidence, but to show that asking the questions DGIC was so concerned with took about five seconds.  There is no reason Direct General could not have asked those same questions of the attorneys while the demand was pending.

8.    A jury must consider ignorance of offer and acceptance.

According to DGIC's expert, claim professionals are supposed to know how to accept demands and the difference between an acceptance and a counteroffer. (Exhibit J, 60:8-16)  They did not.  Quackenbush believed it was possible to negotiate a global pro rata settlement and meet the terms of the two policy limit demands:  "I believe you can do both." (Exhibit C, 48:9-23)  He thought the September 6 letter was an acceptance. (Exhibit C, 65:4-5)  Although she had the demand and the September 6 letters in front of her, attorney Greer could not tell whether the September 6 letter was a counteroffer or an acceptance. (Exhibit A, 59:22 – 61:22)  These are not lay people.  They are attorneys and professionals in the business of offer and acceptance.  DGIC's own expert establishes the goal, and Greer and Quackenbush's testimony shows DGIC fell far short of the goal of understanding a critical claims-handling function.  A jury must see how this ignorance contributed to a $14 million judgment.

26

9.  <u>Country Financial's acceptance of the same demand is a counterexample to be considered by a jury.</u>

The driver of the Justus vehicle had liability insurance with Country Financial. Chumley sent to Country Financial a similar offer to settle a similar claim.  (<u>Exhibit D</u>, ¶22)  Country Financial's attorney requested clarification, and Chumley provided clarification.  (<u>Exhibit D</u>, ¶¶23-24)  The attorneys worked it out and got the claim settled in the usual and customary manner.  (<u>Exhibit D</u>, ¶25)  Country Financial settled the wrongful death claim only and not any estate claims.  (<u>Exhibit D</u>, ¶26)  DGIC could have and should have done what Country Financial did.  A jury should consider and compare Country Financial's reasonableness with DGIC's failure.

10.  <u>DGIC admitted it could not settle all claims and promised it would try to settle some claims.</u>

Matoy was a party to the email traffic in which Greer and Quackenbush decided to convene a GSC.  (Doc 101-6, p.2)  She sent the following letter to the named insured describing DGIC's "plan on this claim" as follows:

> **Should we determine** that the value of the claims being presented have a value to or in excess of your policy limits, we will attempt to schedule a global settlement conference.  At the conference, we will discuss the merits of each of the claims based upon the information available to us and **make appropriate offers** to each of the claimants in order to try to settle all **or as many as possible** of the claims within your available policy limits.

(Doc 99-16, p. 1, emphasis added)  DGIC had already determined the value of the claims were in excess of limits.  (<u>Exhibit B</u>, 146:2 – 147:19)  DGIC did not make

"offers to each of the claimants."  (<u>Exhibit I</u>, 79:22 -80:1 and <u>Exhibit D</u>, ¶21)

The significance of the last part of the letter is that DGIC acknowledged it did not have sufficient limits to settle all claims, but would try to settle "as many as possible."  Contrary to the letter, DGIC now argues it was required to settle all claims as once.  DGIC needs to decide which it is.  In the meantime, however, a jury must decide the truthfulness of DGIC's post hoc rationalizations for failing to settle.

### C.    Proximate Cause is for the Jury

"[I]t is axiomatic that questions regarding proximate cause are undeniably a jury question."  *Layfield v. DOT*, 280 Ga. 848, 849 (2006).  In a failure-to-settle case, proximate cause is primarily a question for the fact finder.  *Am. Guarantee*, 835 F. App'x at 459.  "Telling evidence of foreseeable damage" includes the excess judgment and evidence that the insurer foresaw a significant verdict.  *Id*. at 460.  If DGIC had accepted the demand for Andrew's wrongful death, there would no judgment.  DGIC determined the claims to be "obvious policy limits claims."  The proximate cause of the $14 million judgment is clearly the failure to settle.

DGIC alleges Chumley lacked the intent to settle and "set up" DGIC.  DGIC presents no evidence of Chumley's intent.  Chumley thought the claim would settle.  (<u>Exhibit D</u>, ¶¶5, 13-14)  He sent the same demand to Country Financial and worked cooperatively to settle.  (Exhibit D, ¶¶22-26)  Chumley gave DGIC more time to accept by faxing the demand.  (<u>Exhibit D</u>, ¶¶29-30)  There is no "set up."

