Ellen Greer                                          4/17/2024

```
              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION


DIRECT GENERAL INSURANCE     *
COMPANY                      *
                             *
VS.                          *  CIVIL ACTION FILE NO.
                             *  1:23-cv-03491-ELR
                             *
CHRISTOPHER EVANS AND        *
POLINA DENISSOVA,            *
individually and as co-      *
Administrators of the        *
ESTATE OF ANDREW EVANS,      *
ROGER HARTSFIELD AND         *
D. MAX HIRSH, as             *
administrator of the ESTATE  *
OF SHANNON HARTSFIELD        *




      **************************************

      HYBRID ORAL AND VIDEOTAPED DEPOSITION OF

                     ELLEN GREER

                   APRIL 17, 2024

      **************************************
```

**EXHIBIT**

**A**

        ANSWERS AND DEPOSITION OF ELLEN GREER, produced

as a witness at the instance of the Defendant D. Max

Hirsh, taken in the above-styled and -numbered cause on

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                            4/17/2024

9

1    Q.  Okay.

2         Who -- who was your employer at that time?

3    A.  The name of the company?

4    Q.  Yes, ma'am.

5    A.  I believe NGIC.  National General Insurance

6  Company would be the correct name of the parent company.

7    Q.  Okay.

8         And one of the insurance companies in the

9  family was called Direct General Insurance Company?

10    A.  That's correct.

11    Q.  So were you a lawyer for Direct General

12  Insurance Company?

13    A.  Yes.

14         MR. JURMAN:  Object.

15    Q.  What years?

16    A.  You're asking me what years?

17    Q.  Wh- -- when were you a lawyer for Direct

18  General Insurance Company?

19    A.  I worked for National Gen- -- General from 2016

20  to 2020.

21    Q.  And what was your job title?

22    A.  Senior claims attorney.

23    Q.  And what did you do as a senior claims

24  attorney?

25    A.  I did a variety of things.  Can I just defer to

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                                          4/17/2024

                                                                          10

1  my LinkedIn profile and read that for you?  It's a --

2  it's a basic job description of activities that I did

3  for the company.

4      Q.  Sure.

5      A.  Okay.  I provided guidance, mentor, counseling

6  on policy and coverage interpretation.  I trained,

7  developed and provided technical guidance to claims on

8  various legal topics.  I provided legal analysis and

9  opinions on coverage issues and file handling matters.

10  I served as their resource on litigated claims and acted

11  as a liaison between claims and panel counsel.  I

12  selected and monitored panel counsel, and I granted

13  trial authority.  And I assured appropriate execution

14  and company -- of the company litigation philosophy and

15  guidelines.  And I supported, from time to time, eight

16  to ten states over the years.

17      Q.  Okay.

18              And one of those states was Georgia?

19      A.  It was.

20      Q.  All right.

21              And did you work on bad faith matters?

22      A.  Can you describe what you mean by "bad faith

23  matters"?

24      Q.  Yes.  Insurance bad faith in the third-party

25  context.

Ellen Greer                                                    4/17/2024

16

1  working as a team with the management and the claims

2  professionals outside the log.  Files were not directly

3  assigned to me.  These were the claims professionals'

4  files, and they worked with management, and if they saw

5  a legal question that they wanted to elevate to me, the

6  management would bring it to me and we would discuss,

7  but typically I was never required to put my opinions in

8  the log beyond the coverage analysis that I just

9  referenced.

10      Q.  Okay.

11          Let's go, please, to Bates page 6295.  And

12  just tell me when you're there.

13      A.  Almost.  Okay.  I'm there.

14      Q.  All right.

15          And there is an entry by -- it's toward the

16  bottom of the page, by William Robinson, August 10,

17  2018, at 1:57.  There are actually two of him by them at

18  that time, but one of them has your name in it, Ellen

19  Greer.

20          Do you see that?

21      A.  I do.

22      Q.  Okay.  Great.

23          Well, first, who -- who was William

24  Robinson?

25      A.  So I knew him as Bill.  Bill Robinson was

Ellen Greer                                          4/17/2024

22

1  you like to just read over that page,

2  Mr. Quackenbush's --

3                MR. JURMAN:  What is the Bates stamp

4  number?

