```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
                  ATLANTA DIVISION


DIRECT GENERAL INSURANCE      )
COMPANY,                      )
                              )
          Plaintiff,          )
                              )  CIVIL ACTION FILE
v.                            )  NO. 1:23-CV-03491-ELR
                              )
CHRISTOPHER EVANS and POLINA  )
DENISSOVA, individually and as)
co-administrators of the      )
ESTATE of ANDREW EVANS, ROGER )
HARTSFIELD, and D. MAX HIRSH, )
as administrator of the ESTATE)
OF SHANNON HARTSFIELD,        )
                              )
          Defendants.         )
_____)


                    *  *  *


        Videotaped Zoom Deposition of
                 JEANNA MATOY


               April 16, 2024
                 10:02 a.m.

       Zoom Deposition Originating From
           Legal Technology Services
        4470 Atlanta Highway, Suite A
                 Loganville, GA


     By Kerry A. Anderson, RPR, CCR B-1878

*********************************************************

       PROFESSIONAL COURT REPORTERS LLC
       3659 Chattahoochee Summit Drive
              Atlanta, GA  30339
                 770.952.0604
        www.ProfessionalCourtReporters.com
```

EXHIBIT

B

Jeanna Matoy - 04/16/24                    19

```
 1        A      Underinsured motorist coverage.
 2        Q      Okay.  And what does that mean to you?
 3        A      They have additional coverage for their --
 4   their -- the people in their vehicle.
 5        Q      So that's -- Country Financial Insurance
 6   Company has insurance that covers the people in that
 7   vehicle?
 8        A      Correct.
 9        Q      Is that what you're telling us?
10        A      Yes.
11        Q      And that would be separate from the
12   insurance that Direct General has?
13        A      Correct.
14        Q      Is that your understanding?
15        A      Yes.
16        Q      Did she tell you anything about the
17   accident, or anything, that you -- based on this note?
18        A      We probably discussed what happened.  But I
19   asked her to send the police report so I could verify
20   what happened.
21        Q      And at this point, based on this note
22   entry -- we'll keep going -- did Mr. Hartsfield call
23   you back?
24        A      Based on this note, no.
25        Q      It says "Taking care of property damages."
```

1      Q    Was this the letter that you referred to

2    previously that Ellen Greer and Andy Quackenbush had

3    reviewed?

4      A    Yes.

5      Q    Was this letter in response to the time

6    limit demands?

7      A    Yes.

8      Q    Was this letter sent out within 30 days of

9    the time limit demand?

10      A    Yes.

11      Q    Now, you didn't attend the global settlement

12    conference; correct?

13      A    The file was transferred to me [sic] prior

14    to the global settlement conference.

15              MR. JURMAN:  Let's -- why don't we take

16    five so I can review my notes, please.

17              (A discussion ensued off the record.)

18              THE VIDEOGRAPHER:  Off the record at

19    12:21 p.m.

20              (A recess was taken from 12:21 p.m. to

21        12:28 p.m.)

22              THE VIDEOGRAPHER:  On the record,

23    12:28 p.m.

24              MR. JURMAN:  I have no further

25    questions at this time, but I do reserve my right to

Jeanna Matoy - 04/16/24                      128

```
1                        MR. JURMAN:  Objection.
2                        THE WITNESS:   To protect our insured's
3      interest.
4      BY MR. DOLDER:
5          Q     And protect the insured from what?
6          A     A lawsuit and excess verdict.
7          Q     Precisely.  Okay.  And would you agree that
8      as a claims representative, you know that you should
9      settle a claim if liability is reasonably clear,
10     there's a risk to the insured of a judgment in excess
11     of policy limits, and there is an opportunity to
12     settle that claim within policy limits?
13                       MR. JURMAN:  Objection.
14                       THE WITNESS:  Yes.
15     BY MR. DOLDER:
16         Q     And when you're deciding whether to settle a
17     claim, do you agree that you should give the insured's
18     interest equal consideration as to Direct General's
19     interest?
20                       MR. JURMAN:  Objection.
21                       THE WITNESS:  Yes.
22     BY MR. DOLDER:
23         Q     Have you heard of the equal consideration
24     rule?  Is that something you learned about as a claims
25     representative?
```

1      Q     And would you agree that one reason to

2   evaluate liability is to determine whether it's

3   appropriate to settle a claim?

4      A     Yes.

5      Q     And we have thrown around the word claimant

6   today.  But a claimant is the person who is alleged to

7   have been injured by the insured; correct?

8      A     Yes.

9      Q     All right.  And you know in your experience

10  that claimants or their attorneys will often demand

11  that the insurance company pay a certain amount of

12  money to settle a claim; right?

