```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
                  ATLANTA DIVISION

DIRECT GENERAL INSURANCE        )
COMPANY,                        )
                                )
          Plaintiff,            )
                                ) CIVIL ACTION FILE
                                )
     v.                         ) NO. 1:23-cv-03491-ELR
                                )
                                )
CHRISTOPHER EVANS and POLINA    )
DENISSOVA, individually and as  )
co-administrators of the        )
ESTATE of ANDREW EVANS, ROGER   )
HARTSFIELD, and D. MAX HIRSH,   )
as administrator of the ESTATE  )
OF SHANNON HARTSFIELD,          )
                                )
          Defendants.           )
_____)
```

* * *

Videotaped Zoom Deposition of
ANDREW GEORGE QUACKENBUSH


April 30, 2024
10:07 a.m.


Zoom Deposition Originating From
Legal Technology Services
4470 Atlanta Highway, Suite A
Loganville, Georgia


By Krista E. Capik, RPR, CCR B-1577

*********************************************************

PROFESSIONAL COURT REPORTERS LLC
3659 Chattahoochee Summit Drive
Atlanta, Georgia  30339
770.952.0604
www.ProfessionalCourtReporters.com

**EXHIBIT**

**C**

1        A    It's a demand received on behalf of

2    Andrew Evans by his father, Christopher Evans.

3        Q    All righty.  And is this one of the demands

4    that you were referencing in the claim notes we just

5    discussed?

6        A    Yes, this was one of the demands.

7        Q    Okay.  And this demand was time limited,

8    wasn't it?

9        A    Yes, sir, it was time limited.

10       Q    Okay.  And time-limited demands are pretty

11   normal in your business; correct?

12       A    Yes, sir, they are.

13       Q    And that -- and that's been true, I guess,

14   all the many years you've been working on claims with

15   various insurance companies?

16       A    Yes, sir.

17       Q    Now, at this time, did Direct General have

18   policies and procedures for dealing with time-limited

19   demands?

20       A    Yes, sir.

21       Q    What were they?

22       A    We would escalate any time demands to the --

23   to the manager and to the RCL, and we would involve

24   the claims attorney as needed, and we would evaluate

25   each one on a case-by-case basis and -- and address

1          Christopher Evans is the surviving parent of

2          Andrew, that there's a -- a mother who's not

3          represented, Polina.  There is some question

4          of whether an estate's going to be opened or

5          not.  It created some -- some questions that

6          we would have.

7               I think the demand asked for a hundred

8          thousand dollars when we had $25,000 in

9          available -- a hundred thousand dollars or

10         policy limits if it's greater and we had

11         $25,000 in -- in available coverage per

12         person.

13              You know, it's -- and -- and, truly,

14         the -- the time frame, how quickly it came in

15         without having a full understanding of what

16         the other injuries were and who was

17         presenting claims at that point.

18    BY MR. DOLDER:

19         Q    I'm just scrolling down a few pages.

20         A    Yes, sir.

21         Q    And if there's anything you want to look at,

22    you know, to remind yourself or to explain, feel free

23    to let me know.

24         A    Thank you, sir.

25         Q    I'm on Bates page 1322 of the demand.

```
 1   And -- and it has this language, "We will use the
 2   figure of $100,000 for example purposes only."
 3           Did I read that correctly?
 4       A   That's how it reads on paper, yes, sir.
 5       Q   Okay.  And you -- you said you thought the
 6   demand was for a hundred thousand dollars?
 7       A   Well, it uses the figure of a hundred
 8   thousand dollars for example and then goes on to say
 9   the limit of -- "if the limit of coverage is higher
10   than this amount, our demand will be for said higher
11   amount."
12       Q   So what -- what did you think "for example
13   purposes only" meant?
14           MR. JURMAN:  Objection.
15           THE WITNESS:  I believe the -- the
16       demand is -- is confusing because it -- it
17       specifically says a hundred thousand dollars
18       for example purposes only and then higher.
19       It doesn't mention anything lower than a
20       hundred thousand dollars.
21   BY MR. DOLDER:
22       Q   So it wasn't clear to you?
23       A   Correct.  Yes, sir.
24       Q   Okay.  Now, while you were working on this
25   claim, are you aware of any decision as to how to
```

