Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

- - - - - - - - - - - - - - - - )
ATLANTA DIVISION DIRECT         )
GENERAL INSURANCE COMPANY,      )
                                )
            Plaintiff,          )
vs.                             )   Civil Action File
                                )   No: 1:23-cv-03491-ELR
CHRISTOPHER EVANS and POLINA    )
DENISSOVA, individually and     )
as co-administrators of the     )
ESTATE OF ANDREW EVANS, ROGER   )
HARTSFIELD and D. MAX HIRSH,    )
as administrator of the         )
ESTATE OF SHANNON HARTSFIELD,   )
                                )
            Defendants.         )
- - - - - - - - - - - - - - - - )

The virtual deposition of MICHAEL ST. AMAND,

taken on behalf of the Plaintiffs, pursuant to

the stipulations contained herein; the reading

and signing of the deposition reserved, before

Kris Laroche, Certified Court Reporter, via Zoom

videoconferencing, on the 28th day of March, 2024,

commencing at the hour of 10:08 a.m.

---

M A G N A   L E G A L   S E R V I C E S

866-624-6221
www.MagnaLS.com

EXHIBIT
I



Page 18

1  that you're working on, do you have experience
2  handling matters that concern multiple competing
3  claims arising out of a single occurrence?
4      A    I -- I do.
5      Q    Okay.  And turning to this matter, do you
6  recall when you were retained or when you were
7  brought on board by Direct General?
8      A    Not the specific date, but it was August of
9  2018.
10     Q    Okay.  So around August of 2018, you were, I
11 guess, retained to represent the interests of the
12 insured and the driver; correct?
13     A    No, I was retained by Direct General
14 specifically to set up a global settlement
15 conference.  And at the very beginning, I would've
16 clarified with them whether I'm to represent the
17 company or to represent the insured or insureds.  And
18 in this case, I was not representing the insureds.
19     Q    Okay.  Who were you told you were
20 representing?
21     A    Direct General.
22     Q    Okay.  Were you protecting the interest of
23 the insured at the time?
24     A    So, in the -- in the context of representing
25 the insurance company, their obligation is to hold



Page 21

1  with the email and the attachments, a total of 48
2  pages.  And it looks like Ms. Matoy sent to you the
3  name of the insured, the name of the driver, the date
4  of loss, where the accident occurred, the fact that
5  it's an intersection loss, and then also she names
6  the three passengers that were in the insured's
7  vehicle.  They all died due to injury.  So, she lists
8  out the ages, then she gives you the contact
9  information for Christopher Evans on behalf of Andrew
10 Evans and Nancy Evans, Montlick & Associates.  And
11 this information here was provided to you on August
12 15th; correct?
13     A    Yes.
14     Q    Okay.  So would this be -- you said August
15 of 2018, earlier you said that -- that was probably
16 around the time that you first became involved.
17 Would this be the email you were referring to as to
18 when you got the referral?
19     A    Yes, there could have been a phone call
20 before.  I don't know if she says in there, you know,
21 per our conversation or not, but a lot of times
22 they'll just call up and find out if I've got the
23 capacity to handle something.  But this would've been
24 the first substantive communication.
25     Q    Okay.  And do you know who Montlick &



Page 48

1    Q    And what did he -- what did you understand
2    that to mean, what he was saying?
3    A    Well, a couple things.  One, he'd indicated
4    that there was -- that he had not agreed to a Global
5    Settlement Conference and that it was his position
6    that time demands had expired.  He was unaware that
7    we had tender limits.  And then he and Matthew Hagen
8    asked -- they wanted to meet just amongst the two of
9    them, and so, we provided them the opportunity to do
10   that in a conference room.
11   Q    Was there at any point all the parties, was
12   everyone brought together at any point?
13   A    When I knew everybody was there and I came
14   over those three attorneys, meaning Matthew Hagen,
15   Rory Chumley, and Glenda Mitchell, I believe were in
16   the kind of waiting area.  So, at that point, we were
17   all together.  Jack Witcher was not present and was
18   never physically present.
19   Q    Okay.  Did you find this unusual that they
20   would agree to attend and then not want to
21   participate?
22        MR. DOLDER:  Object to the form.
23        THE WITNESS:  Well, I -- I don't know how to
24   answer that.  I mean, lawyers do things their own
25   way.

