```
            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION

DIRECT GENERAL INSURANCE    )
COMPANY,                    )
                            )
             Plaintiff,     )   CIVIL ACTION FILE
                            )
v.                          )   NO.  1:23-CV-03491-ELR
                            )
CHRISTOPHER EVANS and       )
POLINA DENISSOVA,           )
individually and as         )
co-administrators of the    )
ESTATE OF ANDREW EVANS,     )
ROGER HARTSFIELD and D.     )
MAX HIRSH, as               )
administrator of the        )
ESTATE OF SHANNON           )
HARTSFIELD,                 )
                            )
             Defendants.    )
_____)


              Videotaped Zoom Deposition of
                     BERND G. HEINZE


                    July 29, 2024
                     2:00 p.m.


         Zoom Deposition Originating From
            Legal Technology Services
         4470 Atlanta Highway, Suite A
              Loganville, Georgia


    Reported by Brenda P. Elwell, RPR, CCR-B-2023


  *************************************************
           PROFESSIONAL COURT REPORTERS LLC
           3659 Chattahoochee Summit Drive
              Atlanta, Georgia  30339
                   770.952.0604
            www.ProfessionalCourtReporters.com
```

EXHIBIT J

```
 1          Q.   Excellent.  Let me ask you:  Do you see a
 2   copy of your report on the screen or at least the first
 3   page of it?
 4          A.   I do, Rich.  Yes, thank you.
 5          Q.   Awesome.  So let me -- let's just jump right
 6   into it.  And I'm going go down to page 3 of your report
 7   and focus on paragraph 5.
 8          A.   All right.
 9          Q.   Did you see where I am?
10          A.   Yes, sir.
11          Q.   Okay.  And first, we've got this:  Direct
12   General was not presented with a valid demand or
13   opportunity to settle, and that's part of your opinion;
14   correct?
15          A.   Yes, it is, Rich.
16          Q.   All right.  Now, excuse me.  I thought I
17   might have missed something.
18               What is a valid demand?
19          A.   A valid demand is one that the insurance
20   company can respond to that is within the limits of
21   liability that the policy affords to its insureds.
22          Q.   And where did you get the word "valid"?
23          A.   It's one that I have from my 41 years of
24   experience, and what is custom and practice in the
25   industry with regard to what insurance companies consider
```

1   here, whether the cases that I've cited in my report might
2   be one of the ones that you're considering, so to the
3   extent that it might be, I may have read it in those
4   opinions.  But again, as I said, I'm not rendering any
5   legal opinions here or commenting upon the ultimate issue.
6       Q.   But the bottom line is:  You bring the phrase
7   "valid demand" not from the law but from the standards and
8   practices and customs of the insurance industry?
9       A.   Correct.
10      Q.   Now, we have a valid demand or opportunity to
11  settle, and I just want to ask, you know, since we have
12  this "or," two different things:  Is a valid demand
13  something different from an opportunity to settle?
14      A.   Well, the valid demand is something that
15  gives rise to an opportunity to settle.  So if there is a
16  demand which is made outside of the limits of liability,
17  then certainly there's no opportunity to settle if the
18  insurance company is aware that there's no opportunity to
19  bring the demand of the plaintiff within those limits of
20  liability.
21      Q.   Okay. So is it your opinion that there was
22  no valid demand and no opportunity to settle?
23      A.   Yes.  Because the two are coextensive with
24  each other.
25      Q.   Great.  Thank you.  That's exactly what I was

1      Q.     You bet.
2      A.     Thank you.  That's good.
3             I think what is contained within this page of
4  the correspondence is consistent with the other parts of
5  the correspondence of what formed the overall demand that
6  was being made to Direct General and requested additional
7  information from Mr. Hartsfield with regard to any
8  additional insurance coverages that may have provided
9  benefits to Mrs. Hartsfield or her estate, and with regard
10 to any coverage that might also be available to
11 Mr. Hartsfield.
12     Q.     Anything on this page that informs your
13 opinion that the demand was not a reasonable opportunity
14 to settle?
15            MR. JURMAN:  Objection.
16     A.     As I've said, Rich, other than what it is
17 complementing what the prior parts of the correspondence
18 already requested and demanded, it's part of an overall
19 letter that was being provided to Direct General as part
20 of the demand that was being made --
21 BY MR. DOLDER:
22     Q.     Okay.  Anything unreasonable --
23     A.     -- on behalf of Mr. Evans?
24     Q.     Excuse me.  Anything unreasonable about
25 requesting an affidavit for Mr. Hartsfield?