DGIC is projecting when it says counsel "sat back in silence." DGIC sat back in silence. Chumley sent the demand and thought it would be accepted in the normal course. (Exhibit D, ¶¶5, 13-14) DGIC received the demand and sat back in silence. (Exhibit D, ¶14) DGIC was confused and wanted clarification, but it sat back in silence. DGIC decided in early August it would reject the demands and hold a GSC, but DGIC sat back in silence until September 6. (Exhibit D, ¶¶14-15)

DGIC presents no evidence that any attorney told anyone they were coming to the GSC to negotiate for some smaller share of the limits. DGIC infers that from the fact that the attorneys said they would attend the GSC. No such inference is allowed on summary judgment. Moreover, action or inaction by the attorneys after September 6 is immaterial to entry of the $14 million judgment, because the September 6 counteroffer "changed everything." (Exhibit D, ¶16; Exhibit E, ¶11).

### D.    DGIC is Liable for Punitive Damages

"As with the bad faith inquiry, the issue of punitive damages is generally best left to the jury." *Noe v. Metropolitan General,* 2012 WL 12835879 at *7 (N.D. Ga.). An insurer's failure to take advantage of a single, time-limited demand for policy limits can create a jury question as to punitive damages. *Whiteside*, 311 Ga. at 354.

Specific to cases like this, "conscious indifference to the consequences" exists where an adjuster receives a time-limited demand, knows the insured is at fault, knows damages will exceed policy limits, but fails to accept or ask for an extension.

*Dickerson*, 2009 WL 1035131, *10. "Whether the tort was sufficiently aggravating to authorize punitive damages is generally a jury question, and a jury may award punitive damages even where the clear and convincing evidence **only creates an inference** of the defendant's conscious indifference to the consequences of his acts." *Tookes v. Murray*, 297 Ga. App. 765, 768 (2009) (emphasis added). "[S]ubjective good faith does not provide such legal justification as will negate malice." *Second Cont'l, Inc. v. Atlanta E-Z Builders*, 237 Ga. App. 304, 307 (1999).

DGIC defends its actions by construing facts in its favor and alleging subjective good faith. Construing the facts against DGIC, the GSC was an attempt to intentionally avoid its contractual and common-law duties to prudently protect the insured from large judgments. DGIC had a reasonable opportunity to settle a wrongful death claim. It intentionally ignored the opportunity in favor of throwing its meager limits on the table and inviting the offeror and a multitude of other "interested parties and entities" to figure it out themselves. Rather than using its discretion to adjust the claim, DGIC "punted" to parties adverse to its insured with a conscious indifference to the consequences. That DGIC made not a single offer at the GSC creates a strong inference that DGIC did not care about the consequences.

Shifting from clear-and-convincing to the preponderance standard, DGIC had the "specific intent to cause harm." O.C.G.A. § 51-12-5.1(f) and *Kothari v. Patel*, 262 Ga. App. 168, 173-74 (2003) (ruling on different standards). Specific intent is

30

satisfied if DGIC merely understood "the consequences are substantially certain." *J.B. Hunt v. Bentley*, 207 Ga. App. 250, 255 (1992). Furthermore, the statute does not state who must be the object of the harm. "Neither direct personal contact nor specific malice between defendant and plaintiff is required to support a claim for additional damages under O.C.G.A. § 51-12-5." *Bowen v. Waters*, 170 Ga. App. 65, 66 (1984). In *Bowen*, the court reasoned, whether the tortfeasor knew upon whom it was inflicting injury did not matter, as long as there was some evidence of willful disregard that it was injuring someone. *Id*. at 66. The rule that a defendant need not know whom he might harm makes sense, as unlimited punitive damages would be appropriate if a blindfolded defendant fired a gun randomly, not knowing whom a bullet might strike or if it would strike anyone.

There can be no doubt that a reasonable jury could determine by the preponderance of the evidence that DGIC intended to harm Evans by ignoring his offer and requiring him to show up at a GSC to negotiate for a lesser amount.

### E.   Hirsh's Entitlement to Attorneys' Fees Is a Jury Issue

DGIC argues a counterclaim plaintiff may not invoke O.C.G.A. § 13-6-11. The Supreme Court of Georgia disagrees. *SRM v. Travelers*, 308 Ga. 404 (2020). DGIC cites bad law and invites error. This Court should deny DGIC's motion.