5                MR. DOLDER?  The Bates stamp number is DGIC

6  000092.  You guys good, Rory?

7                MR. JURMAN:  Yep.

8                MR. DOLDER:  Okay.

9                MR. JURMAN:  Thank you.

10                MR. DOLDER:  Sure.  Yeah, just stop me at

11  any time.

12      Q.  And, ma'am, you just let me know when you're

13  ready to take some questions.

14      A.  Okay.  I'm ready.

15      Q.  All right.

16                Now, would you agree with me that in this

17  e-mail exchange Mr. Quackenbush is asking you a question

18  and that you give him an answer?

19      A.  Yes.

20      Q.  All right.

21                And if we look down at Mr. Quackenbush's

22  e-mail, maybe the fourth line, says, Think we should

23  look at some sort of global settlement conference given

24  all the potential exposures.

25                Do you see that?

Ellen Greer                                          4/17/2024

23

1        A.   I do.

2        Q.   All right.

3             Now, are -- did you take this to mean that

4    Mr. Quackenbush was asking you what you thought of the

5    prospect of convening a global settlement conference?

6        A.   Can you repeat your question?

7        Q.   Sure.

8             Did you take this to mean that

9    Mr. Quackenbush was suggesting that Direct General

10   convene a global settlement conference?

11       A.   Yes, he said, I think we should look at some

12   sort of global settlement conference given all the

13   potential exposures.

14       Q.   Right.

15            And would you agree he was seeking guidance

16   from you on that?

17       A.   Yes.

18       Q.   Okay.

19            And are you aware, sitting here today, of

20   any earlier reference to convening a global settlement

21   conference with regard to the claims arising out of the

22   July 27, 2018, car wreck?

23       A.   Well, let's see.  This is dated August 13.  I

24   can look at the materials that you provided me prior --

25   with the subpoena prior to today, and there may have --

Ellen Greer                                                    4/17/2024

25

1  you objecting about?

2       A.  All right.  So I had to review the file to see.

3  I was looking at the date, August 13, to see if there

4  was anything prior to that in the file.  And I couldn't

5  recall, so that's what I'm looking for.

6       Q.  Okay.

7       A.  So on August 2nd, her action plan, it -- one of

8  the items is to attempt to resolve all within limits of

9  25/50, so she didn't talk about a global settlement

10  conference there, but I believe that's where the genesis

11  of it was, because it was a widely accepted way to

12  handle our Georgia nimin -- minimum limits cases when

13  you have multiple competing claims with insufficient

14  policy limits.

15             And she knew from August 2nd that she had

16  three fatalities in a policy of 25/50.  So I think

17  probably there was some thought of it at that point,

18  even though it doesn't say global settlement conference.

19       Q.  Okay.

20             You were --

21       A.  She was looking out for the insured from day

22  one.

23       Q.  And you glean -- have you spoken to Ms. Matoy?

24       A.  I have not.

25       Q.  Okay.

Ellen Greer                                                    4/17/2024

                                                                      26

1              Are you aware that she gave testimony in

2     this case?

3          A.   I don't know that I was.

4          Q.   Okay.

5              Are you aware of anyone giving testimony in

6     this case?

7          A.   No.

8          Q.   Now, back to Exhibit 2.

9          A.   Yes.

10         Q.   So -- and just to catch up, we -- we have

11    Mr. Quackenbush asking about your -- for your guidance

12    on a global settlement conference, and if we go up, we

13    see your response.  And that third paragraph includes

14    this quote, I agree that it would be a good idea to

15    engage Mike St. Amand to negotiate a global pro

16    rattle -- pro rata settlement of all parties and to meet

17    the respective settlement terms of each demand.

18              Do you see that?

19         A.   I do.

20         Q.   Okay.

21              So fair to say that you thought a global

22    settlement conference was a good idea?

23         A.   Yes.

24         Q.   And you proposed hiring Mike St. Amand to do

25    it, correct?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                              4/17/2024

                                                              30

1      Q.   The next paragraph, you say, I recommend that

2   we provide a copy of the time-limited demands to the

3   insured.