13                    MR. JURMAN:  Objection.

14                    THE WITNESS:  In their letters, yes,

15  they can demand a certain amount.

16  BY MR. DOLDER:

17     Q     Demand letters?

18     A     Correct.

19     Q     And demand letters are a pretty common

20  feature of your work in the insurance industry?

21                    MR. JURMAN:  Objection.

22                    THE WITNESS:  Yes.

23  BY MR. DOLDER:

24     Q     And often these demands will threaten to sue

25  the insured if the insurance company does not pay the

```
 1   amount demanded; correct?
 2                   MR. JURMAN:  Objection.
 3                   THE WITNESS:  Yes.
 4   BY MR. DOLDER:
 5       Q    All right.  And often these demands are time
 6   limited; correct?
 7                   MR. JURMAN:  Objection.
 8                   THE WITNESS:  Yes.
 9   BY MR. DOLDER:
10       Q    And by time limited they have -- I mean they
11   have deadlines; right?
12                   MR. JURMAN:  Objection.
13                   THE WITNESS:  Correct.
14   BY MR. DOLDER:
15       Q    Okay.  And in your 40 years, you've probably
16   seen thousands of time-limited demands for policy
17   limits in your work; correct?
18                   MR. JURMAN:  Objection.
19                   THE WITNESS:  Yes.
20   BY MR. DOLDER:
21       Q    There's nothing unusual in your work about
22   receiving time-limited demands?
23                   MR. JURMAN:  Objection.
24                   THE WITNESS:  No.
25
```

```
 1   BY MR. DOLDER:
 2       Q    And that's true in all of those states in
 3   which you adjust claims; correct?
 4                  MR. JURMAN:  Objection.
 5                  THE WITNESS:  Yes.
 6   BY MR. DOLDER:
 7       Q    Was that a yes?
 8       A    Yes.
 9       Q    All right.  Now, in determining whether to
10   accept a time-limited demand, you consider whether
11   there's coverage; correct?
12       A    Yes.
13       Q    And in determining whether to accept a
14   time-limited demand, you consider the strength of the
15   liability case against your insured; correct?
16       A    Could you rephrase that question.
17       Q    Yeah.  In determining whether to accept a
18   time-limited demand, you consider whether your
19   evaluation indicates that the insured is at fault for
20   the accident?
21       A    Yes.
22       Q    Okay.  And in determining whether to accept
23   a time-limited demand, you consider the risk to the
24   insured of a judgment in excess of policy limits;
25   correct?
```

1       A    Yes.

2       Q    So here we have a -- all right.  That's you

3    making an entry on August 2, 2018; correct?

4       A    Yes.

5       Q    All right.  And so by this time, August 2,

6    2018, had you conducted your coverage evaluation?

7       A    Yes.

8       Q    Okay.  And so Shannon Hartsfield was covered

9    for the wreck that took place on July 27, 2018;

10   correct?

11      A    Yes.

12      Q    And here we have an entry from you also

13   dated August 2, 2018, and it's on Bates stamp page --

14   excuse me -- 6308.  And do you see here where it says

15   "Insured 100 percent"?

16      A    Yes.

17      Q    Okay.  And does that mean your investigation

18   and evaluation had determined that Shannon Hartsfield

19   was 100 percent at fault?

20      A    Yes.

21      Q    For the wreck?

22      A    Correct.

23      Q    Yes.  Thank you.  And it says "claimant

24   zero."  Does that mean that you determined that Andrew

25   Evans was blameless for the accident?

```
 1       A     He's a passenger, a negligent-free passenger
 2   in our car.  Yes.
 3       Q     Negligent free?
 4       A     Correct.
 5       Q     Okay.  So he bore no fault for the accident;
 6   correct?
 7       A     Yes.
 8       Q     Let's go back -- all right.  I'm going back
 9   in time a little bit.  Sorry.  But we've got this
10   entry also, August 2, 2018, at 12:18.  And you told
11   Mr. Hartsfield that the policy limits were not enough
12   to compensate all the injured claimants; is that
13   correct?
14       A     Yes.
15       Q     Okay.  And so at this point you had
16   determined that this claim was going to vastly exceed
17   policy limits; correct?
18                   MR. JURMAN:  Objection.
19                   THE WITNESS:  Yes.
20   BY MR. DOLDER:
21       Q     In fact, it was kind of a no-brainer, wasn't
22   it?
23                   MR. JURMAN:  Objection.
24                   THE WITNESS:  Not necessarily.  We
25   still had other folks in the other car that we needed
```

1   to determine their injuries.