Andrew George Quackenbush - 04/30/24                    39

```
 1        Q    And -- and you what to Mr. St. Amand?
 2        A    We -- we brought him into the -- into the
 3   conversation.  We brought -- we brought him into the
 4   claim and asked him to -- to assist.
 5        Q    And did you decide not to try to seek
 6   clarification regarding the demand from the attorney
 7   who had sent it?
 8             MR. JURMAN:  Objection.
 9             THE WITNESS:  We hired Mr. St. Amand and
10        relied on him if clarification was needed
11        to -- to seek it.
12   BY MR. DOLDER:
13        Q    And -- because you actually wanted some
14   clarification on the amount of the demand; right?
15             MR. JURMAN:  Objection.
16             THE WITNESS:  That was one of the -- the
17        issues that were noted.
18             Mr. Dolder?
19             MR. DOLDER:  Yes, sir.
20             THE WITNESS:  I recently had back
21        surgery and I need to get up and move around
22        once in a while.  When --
23             MR. DOLDER:  Absolutely.
24             THE WITNESS:  -- it's a convenient time,
25        can you -- can we take a couple minutes to
```

```
 1        Q    Okay.  And -- and by the way, I mean, if you
 2   need a break at any time, as long as we're not in the
 3   middle of a question, I -- I hope you'll tell me.  You
 4   don't -- you don't have to wait an hour if you need to
 5   stretch your back before then.
 6        A    Okay.  Thank you very much, sir.  I'll take
 7   you up on that.
 8        Q    Yeah.  Do.  Do.  Do.  It's not a -- it's not
 9   a marathon test.
10            All righty.  Do you see the document I have
11   up --
12        A    I do.
13        Q    -- the e-mail?
14        A    Yes, sir.
15            MR. DOLDER:  Thank you.  I'm going to
16        mark this as Exhibit 3.
17                 (Exhibit No. 3 was marked.)
18   BY MR. DOLDER:
19        Q    And it's an e-mail Bates stamped DGIC 237
20   through 239.  The first page looks like an e-mail from
21   Jeanna Matoy dated August 15, 2018.
22            And, Mr. Quackenbush -- oh, you know, before
23   we -- we left, you -- you testified, you know, to the
24   effect that a -- a decision was made to seek
25   Mr. St. Amand's help.
```

Andrew George Quackenbush - 04/30/24                    42

```
 1        A     That is correct.  Yes.
 2        Q     Okay.  And who else was in -- in on that
 3   decision besides you and Ms. Greer?
 4        A     I don't recall anyone else being involved in
 5   the -- in the decision.
 6        Q     Okay.  You didn't have to ask anyone else in
 7   order to make that decision?
 8        A     No, sir.
 9        Q     That was within your authority?
10        A     Yes, sir.
11        Q     Okay.  Thank you.
12              So -- and -- and by the way, so Exhibit 3,
13   is this one of the documents you looked at in
14   preparing for your deposition today?
15        A     Yes, sir.
16        Q     All right.  And it -- does -- does this
17   reflect an e-mail from Jeanna Matoy to
18   Michael St. Amand?
19        A     Yes, sir.
20        Q     And it's dated August 15, 2018; correct?
21        A     That is correct.
22        Q     Excuse me.  I can't get to the highlight
23   function.  All right.  Well -- oh, there we go.
24              So you -- after you guys made the decision
25   to retain Michael St. Amand, you first reached out to
```

Professional Court Reporters LLC
770.952.0604

1   him on August 15, 2018?

2        A    That's what it appears, yes.

3        Q    Yeah.  And I -- I note that it doesn't

4   appear that you are on the -- this e-mail from

5   Ms. Matoy to Michael St. Amand; right?

6        A    That does -- it does not appear I was, no.

7        Q    Yeah.  But did you reach out to

8   Mr. St. Amand before August 15, 2018?

9        A    I don't recall doing so, no.

10       Q    Okay.  Do you know whether Ms. Greer did?

11       A    I do not know.

12       Q    Okay.  I'm going down to the end of the

13  e-mail because that's how we get to the beginning.