MAGNA
LEGAL SERVICES

Page 60

1  Global Settlement Conference.
2      Q    Prior to this query?
3      A    Yes.  But before this query, I'd sent them a
4  proposed letter setting up the Global Settlement
5  Conference.  If they had decided they wanted to do
6  something different at this point, I think they still
7  could have.
8      Q    Okay. Fair enough.  Well, let's take a look
9  at that letter, or at least the final version that
10 you sent out.
11          I'm going to go to Exhibit 4 now, what was
12 marked previously this morning as Exhibit 4, and it
13 attached an -- a letter from you, dated September
14 6th, 2018, addressed to various parties.  Do you --
15 do you see that pretty well?
16     A    I do.
17     Q    Okay. Excellent.  And so, I -- I -- I want
18 to make sure, Direct General approved this letter
19 before you sent it out; isn't that right?
20     A    Yes.
21     Q    And as far as you know, this is the letter
22 Direct General wanted you to send out; is that
23 correct?
24     A    Yes.
25     Q    And when you drafted this letter, you were



Page 61

```
 1   trying to accomplish what Direct General had asked
 2   you to do; correct?
 3           MS. CRONAN:  Objection to the form.
 4           THE WITNESS:  Yes.
 5           MR. DOLDER:  And what -- what's the problem
 6      with the form, Candace?
 7           MS. CRONAN:  Well, I -- you're asking here
 8      about this letter that was already previously
 9      provided as the -- the exhibit you just showed
10      him, and I think you're -- there's not -- none of
11      those -- we are trying to add facts as to what
12      was being accomplished.
13           MR. DOLDER:  Okay.  Thank you.
14           MS. CRONAN:  Maybe if you can just ask it
15      different -- a little different.
16           MR. DOLDER:  I -- I'm satisfied with -- with
17      how that went.
18           MS. CRONAN:  Okay.
19   BY MR. DOLDER:  (Resuming)
20      Q   All right.  Mr. St. Amand, let -- let's look
21   at the very first sentence of your letter.  And it
22   begins, I have been retained by Direct General
23   Insurance Company, and it -- and it goes on.  Do you
24   see that?
25      A   Yes.
```



Page 62

```
 1      Q    All right.  Now, does this sentence
 2   accurately describe the scope of your representation
 3   of Direct General?
 4      A    Yes.
 5      Q    And the scope of your representation did not
 6   include accepting the August 9th demand to settle the
 7   wrongful death claim of Andrew; is -- is that
 8   correct?
 9           MS. CRONAN:  Objection to the form.
10           THE WITNESS:  You characterize it as --
11      there was a demand letter they sent, but the one
12      for Andrew could -- I mean, it couldn't have
13      resolved Andrew's -- the claims arising out of
14      injuries and -- and death of Andrew.
15   BY MR. DOLDER:  (Resuming)
16      Q    Okay.  Well, before we talk about that, let
17   me -- let me just get an answer to my question about
18   the scope.  Did the scope of your representation
19   include attempting to accept the August 9th demand
20   regarding the wrongful death claim of Andrew?
21      A    No, with the caveat that they certainly
22   wanted me to attempt to resolve the claims arising
23   out of the injuries and death of Andrew.
24      Q    But Direct -- I'm sorry.  Were you done with
25   your answer?
```



Page 74

```
 1      Q    Okay.  Are there any other interested
 2   persons or entities you can think of?
 3      A    Well, there would be the insured or
 4   insureds, so there's Shannon Hartsfield who is
 5   deceased, and in her instance, I don't think there
 6   was a representative appointed yet, and then there
 7   would be potentially her husband Roger Hartsfield.
 8   That's all that I can think of.
 9      Q    Okay.  All righty.  Good.  Thank you.
10           Now, as Direct General's attorney at the
11   time, are -- are you able to testify as to what was
12   done to contact any UM carriers that potentially owed
13   benefits to any claimant?
14      A    I -- well, I mean, I -- I did, yes.  The
15   only -- and there were also a liability -- they also
16   had liability coverage that I think was paid at some
17   point, but that would be COUNTRY Financial was the --
18   was the Justus's UM carrier and their liability
19   carrier.
20      Q    Okay.  Any -- any -- anyone else besides
21   COUNTRY Financial?
22      A    As far as -- was your question as far as any
23   other uninsured motors carriers that I was aware of?
24      Q    No, not -- not exactly.
25           Whether as Direct General's attorney at the
```