1        A.    No.
2        Q.    Anything unreasonable about requesting
3   affidavits for persons who might live in the household?
4        A.    No.
5        Q.    Anything unreasonable about asking for an
6   affidavit from Direct General?
7        A.    You're talking about subparagraph D and then
8   three i's?
9        Q.    Correct.
10       A.    No.  But, again, I take these -- this
11  information in context with the overall demand that was
12  being made with regard to the presentation of a claim on
13  behalf of Mr. Evans and taking all of the information in
14  context based upon the limited liability limits that the
15  Direct General policy could afford.
16       Q.    Anything on page 7 that informs your opinion
17  that this was not a reasonable opportunity to settle?
18       A.    Other than being in context for and
19  concluding the correspondence based upon the other
20  information that we've already discussed, no.
21       Q.    So nothing new; fair?
22       A.    I would agree with you on that, yes.
23       Q.    Did you read Gina Matoy's deposition?
24       A.    Yes.
25       Q.    Okay.  And you saw her testimony that she was

```
 1   confused by some aspects of the demand?
 2        A.   I did.
 3        Q.   Would it have been contrary to any custom,
 4   standard, or practice in the insurance industry for
 5   Ms. Matoy to have picked up the phone, called Rory Chumley
 6   and asked if he could clear up her confusion?
 7             MR. JURMAN:  Objection.
 8        A.   There are certain things that can be done,
 9   may have been done, could have been done.  I was focused
10   upon what was done.  And whether Ms. Matoy acted in a
11   manner that was consistent with the generally accepted
12   customs and practices in the insurance industry, whether
13   phone calls could be made with regard to finding out
14   additional information or clarifying matters.
15             I think what I reconciled here, Rich, was
16   more of a standpoint of saying to myself, okay, so that's
17   what her testimony at the deposition was.  What happened
18   after that?  What does the record show me of what happened
19   after that of what Direct General did with regard to
20   trying to engage in a global settlement conference to get
21   full resolution of all claims within its limits of
22   liability?
23             So whether there was confusion or not, Direct
24   General continued to go forward and retain Mr. St Amand
25   and -- operating within his guidance and advice to try to
```

```
 1   arrange a global settlement conference and get the matter
 2   resolved.
 3   BY MR. DOLDER:
 4        Q.    Are you done with your answer?
 5        A.    Thank you.
 6        Q.    Would it have been contrary to any custom,
 7   standard, or practice in the insurance industry for
 8   Ms. Matoy to have picked up the phone, called Rory Chumley,
 9   and asked if he could clear up her confusion?
10              MR. JURMAN:  Objection.
11        A.    Again, it assumes that the confusion would
12   have precluded Ms. Matoy to do exactly what she,
13   Mr. Quackenbush, and Ms. Greer did, which was trying to
14   find a way, whether there was confusion there or not, with
15   regard to what was being demanded there or not, to look
16   for a way to get a pro rata settlement in a global
17   settlement conference, and that's the exact direction that
18   they took.
19              So I did not see that the issue of the
20   confusion of Ms. Matoy had any repercussions or any bases
21   upon what Direct General did in response to that, they
22   still continued to move forward as prudent insurance
23   professionals do in trying to achieve a global settlement.
24   BY MR. DOLDER:
25        Q.    Let me try once more.  Would it have been
```