In a case alleging negligent or bad-faith failure to settle, an insured survives summary judgment on O.C.G.A. § 13-6-11 "by presenting *any* evidence which

31

establishes a jury issue on bad faith; even 'slight evidence' is sufficient." *Dickerson*, 2009 WL 1035131, at \*10 (emphasis in original). *Dickerson* ruled that a knowing refusal to accept a demand within limits creates an issue of fact for attorneys' fees. *Id*. That is what happened in this case. A jury must decide fees.

Stubborn litigiousness and unnecessary trouble and expense under O.C.G.A. § 13-6-11 are for the jury, even if liability is disputed. *Daniel v. Smith*, 266 Ga. App. 637, 638 (2004). In *Daniel*, a jury had to determine fault based on conflicting evidence. Nonetheless, there was a fact issue as to fees. *Id.* at 639. "[I]f there exists *some evidence* authorizing the award of attorney fees, this court cannot hold as a matter of law that there was a reasonable defense as to the [claims at issue]." *Backus Cadillac-Pontiac, Inc. v. Ernest*, 195 Ga. App. 579, 581 (1990). There are fact issues as to DGIC's liability, so a jury must decide attorneys' fees.

"Contrary to [DGIC]'s argument, the existence of a bona fide controversy negates the possibility of a statutory award of attorney fees only '**where bad faith is not at issue.**'" *MARTA v. Morris*, 334 Ga. App. 565, 570 (2015) (emphasis in original). If there is "some evidence" of "bad faith," the existence of a bona fide controversy is not dispositive of the claim for O.C.G.A. § 13-6-11 attorney's fees. *Merlino v. Atlanta*, 283 Ga. 186, 190 (2008). This Court should deny the motion.[7]

---

[7] "All citations to the record evidence should be contained in each party's brief, not just in the party's statement of undisputed (or disputed) facts." (Doc 3, p.7 of 12) DGIC violated this rule by citing to its statement of facts rather than to evidence.

## V.    **CONCLUSION**

The General Assembly told claimants how to make pre-suit time-limited demands; and it told insurers what to do upon receipt. O.C.G.A. § 9-11-67.1. DGIC had sufficient policy limits to timely accept all time-limited demands ever made with regard to claims arising out of the August 27, 2018, wreck. Rather than exercise its discretion as it promised to do in exchange for premiums paid, DGIC punted to the claimants and asked them to adjust their own claims at a "Global Settlement Conference." Prior to the GSC, DGIC promised it would make offers to each claimant and settle what claims it could at the GSC. DGIC did neither.

To excuse its behavior, DGIC says it cannot settle a wrongful death claim without settling an estate claim, but DGIC did precisely that with the Willis claim. To excuse its behavior, DGIC says it had no opportunity to settle Denissova's claim for the death of her son. DGIC does not understand applicable law. To excuse its behavior, DGIC blames Chumley and his demand. Country Financial received the same demand and had no problem cooperating with Chumley to settle a wrongful death claim. Enough excuses. This Court should deny the motion.

---

The violation prejudiced Hirsh, as it necessitated the cumbersome process of referring to the statement of facts and then finding the record evidence. DGIC added an extra step. Meeting and conferring was impractical, as it would require communications, consent motions and then dealing with a brief with altered pagination. It was easier to deal with the problem than try to get DGIC to fix it. DGIC' added a step and created unnecessary trouble and expense, creating a jury issue as to entitlement to attorneys' fees under O.C.G.A. § 13-6-11.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **Defendant D. Max Hirsh's Response to Direct General Insurance Company's Motion for Summary Judgment** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record for all parties.  I further certify that I caused a copy of the foregoing to be served via U.S. mail on the following *pro-se* party:

Roger Hartsfield
29 Duncan Drive SW
Cartersville, GA 30120

I further certify that the foregoing was prepared in Times New Roman 14pt font and otherwise complies with Local Rule 5.1.

Respectfully submitted September 27, 2024.

*/s/ Richard E. Dolder, Jr.*
Richard E. Dolder. Jr.
Georgia Bar No. 220237
**SLAPPEY & SADD, LLC**
352 Sandy Springs Circle
Atlanta, Georgia 30328
(404) 255-6677 (telephone)
rich@lawyersatlanta.com
*Attorney for Mr. Hirsh*