4            Why is that?

5      A.   Because it's important to keep the insured

6   apprised of what's going on.  I think Jeanna Matoy, that

7   was one of her action plan goals on day two, contact the

8   named insured.

9      Q.   And -- and why is it important to keep the

10  insured informed?

11     A.   Because they're going to be concerned about

12  having insufficient policy limits with multiple

13  competing claims in excess of those policy limits.

14     Q.   Okay.

15           So was it Direct General's practice at the

16  time, as far as you know, to provide insureds with

17  copies of time-limited demands?

18     A.   That's a good question.  Yes, I believe it was.

19     Q.   Are -- are you aware of any policies and

20  procedures at Direct General at -- at this time, in

21  August 2018, specifically dealing with time-limited

22  demands?

23     A.   There was training that was given on an annual

24  or six-month basis on insurance good faith, and that

25  would have included multiple competing claim training

**STRYKER REPORTING SERVICES**            **(817) 494-0700**

Ellen Greer                                              4/17/2024

31

```
 1  and time-limit demand training, and the claims
 2  professionals would have had that training.
 3       Q.  Okay.
 4            And would -- would there be training
 5  specific to Georgia?
 6       A.  Yes.
 7       Q.  Who conducted that training?
 8       A.  Mike St. Amand, an attorney from north of
 9  Atlanta, I want to say Robert Walker or Robert Parker.
10  There would have been internal training which I referred
11  to, the good faith training, which would have been the
12  director of complex litigation which would have
13  presented that training.
14       Q.  What's that person's name?
15       A.  Jim Brown.  And then Gina Snow.
16       Q.  Okay.
17       A.  Same position.
18       Q.  Sure.
19            Did -- did you attend any of these
20  trainings?
21       A.  I attended all of them.
22       Q.  Okay.
23            And --
24       A.  I -- and I think there was another one, an
25  Atlanta woman attorney came and presented.  I think her
```

Ellen Greer                                          4/17/2024

32

1    first name was Erica.

2        Q.  Parsons?

3        A.  Yes.

4        Q.  At Lueder Larkin at the time maybe?

5        A.  I believe.

6        Q.  It's a small world, even in Atlanta.

7        A.  Yes.

8        Q.  So these are situations where defense counsel

9    would come to the insurance company and help educate the

10   adjusters on various legal issues that might arise in

11   their claims handling?

12       A.  Yes, but it was required training.  It was

13   mandatory.  And the good faith training that was

14   presented annually or more frequently than that by the

15   director of complex litigation, that was mandatory as

16   well.

17       Q.  Okay.

18               And some of the training specific to

19   Georgia, do you recall that including training about

20   so-called Holt demands?

21       A.  Yes, that was included.

22       Q.  Okay.

23               And you know what I mean by Holt demands?

24       A.  I do.

25       Q.  Okay.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                                4/17/2024

33

1            And do you know if this training included

2  demands made under a Georgia statute -- I'll cite it to

3  you.  I don't know if that's gonna do you much good --

4  OCGA 9-11-67.1.  Do you remember that?

5       A.  Yes.

6       Q.  Okay.

7            It -- the training did include that?

8       A.  I believe so.

9       Q.  Okay.

10           And so you remember that that statute

11  regulated offers to settle?

12      A.  I remember that.

13      Q.  Okay.

14           And so there was training prior to

15  August 2018 for claims professionals at Direct General

16  on these issues we've just talked about?

17      A.  Not all of the training I just related was

18  prior to August 2018.  Some of it was.

19      Q.  Okay.  Fair enough.

20           And you -- you mentioned multiple competing

21  claims, and -- and you refer to that in your e-mail in

22  the first line where you have MCC issue.  Right?

23      A.  Yes, I think that's what my abbreviation MCC

24  would have meant.

25      Q.  Okay.

Ellen Greer                                        4/17/2024

                                                              38

1   was produced in the litigation, and it is what it is.

2        A.   Oh, I see.  Okay.  I didn't know who had

3   compiled this document, so yeah.

4        Q.   Okay.

5        A.   So you want me to look at 122, the letter?

6        Q.   Sure, that -- that version's fine.

7        A.   Okay.  So -- and your question to me was?

8        Q.   Whether you remember having any thoughts on

9   whether Direct General should attempt to accept the

10  demand for the wrongful death of Andrew Evans.