2   BY MR. DOLDER:

3       Q    But even without those injuries, the three

4   deaths vastly exceeds policy limits; right?

5                   MR. JURMAN:  Objection.

6                   THE WITNESS:  Yes.

7   BY MR. JURMAN:

8       Q    That was a no-brainer; right?

9                   MR. JURMAN:  Objection; asked and

10  answered.

11  BY MR. DOLDER:

12      Q    Was it an obvious policy-limit claim?

13                  MR. JURMAN:  Objection.

14                  THE WITNESS:  We were still

15  investigating at this specific time.  But, yes.

16                  MR. DOLDER:  Kerry, what exhibit are we

17  on?

18                  THE STENOGRAPHER:  I've got Rory going

19  through 12.

20                  MR. DOLDER:  Okay.

21                  MR. JURMAN:  We're on 13, Rich.

22                  MR. DOLDER:  Thank you.

23  BY MR. DOLDER:

24      Q    All right.  So I'm going to mark as 13,

25  looks like, a fax to Jeanna Matoy from Montlick &

1  matching note in my file when I received it.

2  BY MR. DOLDER:

3      Q    Well, do you remember looking at a note

4  with -- a claim note with Mr. Jurman that -- where you

5  stated you reviewed the demand on August 10?

6      A    Correct.

7      Q    So is this the demand you reviewed on August

8  10?

9      A    Yes.

10     Q    And this is a time-limited demand; correct?

11     A    Yes.

12     Q    And it's a offer to settle the wrongful

13  death claim of Andrew Evans; correct?

14     A    Yes.

15     Q    Okay.  Now, at this time in 2018, August

16  2018 -- 2018, excuse me -- had Direct General

17  communicated to you procedures for handling demands on

18  an obvious policy-limit claim?

19                  MR. JURMAN:  Objection.

20                  THE WITNESS:  We were still

21  investigating the claim.  So, yes, once -- I just note

22  that the demand came in and notify everybody that we

23  have a policy limits demand.

24  BY MR. DOLDER:

25     Q    Okay.  But -- and my question's a little

Jeanna Matoy - 04/16/24                    158

```
 1  BY MR. DOLDER:

 2       Q    Did -- in your view was this demand

 3  unreasonably early?

 4                 MR. JURMAN:  Objection.

 5                 THE WITNESS:  Demands come in at all

 6  times during a life of a claim file.

 7  BY MR. DOLDER:

 8       Q    And you have handled death claims where you

 9  get demands within weeks of the accident; correct?

10       A    Yes.

11       Q    So this wasn't an unusual situation, was it?

12       A    No.

13                 MR. JURMAN:  Objection.

14  BY MR. DOLDER:

15       Q    Did you have anything -- well, scratch that.

16  Let me start over.

17            Did you yourself accept this demand?

18                 MR. JURMAN:  Objection.

19                 THE WITNESS:  I let everybody know that

20  the claim -- the demand came in.

21  BY MR. DOLDER:

22       Q    Whose decision was it, if you know, to

23  decide whether to accept or not the demand?

24       A    At this point when I got this letter that

25  you're talking about, we were still investigating the
```

1    only."

2            Do you see that?

3       A    Yes.

4       Q    Now, I remember you indicating to Mr. Jurman

5    when you were looking at the claim notes that it was

6    your belief that this demand was for $100,000;

7    correct?

8       A    Policy -- yes, policy limits.

9       Q    Okay.  So you thought that Direct General

10   was going to have to pay $100,000 to meet the terms of

11   this demand?

12                   MR. JURMAN:  Objection.

13                   THE WITNESS:  It's what the attorneys

14   ask for.  We have a $50,000 policy limit.

15   BY MR. DOLDER:

16      Q    Okay.  Now, but do you see where the

17   attorney writes in the letter that your company has

18   not divulged said coverage amount in writing?  Do you

19   see that?

20      A    Yes.

21      Q    So did you take that to mean that he didn't

22   know what the coverage policy limits were at the time?

23                   MR. JURMAN:  Object.

24                   THE WITNESS:  I had sent him a copy of

25   the policy.

1    I'm sorry.  Have you seen an email indicating that you

2    sent the dec page via email?

3                    MR. JURMAN:  Objection.

4                    THE WITNESS:  I put it in my notes that

5    I sent it via email.

6    BY MR. DOLDER:

7        Q    Your notes say you sent it via email?

8        A    Correct.

9        Q    Okay.  Have you seen that email?

10       A    No.

11       Q    Do you know where that email is?

12       A    I do not recall.

13       Q    And do you see where the letter says "We

14   will use the figure of 100,000 for example purposes

15   only"?