14            And, again, I -- I don't want to go too

15  fast, so feel free to stop me, but I'm on page 2.  And

16  it looks like we have an e-mail from you to Ms. Greer;

17  is that right?

18       A    Yes, sir.

19       Q    Okay.  And so had you already spoken to

20  Ms. Greer about this claim?

21       A    I don't believe so, no.

22       Q    You think this was your first communication

23  with Ms. Greer about this claim?

24       A    I believe it is, yes.

25       Q    All right.  And -- and at this time,

1    Mr. St. Amand was not hired; correct?

2        A    That is correct.

3        Q    And if I'm reading this correctly, it looks

4    like you proposed to Ms. Greer a global settlement

5    conference; is that correct?

6        A    When I went back and looked at that, it

7    reads to me more like it was a question and it has the

8    wrong punctuation at the end.

9             Either way -- either I suggested it or asked

10   her if it was the right way to go, but it was an

11   attempt to start the conversation about how to -- how

12   to deal with the two demands that were in and then

13   multiple other injuries given the fact that our

14   insured had only purchased $50,000 in total coverage.

15       Q    Okay.  Well, prior to this, had anyone

16   suggested a global settlement conference to you?

17       A    On this claim?

18       Q    Yes, sir.

19       A    No, sir.

20       Q    So you -- you brought up the idea of a

21   global settlement conference regarding this claim;

22   right?

23            MR. JURMAN:  Objection.

24            THE WITNESS:  Yes, sir.

25   BY MR. DOLDER:

1      Q    And Mr. St. Amand had come into the office

2   and provided training to you and other claims

3   professionals; correct?

4      A    I -- I have met him in training.  I don't

5   know when exactly he came into the office.

6      Q    But he did come into the office to provide

7   some training?

8      A    Yes, he did.

9      Q    And Ms. Greer writes, "I agree that it would

10  be a good idea to -- idea to engage Mike St. Amand to

11  negotiate a global pro -- pro rata settlement of all

12  parties and to meet the respective settlement terms of

13  each demand letter."

14          Do you see that?

15     A    I do, sir.

16     Q    I'm not going to ask you if I read it right

17  because I know I -- I garbled a bit, so...

18          Now, do you agree that it is impossible to

19  negotiate a global pro rata settlement and meet the

20  terms of the demands?

21          MR. JURMAN:  Objection.

22          THE WITNESS:  Well, sir, I'm not an

23      attorney.  I believe you can do both.

24  BY MR. DOLDER:

25     Q    Okay.  What -- what would that look like?

1    cut -- you know, this is -- the prior stuff is some of

2    the e-mails we've already looked at and talked about

3    today; true?

4         A    Yes, sir.

5         Q    All right.  And here we have an e-mail from

6    you to Ms. Greer.  And it mentions Nick and Ray.  And

7    you already told me that, I believe, Mr. Bogdan was --

8    was your immediate report?

9         A    That is correct.

10        Q    He was above you?

11        A    Yes, sir.

12        Q    Okay.  And -- and who's Ray Brown?

13        A    Ray Brown is one of my peers.  He's another

14   regional claims leader within the southwest region.

15        Q    Okay.  And what -- well, let's just start

16   with Mr. Bogdan.  What -- what was his involvement

17   with the claim?

18        A    He had no involvement with the claim.  This

19   might have been his first notice of it when I gave him

20   a carbon copy of -- or, you know, cc'd him on this

21   e-mail.

22        Q    Okay.  You -- you didn't talk to him first,

23   as far as you remember?