Page 75

1  time, are you able to testify as to what was done to
2  contact any other UM carriers who you would've
3  considered to be interested persons or entities?
4      A    Well, for the -- the letter to the attorneys
5  that have the claims pending, obviously part of their
6  job is to flush out and try to find additional
7  uninsured motor carriers.  So, they would presumably
8  know who resident relatives were of each of the
9  claimants and be able to either find that out or
10 begin the process of finding out Richie Willis,
11 potentially whoever he lived with, his own policy,
12 and that's part of what they're being invited to
13 provide in advance of the global settlement
14 conference.
15     Q    So, it -- is -- is it -- are you saying that
16 as Direct General's attorney at the time, it was your
17 understanding that Direct General wanted the
18 claimants to identify the UM carriers?
19          MS. CRONAN:  Objection to the form.
20          THE WITNESS:  I think that's part of the
21      attorney's responsibility, but at the Global
22      Settlement Conference, I would've sat down and
23      gone through them.  If -- I mean, and some
24      lawyers do it more thoroughly than others.  If
25      somebody has an RV sitting in their backyard,



Page 76

1      then a lot of times the claimants or the resident
2      relatives don't think of that.  Or if there's a
3      motorcycle that's being worked on in the garage
4      out back, that's something that I would've gone
5      through with the attorneys to see if they'd been
6      able to flush that out and find all the coverage
7      they could for their respective clients.
8  BY MR. DOLDER:  (Resuming)
9       Q    Okay.  So besides sending this letter to the
10  claimants and what you might have asked them at the
11  global settlement conference as Direct General's
12  attorney at the time, are you able to testify as to
13  anything else that was done to contact UM carriers?
14       A    I know I was in touch with COUNTRY
15  Financial.  And either before or after the settlement
16  conference there -- I think it was after -- it was
17  actually after the settlement conference; I think
18  that I was able to reach Lee Pruitt (phonetic) was
19  the attorney representing COUNTRY Financial.  It's --
20  it is possible that was the day of the settlement
21  conference, but before that we would've been in touch
22  with COUNTRY Financial to find out if they had
23  representation, somebody that we could talk to, to
24  participate in the settlement conference.
25       Q    All right.  And as Direct General's attorney



Page 77

1  at the time of the Global Settlement Conference, are
2  you able to testify as what was done to identify
3  existing lien holders?
4      A    Yes.
5      Q    Go ahead and tell me what that is.
6      A    That would've been this letter to the no --
7  the attorneys of the -- the known attorneys of the
8  claimants.
9      Q    Anything else?
10     A    Not before the settlement conference.  If we
11 were going to resolve anything at the settlement
12 conference, we would've done a lien search on the
13 statewide index.  But I think that's all before the
14 settlement conference, that -- that I did.
15     Q    Well, did -- do you know of anyone doing a
16 lien search?
17     A    No.  We would -- we would've done that if
18 there was going to be a settlement reached.  Because
19 more likely than not, the attorneys would already
20 have that information and they let me know.  But then
21 to double-check, we always do a lien -- a lien search
22 to see if there is something out there.
23     Q    And as Direct General's attorney at the
24 time, were you able to testify as to what was done to
25 contact any potential lien holders?