1   contrary to any custom, standard, or practice in the
2   insurance industry for Ms. Matoy to have picked up the
3   phone, called Rory Chumley and asked if he could clear up
4   her confusion?
5              MR. JURMAN:  Objection.
6        A.    I can't answer the question any differently
7   than I have, Rich, because it assumes that that would be
8   the last thing that would happen, that that would be the
9   one issue that would have tipped the scales in terms of
10  doing something that was within or outside of the customs
11  and practices.
12             My view was to look at the totality of what
13  happened, and not just whether a phone call could have
14  been made, but actually what effectively did happen,
15  whether or not there was confusion, and how Direct General
16  and its claim professionals continued to act consistently
17  with fair consideration and equal consideration of the
18  interests of Mr. and Mrs. Hartsfield based upon the
19  contractual obligations and opportunities of limits of
20  liability that they had within their policy.
21  BY MR. DOLDER:
22       Q.    Well, for the purposes of this hypothetical
23  question, I'm not asking you to assume that it would have
24  ended everything or ended anything.  I am asking you
25  simply, would it have been contrary to any custom,

1    standard, or practice in the insurance industry for
2    Ms. Matoy to have picked up the phone, called Rory
3    Chumley, and asked if he could clear up her confusion?
4            MR. JURMAN:  Objection.
5        A.  And as I said, Rich, I don't think that I can
6    give you any answer other than that, because I'm not
7    looking at individual things.  I'm not looking at
8    telephone calls that could have been made, may have been
9    made.  I'm looking at what actually did happen and whether
10   that was consistent with custom and practice, and I found
11   that what Direct General did, was.
12   BY MR. DOLDER:
13       Q.  So you're unable to answer my question or
14   unwilling?
15           MR. JURMAN:  Objection.
16       A.  I'm not unable or unwilling.  I've answered
17   the question based upon the way in which you phrased it,
18   and based upon my objective review of this record to
19   determine whether what Direct General and its claim
20   professionals did was reasonable, consistent, and had a
21   reasonable basis with regard to the industry customs and
22   practices based upon multiple claimants, and the $50,000
23   limits of liabilities that they had available to them, and
24   trying to use those dollars with equal consideration to
25   Mr. and Mrs. Hartsfield in trying to get all of the claims

1  undertaken scheduling a global settlement conference,
2  bringing all of the representatives of the claimants
3  together, and those that had not yet been making claims,
4  the folks in the Justus vehicle, and seeing how those
5  dollars that were available, whether there were liens that
6  were still outstanding, whether there were additional
7  funds that were available, could be allocated in a
8  pro rata and a fair, equitable manner among all of the
9  various claimants, while giving fair and equal
10 consideration to the interests of Mr. and Mrs. Hartsfield
11 in achieving a global resolution without any uninsured
12 exposure remaining thereafter.
13 BY MR. DOLDER:
14     Q.   When Direct General received this demand, did
15 it have the option to contact Mr. Chumley and request an
16 extension of time to respond?
17          MR. JURMAN:  Objection.
18     A.   Yes.  I believe that is something that can be
19 done under the statute.  I'd have to go back and
20 double-check, but I believe that is an option.
21 BY MR. DOLDER:
22     Q.   Well, I'm not asking you about the statute,
23 I'm just asking about custom and practice in the industry.
24          Wouldn't it have been reasonable for Direct
25 General to have requested an extension of time to respond

1  received.
2          My view of this was Mr. Amand taking
3  affirmative action on behalf of Direct General of making
4  its $50,000 available to all of the claimants based upon
5  not just the demand letter we took a look at a few moments
6  ago, but also the other demands that had also come in.
7  BY MR. DOLDER:
8      Q.   Aren't liability claim professionals supposed
9  to know how to accept demands?
10          MR. JURMAN:  Objection.
11     A.   Yes.
12 BY MR. DOLDER:
13     Q.   Aren't they supposed to know the difference
14 between an acceptance and a counteroffer?
15          MR. JURMAN:  Objection.
16     A.   Yes.
17 BY MR. DOLDER:
18     Q.   The September 6th letter is a counteroffer to
19 the demand; correct?
20          MR. JURMAN:  Objection.
21     A.   Not the way I viewed it.  I viewed it as a
22 way in which Direct General was trying to achieve a global
23 resolution of all claims.
24 BY MR. DOLDER:
25     Q.   So the September 6th letter is not a