11       A.   Well, if you're asking me if I think a child's

12  death is worth $25,000, that's a very small sum.

13       Q.   Well, it's not what I'm asking though.

14       A.   All right.  Then, please, can you reword your

15  question?

16       Q.   Yeah.  When you saw -- do you remember when you

17  saw this demand, did you think Direct General should try

18  to accept it?

19       A.   Well --

20            MR. JURMAN:  Objection.

21       A.   I -- I don't remember, and in looking at the

22  letter, sitting here today, there -- there is a concern

23  about the dollar amount demand.

24       Q.   What is that concern?

25       A.   Well, they're asking for payment in the amount

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                              4/17/2024

                                                              39

1   of a hundred thousand dollars plus the amount of all

2   available insurance funds, and -- and they go on to

3   say -- let's see.  As stated previously in this

4   correspondence --

5        Q.  Can you tell us what page?

6        A.  I am --

7        Q.  I'm sorry to interrupt.

8        A.  No, I'm -- and you -- I -- I apologize.

9                   Page 128.

10       Q.  Go ahead.

11       A.  As stated previously in this correspondence, if

12  the limit of coverage is higher than a hundred thousand

13  dollars, our demand will be for whatever that amount may

14  be in this instance.

15              All right.  So their demand is for a

16  hundred thousand dollars or more, if there's higher

17  limits.

18              And this letter was dated August 9th, and

19  according to the log notes I have that you sent me, a

20  day or two before, Jeanna Matoy had talked to the

21  Montlick law firm and told them what the limits were,

22  and they knew what the limits were, and she had e-mailed

23  to them the DEC page.  So they knew we had a 25/50

24  policy, but they're asking for a hundred thousand

25  dollars.  So that's a little problematic.  It's a --

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                           4/17/2024

                                                            51
1   up before I ask any questions.
2               MR. YEE:  And you said that was Exhibit 1
3   to the pleadings?
4               MR. DOLDER:  It --
5               MR. YEE:  To the complaint?
6               MR. DOLDER:  Well, it -- just in the
7   pleadings, it's Doc 1-1, Page 18 of 78.  It's a page --
8               MR. YEE:  Understood.  Understood.
9               MR. DOLDER:  -- from the policy you
10  attached to your complaint.
11              MR. YEE:  Understood.  One moment.
12              All right.  You're on the page -- you said
13  18 of 78, and that would be Part A - Liability Coverage?
14              MR. DOLDER:  Yes.
15              MR. YEE:  Okay.
16              All right.  We have it in -- in front of
17  us.
18       Q.  A -- a -- and, ma'am, we can make this quick,
19  if you want.
20              But does this policy give Direct General
21  discretion to settle claims as it sees fit?
22       A.  We will settle or defend with a lawyer of our
23  choice, as we consider appropriate, any claim or suit
24  asking for these damages.
25       Q.  Is that a yes or a no?

**STRYKER REPORTING SERVICES**            **(817) 494-0700**

Ellen Greer                                          4/17/2024

```
                                                      52
 1      A.   That is a yes.

 2      Q.   Thank you.

 3           If we go down -- and I'm sorry.  Back to

 4  Exhibit 3, if you don't mind.

 5      A.   Okay.

 6      Q.   So again, on the second page of that exhibit,

 7  which is Bates 140, and about in the middle, there's a

 8  short paragraph, and it reads as follows:  Plus, we are

 9  asking for all claimants to present their injury claims,

10  document injuries and special damages, identify other

11  available insurance (UM), and identify liens that need

12  to be addressed.

13           Did I read that substantially correctly?

14      A.   Yes, you did.

15      Q.   Thank you.

16           Now, why did Direct General want

17  information about UM insurance?

18      A.   Well --

19           MR. JURMAN:  Objection.

20           THE WITNESS:  Go ahead.

21           Oh, he objected.

22      A.   Because it would help, when everybody is

23  sitting at the table, to find out who's been compensated

24  by UM coverage when they're parceling out the pieces of

25  the pie that's far too small for all these people.
```

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                                    4/17/2024

57

1  your deposition, right?