16       A    Yes.

17       Q    Now, doesn't that indicate that the demand

18   is not for 100,000, that 100,000 is just an example?

19                   MR. JURMAN:  Objection.

20                   THE WITNESS:  It's an example of what

21   they thought our policy was.

22   BY MR. DOLDER:

23       Q    That's what you took this to mean, that the

24   author of this letter thought the policy limits were

25   $100,000?

```
 1        A     Correct.
 2        Q     Did it occur to you that you should alert
 3    the author of the letter that the policy limits were
 4    not $100,000?
 5        A     I had already spoken to somebody in that
 6    office and advised them of our policy limits.
 7        Q     So your job was done?
 8                    MR. JURMAN:  Objection.
 9                    THE WITNESS:  I had advised them by
10    phone and sent them a copy of our dec page what our
11    policy limits were.
12    BY MR. DOLDER:
13        Q     Well, but you would agree that the author of
14    this letter is at least writing that he does not know
15    the amount of the policy limits; agreed?
16                    MR. JURMAN:  Objection.
17                    THE WITNESS:  I spoke with his
18    assistant.
19    BY MR. DOLDER:
20        Q     Yeah, I'm not asking about the assistant.
21    I'm just asking about the language in this letter.
22    Doesn't it indicate to you that the author of the
23    letter is writing that he does not know the policy
24    limits?
25                    MR. JURMAN:  Objection.
```

1                    THE WITNESS:  I sent them a copy of the

2    declarations page and advising them what our policy

3    limits were.

4    BY MR. DOLDER:

5        Q    Yes, ma'am.  I'm asking you about the

6    language in this letter.  I'm not asking you about

7    what you might have done earlier.

8                    MR. JURMAN:  Objection.

9                    THE WITNESS:  Again, I advised that

10   attorney's office what our policy limits were.

11   BY MR. DOLDER:

12       Q    And it's your testimony that you read this

13   to mean that the attorney who wrote the letter thought

14   the policy limits were 100,000?

15       A    He put that in writing that, yes, that he

16   thought it was 100,000.

17       Q    Okay.  And you did not correct him after

18   having received this letter?

19       A    I had already spoken to his office twice and

20   let them know via mail and his assistant what our

21   policy limits were.

22       Q    Yes, ma'am, I understand that testimony.

23   But that was not my question.

24            My question was after you received this

25   letter, did you reach out to the attorney to correct

Jeanna Matoy - 04/16/24                              165

```
1    the understanding as to the policy limits?
2                    MR. JURMAN:  Objection.
3                    THE WITNESS:  No.
4    BY MR. DOLDER:
5        Q    So was this language about the $100,000 for
6    example purposes only at all unclear to you?
7                    MR. JURMAN:  Objection.
8                    THE WITNESS:  Rephrase your question.
9    BY MR. DOLDER:
10       Q    Is this language in Condition A crystal
11   clear to you?
12                   MR. JURMAN:  Objection.
13                   THE WITNESS:  No.
14   BY MR. DOLDER:
15       Q    Could you have used clarification?
16       A    Yes, because I had already advised their
17   attorney's office of our policy limits.
18       Q    Did you seek clarification?
19                   MR. JURMAN:  Objection.
20                   THE WITNESS:  No.
21   BY MR. DOLDER:
22       Q    Why not?
23       A    I had already advised the attorney's office
24   and sent them a copy of our declarations page,
25   advising them that our policy limits were $50,000.
```

```
1    sometimes they don't want them.

2         Q     And how do you know that?

3         A     By asking them.

4         Q     Okay.

5         A     And I had already asked if they wanted a

6    certified copy of the policy, and they said no.

7         Q     Okay.  And but when claimants or their

8    attorneys ask for affidavits as a condition of

9    settlement, you try to provide them; correct?

10        A     Yes.

11                   MR. JURMAN:  Objection.

12                   THE WITNESS:  Yes.

13   BY MR. DOLDER:

14        Q     Okay.  And you've provided affidavits like

15   the ones requested here many times in order to settle

16   claims in the past; correct?

17                   MR. JURMAN:  Objection.

18                   THE WITNESS:  Yes.

19   BY MR. DOLDER:

20        Q     Besides the amount that we've talked about a

21   few times, was there anything about this demand that

22   you found unusual?

23        A     No.

24        Q     Pretty run-of-the-mill?

25                   MR. JURMAN:  Objection.
```

```
 1        Q    It's August 15, 2018; correct?

 2        A    Yes.

 3        Q    And this is, as far as you know, the first

 4   communication with St. Amand about this claim;

 5   correct?

 6        A    Yes.

 7        Q    And prior to sending this email, you had

 8   received instructions from Mr. Quackenbush and

 9   Ms. Greer to retain Mr. St. Amand to convene a global

10   settlement conference; correct?

11                    MR. JURMAN:  Objection.

12                    THE WITNESS:  Yes.

13   BY MR. DOLDER:

14        Q    Is that correct?

15        A    Yes.

16        Q    Now, the -- you included the two demands you

17   had received on this email; right?

18        A    Yes.

19        Q    Okay.  And did you ask Mr. St. Amand to do

20   anything with the demands?

21        A    To the -- review them.

22        Q    Where is that written?

23        A    I sent him all the documents for review.

24        Q    But did you ask him to review the demands?

25        A    I sent him the documents, all the documents,
```