24        A    Not to my recollection, no.

25        Q    Did he respond to you about this e-mail?

```
 1        A     Not to my recollection, no.
 2        Q     If he did, it would be in the claim notes;
 3   right?
 4        A     My --
 5                 (Simultaneous crosstalk)
 6              MR. JURMAN:  Objection.
 7              THE WITNESS:  -- expectation was that it
 8        would be in the claim notes.
 9                 (Court reporter clarification.)
10              THE WITNESS:  My expectation would be
11        that it would be in the claim notes.
12   BY MR. DOLDER:
13        Q     In fact, if Mr. Bogdan had communicated with
14   you about this e-mail soon thereafter, you -- you
15   would expect him to put it in the claim notes;
16   correct?
17              MR. JURMAN:  Objection.
18              THE WITNESS:  We would expect them to
19        show up in -- or be put in the -- not show up
20        in there -- be put in the claim notes,
21        whether he put it in or myself or someone
22        else.
23   BY MR. DOLDER:
24        Q     Okay.  Because if he didn't, you would;
25   right?
```

1        A      I believe I would, yes.

2        Q      And what about Ray Brown?  Who -- so he --

3   he was another RCL?

4        A      Yes, he -- yes, he was.

5        Q      Okay.  And had you discussed this claim with

6   him before copying him on this e-mail?

7        A      No, sir, I don't believe I did.

8        Q      Okay.  Why -- why did you copy him on this

9   e-mail?

10       A      At this time, we were in the midst of

11  restructuring our region to better handle the claims

12  that were coming in the door and -- and balance

13  workloads out.

14              Ray's group was going to take on a number of

15  our claims, including Georgia claims, and this claim

16  was going to end up in his -- with -- with one of his

17  adjusters, one of his managers.

18       Q      Okay.  So was this -- as far as you know,

19  was this his introduction to this claim?

20       A      As far as I know, yes.

21       Q      And did you -- first did you discuss this

22  e-mail, this plan of action with Mr. Brown?

23       A      Not to the best of my recollection, no.

24       Q      And did you discuss this claim with

25  Mr. Brown at any time?

```
 1        A     Not to the best of my recollection, no.
 2        Q     Did you discuss this claim with Mr. Bogdan
 3   at any time?
 4        A     Not to the best of my recollection.
 5        Q     So you wouldn't say that they were -- that
 6   Mr. Bogdan or -- or Mr. Brown were involved in
 7   deciding the plan of action referred to in your
 8   e-mail; correct?
 9        A     No, I don't believe that they were involved
10   in the decision-making.
11        Q     And up here, we have Ms. Greer responding to
12   you saying, "Yes, I agree with this plan."
13              Do you see that?
14        A     Yes, sir.
15        Q     Are you aware of anyone else agreeing with
16   the plan?
17        A     I'm not aware of anyone else.
18              MR. DOLDER:  All right.  I'm marking as
19         Exhibit 6 a two-page document.  It's Bates
20         stamp CE0000 1826 through 1827.
21                  (Exhibit No. 6 was marked.)
22   BY MR. DOLDER:
23        Q     It looks like a -- a letter on Gray, Rust,
24   St. Amand stationery dated September 6, 2018.
25              And -- well, let me ask you first:  Is this
```

```
 1   a document you reviewed in preparation for your

 2   deposition?

 3        A    Yes, sir, I believe it is.

 4        Q    Okay.  And prior to preparing for your

 5   deposition, did you ever see this letter?

 6        A    I believe I would have seen it back in -- in

 7   September of 2018.

 8        Q    Okay.  So -- and am I going too fast, or are

 9   you familiar with the exhibit?

10        A    I may ask you to -- to go back to certain

11   parts if you ask me questions, but I'm fairly

12   familiar --

13        Q    Okay.

14        A    -- with the letter.

15        Q    Sure.  Thank you.

16             Is this the letter you wanted Mr. St. Amand

17   to send?

18        A    Yes, sir.

19        Q    Did Mr. St. Amand write anything in this

20   letter you did not want him to write?

21        A    No, I don't believe so.

22        Q    And would you agree this is a counteroffer

23   to the time-limited demand to settle the wrongful

24   death claim of Andrew Evans?

25             MR. JURMAN:  Objection.
```

1            THE WITNESS:  No, sir, I would not.  I

2       believe it was an acceptance.  We recognized

3       that there was multiple claimants.  We had

4       two demands -- or two -- two fatalities that

5       had made demands.