Page 78

```
 1     A     Yes.
 2     Q     Go ahead and tell me about that.
 3     A     That would've been this letter to the
 4  attorneys representing the claimants.
 5     Q     Same answer then.  Right?  Fair?
 6     A     True.  And I don't know if Direct General
 7  had access to the CMS Medicare Portal.  Sometimes the
 8  carriers have access to that.  It's not -- they can't
 9  really rely on it, but they can look up by Social
10  Security number, date of birth, things like that, and
11  see if there's a Medicare claim.  I don't know if
12  Direct General had done that by this time or if they
13  did it at all in this -- in this instance.
14     Q     So, if Direct General had done anything like
15  that, Direct General did not convey that information
16  to you prior to the Global Settlement Conference?
17     A     Not that I recall.  I think I'd remember if
18  they had done something like that.  I -- I think I
19  saw in the claim file that they did send out the
20  Medicare reporting letters.  I'm not a 100 percent
21  sure, but usually, they'll send out to the claimants
22  asking for identification stuff so that they can put
23  Medicare or CMS on notice.
24     Q     Now, during the Global Settlement
25  Conference, was a specific offer made to settle the
```



Page 79

1  wrongful death claim of Andrew?
2       A    There was no global settlement conference.
3       Q    And why is that?
4       A    Because Mr. Chumley said that he would not
5  participate in a global settlement conference.  He
6  wasn't here to participate in the Global Settlement
7  Conference, and Matthew Hagen somehow expressed his
8  agreement with that position because Matthew did not
9  attend a Global Settlement Conference or engage in
10 any conversations to resolve claims.
11      Q    So, it -- it's your position now that no
12 Global Settlement Conference ever occurred?
13      A    Correct.  Unless you consider my meeting
14 with Glenda Mitchell in an effort to resolve the
15 Richie Willis.  It's not really global though.
16 There's only one attorney and -- and three of them --
17 two others are in a different room, or not
18 participating in the conversation.  They don't have
19 to be in the same room, but there should be some
20 engagement for it to be considered a global
21 settlement conference.
22      Q    Well, as Direct General's attorney, did you
23 ever make a specific offer to settle the wrongful
24 death claim of Andrew?
25      A    Other than the tender of the limits,



Page 80

1  globally.
2      Q    But that's -- that's not really a specific
3  offer to settle a specific claim, is it?
4      A    It was a global tender of their limits to
5  settle claims that would include Andrew's.
6      Q    Yes, sir.  But that's not what I asked.
7  What I asked is, the global tender is not an offer to
8  settle a specific claim for a specific amount;
9  correct?
10     A    Correct.
11     Q    Okay.  And the global tender described in
12 this letter was not an offer capable of acceptance by
13 any claimant; correct?
14          MS. CRONAN:  Objection to the form.
15          THE WITNESS:  I would not agree with that.
16 I'm sorry.  I would not agree with that.
17 BY MR. DOLDER:  (Resuming)
18     Q    I -- I -- I'm sorry, I didn't hear the
19 answer.
20     A    I -- I would not agree with that.
21     Q    Who -- who -- who could have accepted the
22 tender and how could they have accepted it to make a
23 binding settlement agreement?  Can you explain that?
24     A    By attending the Global Settlement
25 Conference and then either making agreements globally



Page 82

```
 1      A     I -- I think I need you to clarify.
 2      Q     Well, was Direct General offering its
 3   $50,000 unconditionally?
 4      A     No.
 5      Q     Thank you.
 6            You -- you spoke before, this morning, you
 7   described yourself as an insurance defense attorney;
 8   is that accurate?
 9      A     No.  I think I was asked what my practice
10   involves and I said it primarily involves insurance
11   defense.  I mean, I could call myself an insurance
12   defense attorney.  I'm not quibbling with identifying
13   myself as an insurance defense attorney.  That --
14   that's -- I just don't think that's what the question
15   was earlier.
16      Q     Okay.  So you're an insurance defense
17   attorney and you couldn't stop the sheriff's --
18   excuse me, I interrupted you, I -- and I apologize.
19   Oh, there it is.  All right.  Okay.  You -- I'll just
20   repeat it, and I'm sorry I did interrupt you.
21            You would describe yourself an insurance --
22   as an insurance defense attorney?
23      A     I -- I don't think I would identify myself
24   as an insurance defense attorney.  I would say that's
25   a large part of my practice.
```