1   the doctrine of unclean hands and/or estoppel.  Is this
2   anything you know about in the insurance industry?
3          A.   It's more of a legal standard, Rich.  It's
4   not really anything that would be related to what Direct
5   General did with regard to its actions and conduct here,
6   so that would be something that I would not be able to
7   respond to for you.
8          Q.   Okay.  And just -- and I think I understand
9   but just more specifically, do you have any opinions on
10  whether Mr. Hirsh is estopped from anything?
11              MR. JURMAN:  Objection.
12         A.   The opinions that I have, Rich, are included
13  within my testimony here with you today and are good
14  discussions and in my reports.  With regard to this --
15  this is more an affirmative defense with regard to the
16  claims that were contained within the counterclaim that
17  was made by Mr. Hirsh to the answer that was filed in
18  Direct General's declaratory judgment action.
19              So I've not been asked to render an opinion
20  on that.  But as I've said in both my reports, I
21  understand that discovery is continuing and I've left open
22  the opportunity to consider anything else that counsel
23  wishes me to review and to amend or supplement my opinions
24  accordingly.
25

```
 1   BY MR. DOLDER:
 2        Q.    Okay.  Well, right now do you have any
 3   opinions on whether Mr. Hirsh should be subject to any
 4   estoppel?
 5        A.    That's a legal issue.  That's not anything
 6   for me to comment upon.  I've not commented upon it, and
 7   I've not rendered any opinion with regard to it to date.
 8        Q.    So you have no opinions?
 9        A.    As of this time, that's correct.
10        Q.    See how easy it can be?
11              Do you have any opinions on whether Mr. Hirsh
12   has unclean hands?
13        A.    I've not been asked to render an opinion upon
14   that, and it's beyond the scope of my retention.  It would
15   call for a legal conclusion which I'm not allowed to
16   provide.
17        Q.    Okay.  But do you have any opinions on it?
18        A.    No.  Because it calls for legal conclusion --
19        Q.    Okay, thank you.
20              Okay.  Thirteenth affirmative defense,
21   setoff:  Do you have any opinions about why Direct General
22   might be entitled to a setoff?
23        A.    Not at this time, no.
24        Q.    Your report, which is Exhibit 1, is that a
25   complete and comprehensive account of your opinions and
```

```
 1  the reasons for them?
 2       A.   Yes, and complemented by my rebuttal report.
 3       Q.   Yeah.  Well, I was going to ask that, if your
 4  rebuttal report is a complete and comprehensive account of
 5  your opinions with regard to Lou Fey's opinions?
 6       A.   Yes, sir.
 7            MR. DOLDER:  All right.  That's all I have
 8       for you.
 9            THE WITNESS:  Thank you very much.  It's
10       great to see you again, Rich.  Best to the family
11       and I hope to see you again soon.
12            MR. DOLDER:  Yes, we will.  Maybe in the
13       spring.
14            MR. JURMAN:  Very good.
15            MR. DOLDER:  Anyone else?
16            MR. JURMAN:  I have some questions.  Does
17       anyone else have any?
18            MR. PARKER:  None for me.
19            MR. YEE:  I don't have any questions.
20            MR. JURMAN:  All right.  Jon, are you there?
21            MR. YEE:  I am.
22            MR. JURMAN:  Okay.  Very good.
23                        EXAMINATION
24  BY MR. JURMAN:
25       Q.   Mr. Heinze, I'm just going to ask you some
```

```
 1   questions concerning your testimony.  Is it okay to
 2   continue, or do you need a break?  I know we've been
 3   going.
 4        A.   I'm absolutely fine, Rory.
 5        Q.   Very good.
 6             Do you recall the testimony concerning the
 7   global settlement conference?
 8        A.   Yes, sir.
 9        Q.   Did you review the record and materials that
10   we sent to you regarding the global settlement conference?