2      A.  Yes.

3      Q.  Okay.

4          Did -- did you see anything that causes you

5  to think, gosh, I should not have approved this?

6                MR. JURMAN:  Objection.

7      A.  Can you be more specific with your question?

8      Q.  Yes.

9          Is there anything in Mr. St. Amand's

10 September 6, 2018, letter that you disapprove of him

11 having said, or wrote, I should say?

12     A.  Well, he tendered the limits.  He accepted that

13 Direct General was going to pay the full 50,000 limits.

14 I'm not saying I disapproved of that; I'm just seeing --

15 noting what I see.

16     Q.  Sure.  Sure.

17     A.  There was the -- the time-limit demand that

18 we've discussed, and we discussed some of the problems

19 that the company saw with it, that time-limit demand.

20 This is -- this is a timely response, within the

21 30 days, and he tendered limits, invited everybody to

22 the global settlement conference to make a fair

23 allocation that's acceptable to all.

24          And then he talks about UM, the wrongful

25 death claim, the estates of the decedents, and potential

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Ellen Greer                                          4/17/2024

59

1   he had with them about this settlement conference that

2   was upcoming.  All I have is the e-mail and the letter.

3   So he may have done all kinds of other conversations and

4   e-mails and writings with the other attorneys, and I

5   don't have any knowledge of that.

6        Q.  Okay.

7              But -- and -- and I qualified my question.

8   That's why I qualified my question as -- as to what you

9   know of.

10             Do you know of anything Michael St. Amand

11  did in handling this claim that Direct General didn't

12  want him to do?

13             MR. JURMAN:  Objection.

14       A.  Based upon the information that I've been

15  provided here today, no.

16       Q.  Okay.

17             And do you have any independent

18  recollection of -- of him doing anything you didn't want

19  him to do?

20       A.  No.

21       Q.  Okay.  Thank you.

22             On -- on the letter, so it's the second --

23  the first page of the letter, which is the second page

24  of Exhibit 5, near the bottom, second paragraph to the

25  bottom, you pointed to this as -- as -- as tender

Ellen Greer                                                    4/17/2024

60

1    language.  And it says, Direct General has agreed to

2    tender its per accident liability limits $50,000 among

3    the bodily injury claimants.

4                    And it goes on.  Do you see that?

5        A.  I do.

6        Q.  Now, you would agree with me that that is a

7    counteroffer to the time-limited demands, right?

8                    MR. JURMAN:  Ob- -- objection.

9        A.  What I would agree is that the log notes

10   indicate that all the attorneys were coming to the

11   global settlement conference, and that nobody objected

12   to the global settlement conference.

13       Q.  Are you done with your answer?

14       A.  I am.

15       Q.  Okay.

16                   Well, that wasn't my question.

17                   My question is, do you agree that it's a

18   counteroffer --

19                   MR. JURMAN:  Objection.

20       Q.  -- to the time-limited demands?

21                   MR. JURMAN:  Objection.

22       A.  So I can't agree to that, because I don't know

23   what other correspondence is out there from Mike

24   St. Amand or e-mails or agreements with these attorneys,

25   so I -- I can't -- I can't say that that's a

**STRYKER REPORTING SERVICES**                        **(817) 494-0700**

Ellen Greer                                                    4/17/2024

61

1  counteroffer.

2      Q.  Okay.

3          Well, you would agree with me that it's not

4  an acceptance of the time-limited demands?

5              MR. JURMAN:  Objection.

6      A.  Well, it's a timely tender of the policy

7  limits.

8      Q.  That wasn't my question.  My question is, you

9  would agree with me that it is not an acceptance of the

10  time-limited demands?

11      A.  Well --

12             MR. JURMAN:  Objection.

13      A.  -- as -- as we discussed, the time-limited

14  demand letter had a lot of issues, and we didn't discuss

15  all those issues.  We discussed one or two.

16      Q.  Okay.

17             Again, let me try the question.  You would

18  agree that this letter is not an acceptance of the

19  time-limited demands, correct?

20             MR. JURMAN:  Objection.

21      A.  Again, I can't say that, because I don't know

22  what else is out there.

23      Q.  Okay.

24             Are -- are you aware that Direct General

25  had claims handling guidelines for the claim

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**