1  BY MR. DOLDER:

2      Q    Okay.  Go ahead.

3              MR. JURMAN:  And you know that, and

4  you're being persnickety, per your own thing.  So you

5  could ask me [sic] every time, or you could restate

6  your question, but you're going to get the same answer

7  from her, I would hope.  Or we can speak with the

8  judge, but all I could do is object.

9              MR. DOLDER:  Okay.

10              MR. JURMAN:  If you don't like the

11  answer, tell her you don't like the answer and then

12  rephrase it.

13  BY MR. DOLDER:

14      Q    Ma'am, do you understand the question?

15      A    I gave Mr. St. Amand all the documents to

16  review.

17      Q    At any point in time, did you ask

18  Mr. St. Amand to do anything with the demands other

19  than review them?

20      A    I did not.

21      Q    Okay.  See, that was easy.

22          Did you ever ask Mr. St. Amand for legal

23  advice about the demands?

24      A    I did not.

25      Q    Do you know if anyone else did?

1    BY MR. DOLDER:

2        Q    Did anyone ever tell you that Mr. St. Amand

3    did something other than what he was hired to do on

4    this claim?

5        A    I do not recall.

6        Q    Prior to working on this claim, had you

7    worked on other claims for Direct General where there

8    was a global settlement conference?

9        A    Yes.

10        Q    And were you aware in August 2018 whether

11    there were any policies or procedures at Direct

12    General regarding global settlement conferences?

13        A    No.

14        Q    Under what circumstances would you try to

15    settle cases with a global settlement conference?

16        A    As soon as we determine all parties and all

17    their injuries, we attempt -- I would attempt to

18    settle it myself or involve an attorney to help me

19    with the global settlement conference.

20        Q    Now, I understand that you ended your work

21    on this claim prior to the global settlement

22    conference; is that right?

23        A    Yes.

24        Q    Okay.  But do you know, do you have any

25    knowledge of what happened at the global settlement

```
1                  MR. JURMAN:  Objection.
2                  THE WITNESS:  I do not.
3    BY MR. DOLDER:
4         Q    And by the way, this separate Georgia
5    document in the tool kit, that was available to you in
6    August 2018?
7         A    Yes.
8         Q    And the statutes also?
9         A    Yes.
10        Q    Did you receive any training from National
11   General on its claim handling guidelines?
12        A    When you start with the company, there's
13   always an onboarding class to go over all this.
14        Q    And so you did that a long time ago?
15        A    Yes.
16        Q    I guess is it September 2014?
17        A    Yes.
18        Q    And any update training after September
19   2014?
20        A    They have company training.  But I've been
21   doing this for a long time.  So I don't get as much
22   training.
23        Q    Okay.  Did you get any training specific to
24   Georgia when you started handling Georgia claims?
25        A    That's why we refer to the tool kit.  It has
```

1    the information on each state, or I would talk to my

2    supervisor if I had a question.

3         Q    Got you.  But other than access to the tool

4    kit and access to a supervisor for questioning, no

5    training specific to Georgia?

6         A    No.

7         Q    I'm going to mark as an exhibit --

8              MR. DOLDER:  And, Kerry, if you could

9    tell me what this exhibit is.

10              THE STENOGRAPHER:  That will be 14,

11    Rich.

12              MR. DOLDER:  14.  And that's what I

13    originally had it marked.  Amazing.

14         (Plaintiff's Exhibit 14 marked for

15         identification.)

16    BY MR. DOLDER:

17         Q    And this is a 13-page document.  It's

18    Bates-stamped DGIC 006753 through 6765.

19              Now, let's start with the first page.  You

20    see this looks like an email, and then below it

21    there's a kind of a dialogue, a text dialogue.  Do you

22    see that?

23         A    Yes.

24         Q    Okay.  And where does that come from; do you

25    know?