6            We -- the -- the file notes reflect that

7       Jeanna had reached out to each law firm to

8       discuss the idea of a settlement conference

9       and everyone seemed to be in agreement --

10       were in agreement for it.  And this was just

11       confirming that, sending it along saying

12       we'll -- we'll get together in October and

13       we'll -- we'll -- we'll look to apportion the

14       moneys that were available.

15            Again, our insured had purchased $50,000

16       in coverage, the minimum limits in the state,

17       and we were trying our best to resolve all

18       the claims within those $50,000.

19   BY MR. DOLDER:

20       Q    So to -- just to be clear, are -- is it your

21   testimony that the September 6, 2018, letter was an

22   acceptance of the time-limited demand for the wrongful

23   death of Andrew Evans?

24       A    I believe it was a tender of our limits.

25       Q    Okay.  But I'm -- I'm asking you if it was

```
 1   an acceptance.
 2              MR. JURMAN:  Objection.
 3              THE WITNESS:  I'm -- I'm not an
 4        attorney, sir.  I believe it's an -- it's an
 5        acceptance of the demands.  Again, we -- we
 6        tendered our full limits in an attempt to
 7        resolve all the claims that were being
 8        presented.
 9   BY MR. DOLDER:
10        Q    Well, you're not an attorney.  You're a
11   claims professional; correct?
12        A    Yes, sir.
13        Q    And in your job as a claim professional, you
14   have to know something about the law; correct?
15              MR. JURMAN:  Objection.
16              THE WITNESS:  I know the -- I guess a
17        layman's understanding of the law or -- or
18        slightly more than that, but we rely on our
19        attorneys to provide legal guidance.
20   BY MR. DOLDER:
21        Q    Well, you -- a good claim professional knows
22   more about the law than the average layman; true?
23              MR. JURMAN:  Objection.
24              THE WITNESS:  I believe so.  And I think
25        I -- I responded in that way.
```

1    know if -- well, I'll leave it up to you whether you

2    want to read the whole thing, but do you recognize

3    Exhibit 7 as something that is available in your

4    Toolkit?

5         A    It -- it appears that it is, yes.

6         Q    Okay.  And I have highlighted it.  It

7    references 33-6-34, unclaimed [sic] settlement

8    practices.  Do you see that?

9         A    Yes, sir.

10        Q    And is it your understanding that 33-6-34 is

11   a Georgia statute?

12        A    Again, I'm not an attorney and I -- but it

13   sounds -- it sounds right, yes.

14        Q    Okay.  Well, but this -- a Toolkit is a

15   resource for claim professionals like yourself;

16   correct?

17        A    Yes, sir.  It's a -- a -- a compository or

18   an encyclopedia of different information by state.

19        Q    Including law?

20        A    Well, it gives you -- it gives you -- yes.

21   It gives you that information for review.

22        Q    Now, do you know why the Toolkit references

23   the Unfair Claims Settlement Practices Act?

24        A    I'm sorry.  I don't -- I don't understand

25   what your question is.

```
 1        Q     Yeah.  Do you know why this is part of the
 2   Toolkit, this statute I have highlighted?
 3        A     Well, I think it's one of the laws of the
 4   land.
 5        Q     And as a claim professional, are you
 6   expected to be knowledgeable of this statute?
 7             MR. JURMAN:  Objection.
 8             THE WITNESS:  Specifically, I -- I'm not
 9         sure I can answer that.  In general, we -- we
10         effort to handle all claims in good faith.
11         You know, that's our -- that's -- that's one
12         of our mantras.
13   BY MR. DOLDER:
14        Q     Did you receive training on Georgia's Unfair
15   Claims Settlement Practices Act?
16        A     I do not believe specifically -- or I do not
17   recall specifically getting training on Georgia's
18   Unfair Claims Settlement Practices Act, but it very
19   well could have been a part of training that we
20   underwent.
21        Q     I'm going to -- down at the bottom, I'm
22   going to highlight another statute, 9-11-67.1.  Are
23   you familiar with that statute?
24        A     Not by the number, but I see that it is --
25   if it's on the Toolkit, I assume it's a Georgia
```

 1  statute.