11        A.   Yes, sir.
12        Q.   Do you remember who attended the global
13   settlement conference or appeared at Mr. St. Amand 's
14   office?
15        A.   From memory, I believe it was from counsel
16   for the claimants that had made claims to Direct General
17   at the time.
18        Q.   Very good.  And do you remember if
19   Mr. Chumley appeared?
20        A.   Yes.
21        Q.   Okay.  So are we up to Exhibit 4?
22        A.   I believe that's correct.
23             (Thereupon, marked for identification was
24        Defendants' Exhibit Number 4.)
25
```

```
 1  BY MR. JURMAN:
 2       Q.   So I'm going to mark Exhibit 4 that can show
 3  you a October 4, 2018, e-mail from Matt Hagen.  If we
 4  could maybe show this document to Mr. Heinze, please.
 5       A.   Could you make it a little larger for me,
 6  please?  Okay.  That's good.
 7       Q.   I believe it is GRSMB7.
 8       A.   All right.
 9       Q.   Tell me when you're ready to proceed with
10  some questions.
11       A.   I'm ready.
12       Q.   Does this e-mail indicate to you anything
13  regarding Mr. Chumley's knowledge of the global settlement
14  conference?
15            MR. DOLDER:  Object to form.
16       A.   It indicates he was aware of it based upon
17  what Mr. Hagen has responded to in his e-mail that he had
18  spoken with Mr. Chumley about the global settlement
19  conference date and time, and that it would appear that
20  that date and time would work for Mr. Chumley and
21  Mr. Hagen.
22  BY MR. JURMAN:
23       Q.   Now, this e-mail is something that you recall
24  reviewing in the course and scope of all the documents
25  that we sent to you?
```

```
 1        A.   There were a lot, but, yes, I do remember
 2   this -- the document, yes.
 3        Q.   And Mr. Chumley, in this e-mail, indicated
 4   that he was agreeable or not agreeable to attending the
 5   global settlement conference?
 6             MR. DOLDER:  Object to form.
 7        A.   Well, neither.  Neither, actually.  Because
 8   it's Mr. Hagen responding to the fact that he had spoken
 9   with Mr. Chumley and is relating what Mr. Chumley told
10   him, that Mr. Hagen -- or Mr. Chumley would be available
11   and was prepared to attend the global settlement
12   conference at that date and time.
13   BY MR. JURMAN:
14        Q.   Now, just for clarification again, it is
15   Mr. Hagen who responds to this e-mail chain; is that your
16   testimony?
17             MR. DOLDER:  Object to the form.
18        A.   Yes.
19   BY MR. JURMAN:
20        Q.   What is -- well, let's go through this
21   e-mail.  It says it's from -- on the top there, it says
22   it's from Matthew Hagen.
23        A.   Correct.
24        Q.   Do you see that?
25        A.   I do.
```

```
 1         Q.    And who is it to?
 2         A.    If you could make it a little bigger for me,
 3   please, Rory.  Yes, that's good.
 4               So it's to Ms. Weaver and Ms. Mitchell with a
 5   carbon copy to Mr. Chumley, Mr. Witcher, Ms. Matoy,
 6   Ms. Quisao -- I don't know if I'm pronouncing her name
 7   correctly -- Ms. Schott and Mr. St. Amand.
 8         Q.    And what is your understanding of what this
 9   e-mail is trying to do or achieve with regard to the
10   October 8th global settlement conference?
11               MR. DOLDER:  Object to the form.
12         A.    Based upon what the e-mail says, it is
13   indicating to Mr. St. Amand and all the other recipients
14   that the proposed date and time is acceptable to both
15   Mr. Hagen and Mr. Chumley.
16   BY MR. JURMAN:
17         Q.    And this e-mail, one way or the other, does
18   it indicate Mr. Chumley's e-mail address on it?
19         A.    Yes.
20         Q.    And does it indicate Ms. Matoy's e-mail
21   address on it?
22         A.    Not necessarily.  It does have Ms. Matoy's
23   name there with an underlined hyperlink to it, which is
24   usually the way Outlook and other e-mail systems work.  So
25   I see Mr. Chumley's e-mail specifically listed, but -- and
```