 2       Q    And do you know why this is in the Toolkit,

 3  this particular statute?

 4       A    Again, the Toolkit is a -- a -- groups

 5  together all -- you know, much data or -- or much

 6  information from each state.  So settlement offers and

 7  agreements would be something that would be a part of

 8  it.

 9            MR. DOLDER:  I'm going to mark as

10       Exhibit 8 a two-page document Bates stamped

11       DGIC-006818 through 6819.

12            (Exhibit No. 8 was marked.)

13  BY MR. DOLDER:

14       Q    And do you recognize this as also part of

15  the Toolkit?

16       A    It appears that it's a -- a screenshot from

17  Toolkit.

18       Q    Okay.  And there at the top, it says,

19  "Georgia communication time limits"; correct?

20       A    Yes, it does.

21       Q    Okay.  And then underneath, there's a lot of

22  statutes and laws cited; right?

23       A    Yes, sir.

24       Q    And this is information provided to you to

25  handle claims for Direct General; correct?

1   BY MR. DOLDER:

2        Q    Did you ever see -- receive training on

3   9-11-67.1?

4        A    I believe we did.

5        Q    And do you know by whom?

6        A    I don't recall.  No, sir.

7        Q    Was it a -- do you remember if it was an

8   in-house person or someone coming from outside the

9   company?

10       A    I -- I don't recall.  It's a -- it was an

11  attorney.  I just don't remember who it was.

12       Q    Okay.  Do you think it was an outside

13  attorney?

14       A    Again, I'm not sure, sir.

15       Q    Sure.  Do you know if it was before or after

16  you addressed the Holt demand we talked about earlier

17  in this case?

18       A    I think we had training both before and

19  after.

20       Q    Gotcha.

21            I'm going to highlight a part here.  It

22  references seeking clarification.  Do you see that?

23       A    Yes, sir.

24       Q    Okay.  At the time that you were dealing

25  with the Holt demand we've already talked about, were

1    you aware that you had the right to seek

2    clarification?

3              MR. JURMAN:  Objection.

4              THE WITNESS:  I -- I knew that was a --

5         a part of the -- you know, I had read this

6         before.  So, yes, I knew it was available.

7    BY MR. DOLDER:

8         Q    And did -- did you consider seeking

9    clarification?

10        A    I believe -- I believe we did via the letter

11   from Mr. St. Amand referencing the -- the settlement

12   conference.  I believe he -- he sought clarification

13   for items that he -- he felt were needed.

14        Q    And when -- when you said -- you said, "I

15   believe we did," who -- just to be clear, who is "we"?

16             THE WITNESS:  I'm sorry.  I -- I

17        don't -- can you read back my -- my response

18        so I can -- Krista.

19             (The referred-to answer was read.)

20             THE WITNESS:  Okay.

21             THE COURT REPORTER:  Is that the one?

22             THE WITNESS:  Yes.  Thank you.

23             I think that was just a -- a

24        misspeaking.  I believe that Mr. St. Amand's

25        letter tendering our limits, suggesting the

1        settlement conference, and seeking

2        clarifications or seeking additional

3        information was us seeking clarification.

4    BY MR. DOLDER:

5        Q    So are you saying Mr. St. Amand sought

6    clarification for you?

7        A    For -- for our insured and for

8    Direct General.

9        Q    By way of that September 6th letter we

10   looked at earlier?

11       A    Yes, sir.

12       Q    I'm going to show you what's been marked as

13   Exhibit 9.

14            (Exhibit No. 9 was marked.)

15   BY MR. DOLDER:

16       Q    It's a document titled "Georgia claims

17   handling" with a date of October 2018.  It's Bates

18   stamped DGIC-006779 through 6784.

19            And let me maybe -- it's six pages, so let

20   me just kind of scroll through it.

21            MR. JURMAN:  Rich, for the record, is it

22       Exhibit 8 or Exhibit 9?

23            MR. DOLDER:  It should be Exhibit 9.  Is

24       that correct, Krista?  What did I say?  Oh.

25            THE COURT REPORTER:  You said nine.  You

```
 1   is roughly the same thing as a global settlement
 2   conference?
 3        A    That would be my understanding, yes.
 4        Q    Now, did Direct General have policies and
 5   procedures for global settlement conferences in
 6   October 2018?
 7        A    You know, I don't know the answer to that,
 8   Mr. Dolder.
 9        Q    Do you know if this presentation was before
10   or after the global settlement conference in this
11   case?
12        A    I do not know the date of this, so I don't
13   know if it was before or after, but it was certainly
14   after the decision was made and the letter was sent to
15   tender the limits and suggest the October 8th, I
16   believe, settlement conference.
17        Q    Now, I've gone on.  There's a page or slide
18   titled "offer of settlement response."  Do you see
19   that?
20        A    I do see that, yes.
21        Q    And there's acceptance and rejection.  Do
22   you see those two bullet points?
23        A    I do.
24        Q    Okay.  So were you trained on the
25   difference?
```

```
 1        A     Again, I don't recall the -- the -- the
 2   specific training that this was, so I don't know the
 3   context of those -- those two.
 4              I know the difference between an acceptance
 5   and rejection.  In this case, I truly believe that we
 6   accepted the offer.  We -- we recognized that there
 7   was multiple claimants, the value exceeded our policy
 8   limits, and we tried -- and we made every effort to
 9   try to resolve all the claims within those $50,000
10   available.
11              MR. DOLDER:  And I'm marking as
12         Exhibit 10 a document titled "Introduction to
13         good faith file handling," Bates stamped
14         DGIC-006785 through 6803.
15              (Exhibit No. 10 was marked.)
16   BY MR. DOLDER:
17        Q     Is this document also familiar to you?
18        A     Again, I -- I reviewed it as part of the
19   submission or -- or in preparation of today.
20              It's a corporate training that we -- we do
21   every year or something similar every year to promote
22   good-faith claims handling.
23        Q     Okay.  So this is done every year?
24        A     This or something -- some sort of good-faith
25   claims handling.
```

1   understand.  So let me just ask -- ask it this way:
2   Was it a program where you would give it information
3   and it would give you back an answer, for example, of
4   what the damages might be in a particular case?
5             MR. JURMAN:  Objection.
6   BY MR. DOLDER:
7        Q    Did that make any sense to you?
8        A    It does.  Sir, I'll be -- I'll be perfectly
9   honest with you.  We don't use ClaimsIQ and we haven't
10  in years, so I'm not -- I don't recall how it actually
11  worked.
12       Q    Okay.  And even when you did use it, I -- I
13  think you mentioned you didn't use it in death claims?
14       A    Correct.  It would not be -- it would not be
15  associated with MCC or death claims.
16       Q    What's EPIC notes?
17       A    That's a -- a claims file system -- claims
18  handling system.
19       Q    Is that part of the -- the notes we looked
20  at earlier in your deposition?
21       A    Yes, sir.  Those would be EPIC notes.
22       Q    Okay.  What's an obvious policy limit claim?
23       A    An obvious policy limit claim would be one
24  where you recognize that the limits in place aren't
25  enough to resolve the -- the claim or claims to be

1  presented.

2      Q    And the -- the claim we've been talking

3  about today, that's an obvious policy limit claim;

4  correct?

5      A    Correct.  Absolutely.  Six claimants, three

6  fatalities, with minimum limits that the insured

7  purchased of $50,000, that's an obvious policy limit

8  claim.

9      Q    Are you aware of any policies and procedures

10  in effect in 2018 for handling obvious policy limit

11  claims?

12      A    We -- no, I'm not.

13          MR. DOLDER:  I've marked as Exhibit 12 a

14      letter dated August 15, 2018.  It's Bates

15      stamped DGIC 001150.

16          (Exhibit No. 12 was marked.)

17  BY MR. DOLDER:

18      Q    And let me -- is this big enough for you to

19  read?

20      A    Yes, sir.

21      Q    Okay.  And it looks like a letter addressed

22  to Roger Hartsfield; right?

23      A    Correct.  Yes, sir.

24      Q    And he was Direct General's insured -- or is

25  Direct General's insured; right?